ORIGINAL

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| RICKEY A. BECHTEL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DANIEL A. VIRTUE, Business Agent of the | ) | Case No. 3:01-CV-789 |
| International Brotherhood of Teamsters; | ) | Judge Sylvia H. Rambo |
| INTERNATIONAL BROTHERHOOD OF | ) | |
| TEAMSTERS; LOCAL 776, | ) | |
| INTERNATIONAL BROTHERHOOD OF | ) | |
| TEAMSTERS; ABF FREIGHT SYSTEM, | ) | |
| INCORPORATED, | ) | |
| | ) | |
| Defendants. | ) | |

FILED
HARRISBURG

APR 1 5 2002

MARY E. D'ANDREA, CLERK
Per_____
DEPUTY CLERK

## EXHIBITS IN SUPPORT OF DEFENDANT ABF FREIGHT
## SYSTEM, INC.'S MOTION FOR SUMMARY JUDGMENT

Respectfully submitted,

_____

Joseph E. Santucci, Jr. (*pro hac vice*)
Mary D. Walsh (*pro hac vice*)
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, N.W.
Washington, DC 20004
(202)739-5398

Vincent Candiello
MORGAN, LEWIS & BOCKIUS LLP
One Commerce Square
417 Walnut Street
Harrisburg, PA 17101-1904
(717) 237-4000

Attorneys for Defendant
ABF Freight System, Inc.

Dated:  April 15, 2002

# TABLE OF CONTENTS

**EXHIBIT**

Article 5 and Article 8 of the National Master Freight Agreement .......................... 1

Affidavit of Steven J. Froias and Attached Exhibits ................................................. 2

Excerpts from the Deposition of Rickey Bechtel (March 7, 2002) ........................... 3

March 21,1995 Letter to Thomas Griffith & Ron Carey from Richard Valitutto
Re: Closure of the Carlisle Facility ........................................................................ 4

March 27, 1995 Letter to Paula Caira from Thomas Griffith re: Carolina Freight
Carriers Corporation ............................................................................................... 5

Excerpts from Transcript of September 14, 1995 Change of Operations
Committee Hearings ................................................................................................ 6

Employment Opportunity Form Signed By Rickey Bechtel ...................................... 7

November 9, 1995 Letter to Rickey Bechtel from Gordon Ringberg
Re: Article 5, Section 5 Job Offer .......................................................................... 8

Rickey Bechtel NMFA Grievance Dated February 20, 2000 ................................... 9

February 29, 2000 Letter to Rickey Bechtel from Charles Shughart
Re: Grievance 94530 ............................................................................................. 10

March 29, 2000 Letter to Rickey Bechtel from Charles Shughart
Re: Grievance 94530 ............................................................................................. 11

April 5, 2000 Letter to Andy Upchurch from Charles Shughart Re: Meeting of
April 5, 2000 .......................................................................................................... 12

July 10, 2000 E-mail from Ray Snyder to Rickey Bechtel ..................................... 13

Draft of Bechtel Brief Re: Grievance 94530 .......................................................... 14

## **EXHIBIT**

July 18, 2000 Letter from Charles Shughart to Rickey Bechtel Re: Brief in
Grievance 94530 ...................................................................................... 15

Bechtel Brief in Grievance 94530 and Exhibits...................................................... 16

June 15, 2000 Letter to Rickey Bechtel from Charles Shughart Re: Hearing in
Grievance 94530........................................................................................ 17

July 16, 2000 E-mail to Rickey Bechtel.................................................................. 18

November 8, 2000 Letter form Charles Shughart to Rickey Bechtel
Re: Grievance 94530 ................................................................................. 19

December 28, 2000 Letter to Rickey Bechtel from Charles Shughart Regarding
Decision of the Change Operations Committee and Attached Exhibits ................. 20

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of April 2002, a copy of Defendant

ABF Freight System, Inc.'s Exhibits in Support of Motion for Summary Judgment

was served via overnight delivery on the following:

Robert S. Mirin
AHMAD & MIRIN
8150 Derry Street, Suite A
Harrisburg, PA 17111

James A. McCall
Special Counsel
INTERNATIONAL BROTHERHOOD OF TEAMSTERS
25 Louisiana Avenue, N.W.
Washington, DC 20001

Ira Weinstock
Jason Weinstock
IRA WEINSTOCK, P.C.
800 N. 2nd Street
Harrisburg, PA 17102

_____
Mary D. Walsh
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, N.W.
Washington, DC 20004
(202)739-5720

Attorney for Defendant
ABF Freight System, Inc.

EXHIBIT 1





# NATIONAL MASTER FREIGHT AGREEMENT

Covering

OVER-THE-ROAD

and

LOCAL CARTAGE

EMPLOYEES OF PRIVATE,
COMMON, CONTRACT AND
LOCAL CARTAGE CARRIERS

For the Period of
APRIL 1, 1994
through
MARCH 31, 1998

## Article 4

Union shall be limited to, and shall not exceed, the following duties and activities:

(a) The investigation and presentation of grievances with his/her Employer or the designated company representative in accordance with the provisions of the collective bargaining agreement;

(b) The collection of dues when authorized by appropriate Local Union action;

(c) The transmission of such messages and information, which shall originate with and are authorized by the Local Union or its officers, provided such message and information;

(1) have been reduced to writing; or,

(2) if not reduced to writing, are of a routine nature and do not involve work stoppages, slowdowns, refusal to handle goods, or any other interference with the Employer's business.

When requested by the Union or the employee, there shall be a steward present whenever the Employer meets with the employee about grievances or discipline or to conduct investigatory interviews. If a steward is unavailable, the employee may designate a bargaining unit member who is available at the terminal at the time of the meeting to represent him/her. Meetings or interviews shall not begin until the steward or designated bargaining unit member is present. An employee who does not want a Union steward or available bargaining unit member present at any meeting or interview where the employee has a right to Union representation must waive Union representation in writing. If the Union requests a copy of the waiver, the Employer shall promptly furnish it.

Job stewards and alternates have no authority to take strike action, or any other action interrupting the Employer's business, except as authorized by official action of the Local Union. The Employer recognizes these limitations upon the authority of job stewards and their alternates, and shall not hold the Local Union liable for any unauthorized acts. The Employer in so recognizing such limitations shall have the authority to impose proper discipline, including discharge, in the event the job steward or his/her designated alternate has taken unauthorized strike action, slowdown or work stoppage in violation of this Agreement.

## Article 4

The job steward, or his/her designated alternate, shall be permitted reasonable time to investigate, present and process grievances on the company property without loss of time or pay during his/her regular working hours without interruption of the Employer's operation by calling group meetings; and where mutually agreed to by the Local Union and the Employer, off the property or other than during his/her regular schedule without loss of time or pay. Such time spent in handling grievances during the job steward's or his/her designated alternate's regular working hours shall be considered working hours in computing daily and/or weekly overtime if within the regular schedule of the "job steward."

The job steward, or his/her designated alternate, shall be permitted reasonable time off without pay to attend Union meetings called by the Local Union. The Employer shall be given twenty-four (24) hours' prior notice by the Local Union.

## ARTICLE 5.

### Section 1. Seniority Rights

(a) The application of seniority which has been accrued herein shall be established in the Supplemental Agreements.

(b) Seniority shall be broken only by discharge, voluntary quit, retirement, or more than a five (5)- year layoff.

(c) This Section shall apply to all Supplemental Agreements.

### Section 2. Mergers of Companies-General

(a) In the event the Employer is a party to a merger of lines, seniority of the employees who are affected thereby shall be determined by mutual agreement between the Employer and the Local Unions involved.

In the application of this Section, it is immaterial whether the transaction is called a merger, purchase, acquisition, sale, etc. Further, it is also immaterial whether the transaction involves merely the purchase of stock of one (1) corporation by another, with two (2) separate corporations continuing in existence.

19

## Article 5, Section 2

(b) If such merger of companies results in the combination of terminals or over-the-road operations, a change of operation shall be submitted to the Co-Chairmen of the National Grievance Committee for assignment to an appropriate Change of Operations Committee established pursuant to Article 8, Section 6. The Change of Operations Committee shall retain jurisdiction for one (1) year after the effective date of the Committee decision and shall have the authority to amend its decision in the event of a substantial change in the amount of work to be performed at the terminals or over-the-road operations which were combined.

## Combining of Terminals or Operations as a Result of Merger of Companies

(c) In the application of this Section, when terminals or operations of two (2) or more companies are combined, as referred to above, the following general rules shall be applied by the Employer and the Local Unions, which general rules are subject to modification pursuant to the provisions of Section 4 of this Article:

### Active Seniority List

(1) The active employee seniority rosters (excluding those employees on letter of layoff) shall be "dovetailed" by appropriate classification (i.e., road or city) in the order of each employee's full continuous classification (road or city) seniority date that the employee is currently exercising. (The term "continuous classification seniority" as used herein is defined as that seniority which the employee is currently exercising and has not been broken in the manner provided in Section 1 of this Article or by voluntary changes in domicile not directed, approved or ordered by a Change of Operations Committee.) The active "dovetailed" seniority roster shall be utilized first and until exhausted to provide employment at such combined terminal or operational location.

### Layoff Seniority List

(2) In addition, the inactive seniority rosters (employees who are on letter of layoff) shall be similarly "dovetailed" by appropriate classification. If additional employees are required after the active list is exhausted, they shall be recalled from such inactive

seniority roster and after recall such employees shall be "dovetailed" into the active seniority roster with their continuous classification (road or city) seniority dates they are currently exercising which shall then be exercised for all purposes. Seniority rosters previously combining job classifications shall be continued unless otherwise agreed.

## Temporary Authority

(d) Where only temporary authority is granted in connection with any of the transactions described above, then separate seniority lists shall continue only when terminals or operations are not merged, unless otherwise agreed. The Employer which is to survive will assume the obligations of both collective bargaining agreements during the period of the temporary authority.

In the event of temporary merger of operations which are contingent upon approval by regulatory agencies or on other stated conditions, the seniority of the involved employees shall continue to accrue with their original Employer during the period of temporary merger, so that if there is no final consummation of the merger, the seniority of such employees shall be continued with their respective employers. However, if, on the failure of final consummation and dissolution of the merger, one of the parties to the proposed merger discontinues the operations which were subject to such merger, the employees of such Employer shall be granted seniority rights for all purposes with the other Employer only for the period of time they were employed in such temporary merged operations.

## Purchase of Rights

(e) If a merger, purchase, acquisition, sale, etc., constitutes merely the acquisition of permits or rights, without the purchase or acquisition of equipment or terminals, and/or without the consolidation of terminals or operations, or in the event of the purchase of rights during bankruptcy proceedings, the following shall apply:

Where the purchasing company has a terminal operation at the domicile of the employees of the seller, the employees of the selling company shall be placed on a master seniority list, and the purchasing company or companies shall hire, after recall of the purchasing company's employees from layoff, such employees as needed

# Article 5, Section 2

for regular employment within the first twelve (12)-calendar months after purchase or acquisition of permits and/or rights, and they shall be dovetailed with full seniority. If an employee refuses a bona fide offer of regular work opportunity with any of the purchasing companies, his/her name shall be removed from the list. No employee hired under this provision shall be required to serve a probationary period. After the expiration of the aforementioned twelve (12)-calendar month period, the purchaser shall have no further obligation to the employees of the seller.

However, if the purchasing or acquiring company does not have and/or continue a terminal or operation at the domicile of the employees of the seller, resulting in their layoff, such Employer shall place the laid-off employees on a master seniority list and such Employer shall, if and when additional regular employees are required, within a twelve (12)-calendar month period after purchase or acquisition, and providing its employees on layoff have been recalled, offer employment to such laid-off employees at the terminal locations or operations to which the work has been transferred. Any such laid-off employees accepting transfer shall be dovetailed in accordance with their terminal seniority for work purposes, including layoff, and holding company seniority for all fringes. If an employee refuses a bona fide offer of regular work opportunity with any of the purchasing companies, his/her name shall be removed from the list. No employee hired under this provision shall be required to serve a probationary period. After the expiration date of the aforementioned twelve (12)-calendar month period, the purchaser shall have no further obligation to the employees of the seller. The transferring employee shall be responsible for lodging and moving expenses.

## Exclusive Cartage Operations

(f) If in connection with the transactions described in these rules the successor Employer determines to discontinue the use of a local cartage company, the employees of that local cartage company who have worked exclusively on the pickup and delivery service which is retained by the successor Employer shall be given the opportunity to continue to perform such service as an employee of such successor Employer, and shall have their seniority "dovetailed" as described in the above rules.

# Article 5, Section 2

## Committee Authority

(g) Area and/or State Committees created pursuant to Local Supplements which have previously established rules of seniority, not contrary to the provisions of such Supplements, and approved by the Joint Area Committee, may continue to apply such rules if such rules are reduced to writing.

## Section 3.   Intent of Parties

(a) The parties acknowledge that the above rules are intended solely as general standards and further that many factual situations will be presented which necessitate different application, modification or amendment. Accordingly, the parties acknowledge that questions of the application of seniority rights may arise which require different treatment and it is anticipated and understood that the Employers and Unions jointly involved and/or the respective grievance committees may mutually agree to such disposition of questions of seniority which in their judgment is appropriate under the circumstances.

(b) In all instances, the disposition of questions involving the application of seniority rights made by the parties pursuant to this Section may be presented to the appropriate grievance committees provided herein whose decisions shall be final and binding.

## Section 4.   Equipment Purchases

(a) The Employer shall not require as a condition of continued employment, that an employee purchase truck, tractor and/or tractor and trailer or other vehicular equipment, or that any employees purchase or assume any proprietary interest or other obligation in the business, except as referred to in Article 6, Section 2. The requirements of this provision shall be maintained during the renegotiation of this Agreement unless either party has terminated the Agreement in the manner provided.

## Highest Rates Prevail

(b) If the minimum wage, hours and working conditions in the Company absorbed differ from those minimums set forth in this

23

## Article 5, Section 4

Agreement and Supplements thereto, the higher of the two shall remain in effect for the employees so absorbed.

### Cutting Seniority Board

(c) The Union reserves the right to cut the road seniority board when the average weekly earnings fall to seven hundred dollars ($700.00) or less. This is not to be construed as imposing a limitation on earnings. After the Union notifies the Employer to cut the board and in the event that Employer refuses, the Union shall immediately submit the matter to the grievance procedure. In determining whether average weekly earnings will fall to seven hundred dollars ($700.00) or less, only the earnings of the lower twenty-five percent (25%) of the drivers on the seniority board, counting from the bottom up, shall be considered. The average shall be calculated for the thirty (30)-day period preceding the Union's original request. After such calculation is made, the average earnings of the drivers for the top seventy-five percent (75%) of the seniority board must also average more than seven hundred dollars ($700.00) per week, or layoff shall be made in accordance with seniority. The above provisions shall also apply to extra board for sleeper drivers exclusively.

### Posting Seniority List

(d) The Employer shall give the Local Union a seniority list at least every six (6) months. The Employer shall also post a seniority list at least once every six (6) months and shall maintain a current seniority roster at the terminal. Protest of any employee's seniority date or position on such list must be made in writing to the Employer within thirty (30) days after such seniority date or position first appears, and if no protests are timely made the dates and positions posted shall be deemed correct. Any such protest which is timely made may be submitted to the grievance procedure.

### Section 5. Work Opportunity

Over-the-road employees, who are on letter of layoff, shall be given an opportunity to transfer to permanent over-the-road employment (prior to the employment of new hires) occurring at other over-the-road domiciles of the Employer located within the Conference area provided they notify the Employer in writing of their interest in a

24

## Article 5, Section 5

transfer opportunity. The offer of transfer will be made in the order of continuous over-the-road seniority of the laid-off drivers domiciled within the Conference area. The Employer shall be required to make additional offers of transfer to an employee who has previously rejected a transfer opportunity provided the employee again notifies the Employer in writing of his/her continued interest in additional transfer opportunities. However, the Employer will only be required to make one transfer offer in any six (6) calendar month period. Any employee accepting such offer shall be employed as a "new hire" and shall be placed at the bottom of the seniority board for bidding and layoff purposes, but shall retain company seniority for fringe benefits only. A transferring employee shall pay his/her own moving expenses and shall, upon reporting to such new domicile, be deemed to have relinquished his/her right to return with seniority to the domicile from which he/she transferred.

### Section 6. Dock Operations

The Rule of Forty (40) and Out shall apply to PURE DOCK WORK ONLY for the life of the contract and shall operate as follows:

(a) The employer's obligation to each full-time regular employee ("regular employee") is to satisfy the daily and/or weekly guarantee as set forth in a bid under the applicable Supplemental Agreement. It is understood that a weekly guarantee under a supplement may call for four (4) or five (5) punches depending upon whether the daily guarantee is eight (8) or ten (10) hours.

(b) A regular employee who is assigned to or elects work on the dock for forty (40) straight-time hours during a work week, other than through a bid, is also subject to the Rule of Forty (40) and Out.

(c) No casual may work on the dock unless each regular employee who was on the seniority list as of March 31, 1994, and unless each regular employee added to the seniority list thereafter, has been offered an opportunity to work that day at the straight time rate of pay.

(d) The Employer is not obligated to offer any overtime work on the dock to any regular employee whose daily guarantee has been satisfied. If the Employer does offer daily overtime to regular employees, overtime must be offered in seniority order in accordance with the applicable Supplement.

25

## Article 5, Section 6

(e) Overtime offered to a regular employee after the guaranteed day shall not count toward the weekly guarantee. Example: An employee has a five (5) day regular workweek. At the close of the fourth (4th) day, the employee has thirty-two (32) hours of regular time and four (4) hours of overtime. The employee is guaranteed his/her fifth (5th) regular punch and at least forty-four (44) hours for the week. Example: An employee has a four (4) day regular workweek. At the close of the third (3rd) day, the employee has thirty (30) hours of regular time and ten (10) hours of overtime. The employee is guaranteed his/her fourth (4th) regular punch and at least fifty (50) hours for the week.

(f) The Employer is not obligated to offer a premium day punch for pure dock work to any regular employee after the weekly guarantee has been satisfied. The Employer's obligation, if any, to provide premium day work other than pure dock work is governed by the applicable Supplement. Example: An employee has a five (5) day regular workweek. At the close of the fifth (5th) day, the employee has earned the weekly guarantee. The Employer is not obligated to offer the employee a sixth (6th) or seventh (7th) day premium punch for pure dock work.

(g) If all regular employees on the seniority list have worked at least forty (40) hours in a given work week, and if the Employer offers premium day work on the dock to regular employees, premium day work shall be offered on the basis of seniority as defined in the applicable Supplement.

(h) A regular employee who has broken his/her daily or weekly guarantee shall not be entitled to claim any work occurring outside of the employee's regularly scheduled work week, except as may be provided by the applicable Supplement.

# ARTICLE 6

## Section 1.  Maintenance of Standards

The Employer agrees, subject to the following provisions, that all conditions of employment in his/her individual operation relating to wages, hours of work, overtime differentials and general working conditions shall be maintained at not less than the highest stan-

## Article 6, Section 1

dards in effect at the time of the signing of this Agreement, and the conditions of employment shall be improved whenever specific provisions for improvement are made elsewhere in this Agreement.

### Local Standards

(a) The Local Unions and the Employer shall, within one hundred eighty (180) days following ratification of this Agreement, identify and reduce to writing, and submit to the appropriate Conference Joint Area Committee, those local standards and conditions practiced under this Article. Those local standards and conditions previously practiced hereunder which are not so submitted shall be deemed to have expired.

The appropriate Conference Joint Area Committee shall, not later than ninety (90) days following ratification, adopt a procedure to consider the disposition of the local standards and conditions submitted including the right to appoint a subcommittee to make recommendations. The Conference Joint Area Committee shall provide to the parties the opportunity to present their views. The Conference Joint Area Committee shall have the sole discretion to determine the disposition of the submitted local standards and conditions which determination shall be final and binding. However, if deadlocked, the matter shall be referred to the National Grievance Committee for decision which shall be final and binding.

### Individual Employer Standards

(b) Individual Employers may during the life of this Agreement file with the appropriate Conference Joint Area Committee and request review of those individual standards and conditions claimed or practiced under this Article which exceed the provisions of this Agreement and Supplemental Agreements.

The Conference Joint Area Committee shall develop a procedure to review the filing including the right to appoint a subcommittee to make recommendations. The Committee shall make every effort to adjust the matter. If the Committee reaches agreement concerning the disposition of the individual standards or conditions, the decision of the Committee shall be final and binding. However, if deadlocked, the matter shall be referred to the National Grievance Committee for decision which shall be final and binding.

Article 7, Section 2

thirty (30) days after the date the Local Union receives the grievance.

10. A copy of the grievance committee Rules of Procedure, including the Grievant's Bill of Rights, must be provided, upon request, to the grievant prior to the commencement of the grievance hearing.

## Section 3.

All Local, State and Area Grievance Committees established under Supplemental Agreements shall revise their Rules of Procedure to include the "Grievant's Bill of Rights" set forth in Section 2 above and shall submit their revised Rules of Procedure to the National Grievance Committee for approval no more than ninety (90) days after the effective date of this Agreement. The National Grievance Committee may revise, delete or add to the Rules of Procedure for a Supplemental Grievance Committee in any manner necessary to ensure conformity with the purposes and objectives of the Grievant's Bill of Rights. The decisions of the National Grievance Committee in this regard shall be final and binding.

## Section 4.

Except in cases involving "cardinal" infractions under the applicable Supplemental Agreement, an employee to be discharged or suspended shall be allowed to remain on the job until the discharge or suspension is sustained under the grievance procedure.

## ARTICLE 8.
## NATIONAL GRIEVANCE PROCEDURE

## Section 1.

All grievances or questions of interpretations arising under this National Master Freight Agreement or Supplemental Agreements thereto shall be processed as set forth below. If such Supplemental Agreements provide for arbitration of discharges, such procedure shall be continued.

(a) All factual grievances or questions of interpretation arising under the provisions of the Supplemental Agreement (or factual

Article 8, Section 1

grievances arising under the National Master Freight Agreement), shall be processed in accordance with the grievance procedure of the applicable Supplemental Agreement.

If upon the completion of the grievance procedure of the Supplemental Agreement the matter is deadlocked, the case shall be immediately forwarded to both the Employer and Union secretaries of the National Grievance Committee, together with all pertinent files, evidence, records and committee transcripts.

Any request for interpretation of the National Master Freight Agreement shall be submitted directly to the Conference Joint Area Committee for the making of a record on the matter, after which it shall be immediately referred to the National Grievance Committee. Such request shall be filed with both the Union and Employer secretaries of the National Grievance Committee with a complete statement of the matter.

All grievances arising under the provisions of the Master Agreement (Articles 1-39) shall be filed directly with the appropriate Conference Joint Area Committee. The Conference Joint Area Committee shall have the authority to render a final and binding decision or direct the grievance to the appropriate lower level committee for hearing if the grievance is not properly claimed under the provisions of the Master Agreement. The Conference Joint Area Committee must hear and decide such cases within ninety (90) days of the filing of the grievance. In the event of a deadlock, the case shall be referred to and heard by the National Grievance Committee. Grievances arising under Article 9-Protection of Rights, Article 29-Substitute Service and Article 32-Subcontracting shall be expeditiously processed and may be heard at either regularly scheduled or specially called hearings. A grievance may be filed by any Area Conference whose members are adversely affected by an alleged violation of Article 32, Section 4(b) occurring within its jurisdiction.

(b) Any matter which has been referred pursuant to Section 1(a) above, or any question concerning the interpretation of the provisions contained in the National Master Freight Agreement, shall be submitted to a permanent National Grievance Committee which shall be composed of an equal number of employer and union representatives. The National Grievance Committee shall meet on a regular basis, for the disposition of grievances referred to it, or may

## Article 8, Section 1

meet at more frequent internals, upon call of the chairman of either the Employer or Union representatives on the National Grievance Committee. The National Grievance Committee shall adopt rules of procedure which may include the reference of disputed matters to subcommittees for investigation and report, with the final decision or approval, however, to be made by the National Grievance Committee. If the National Grievance Committee resolves the dispute by a majority vote of those present and voting, such decisions shall be final and binding upon all parties.

Cases deadlocked by the National Grievance Committee shall be referred to an arbitration panel, as provided in Section 2(b) below. Procedures relating to such referrals shall be included in the Rules of Procedure of the National Grievance Committee.

The Employer may request the co-chairmen of the National Grievance Committee to appoint and convene a joint Employer and Union Committee which shall have the authority to approve uniform dispatch procedures and rules which shall apply to the individual company's over-the-road operations.

No Employer signatory to this Agreement shall be permitted to have its own grievance procedure.

## Section 2.

(a) The National Grievance Committee by majority vote may consider and review all questions of interpretation which may arise under the provisions contained in the National Master Freight Agreement which are submitted by either the National Freight Director or the designated employer representative; and shall have the authority to reverse and set aside the majority interpretation of any area, regional, or local grievance committee or arbitration panel established within the Supplemental Agreements if, in its opinion, such interpretation is contrary to the provisions set forth in the National Master Freight Agreement, in which case the decision of the National Grievance Committee shall be final and binding. A failure by the National Grievance Committee to reach a majority decision on a question concerning interpretation or on a review of a decision by a lower level grievance committee or arbitration panel shall not be considered a deadlock and will not be referred to arbitration. In case of a failure to reach a majority decision in review-

## Article 8, Section 2

ing the decision of a lower level grievance committee or arbitration panel, the decision of the lower level grievance committee or arbitration panel shall stand as final and binding.

(b) All grievances deadlocked at the Conference Joint Area Committee and the National Grievance Committee shall be subject to arbitration and processed as set forth below.

1. All grievances involving the provisions of the Supplemental Agreements, including discharges or suspensions, which have been deadlocked by the Conference Joint Area Committee, shall be automatically referred to a Conference Arbitration Panel, whose decision shall be final and binding on all parties.

2. The Conference Arbitration Panel shall consist of the Union and Employer co-chairmen of the Conference Joint Area Committee, or their designees, and an impartial arbitrator selected by the co-chairmen. The procedures for the selection of the arbitrator for the Conference Arbitration Panel and the cost of arbitration shall be determined by the Rules of Procedure of the Conference Joint Area Committee.

3. At the arbitration hearing before the Conference Arbitration Panel, the Employer's case will be presented by a full-time employee of the Employer and the Union's case by a full-time employee of the Local Union, and the Rules of Procedure of the Conference Joint Area Committee shall apply.

4. The Conference Arbitration Panel shall issue a "bench decision" at the conclusion of the grievance hearing, unless the Committee's Rules of Procedure provides otherwise in discharge cases. Either party, however, may request a clarification or further explanation of a previous decision rendered by the Conference Arbitration Panel.

5. All grievances involving the Master Agreement (Articles 1-39), which have been deadlocked by the National Grievance Committee, shall be automatically referred to the National Arbitration Panel, whose decision shall be final and binding on all parties.

6. The National Arbitration Panel shall consist of the Union and Employer co-chairmen of the National Grievance Committee, or their designees, and an impartial arbitrator selected by the co-chairmen. The procedures for the selection of the arbitrator for the

## Article 8, Section 2

National Arbitration Panel and the cost of arbitration shall be determined by the Rules of Procedure of the National Grievance Committee.

7. At the arbitration hearing before the National Arbitration Panel, the Employer's case will be presented by a full-time employee of the Employer and/or Employer representative on the National Grievance Committee and the Union's case by a designee of the National Freight Director and the Rules of Procedure of the National Grievance Committee shall apply.

8. The National Arbitration Panel shall issue a "bench decision" at the conclusion of the grievance hearing. Either party, however, may request a clarification or further explanation of a previous decision rendered by the National Arbitration Panel.

9. No lawyers will be permitted to present cases at any step of the grievance procedure.

10. The decision of any arbitration panel shall be specifically limited to the matters submitted to it and the panel shall have no authority in any manner to amend, alter or change any provision of the Agreement.

11. If the Employer or Union challenges in court a decision issued by any arbitration panel provided for in this Section, the cost of the challenge, including the court costs and attorneys' fees, shall be paid by the losing party.

12. Where Supplements under the 1991-94 NMFA provided for arbitration in discharge cases, the procedures for such arbitration shall be maintained under the 1994-98 Agreement.

## Section 3. Work Stoppages

(a) The parties agree that all grievances and questions of interpretation arising from the provisions of this Agreement shall be submitted to the grievance procedure for determination. Accordingly, no work stoppage, slowdown, walkout or lockout shall be deemed to be permitted or authorized by this Agreement except as provided in Section 3(b) below.

A "representation dispute" in circumstances under which the Employer is not required to recognize the Union under this Agreement

36

## Article 8, Section 3

is not subject to the grievance procedure herein and the provisions of this Article do not apply to such dispute.

(b) In the event an Employer is delinquent in its health & welfare or pension payments in the manner required by the applicable Supplemental Agreement, the Local Union shall have the right to take whatever action it deems necessary until such delinquent payments are made. The Local Union shall give the Employer a seventy-two (72)-hour, (excluding Saturdays, Sundays, and holidays), prior written notice of the Local Union's authorization of strike action which notice shall specify the failure to make health & welfare or pension payments providing the basis for such strike authorization. In no event shall the Union have the right to strike over a dispute concerning the eligibility and/or payment of health & welfare or pension contributions by an Employer on behalf of specific individuals, and such disputes shall be subject to the grievance procedure.

## Section 4.

(a) It is mutually agreed that the Local Union will, within two (2) weeks of the date of the signing of this Agreement, serve upon the Employer a written notice listing the Union's authorized representatives who will deal with the Employer, make commitments for the Local Union generally and, in particular, those individuals having the sole authority to act for the Local Union in calling or instituting strikes or any stoppages of work which are not in violation of this Agreement. The Local Union may from time to time amend its listing of authorized representatives by certified mail. The Local Union shall not authorize any work stoppages, slowdown, walkout, or cessation of work in violation of this Agreement. It is further agreed that in all cases of an unauthorized strike, slowdown, walkout, or any unauthorized cessation of work which is in violation of this Agreement the Union shall not be liable for damages resulting from such unauthorized acts of its members.

In the event of a work stoppage, slowdown, walkout or cessation of work, not permitted by the provisions of Article 8, Section 3(a), alleged to be in violation of this Agreement, the Employer shall immediately send a wire to the appropriate Area Conference to determine if such strike, etc., is authorized.

37

# Article 8, Section 4

No strike, slowdown, walkout or cessation of work alleged to be in violation of this Agreement shall be deemed to be authorized unless notification thereof by telegram has been received by the Employer and the Local Union from such Area Conference. If no response is received by the Employer within twenty-four (24) hours after request, excluding Saturdays, Sundays, and holidays, such strike, etc., shall be deemed to be unauthorized by the Area Conference for the purpose of this Agreement.

In the event of such unauthorized work stoppage or picket line, etc., in violation of this Agreement, the Local Union shall immediately make every effort to persuade the employees to commence the full performance of their duties and shall immediately inform the employees that the work stoppage and/or picket line is unauthorized and in violation of this Agreement. The question of whether employees who refuse to work during such unauthorized work stoppages, in violation of this Agreement, or who fail to cross unauthorized picket lines at their Employer's premises, shall be considered as participating in an unauthorized work stoppage in violation of this Agreement may be submitted to the grievance procedure, but not the amount of suspension herein referred to.

It is specifically understood and agreed that the Employer during the first twenty-four (24)-hour period of such unauthorized work stoppage in violation of this Agreement, shall have the sole and complete right of reasonable discipline, including suspension from employment, up to and including thirty (30) days, but short of discharge, and such employees shall not be entitled to or have any recourse to the grievance procedure. In addition, it is agreed between the parties that if any employee repeats any such unauthorized strike, etc., in violation of this Agreement, during the term of this Agreement, the Employer shall have the right to further discipline or discharge such employee without recourse for such repetition. After the first twenty-four (24)-hour period of an unauthorized stoppage in violation of this Agreement, and if such stoppage continues, the Employer shall have the sole and complete right to immediately further discipline or discharge any employee participating in any unauthorized strike, slowdown, walkout, or any other cessation of work in violation of this Agreement, and such employees shall not be entitled to or have any recourse to the grievance procedure. The suspension or discharge herein referred to shall be uniformly applied

# Article 8, Section 4

to all employees participating in such unauthorized activity. The Employer shall have the sole right to schedule the employee's period of suspension.

The International Brotherhood of Teamsters, the Teamsters National Freight Industry Negotiating Committee, Area Conferences, Joint Councils and Local Unions shall make immediate efforts to terminate any strike or stoppage of work as aforesaid which is not authorized by such organizations, without assuming  liability therefor. For and in consideration of the agreement of the International Brotherhood of Teamsters, Teamsters National Freight Industry Negotiating Committee, Area Conferences, Joint Councils and Local Unions affiliated with the International Brotherhood of Teamsters to make the aforesaid efforts to require Local Unions and their members to comply with the law or the provisions of this Agreement, including the provisions limiting strikes or work stoppages, as aforesaid, the Associations and Employers who are parties hereto agree that they will not hold the International Brotherhood of Teamsters, the Teamsters National Freight Industry Negotiating Committee, Area Conferences, Joint Councils and Local Unions liable or sue them in any court or before any administrative tribunal for undertaking such efforts to terminate unauthorized strikes or stoppages of work as aforesaid or for undertaking such efforts to require Local Unions and their members to comply with the law or the provisions of this Agreement, or for taking no further steps to require them to do so. It is further agreed that signator Associations and Employers will not hold the International Brotherhood of Teamsters, Teamsters National Freight Industry Negotiating Committee, Area Conferences, Joint Councils or Local Unions liable or sue them in any court or before any  administrative tribunal for such unauthorized work stoppages alleging condonation, ratification or assumption of liability for undertaking such efforts to terminate strikes or stoppages of work, or requiring Local Unions and their members to comply with the law or the provisions of this Agreement.

The provisions of this Article shall continue to apply during that period of time between the expiration of this Agreement and the conclusion of the negotiations or the effective date of the successor Agreement, whichever occurs later, except as provided in  Article 39. It is understood and agreed that failure by the International Brotherhood of Teamsters, Teamsters National Freight Industry

## Article 8, Section 4

Negotiating Committee, Area Conferences and/or Joint Councils to authorize a strike by a Local Union shall not relieve such Local Union of liability for a strike authorized by it and which is in violation of this Agreement.

(b) The question of whether the International Union, Teamsters National Freight Industry Negotiating Committee, an Area Conference, Joint Council or Local Union have met its obligation set forth in the immediately preceding paragraphs, or the question of whether the International Union, Teamsters National Freight Industry Negotiating Committee, an Area Conference, Joint Council or the Local Union, separately or jointly, participated in an unauthorized work stoppage, slowdown, walkout or cessation of work in violation of this Agreement by calling, encouraging, assisting or aiding such work stoppage, etc., in violation of this Agreement, or the question of whether an authorized strike provided by Article 8, Section 3(b) is in violation of this Agreement, or whether an Employer engaged in a lockout in violation of this Agreement, shall be submitted to the grievance procedure at the national level, prior to the institution of any damage suit action. When requested, the co-chairmen of the National Grievance Committee shall immediately appoint a subcommittee to develop a record by collecting evidence and hearing testimony, if any, on the questions of whether the International Union, Teamsters National Freight Industry Negotiating Committee, an Area Conference, Joint Council or Local Union have met its obligations as aforesaid, or of Union participation or Employer lockout in violation of this Agreement. The record shall be immediately forwarded to the National Grievance Committee for decision. If a decision is not rendered within thirty (30) days after the co-chairmen have convened the National Grievance Committee, the matter shall be considered deadlocked.

A majority decision of the National Grievance Committee on the questions presented as aforesaid shall be final and binding on all parties. If such majority decision is rendered in favor of one (1) or more of the Union entities, or the Employer, in the case of lockout, no damage suit proceedings on the issues set forth in this Article shall be instituted against such Union entity or such Employer. If, however, the National Grievance Committee is deadlocked on the issues referred to in this subsection 4(b), the issues must be referred to the National Arbitration Panel for resolution prior to either party

40

instituting damage suit proceedings. If the National Arbitration Panel decides that a strike was unlawful, it shall not have the authority to assess damages. Except as provided in this subsection 4(b), agreement to utilize this procedure shall not thereafter in any way limit or constitute a waiver of the right of the Employer or Union to commence damage suit action. However, the use of evidence in this procedure shall not waive the right of the Employer or Union to use such evidence in any litigation relating to the strike or lockout, etc., in violation of this Agreement. There shall not be any strike, slowdown, walkout, cessation of work or lockout as a result of a deadlock of the National Grievance Committee on the questions referred to under this subsection 4(b) and any such activity shall be considered a violation of this Agreement.

(c) In the event that an Employer, party to this Agreement, commences legal proceedings against the Union after the Union's compliance with the provisions of Article 8, Section 3(b), the Employer Associations will cooperate in the presentation to the court of the applicable majority grievance committee decision.

(d) Nothing herein shall prevent the Employer or Union from securing remedies granted by law except as specifically set forth in subsection 4(b).

## Section 5.

(a) In the event of strikes, work stoppages, or other activities authorized by Article 8, Section 3(b) of this Agreement, no interpretation of this Agreement or any Supplement thereto relating to the Employer's obligation to make health & welfare and/or pension contributions to any tribunal shall be binding upon the Union or affect the legality or lawfulness of the strikes unless the Union stipulates to be bound by such interpretation, it being the intention of the parties to resolve all questions of interpretation by mutual agreement.

(b) It is the intention of the parties to resolve all grievances and requests for interpretation arising under this Agreement through the grievance procedure. However, it is understood and agreed that nothing herein shall prevent the Employer or Union from securing remedies in those circumstances where the application of this Agreement is contrary to law.

41

Article 8, Section 6

## Section 6.  Change of Operations

### Change of Operations Committee

(a) Present terminals, breaking points or domiciles shall not be transferred, changed or modified without the approval of an appropriate Change of Operations Committee. Such Committee shall be appointed in each of the Conference Areas, equally composed of Employer and Union representatives.  The Change of Operations Committee shall have the authority to determine the seniority of the employees affected and such determination shall be final and binding.

In the event a proposed change of operations includes the establishment of either a new or satellite terminal as a "combination" facility with a common city driver and dock seniority roster, when such change of operations results in the relocation or movement of city drivers and dock employees from an existing terminal recognizing separate (split) seniority rosters for city drivers and dock employees, the Change of Operations Committee shall have the authority to determine the conditions under which such a combination facility may be established, including but not limited to, the number of city drivers and dock employees who qualify, be allowed to follow the work to the new or satellite combination terminal, the implementation of training programs to qualify dock employees as city drivers and the seniority right of affected employees to either return to the "mother" terminal and/or claim additional driving positions at the satellite terminal within reasonable time periods following the establishment of such combination terminal, as determined by the Committee. Existing terminals that recognize separate city driver and dock seniority rosters (split terminals) shall not be converted to "combination" terminals unless and until such time as a majority of those affected employees agree to such conversion, in which case the Change of Operations Committee shall have the authority to determine the conditions under which such conversion shall be implemented.

Such Committee, however, shall observe the Employer's right to designate domiciles and the operational requirements of the business. Where the Union raises the question as to whether or not certain proposed runs of excessive length can be made, the Employer must be prepared to submit objective evidence including DOT certifica-

tion or logs and tapes that such runs have been tested and were made within the DOT hours of service regulations. Individual employees shall not be redomiciled more than once during the term of this Agreement as the result of an approved change of operations unless a merger, purchase, sale, acquisition or consolidation of employers is involved, or unless there is proven economic need as determined by the Change of Operations Committee based on factual evidence presented.

Pension and health & welfare contributions paid on behalf of a redomiciled employee shall be paid to the Funds to which the contributions were made prior to the employee's change of domicile, and the decisions of the Change of Operations Committee shall so specify. This Section does not apply to employees who voluntarily transfer to new domiciles, unless such transfer is a result of a Change of Operations Committee decision. Any dispute concerning the appropriate fund for an Employer's contribution on behalf of a redomiciled employee, pursuant to a Change of Operations Committee decision, shall be referred to the National Grievance Committee. The decision of the National Grievance Committee shall to the extent permitted by law, be final and binding on all affected parties, including the Trust Funds.

The Change of Operations Committee shall also have jurisdiction for a period of twelve (12) months following the opening of a new terminal to consider the redomicile of employees who are laid off as a direct result of such opening of a terminal.  The Committee shall also have jurisdiction over the closing of a terminal in regard to seniority, as well as to determine the conditions under which freight may or may not be interlined into the area of a vacated operations when necessary to retain major customers, including mandating the use of union carriers where available.  In no event will the Employer be granted the authority to vacate a facility and interline the freight on a non-union subsidiary of the parent company.

The above shall not apply within a twenty-five (25)-mile radius.

### Change of Operations Committee Procedure

(b) The National Grievance Committee shall adopt Rules of Procedure concerning the application and administration of this Article.

## Article 8, Section 6

The Employer shall notify all affected Local Unions of the proposed change of operations at least twenty (20) calendar days prior to the hearing at the Conference Joint Area Committee, and the Employer and the Local Unions involved shall have a mutual responsibility to inform the employees subject to redomicile prior to such hearing in accordance with the practice and procedures agreed to in the respective Area Committee. Any exception or waiver of the aforesaid twenty (20) day period shall be mutually agreed to between the Employer and the Local Unions involved and approved by the Conference Area Change of Operations Committee.

## Moving Expenses

(c) Where an employee is required to transfer to another domicile in order to follow employment as a result of a change of operations, the Employer shall move the employee and assume the responsibility for proven loss or damage to household goods due to such move, including insurance against loss or damage. Should any employee possess household items of unusual or extraordinary value which will be included in the move, such items shall be declared and an appraised value determined prior to the move. The Employer shall provide packing materials for the employee's household goods when requested or at the employee's request pay all costs and expenses of moving such household goods, including packing.

The Employer shall pay reasonable expenses to demount and remount an employee's mobile home, if used as his/her residence and in such instance shall pay normal expenses to move such mobile home, including the use of other modes of transportation where required by law.

An employee shall have a maximum of one (1) year to move in accordance with the provisions of an approved change of operations unless, prior to the expiration of such year, he/she requests, in writing, an extension for a reasonable period of time due to an unusual or special problem. The Employer shall provide lodging for the employee at the point of redomicile, not to exceed ninety (90) calendar days, and in addition, shall reimburse the employee twenty-nine cents (29¢) per mile to transport one (1) personal automobile to the new location.

## Article 8, Section 6

The Employer shall not be responsible for moving expenses if the employee changes his/her residence as a result of voluntary transfer.

None of the Employer obligations set forth in this Subsection (c)-Moving Expenses shall apply to transfers of domiciles within a fifty (50)-mile radius.

## Change of Operations Seniority

(d) The Change of Operations Committee established herein shall have the sole authority to determine questions of the application of seniority in those situations presented to it and in connection therewith the following general rules shall apply, subject, however, to modification as provided by Section 6(g) below:

## Closing, Partial Closing of Terminals-Transfer of Work

(1)a. When branches, terminals, divisions or operations (hereinafter "terminal(s)") are closed or partially closed and the work of such terminal(s) is transferred, in whole or in part, to another terminal(s), the active employees (excluding those employees on letter of layoff) at the closed or partially closed terminal(s) shall have the right to bid into a master seniority roster (road or city) comprised of bidders from the active seniority rosters of closed or partially closed terminal(s) in the order of their continuous classification (road or city) seniority. Continuous classification seniority shall be defined as that seniority which the employee is currently exercising and has not been broken in the manner provided by Article 5, Section 1, or by voluntary changes in domicile not directed, approved or ordered by a Change of Operations Committee. Employees shall bid from the combined master seniority roster into openings at the terminal(s) into which work is being transferred. Employees so transferring shall be "dovetailed" into the appropriate active seniority roster at the new terminal(s) in the order of their continuous classification seniority. Such transfers shall be permitted prior to the recall of laid-off employees at such gaining terminal(s). If and when additional employees are required in excess of those who formed the combined active roster at the point of redomicile, employees on letter of layoff at that location shall be

## Article 8, Section 6

recalled. If recalled, such employees shall be "dovetailed" with their continuous classification seniority.

In addition, the inactive seniority rosters (employees who are on letter of layoff) at the terminal(s) from which employees are being redomiciled shall be "dovetailed" into a master "laid off" seniority roster and such employees shall have the same opportunities to transfer to terminal(s) within the area of the Supplemental Agreement which are afforded to employees covered by the provisions of subparagraph 2(b) below.

b. The following seniority bidding procedures are to be applied in all change of operations cases that involve master pool bidding:

1. The Change of Operations Committee shall have the authority to establish a date for purposes of determining active and inactive (on letter of layoff or the equivalent thereof) employees at both gaining and losing locations.

2. Affected employees at losing locations shall be allowed to bid onto an active master pool seniority list on a dovetailed seniority basis.

3. At the time of the original bid, an employee on the active master pool seniority list shall be afforded the opportunity to bid any available position for which he/she is qualified at a gaining location in accordance with his/her seniority on the master pool seniority list. In the event the active employees at any given location elect not to bid the number of positions being lost at that particular location, inactive employees at that location, in accordance with their seniority, shall then be afforded the opportunity to bid as an active employee until the number of positions being lost at that particular location are filled. An employee who elects to "hold" as set forth in paragraph 4 below shall not be considered as filling a losing position. A successful bidder shall be dovetailed on the seniority list at the location he/she bids into. The number of successful bidders from any losing location shall not exceed, at the time of the original bid, the number of positions lost at that location as approved by the Change of Operations Committee.

4. An employee on the active master pool seniority list who does not have seniority to bid the location he/she desires in the initial bid may remain at his/her present domicile in such status as his/her

16

## Article 8, Section 6

bidding seniority will allow. Should an opening occur during the window period at the location to which he/she desired to transfer, he/she shall be afforded transfer opportunity in line with his/her bidding seniority. A successful bidder under this provision shall be dovetailed on the applicable seniority list at the location into which he/she bids and his/her moving expenses shall be paid in accordance with other transferring employees. The transfer provisions of this Section shall apply only during the window period.

5. An employee who elects to hold as set forth in Paragraph 4 above may hold for only one (1) location and must designate that location at the time of the original bid and may hold only for a position within the classification the employee has seniority to bid. If an employee refuses to accept an opportunity to claim a position he/she is holding for, the employee shall have no further claim to a position that may become available during the window period.

6. An employee who elects to hold, shall also be entitled to exercise seniority to claim a voluntary move under the provisions of Article 5, Section 5 herein, and in the event the employee accepts such a voluntary move, he/she shall retain his/her hold position at his/her home domicile during the remainder of the window period but shall forfeit any other seniority rights at his/her home domicile. Should a position become available at the location such employee is holding for and which the employee has seniority to successfully claim, moving expenses set forth in Article 8, Section 6(c) shall be computed from the employees original home domicile.

7. There shall not be less than a one hundred and twenty (120) day window period in all change of operations involving master pool bidding; provided, however, the Change of Operations Committee may extend the window period beyond one hundred and twenty (120) days when the circumstances involved justify a longer period of time.

## Closing of Terminals-Elimination of Work

(2) a. When a terminal(s) is closed and the work of such terminal(s) is eliminated, an employee who was formerly employed at another terminal shall have the right to return to such former terminal and exercise his/her continuous classification (road or city)

17

## Article 8, Section 6

establish a new OTR domicile there, the Company shall first file for a Change of Operations giving transfer opportunity, with regard to the initial complement, to OTR drivers from those system OTR domiciles that previously serviced such Local Cartage Operation with reasonable regularity. Such transfer opportunity shall remain in effect for any additions to the initial complement for a period of not less than 120 calendar days, after which further additions to such complement shall be hired at the locality where such new OTR domicile was established.

(5) Any employee redomiciled by an approved change of operations or voluntary transfer to another domicile shall upon reporting to such new domicile be deemed to have relinquished his/her right to return, with seniority, to the domicile from which he/she was transferred, except under another approved change of operations. Employees who avail themselves of the transfer privileges because they are on layoff at their original terminal may exercise their seniority rights if work becomes available at their original terminal during the five (5)-year layoff period allowed them at their original terminal.

### Definition of Terms

(e) The term "continuous classification seniority" as used in this Agreement is defined as that seniority which the employee is currently exercising and has not been broken in the manner provided in Article 5, Section I, or by voluntary changes in domicile not directed, approved or ordered by a Change of Operations Committee.

### Qualifications

(f) In all transfers referred to in this Section, the employee must be qualified to perform the job by experience in the classification. If a driver test is required, such test shall be given by a qualified driver-supervisor or driver.

### Intent of Parties

(g) The parties acknowledge that the above rules are intended solely as general standards and further that many factual situations will be presented which necessitate different application, modification or amendment. Accordingly, the parties acknowledge that

49

---

seniority, provided he/she has not been away from such former terminal for more than a five (5)-year period.

### Layoff

b. When a terminal(s) is closed and the work of such terminal(s) is eliminated, employees who are laid-off thereby shall be given first (1st) opportunity for available regular employment at any other terminal(s) of the Employer within the area of the Supplemental Agreement where such employee was employed. The obligation to offer such employment shall continue for a period of five (5) years from the date of closing. However, the Employer shall not be required to make more than one (1) offer during this period. Any employee accepting such offer shall pay his/her own moving expenses. If hired, he/she shall go to the bottom of the seniority board for bidding and layoff purposes, but shall retain company seniority for fringe benefits only.

### Opening of Terminals

(3) When a new terminal(s) is opened (except as a replacement for existing operations or a new division in a locality where there are existing operations), the Employer shall offer to those employees, if any, affected thereby the opportunity to transfer to regular positions in the new terminal(s) in the order of such employee's continuous classification (road or city) seniority date as defined herein. Upon arrival at such new location, such employees shall be "dovetailed" with their continuous classification (road or city) seniority date together with other employees so transferring.

This provision is not intended to cover situations where there is replacement of an existing operation or where a new division is opened in a locality where there is an existing terminal. In these latter situations, those employees laid off at the existing facilities shall have first (1st) opportunity for employment at the new operation in accordance with their continuous classification (road or city) seniority date, and upon arrival shall be similarly "dovetailed." If all regular full-time positions are not filled in this manner, then the provisions of the preceding paragraph shall apply.

(4) When a Company which has an established Local Cartage Operation, which has been cleared by system OTR drivers, seeks to

48

# Article 8, Section 6

questions of the application of seniority rights may arise which require different treatment and it is anticipated and understood that the Employers and Unions jointly involved and/or the respective grievance committees may mutually agree to such disposition of questions of seniority which in their judgment is appropriate under the circumstances.

The Change of Operations Committees, as provided herein or in the Supplemental Agreements, shall have the authority to determine the application of seniority in those situations presented to them. In all cases, the seniority decisions of the Joint Committees, including the Change of Operations Committees and subcommittees established by the National Master Freight Agreement and the respective Supplemental Agreements, shall be final and binding.

## Section 7.

All local, area and national grievance committees as constituted under this Agreement shall have the jurisdiction and power to decide grievances which arose under the preceding agreements and supplements thereto, applying, however, the contract under the grievance arose.

## ARTICLE 9.
## PROTECTION OF RIGHTS

### Section 1.  Picket Lines: Sympathetic Action

It shall not be a violation of this Agreement, and it shall not be cause for discharge, disciplinary action or permanent replacement in the event an employee refuses to enter upon any property involved in a primary labor dispute, or refuses to go through or work behind any primary picket line, including the primary picket line of Unions party to this Agreement, and including primary picket lines at the Employer's places of business.

### Section 2.  Struck Goods

It shall not be a violation of this Agreement and it shall not be cause for discharge, disciplinary action or permanent replacement if any employee refuses to perform any service which his/her Employer

# Article 9, Section 2

undertakes to perform as an ally of an Employer or person whose employees are on strike and which service, but for such strikes, would be performed by the employees of the Employer or person on strike.

## Section 3.

Subject to Article 32 - Subcontracting, hereof, the Employer agrees that it will not cease or refrain from handling, using, transporting, or otherwise dealing in any of the products of any other Employer or cease doing business with any other person, or fail in any obligation imposed by the Motor Carriers Act or other applicable law, as a result of individual employees exercising their rights under this Agreement or under law, but the Employer shall, notwithstanding any other provision in this Agreement, when necessary, continue doing such business, including pickup or delivery to or from the Employer's terminal and to or from the premises of a shipper or consignee.

## Section 4.

The layover provision of the applicable Supplemental Agreement shall apply when the Employer knowingly dispatches a road driver to a terminal at which a primary picket line has been posted as a result of the exhaustion of the grievance procedure, or after proper notification of a picket line permitted by the collective bargaining agreement, or economic strikes occurring after the expiration of collective bargaining agreements, or to achieve a collective bargaining agreement. In such event and upon his/her request, a driver shall be provided first class public transportation to his/her home terminal, plus be paid a minimum of eight (8) hours or actual time spent while returning, whichever is greater. The Employer shall determine the mode of transportation to be utilized.

EXHIBIT 2

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **RICKEY A. BECHTEL,** | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **DANIEL A. VIRTUE, Business Agent of the** | ) **Case No. 3:01-CV-789** |
| **International Brotherhood of Teamsters;** | ) **Judge Sylvia H. Rambo** |
| **INTERNATIONAL BROTHERHOOD OF** | ) |
| **TEAMSTERS; LOCAL 776, INTERNATIONAL** | ) |
| **BROTHERHOOD OF TEAMSTERS; ABF** | ) |
| **FREIGHT SYSTEM, INCORPORATED,** | ) |
| | ) |
| **Defendants.** | ) |

## AFFIDAVIT OF STEVEN J. FROIAS

I, Steven J. Froias, being duly sworn, do hereby depose and say as follows:

1.     I am a Director, Industrial Relations at ABF Freight System, Inc. ("ABF"). As a Director, Industrial Relations, I have responsibility for representing ABF in grievance proceedings and hearings before regional Joint Area Committees and Multi-Region Change of Operations Committees. In this capacity, I represented ABF in the proceedings concerning Rickey Bechtel's grievance at both the Eastern Region Joint Area Committee and the Multi-Region Change of Operations Committee.

2.     As a Director, Industrial Relations, I am thoroughly familiar with the terms and provisions of the National Master Freight Agreement ("NMFA"). The NMFA is the national collective bargaining agreement between Trucking Management, Inc. ("TMI"), a multi-employer association, which serves as the collective bargaining representative for the major less-than-truck load ("LTL") common carriers, and the Teamsters Nation al Freight Industry Negotiating

Committee ("TNFINC"), which negotiates the agreement on behalf of over 100 Teamster Local Unions, including Teamsters Local 776. The NMFA, along with its area supplements, governs the terms and conditions of employment for all Teamster-represented employees in the trucking industry who work for NMFA-covered carriers.

3.      The NMFA contains several provisions that set forth the procedures to be followed when there is change in operations resulting from a combination of terminals or over-the-road operations.   Article 8, Section 6 of the NMFA requires that a change of operations be approved by a Change of Operations Committee.   The Change of Operations Committee is comprised of an equal number of Union and Employer representatives.  The Committee's primary task is to determine the proper application of seniority for employees affected by the change of operations, in compliance with the NMFA.  Decisions of the Change of Operations Committee are final and binding.  In addition, the Change of Operations Committee retains authority to hear and decide future grievances that arise from a previous decision of the Committee.

4.      In May 1995, Carolina Freight Carriers Corp. ("Carolina") closed its Carlisle, PA terminal.  Employees at this facility were given the opportunity to transfer to other Carolina facilities or accept a layoff.  Mr. Bechtel accepted a layoff.

5.      In July 1995, two months after Carolina's Carlisle, PA terminal closed, Arkansas Best Corp., the parent company of ABF, announced that it was acquiring WorldWay Corp., the parent company of Carolina.  As a result of this acquisition, ABF and Carolina were merged, with ABF being the surviving carrier.

6.      In late August 1995, a Change of Operations Committee ("Committee") was appointed to consider the proposed the change of operations plan submitted by ABF as a result of

ABF/Carolina merger.  Among other issues, the Committee had the authority under the NMFA

to resolve and decide seniority issues arising from the change of operations.  The Committee

held hearings on September 14 and 15, 1995.  I assisted in presenting ABF's position at the

Committee hearings.  The Committee issued a decision on September 19, 1995, in which it

determined that ABF and Carolina seniority rosters should be dovetailed.  Exhibit A is a copy of

this decision. The ABF/Carolina merger was completed on September 25, 1995.

  7. Article 5, Section 2 of the NMFA applies to mergers.  Specifically, this section

applies when terminals or operations of two or more companies are combined.  In accordance

with Article 5, Section 2, the Change of Operations Committee, which considered ABF's

proposed change of operations, required that, "every facility whose work has been merged with

the work of another facility must be grouped with that facility."

  8. There was no combination of terminals or merger of facilities in Carlisle, PA.

Carolina closed its terminal in May 1995, five months prior to the ABF/Carolina merger.  This

fact is clearly demonstrated in Exhibit A to the Proposed Seniority Application, attached to the

Committee's September 19, 1995 decision.  (Exhibit A).  This document shows the number of

active and inactive ABF and Carolina employees at the time of the ABF/Carolina merger.  For

Carlisle, PA, there were 328 total ABF employees and 0 total Carolina employees.  Because

Carolina's Carlisle facility did not exist at the time of the acquisition of Carolina, it was not part

of the merger, and employees laid off from Carolina's Carlisle facility had no rights under

Article 5, Section 2 of the NMFA.  Thus, Mr. Bechtel had no recall rights under Article 5,

Section 2 of the NMFA.

  9. In an effort to provide employment opportunities for other laid off bargaining unit

employees, the Change of Operations Committee decided to extend the transfer rights of

Article 5, Section 5 of the NMFA to all laid off bargaining unit employees, for the life of the 1994-1998 NMFA. (Exhibit A, Paragraph 7A). Usually, Article 5, Section 5 is applied only to over-the-road drivers. Under the Committee's September 19, 1995 decision, however, all laid off bargaining unit employees, who submitted a written request for work opportunities, were eligible for work opportunities at ABF terminals throughout its system. This benefit was extended to former Carolina employees laid off from Carolina's Carlisle terminal when the terminal closed in May 1995, including Mr. Bechtel.

10.     In October 1995, Local 776, International Brotherhood of Teamsters ("Local 776" or "the Union") sent a letter to all former Carolina Carlisle employees, including Mr. Bechtel, specifically informing them that pursuant to the Committee's decision, they had transfer rights under Article 5, Section 5 of the NMFA. This letter is attached as Exhibit B.

11.     Mr. Bechtel submitted to ABF a request for work opportunities under Article 5, Section 5 of the NMFA. ABF called Mr. Bechtel to offer him work at several ABF terminals, however, Mr. Bechtel declined this opportunity.

12.     I believe that ABF correctly applied the decision of the Multi-Region Change of Operations Committee to laid off employees at Carolina's Carlisle facility.

13.     In February 2000, Rickey Bechtel filed a grievance claiming that ABF violated Article 5, Section 2 of the NMFA by failing to recall him to ABF's Carlisle terminal. The Eastern Region Joint Area Committee ("ERJAC") heard Bechtel's grievance in July 2000. I presented ABF's case at this hearing and submitted a brief on behalf of ABF. A copy of this brief, and exhibits, is attached as Exhibit C. Mr. Charles Shugart, Business Agent for Local 776, represented Mr. Bechtel and submitted a brief with several exhibits on his behalf. Mr. Bechtel attended the hearing. At this hearing, Mr. Shugart argued that Mr. Bechtel had recall rights

4

under Article 5, Section 2 because he was on a letter of layoff from Carolina at the time of the ABF/Carolina merger.  ABF took the position that Mr. Bechtel had no recall rights under Article 5, Section 2 because the Carolina Carlisle terminal closed prior to the ABF/Carolina acquisition and merger, and thus there was no merger of terminals in Carlisle.   ABF requested that Mr. Bechtel's grievance be denied.

14.     At the conclusion of the hearing, the panel issued a decision, referring the case to the Multi-Region Change of Operations Violations Committee.  A copy of this decision is attached as Exhibit D.  In my experience, having handled approximately 200 grievances before the Multi-Region Change of Operations Committee, a grievance related to a previous decision of a Change of Operations Committee will be referred back to that Committee for resolution.

15.     The Multi-Region Change of Operations Committee heard Mr. Bechtel's grievance on October 26-27, 2000.  I presented ABF's case at this hearing and submitted a brief on behalf of ABF.  This was the same brief that I submitted at the ERJAC hearing.  Mr. Charles Shugart represented Bechtel and submitted a brief on his behalf.  Mr. Bechtel attended the hearing and made a statement at the hearing.  A true copy of the transcript of the portion of the Committee hearing relating to Mr. Bechtel's grievance is attached as Exhibit E.   The arguments presented to the Multi-Region Change of Operations Committee were virtually the same as those presented to the ERJAC.

16.     At the conclusion of the hearing, the Multi-Region Change of Operations Committee denied Mr. Bechtel's grievance in accordance with the September 19, 1995 decision rendered by the Multi-Region Change of Operations Committee regarding the ABF/Carolina change of operations.  A copy of an index reflecting the Committee's decision is attached as Exhibit F.  This decision was final and binding.

5

I have read the foregoing and declare that it is true and correct to the best of my knowledge, information and belief.

April 5, 2002
Dated

Steven J. Froias
Steven J. Froias

State of North Carolina

County of Forsyth

Notary Public

My Commission Expires: November 15, 2004

TITAN ELECTRONIC MAIL

```
DATE.  09/19/95
TIME.  15.37 EST
TO.    LCL/TERM-ID 373
FROM.  LCL/TERM-ID TPI            TPI1
FOR.   PRINCIPAL OFFICER
PAGE   001     MSG NMBR 431
```

TO:  THE PRINCIPAL OFFICERS OF THE FOLLOWING LOCAL UNIONS:

   7, 20, 24, 26, 40, 41, 43, 50, 75, 89, 92, 100, 116, 120, 135,
   147, 160, 164, 200, 215, 236  238, 245, 279, 299, 301, 325, 332,
   339, 346, 364, 371, 377, 406, 407, 413, 414, 460, 534, 544, 554, 563,
   574, 580, 600, 614, 627, 637, 651, 662, 673, 688, 695, 696, 697, 705,
   710, 722, 749, 795, 823, 833, 908, 916, & 957 OF THE CENTRAL REGION

   22, 25, 28, 29, 30, 42, 59, 61, 71, 107, 110, 118, 170, 171,
   175, 182, 191, 229, 249, 251, 294, 312, 317, 340, 355, 375,
   384, 391, 397, 401, 404, 429, 430, 437, 443, 445, 449, 470,
   493, 500, 509, 529, 538, 557, 560, 592, 597, 633, 639, 649,
   653, 671, 676, 677, 687, 693, 701, 707, 764, 771, 773, 776,
   789, 822, & 992 OF THE EASTERN REGION

   5, 79, 217, 270, 373, 385, 390, 402, 480, 512, 515, 519, 523,
   528, 549, 568, 577, 612, 657, 667, 728, 745, 878, 886, 891,
   920, 969, 988, & 991 OF THE SOUTHERN REGION

   961 OF THE WESTERN REGION


RE:  ABF FREIGHT SYSTEM, INC. — MULTI-REGION CHANGE OF OPERATIONS
     DECISION IN CASE NO. MR-CO-38-9/95

DEAR SISTERS AND BROTHERS:

     FOLLOWING IS THE DECISION RENDERED BY THE MULTI-REGION CHANGE OF
OPERATIONS COMMITTEE IN THE ABOVE REFERENCED CASE.  UPON RECEIPT OF THIS
DECISION PLEASE COPY AND DISTRIBUTE TO ALL ABF AND CAROLINA FREIGHT
WORK SITES FOR IMMEDIATE POSTING:

THE MULTI-REGION CHANGE OF OPERATIONS COMMITTEE ADOPTED A MOTION THAT
THE COMPANY'S PROPOSED CHANGE OF OPERATIONS BE APPROVED AS MODIFIED
AND CLARIFIED BY THE COMPANY ON THE RECORD WITH THE FOLLOWING PROVISOS:

1.   THIS CHANGE OF OPERATIONS INVOLVES A TRANSACTION WITHIN THE
     MEANING OF ARTICLE 5, SECTION 2(A)-(C) OF THE NMFA:

     A.  THE COMMITTEE DIRECTS THAT, IN ACCORDANCE WITH THE PROVISIONS
         OF ARTICLE 5, SECTION 2(A)-(C), ARTICLE 5, SECTION 3, AND
         ARTICLE 8, SECTION 6(G) OF THE NMFA, THE SENIORITY LISTS AT
         DOMICILES AND TERMINALS AFFECTED BY THIS CHANGE OF OPERATIONS
         SHALL BE GROUPED FOR DOVETAILING AS REFLECTED ON THE EXHIBITS
         CONTAINED IN THE PROPOSED CHANGE OF OPERATIONS, (AS CLARIFIED
         OR CORRECTED ON THE RECORD), AND AS PROVIDED IN ARTICLE 5,
         SECTION 2(C) OF THE NMFA.  DOVETAILING APPLIES TO ALL
         BARGAINING UNIT EMPLOYEES AFFECTED BY COMBINING OR ELIMINATING

TITAN ELECTRONIC MAIL

```
DATE.  09/19/95
TIME.  15.37 EST
TO.    LCL/TERM-ID 373
FROM.  LCL/TERM-ID TPI              TPI1
FOR.   PRINCIPAL OFFICER
PAGE   002     MSG NMBR 431
```

ABF AND CAROLINA FREIGHT CARRIERS/RED ARROW FACILITIES AND INCLUDES ALL MAINTENANCE AND OFFICE EMPLOYEES. EVERY FACILITY WHOSE WORK HAS BEEN MERGED WITH THE WORK OF ANOTHER FACILITY MUST BE GROUPED WITH THAT FACILITY. THIS PARAGRAPH DOES NOT APPLY TO LOCAL UNIONS 673, 705 AND 710 (DOCK AND OFFICE), WHICH ARE NOT SIGNATORY TO THE NMFA.

B.  DOVETAILING SHALL BE ACTIVE TO ACTIVE, INACTIVE TO INACTIVE, BY CLASSIFICATION. THOSE EMPLOYEES WHO WERE ON LETTER OF LAYOFF (OR THE EQUIVALENT THEREOF UNDER THOSE SUPPLEMENTS WHERE LETTERS OF LAYOFF ARE NOT UTILIZED) ON AUGUST 11, 1995, SHALL BE CONSIDERED AS INACTIVE FOR THE PURPOSES OF THIS DECISION, EVEN IF THEY HAVE BEEN USED FOR TEMPORARY WORK OR RECALLED PRIOR TO THE EFFECTIVE DATE OF THE CHANGE OF OPERATIONS. ANY EMPLOYEES LAID OFF AFTER AUGUST 11, 1995, BUT BEFORE THE EFFECTIVE DATE OF THE CHANGE OF OPERATIONS SHALL BE CONSIDERED TO BE ACTIVE AND SHALL RETAIN THEIR RESPECTIVE POSITIONS ON THE DOVETAILED ACTIVE LISTS. ANY EMPLOYEE ON LONG TERM DISABILITY SHALL BE CONSIDERED AS ACTIVE IF HIS SENIORITY DATE WOULD HAVE PUT HIM/HER ON THE ACTIVE LIST.

C.  A MASTER ACTIVE/LAID OFF POOL SHALL BE CREATED AND SHALL CONSIST OF THOSE OVER-THE-ROAD DRIVERS WHO WERE ACTIVE ON AUGUST 11, 1995, AT EITHER ABF, CAROLINA OR RED ARROW AND WHO WERE LAID OFF AS A DIRECT RESULT OF IMPLEMENTATION OF THIS CHANGE OF OPERATIONS.

A MASTER INACTIVE/LAID OFF POOL SHALL BE CREATED AND SHALL CONSIST OF THOSE OVER-THE-ROAD DRIVERS WHO WERE IN LAYOFF STATUS ON AUGUST 11, 1995, AT EITHER ABF, CAROLINA OR RED ARROW, REGARDLESS OF WHY THEY WERE LAID OFF.

AFTER IMPLEMENTATION, ANY ADDITIONAL JOB OPENINGS AT A ROAD DOMICILE WHERE EMPLOYEES IN EITHER POOL ARE ON LAYOFF SHALL BE OFFERED IN LINE OF SENIORITY TO SUCH EMPLOYEES FROM THAT DOMICILE, FIRST TO EMPLOYEES ON THE MASTER ACTIVE/LAID OFF POOL AND THEM TO EMPLOYEES ON THE MASTER INACTIVE/LAID OFF POOL.

JOB OPENINGS AT ANY DOMICILE OTHER THAN WHERE EMPLOYEES ARE PRESENTLY LAID OFF SHALL BE OFFERED FIRST, DURING THE WINDOW PERIOD, IN LINE OF SENIORITY TO THOSE EMPLOYEES ON THE MASTER ACTIVE/LAID OFF POOL AND THEN, IF NOT FILLED, IN LINE OF SENIORITY TO THOSE EMPLOYEES ON THE MASTER INACTIVE/LAID OFF POOL.

SUCCESSFUL BIDDERS SHALL RELINQUISH THEIR SENIORITY AT THEIR PRESENT ROAD DOMICILE UNDER THIS PROVISION AND SHALL BE DOVETAILED WITH THEIR CURRENT BIDDING SENIORITY DATE AT THE ROAD DOMICILE THEY BID. ALL OF THE PROVISIONS OF ARTICLE 8,

TITAN ELECTRONIC MAIL

DATE. 09/19/95
TIME. 15.37 EST
TO.   LCL/TERM-ID 373
FROM. LCL/TERM-ID TPI                  TPI1
FOR.  PRINCIPAL OFFICER
PAGE  003    MSG NMBR 431

SECTION 6 SHALL APPLY TO SUCH TRANSFER.

ANY EMPLOYEE IN EITHER POOL WHO REFUSES THE OFFER OF A WORK
OPPORTUNITY UNDER THIS PROVISION SHALL NOT BE OFFERED A SECOND
OPPORTUNITY TO TRANSFER BUT SHALL REMAIN ON THE LIST ONLY FOR
RECALL TO HIS PRESENT ROAD DOMICILE.

2.    THE WINDOW PERIOD SHALL BE FOR ONE (1) YEAR.  THE COMMITTEE SHALL
      RETAIN JURISDICTION TO EXTEND THE WINDOW PERIOD IF CIRCUMSTANCES
      WARRANT.  AS STATED BY ABF ON THE RECORD, THE WINDOW PERIOD SHALL
      ALSO APPLY TO FULL LOCAL CARTAGE POSITIONS THAT BECOME AVAILABLE
      AT LOCATIONS WHERE INSUFFICIENT WORK FOR A FULL POSITION WAS
      ORIGINALLY TRANSFERRED AT THE TIME OF IMPLEMENTATION OF THIS
      DECISION.  ONLY LOCAL CARTAGE EMPLOYEES FROM THE LOCATION FROM
      WHICH THE WORK WAS ORIGINALLY TRANSFERRED SHALL BE ELIGIBLE TO FILL
      SUCH POSITIONS.  THE PROVISIONS OF ARTICLE 8, SECTION 6 SHALL
      APPLY.

3.    PENSION AND HEALTH & WELFARE CONTRIBUTIONS PAID ON BEHALF OF
      AN EMPLOYEE TRANSFERRING UNDER THIS DECISION SHALL BE PAID TO THE
      FUNDS TO WHICH THE CONTRIBUTIONS WERE MADE PRIOR TO THE
      EMPLOYEE'S CHANGE OF DOMICILE.

4.    ANY REBIDDING SHALL BE HANDLED BY THE LOCAL UNION AND ABF.

5.    SOUTHERN MODIFIED SENIORITY SHALL BE EXCERCISED UPON IMPLEMENTATION
      OF THE CHANGE OF OPERATIONS.

6.    AN EMPLOYEE REDOMICILING TO AN EASTERN REGION AREA DOMICILE POINT
      THAT MAINTAINS A SINGLE SENIORITY BOARD (I.E. COMBINATION ROAD
      AND LOCAL) SHALL REMAIN IN THAT JOB CLASSIFICATION WITH WHICH
      HE REDOMICILED FOR A PERIOD OF (1) ONE YEAR, UNLESS THE ANNUAL
      JOB BID AT THAT DOMICILE TAKES PLACE AT LEAST NINE (9) MONTHS
      AFTER REDOMICILE.

7.    THE FOLLOWING PROVISIONS WILL APPLY TO ANY EMPLOYEE LAID-OFF AS
      A RESULT OF THIS CHANGE OF OPERATIONS AND TO ANY OTHER EMPLOYEE
      CURRENTLY LAID-OFF, AND TO ANY EMPLOYEE LAID OFF AFTER THIS CHANGE
      OF OPERATIONS, FOR THE LIFE OF THE 1994-1998 NMFA:

      A.  ABF AGREES TO EXTEND THE PROVISIONS OF ARTICLE 5, SECTION 5
          OF THE NMFA TO ANY BARGAINING UNIT EMPLOYEE.  ABF ALSO AGREES
          TO EXTEND THE RIGHT TO TRANSFER UNDER ARTICLE 5, SECTION 5
          OF THE NMFA TO ANY ABF LOCATION IN THE CENTRAL, EASTERN AND
          SOUTHERN REGIONS, AS OPPOSED TO WITHIN THE REGIONAL AREA.
          TRANSFERS SHALL BE OFFERED ON THE BASIS OF BIDDING SENIORITY,
          BY CLASSIFICATION.  THE COMMITTEE APPROVES THESE EXTENSIONS
          OF THE PROVISIONS OF ARTICLE 5, SECTION 5, AND AGREES THAT
          SUCH EXTENSIONS ARE LIMITED SOLELY TO THIS CHANGE OF
          OPERATIONS AND HAVE NO PRECEDENTIAL EFFECT.

TITAN ELECTRONIC MAIL

DATE. 09/19/95
TIME. 15.37 EST
TO.   LCL/TERM-ID 373
FROM. LCL/TERM-ID TPI          TPI1
FOR.  PRINCIPAL OFFICER
PAGE  004   MSG NMBR 431

B.  PENSION AND HEALTH & WELFARE CONTRIBUTIONS PAID ON BEHALF
    OF AN EMPLOYEE TRANSFERRING UNDER THIS PARAGRAPH SHALL BE
    PAID TO THE FUNDS TO WHICH THE CONTRIBUTIONS WERE MADE PRIOR
    TO THE EMPLOYEE'S CHANGE OF DOMICILE.

8.  QUALIFIED BIDDERS ON LONG TERM DISABILITY (LTD) AT THE TIME OF ANY
    BID SHALL BE ALLOWED TO BID.  IF SUCCESSFUL LTD BIDDERS ARE UNABLE
    TO CLAIM THEIR BID ON THE DATE OF IMPLEMENTATION, A HOLD-DOWN BID
    WILL BE ALLOWED.  THIS HOLD-DOWN BID WILL BE OFFERED TO THE
    REMAINING ACTIVE EMPLOYEES AT THE LTD'S CURRENT LOCATION AND
    CLASSIFICATION.  THE SUCCESSFUL HOLD-DOWN BIDDER SHALL BE
    DOVETAILED.  WHEN THE LTD RETURNS TO WORK AND CLAIMS HIS BID,
    THE "HOLD-DOWN" EMPLOYEE MAY EITHER REMAIN AT THE HOLD-DOWN
    LOCATION UNDER PROVISIONS OF ARTICLE 5, SECTION 5 WITH A BIDDING
    SENIORITY DATE CONSISTENT WITH THE DATE OF IMPLEMENTATION OF THIS
    CHANGE OF OPERATIONS OR RETURN TO HIS ORIGINAL LOCATION WITH HIS
    ORIGINAL BIDDING SENIORITY DATE.  THE "HOLD-DOWN" EMPLOYEE MAY
    NOT RETURN TO A LOCATION WHERE THE CLASSIFICATION FROM WHICH HE
    BID HAS BEEN ELIMINATED.

    ABF SHALL NOT BE RESPONSIBLE FOR THE MOVING EXPENSES OF THE
    EMPLOYEE FILLING THE HOLD-DOWN BID UNLESS AND UNTIL SUCH TIME
    AS IT IS DETERMINED THAT THE EMPLOYEE ON LTD WILL NEVER BE ABLE
    TO CLAIM HIS BID AND THE HOLD-DOWN BIDDER BECOMES A REGULAR
    PERMANENT EMPLOYEE AT THE HOLD-DOWN LOCATION.

9.  IN RESPONSE TO THE QUESTION RAISED BY LOCAL UNION 41 ON THE
    RECORD, THE COMMITTEE SPECIFICALLY FINDS THAT ARTICLE 43, SECTION 1
    OF THE CENTRAL STATES OVER-THE-ROAD AND LOCAL CARTAGE SUPPLEMENTS
    SHALL APPLY IN DETERMINING THE RECALL RIGHTS OF LAID-OFF EMPLOYEES.
10. INTERLINING SHALL BE HANDLED AS FOLLOWS:

    A.  WHERE BOTH ABF AND CAROLINA FREIGHT CARRIERS/RED ARROW ARE
        INTERLINING TO SERVICE AN AREA, ABF MAY CONTINUE TO INTERLINE.

    B.  WHERE ABF IS PRESENTLY SERVICING AN AREA WITH ITS OWN
        EMPLOYEES AND CAROLINA FREIGHT CARRIERS/RED ARROW ARE
        INTERLINING INTO THAT AREA, ABF SHALL CONTINUE TO SERVICE
        THE AREA WITH ITS OWN EMPLOYEES.

    C.  WHERE ABF IS PRESENTLY INTERLINING TO SERVICE AN AREA, AND
        CAROLINA FREIGHT CARRIERS/RED ARROW ARE SERVICING THAT AREA
        WITH THEIR OWN EMPLOYEES, ABF SHALL SERVICE THE AREA WITH
        ITS OWN EMPLOYEES.

    D.  ABF AND THE LOCAL UNIONS SHALL MEET TO RESOLVE ANY DISPUTES
        ABOUT WHETHER INTERLINING IS JUSTIFIED IN THE SITUATIONS
        OUTLINED ABOVE.  IF THE PARTIES FAIL TO RESOLVE THEIR
        DIFFERENCES, THE DISPUTE WILL BE RESOLVED THROUGH THE
        GRIEVANCE PROCEDURE.  UNTIL THERE IS A FINAL DISPOSITION OF

TITON ELECTRONIC MAIL

DATE. 09/19/95
TIME. 15.37 EST
TO.   LCL/TERM-ID 373
FROM. LCL/TERM-ID TPI                    TPI1
FOR.  PRINCIPAL OFFICER
PAGE  005    MSG NMBR 431

THE GRIEVANCE, INTERLINING SHALL CONTINUE IN SITUATIONS OUTLINED IN SUB-PARAGRAPH A, ABOVE, AND SHALL BE PROHIBITED IN SITUATIONS OUTLINED IN SUBPARAGRAPHS B AND C, ABOVE.

E.  WHERE ABF PROVIDED LOCAL CARTAGE SERVICE WITHIN A CITY WITH LOCAL CARTAGE/DRAYAGE SUBCONTRACTORS, AND CAROLINA FREIGHT CARRIERS/RED ARROW SERVICED THAT CITY WITH THEIR OWN EMPLOYEES, ABF SHALL SERVICE THE AREA SOLELY WITH ITS OWN EMPLOYEES, INCLUDING BUT NOT LIMITED TO THE AREA CURRENTLY SERVICED BY LOCAL UNION 707.

11.  THE COMMITTEE FINDS WITH REGARD TO THE CINCINNATI, FLORENCE, AND DAYTON TERMINALS, THE FOLLOWING SHALL APPLY:

THE CAROLINA, FLORENCE, AND CINCINNATI TERMINAL SENIORITY LISTS SHALL BE DOVETAILED IN ACCORDANCE WITH CURRENT BIDDING SENIORITY.

DURING THE WINDOW PERIOD, THE FIRST THIRTEEN (13) POSITIONS ADDED TO THE DAYTON SENIORITY LIST SHALL BE OFFERED IN LINE OF SENIORITY TO THE CINCINNATI TERMINAL SENIORITY LIST AND THE SUCCESSFUL BIDDERS SHALL BE DOVETAILED.

12.  THE COMMITTEE FINDS THAT THE ABF INTERMODAL DECISION IN CASE NO. MR-ICO-1-6/95 WAS BASED ON ABF'S PRESENT AND PROPOSED INTERMODAL OPERATIONS AT THE TIME OF THE INTERMODAL HEARING, WHICH OCCURRED BEFORE THE MERGER INVOLVED IN THIS CHANGE OF OPERATIONS.  THEREFORE, THE COMMITTEE REFERS TO THE NATIONAL INTERMODAL COMMITTEE THE QUESTION OF WHETHER THE CHANGE OF OPERATIONS APPROVED BY THE COMMITTEE IN THIS DECISION AFFECTS THE TERMS OF THE INTERMODAL DECISION IN CASE NO. MR-ICO-1-6/95, AND IF SO, WHAT MODIFICATIONS SHOULD BE MADE.

AS LONG AS ANY DISPLACED ROAD DRIVER IS ON INVOLUNTARY LAYOFF STATUS AT DALLAS, TX, THE RESTRICTIONS OF ARTICLE 29, SECTION 1 OF THE NMFA (CLEAN AND DIRTY RULE) SHALL REPLACE THE RAILING AUTHORITY OF ARTICLE 29, SECTION 3 OF THE NMFA.

THE PROVISIONS OF ARTICLE 29, SECTION 1 SHALL APPLY TO ABF'S NEW CHICAGO ROAD DOMICILE.

13.  THE COMMITTEE EXPRESSLY DISAPPROVES ABF'S PROPOSAL TO USE VENDORS TO PERFORM MAINTENANCE WORK WITH MAINTENANCE BARGAINING UNIT EMPLOYEES ON INVOLUNTARY LAYOFF STATUS.  THE APPLICABLE COLLECTIVE BARGAINING AGREEMENT OPERATIVE AT THE TIME OF THE CHANGE OF OPERATIONS SHALL CONTINUE IN EFFECT, INCLUDING THE CONTRACT'S SUBCONTRACTING PROVISIONS.

14.  ABF SHALL PROTECT THE CAROTRANS WORK OPPORTUNITY PRESENTLY PERFORMED BY CAROLINA AT JACKSONVILLE, MIAMI, AND HOUSTON WITH ABF BARGAINING UNIT EMPLOYEES.

15.  AS LONG AS ANY DISPLACED OVER-THE-ROAD DRIVER IS ON INVOLUNTARY

TITAN ELECTRONIC MAIL

```
DATE.  09/19/95
TIME.  15.37 EST
TO.    LCL/TERM-ID 373
FROM.  LCL/TERM-ID TPI              TPI1
FOR.   PRINCIPAL OFFICER
PAGE   006    MSG NMBR 431
```

LAYOFF STATUS AS A RESULT OF THIS CHANGE OF OPERATIONS, THE COMPANY, ONLY TO THE EXTENT ALLOWED BY AN APPLICABLE SUPPLEMENTAL AGREEMENT, MAY USE CITY DRIVERS TO RUN THE ROAD, BUT ONLY AT ESTABLISHED ROAD DOMICILES. THIS PRACTICE SHALL NOT VIOLATE THE ESTABLISHED ORDER OF CALL AT THE APPLICABLE ROAD DOMICILE.

16. EMPLOYEES WHO HAVE BEEN DISCHARGED, AND WHOSE DISCHARGE IS PENDING ADJUDICATION UNDER THE GRIEVANCE PROCEDURE, SHALL BE OFFERED THE OPPORTUNITY TO BID.

17. UNION AND NON-UNION OFFICE EMPLOYEES SHALL BE DOVETAILED AS SET OUT IN PARAGRAPH 1 OF THIS DECISION. THE UNION EMPLOYEES SHALL CONTINUE TO BE COVERED BY ALL PROVISIONS OF THEIR RESPECTIVE COLLECTIVE BARGAINING AGREEMENTS, INCLUDING BUT NOT LIMITED TO, WAGES AND BENEFITS. IN ANY CASE WHERE A FUND WILL NOT ACCEPT CONTRIBUTIONS FROM ABF FOR UNION EMPLOYEES, THE COMMITTEE WILL DETERMINE THE STEPS NECESSARY TO ASSURE THAT ABF PROVIDES BENEFITS EQUIVALENT TO THOSE PROVIDED TO SUCH EMPLOYEES BEFORE TRANSFER.

18. DOCK EMPLOYEES WHO ARE ADVERSELY AFFECTED BY THIS CHANGE OF OPERATIONS AND MUST BE CDL QUALIFIED IN ORDER TO TRANSFER AND ELECT TO BID, SHALL BE PROVIDED A 60-DAY PERIOD, COMMENCING SEPTEMBER 19, 1995, DURING WHICH PERIOD SUCH EMPLOYEES WILL EITHER BECOME CDL QUALIFIED OR FORFEIT ANY RIGHTS TO FILL THE BID UNDER THIS DECISION. DURING THIS PERIOD, ABF IS INSTRUCTED TO PROVIDE ADEQUATE EQUIPMENT AND TRAINING PERSONNEL TO COMPLY WITH THIS PARAGRAPH.

19. AS A RESULT OF LOCAL 25'S HAVING ATTAINED BARGAINING UNIT JURISDICTION AT THE BURLINGTON, MASSACHUSETTS FACILITY, WHICH RESULTS IN TWO FACILITIES BEING UNDER LOCAL UNION 25'S JURISDICTION, THE PROVISIONS OF ARTICLE 43, SECTION 1(A) OF THE CURRENT NEW ENGLAND SUPPLEMENTAL FREIGHT AGREEMENT SHALL APPLY.

20. THE COMMITTEE DIRECTS ABF TO GIVE THE LOCAL UNIONS FULL DETAILS CONCERNING ANY 401(K) PLAN COVERING CAROLINA FREIGHT CARRIERS OR RED ARROW EMPLOYEES AND TO KEEP IN EFFECT ANY SUCH PLAN, UNTIL ABF ESTABLISHES AN EQUIVALENT PLAN. THE COMMITTEE ALSO DIRECTS ABF TO PROVIDE THE LOCAL UNIONS FULL DETAILS REGARDING THE PRIOR PENSION PLAN FOR RED ARROW EMPLOYEES.

21. THE REQUEST OF LOCAL UNION 200 TO ALLOW A MEMBER TO EXERCISE COMPANY SENIORITY IS DENIED.

22. THE ISSUED RAISED BY LOCAL UNION 61 REGARDING THE APPLICABLE PEDDLE RADIUS FOR CITY DRIVERS (50 OR 75 MILES) IS REFERRED TO THE PARTIES FOR RESOLUTION. ANY DIFFERENCES WILL BE RESOLVED THROUGH THE GRIEVANCE PROCEDURE.

23. ABF'S REQUEST FOR A TRIAL PERIOD TO DETERMINE FREIGHT FLOW FOR BIDDING PURPOSES IS REFERRED BACK TO THE LOCAL UNIONS AND ABF

TITAN ELECTRONIC MAIL

```
DATE.  09/19/95
TIME.  15.37 EST
TO.    LCL/TERM-ID 373
FROM.  LCL/TERM-ID TPI                    TPI1
FOR.   PRINCIPAL OFFICER
PAGE   007      MSG NMBR 431
```

FOR RESOLUTION, WITH BIDS TO BE POSTED WITHIN 60 DAYS OF
IMPLEMENTATION, OR SOONER WHEREVER POSSIBLE.

24.  THE COMMITTEE FINDS THAT THERE ARE NO CIRCUMSTANCES THAT WOULD
ALLOW ANY EMPLOYEE WHO HAD RELOCATED UNDER A PREVIOUS CHANGE OF
OPERATIONS DECISION OR UNDER THE PROVISIONS OF ARTICLE 5,
SECTION 5 OF THE NMFA TO RETREAT TO THE EMPLOYEE'S FORMER
TERMINAL/DOMICILE.  ACCORDINGLY, THE REQUESTS BY THE VARIOUS
LOCAL UNIONS TO ALLOW EMPLOYEES TO RETREAT ARE SPECIFICALLY
DENIED.

25.  THIS CHANGE OF OPERATIONS MAY BE IMPLEMENTED NO SOONER THAN
SEPTEMBER 25, 1995.

26.  THIS MULTI-REGION CHANGE OF OPERATIONS COMMITTEE SHALL RETAIN
JURISDICTION ON ALL ISSUES THAT MAY ARISE UNDER THIS DECISION
DURING THE TERM OF THE CONTRACT.  ALL GRIEVANCES SHALL BE FILED
WITH THE APPROPRIATE REGIONAL JOINT AREA COMMITTEE, TO BE HEARD
BY THE MULTI-REGION CHANGE OF OPERATIONS COMMITTEE.

PLEASE SEND ACKNOWLEDGMENT OF THIS MESSAGE BY TITAN (TITAN TERMINAL
ADDRESS:  IUFD) OR FACSIMILE (TEL. 202/624-8722).

FRATERNALLY,

DENNIS C. SKELTON, DIRECTOR
NATIONAL FREIGHT DIVISION
CC: - RON CAREY, CHAIRMAN, TNFINC
    - CHUCK PISCITELLO, ASSISTANT DIRECTOR, NATIONAL FREIGHT DIVISION
    - FRANK BUSALACCHI, ACTING REGIONAL FREIGHT COORDINATOR
      CENTRAL REGION OF TEAMSTERS, C/O TEAMSTERS LOCAL UNION NO. 200
    - DANIEL W. SCHMIDT, REPRESENTATIVE, EASTERN REGION OF TEAMSTERS
    - FRANK HOPKINS, REGIONAL FREIGHT DIVISION COORDINATOR,
      SOUTHERN REGION OF TEAMSTERS, C/O ANNIE HOPKINS, SECRETARY, LOCAL
      UNION NO. 519
    - JIM ROBERTS, REGIONAL FREIGHT DIVISION COORDINATOR
      WESTERN REGION OF TEAMSTERS
    - BOB KNOX, THE GENERAL PRESIDENT'S PERSONAL REPRESENTATIVE
      CENTRAL REGION OF TEAMSTERS
    - JAMES A. MCCALL, IBT LEGAL DEPT.
    - RICK BANK, SPECIAL COUNSEL TO THE GENERAL PRESIDENT

## PROPOSED SENIORITY APPLICATION

The following proposal is based on the general principle that employees who are dovetailed on the date of implementation are those who are bringing work load to follow, so that the list into which they dovetail should not be adversely affected based on the current economic levels.

At common terminal points for local cartage operations, the company will ascertain the work load that ABF can reasonably expect to retain at the time of combining employees. ABF will prepare a Master Active List of its employees and will then prepare a Master Active List of the Carolina employees and the Red Arrow employees, and all three lists will be based on the date this change is implemented. The Company will then offer job opportunity at ABF in numbers equivalent to the work load coming to ABF, by seniority, to the applicable Carolina or Red Arrow Master Active List and they shall be dovetailed into the ABF Master Active List. Those employees on the Carolina or Red Arrow Master Active List who are not offered job opportunity due to insufficient work load to transfer shall remain on such Master Active Seniority List and shall be offered work opportunity as it arises and when permanent job opportunity arises they shall be recalled and dovetailed.

The Company will also establish a Master Inactive List comprised of all employees on lay-off at ABF and Carolina or ABF and Red Arrow on the date this change is implemented. After the Master Active List set forth above has been exhausted, all future job opportunities shall be offered, in line of seniority, to the employees on the Master Inactive List and, upon proper recall, they shall be dovetailed into the Master Active List.

At all other ABF locations which involve Carolina or Red Arrow employees, the same general principle shall apply, i.e., only the number of Carolina or Red Arrow employees equivalent to actual work load transferred will be offered to the Carolina or Red Arrow Master Active List on the first day of the combined operations.

The same principle as outlined above shall apply to combining over-the-road seniority lists, office and/or maintenance groups, where appropriate, as well as to transfer opportunity involving any of those respective classifications.

Therefore, as a general rule:

> Where only one (1) of the three (3) companies has a terminal location, the employees at that location will remain as they are. (See Exhibit "A" in the section on local cartage operations.)

> Where there are dual facilities in any one location or area, the aforementioned seniority application will prevail. (See Exhibit "B" in the section on local cartage operations.)

> Where there are apparent exceptions to the general rule, these will be resolved in Exhibit "C" in the section on local cartage operations.

v

8/24/95

Exhibit "A"
Employee Analysis (Single)
Local Cartage

| Terminal | | ABF Freight Active | L/O | Total | Carolina/Red Arrow Active | L/O | Total | Empl. Rqmts. |
|---|---|---|---|---|---|---|---|---|
| ABILENE | TX | 2 | 0 | 2 | | | | 2 |
| AKRON | OH | 19\8 | 0 | 19\8 | | | | 19\8 |
| ALEXANDRIA | LA | 3 | 0 | 3 | | | | 3 |
| AMARILLO | TX | 5 | 0 | 5 | | | | 5 |
| ASHTABULA | OH | 3 | 1 | 4 | | | | 4 |
| BEAUMONT | TX | 5 | 0 | 5 | | | | 5 |
| BENTON HARBOR | MI | 3 | 0 | 3 | | | | 3 |
| BILOXI | MS | 4 | 0 | 4 | | | | 4 |
| BINGHAMPTON | NY | 7 | 0 | 7 | | | | 7 |
| BOWLING GREEN | KY | 3 | 0 | 3 | | | | 3 |
| BROOKLYN PARK | MN | 13 | 0 | 13 | | | | 13 |
| BROWNSVILLE | TX | 4 | 0 | 4 | | | | 4 |
| BRYAN | OH | 3 | 0 | 3 | | | | 3 |
| BUTLER | PA | 4 | 0 | 4 | | | | 4 |
| CADILLAC | MI | 3 | 0 | 3 | | | | 3 |
| CAMP HILL | PA | 96 | 0 | 96 | | | | 62 |
| CANTON | OH | 11 | 2 | 13 | 4 | 0 | 4 | 12 |
| CAPE GIRARDEAU | MO | 8 6 | 9 3 | 8 | | | | 8 5 |
| CARLISLE | PA | 328 | 0 | 328 | | | | 296 |
| CARLLS CORNER | NJ | 1 | 0 | 1 | | | | 1 |
| CEDAR RAPIDS | IA | 8 | 0 | 8 | | | | 8 |
| CHAMPAIGN | IL | 4 | 0 | 4 | | | | 4 |
| CHARLESTON | SC | 5 | 0 | 5 | | | | 5 |
| CHESTER | PA | 21 | 0 | 21 | | | | 21 |
| COLUMBUS | NE | 2 | 0 | 2 | | | | 2 |
| CORPUS CHRISTI | TX | 2 | 0 | 2 | | | | 2 |
| DAYTON | OH | 227 | 0 | 227 | | | | 227 |
| DECATUR | IL | | | | 4 | 2 | 6 | 0 |
| DUBOIS | PA | 4 | 0 | 4 | | | | 4 |
| DULUTH | MN | 2 | 0 | 2 | | | | 2 |
| EAGAN | MN | 20 | 0 | 20 | | | | 20 |
| EAU CLAIRE | WI | 3 | 0 | 3 | | | | 3 |
| EFFINGHAM | IL | 2 | 0 | 2 | | | | 2 |
| EL DORADO | AR | 3 | 0 | 3 | | | | 3 |
| EL PASO | TX | 15 | 0 | 15 | | | | 15 |
| ELGIN | IL | 11 | 0 | 11 | | | | 10 11 |
| ELMIRA | NY | 5 | 0 | 5 | | | | 5 |
| FAIRFIELD | IA | 3 | 1 | 4 | | | | 3 |
| FAIRMONT | WV | 4 | 0 | 4 | | | | 4 |
| FARGO | ND | 3 | 0 | 3 | | | | 3 |
| FAYETTEVILLE | AR | 8 | 0 | 8 | | | | 8 |
| FEDERALSBURG | MD | 5 | 0 | 5 | 5 | 0 | 5 | 5 |
| FLORENCE | KY | | | | 5 | 0 | 5 | 0 |
| FT. SMITH | AR | 11 | 0 | 11 | | | | 11 |
| GRAND ISLAND | NE | 4 | 0 | 4 | | | | 4 |

THOMAS VINSON
VICE PRESIDENT

ANDREW C. REILEY
RECORDING SECRETARY

MELVIN HARRIS
TRUSTEE

TERRY L. KING
TRUSTEE

JEANETTE WATERS
TRUSTEE

**Local Union No. 776**

AFFILIATED WITH THE

International Brotherhood of Teamsters
2552 JEFFERSON STREET
HARRISBURG, PA 17110-2505

THOMAS B. GRIFFITH
PRESIDENT AND BUSINESS AGENT

DALE H. CRUM
SECRETARY TREASURER AND BUSINESS AGENT

BUSINESS AGENTS

JOHN L. FOGLE
CARLOS N. RAMOS, II
CHARLES SHUGHART
GEORGE F. SMART, SR.
RUSSELL A. STEPP
DANIEL A. VIRTUE

October 12, 1995

Dear Carolina Employee:

    This letter is important. Please take the time to read it.

    Surely you're aware that ABF and Carolina Freight recently merged their operations. Because of that merger, a change of operations was held on September 14/15, 1995.

    As a result of the decision from the change of operations committee, the Carolina employees who are laid off at Carlisle, Pa will have certain rights to future work opportunities with ABF. Article 5, Section 5 of the NMFA addresses those rights. Those work opportunities will be offered to laid off Carolina employees in seniority order. However, it is necessary that you notify ABF in writing of your desire to be offered available work.

    Enclosed is a form letter and an envelope. If you desire to be offered available work, you must complete the letter and mail it to ABF **as soon as possible.** If you desire, you may also draft your own letter instead of using the form letter. It is your choice to send the letter via regular mail or certified mail. In either case, I suggest that you keep a copy of the letter as your file copy.

    You should <u>mail the letter to ABF</u> today. On October 16, 1995, the Company will begin compiling the list of employees who desire available work.

    If you have any questions, please feel welcome to contact us.

Sincerely,



EXHIBIT
Bechtel-4
lot    3-7-02

Charles Shughart
Business Agent

ABF
EMPLOYER BRIEF

EASTERN REGION JOINT AREA COMMITTEE
CASE NO. C-149-00
ABF CASE NO. 042-040-MR-00
LOCAL UNION 776 VS ABF  (RICKEY BECHTEL)

The Union is claiming a violation of Article 5, Section 2 of the NMFA.
They have not provided the Company with any date for this alleged
violation.

I have attached a copy of the article in question.  This article deals with
"MERGERS OF COMPANIES-GENERAL".  Specifically Section 2 (c)
reads in part "IN THE APPLICATION OF THIS SECTION, WHEN
TERMINALS OR OPERATIONS OF TWO (2) OR MORE COMPANIES
ARE COMBINED, AS REFERRED TO ABOVE, THE FOLLOWING
GENERAL RULES SHALL BE APPLIED BY THE EMPLOYER AND
THE LOCAL UNIONS".

In this case there was no merger of terminals in the Carlisle, PA area.
Carolina had closed their Carlisle terminal 5 months before the ABF,
Carolina, Red Arrow, Change of Operations.  This fact is not in dispute.

Attached is a copy of that Change decision (MR-CO-38-9/95).  I would like
to review Item #1 A with the Committee.  As you can see it is very specific
about combining terminals and seniority list affected by this Change. It
further reads "EVERY FACICILY WHOSE WORK HAS BEEN MERGED
WITH THE WORK OF ANOTHER FACILITY".

Also attached are copies of pages V and -2- of that Change. There is no
reference to any Carolina facility in Carlisle, PA because none existed at the
time of the Change.

On October 12, 1995 the Union sent the attached letter to all Carolina
employees layed off when Carolina closed the Carlisle, PA terminal.  This
letter reviews the rights of these employees concerning the ABF, Carolina,

Red Arrow Change decision.  I would like to review that letter with the Committee.

There was no merger of terminals in Carlisle, PA and Article 5, Section 2 has no application.  We respectfully request the claim of the Union be denied.

# ARTICLE 5.

## Section 1. Seniority Rights

(a) The application of seniority which has been accrued herein shall be established in the Supplemental Agreements.

(b) Seniority shall be broken only by discharge, voluntary quit, retirement, or more than a five (5) - year layoff.

(c) This Section shall apply to all Supplemental Agreements.

## Section 2. Mergers of Companies-General

(a) In the event the Employer is a party to a merger of lines, seniority of the employees who are affected thereby shall be determined by mutual agreement between the Employer and the Local Unions involved.

In the application of this Section, it is immaterial whether the transaction is called a merger, purchase, acquisition, sale, etc. Further, it is also immaterial whether the transaction involves merely the purchase of stock of one (1) corporation by another, with two (2) separate corporations continuing in existence.

(b) If such merger of companies results in the combination of terminals or over-the-road operations, a change of operations shall be submitted to the Co-Chairmen of the National Grievance Committee for assignment to an appropriate Change of Operations Committee established pursuant to Article 8, Section 6. The Change of Operations Committee shall retain jurisdiction for one (1) year after the effective date of the Committee decision and shall have the authority to amend its decision in the event of a substantial change in the amount of work to be performed at the terminals or over-the-road operations which were combined.

## Combining of Terminals or Operations as a Result of Merger of Companies

(c) In the application of this Section, when terminals or operations of two (2) or more companies are combined, as referred to above, the following general rules shall be applied by the Employer and the Local Unions, which general rules are subject to modification pursuant to the provisions of Section 4 of this Article:

TITAN ELECTRONIC MAIL

'E. 09/19/95
IE. 15.37 EST
     LCL/TERM-ID 373
IM. LCL/TERM-ID TPI                TPI1
:.  PRINCIPAL OFFICER
iE  001      MSG NMBR 431


THE PRINCIPAL OFFICERS OF THE FOLLOWING LOCAL UNIONS:

7, 20, 24, 26, 40, 41, 43, 50, 75, 89, 92, 100, 116, 120, 135,
147, 160, 164, 200, 215, 236  238, 245, 279, 299, 301, 325, 332,
339, 346, 364, 371, 377, 406, 407, 413, 414, 460, 534, 544, 554, 563,
574, 580, 600, 614, 627, 637, 651, 662, 673, 688, 695, 696, 697, 705,
710, 722, 749, 795, 823, 833, 908, 916, & 957 OF THE CENTRAL REGION

22, 25, 28, 29, 30, 42, 59, 61, 71, 107, 110, 118, 170, 171,
175, 182, 191, 229, 249, 251, 294, 312, 317, 340, 355, 375,
384, 391, 397, 401, 404, 429, 430, 437, 443, 445, 449, 470,
493, 500, 509, 529, 538, 557, 560, 592, 597, 633, 639, 649,
653, 671, 676, 677, 687, 693, 701, 707, 764, 771, 773, 776,
789, 822, & 992 OF THE EASTERN REGION

5, 79, 217, 270, 373, 385, 390, 402, 480, 512, 515, 519, 523,
528, 549, 568, 577, 612, 657, 667, 728, 745, 878, 886, 891,
920, 969, 988, & 991 OF THE SOUTHERN REGION

961 OF THE WESTERN REGION


 ABF FREIGHT SYSTEM, INC. — MULTI-REGION CHANGE OF OPERATIONS
 DECISION IN CASE NO. MR-CO-38-9/95

iR SISTERS AND BROTHERS:

 FOLLOWING IS THE DECISION RENDERED BY THE MULTI-REGION CHANGE OF
iRATIONS COMMITTEE IN THE ABOVE REFERENCED CASE.  UPON RECEIPT OF THIS
iCISION PLEASE COPY AND DISTRIBUTE TO ALL ABF AND CAROLINA FREIGHT
iRK SITES FOR IMMEDIATE POSTING:

i MULTI-REGION CHANGE OF OPERATIONS COMMITTEE ADOPTED A MOTION THAT
i COMPANY'S PROPOSED CHANGE OF OPERATIONS BE APPROVED AS MODIFIED
) CLARIFIED BY THE COMPANY ON THE RECORD WITH THE FOLLOWING PROVISOS:

THIS CHANGE OF OPERATIONS INVOLVES A TRANSACTION WITHIN THE
MEANING OF ARTICLE 5, SECTION 2(A)-(C) OF THE NMFA:

A.  THE COMMITTEE DIRECTS THAT, IN ACCORDANCE WITH THE PROVISIONS
    OF ARTICLE 5, SECTION 2(A)-(C), ARTICLE 5, SECTION 3, AND
    ARTICLE 8, SECTION 6(G) OF THE NMFA, THE SENIORITY LISTS AT
    DOMICILES AND TERMINALS AFFECTED BY THIS CHANGE OF OPERATIONS
    SHALL BE GROUPED FOR DOVETAILING AS REFLECTED ON THE EXHIBITS
    CONTAINED IN THE PROPOSED CHANGE OF OPERATIONS, (AS CLARIFIED
    OR CORRECTED ON THE RECORD), AND AS PROVIDED IN ARTICLE 5,
    SECTION 2(C) OF THE NMFA.  DOVETAILING APPLIES TO ALL
    BARGAINING UNIT EMPLOYEES AFFECTED BY COMBINING OR ELIMINATING

TITA● ELECTRONIC MAIL

ITE. 09/19/95
ME. 15.37 EST
I. LCL/TERM-ID 373
OM. LCL/TERM-ID TPI                    TPI1
IR. PRINCIPAL OFFICER
IGE 002    MSG NMBR 431

ABF AND CAROLINA FREIGHT CARRIERS/RED ARROW FACILITIES AND
INCLUDES ALL MAINTENANCE AND OFFICE EMPLOYEES. EVERY FACILITY
WHOSE WORK HAS BEEN MERGED WITH THE WORK OF ANOTHER FACILITY
MUST BE GROUPED WITH THAT FACILITY. THIS PARAGRAPH DOES NOT
APPLY TO LOCAL UNIONS 673, 705 AND 710 (DOCK AND OFFICE),
WHICH ARE NOT SIGNATORY TO THE NMFA.

B.  DOVETAILING SHALL BE ACTIVE TO ACTIVE, INACTIVE TO INACTIVE, BY
    CLASSIFICATION. THOSE EMPLOYEES WHO WERE ON LETTER OF LAYOFF
    (OR THE EQUIVALENT THEREOF UNDER THOSE SUPPLEMENTS WHERE
    LETTERS OF LAYOFF ARE NOT UTILIZED) ON AUGUST 11, 1995, SHALL
    BE CONSIDERED AS INACTIVE FOR THE PURPOSES OF THIS DECISION,
    EVEN IF THEY HAVE BEEN USED FOR TEMPORARY WORK OR RECALLED
    PRIOR TO THE EFFECTIVE DATE OF THE CHANGE OF OPERATIONS. ANY
    EMPLOYEES LAID OFF AFTER AUGUST 11, 1995, BUT BEFORE THE
    EFFECTIVE DATE OF THE CHANGE OF OPERATIONS SHALL BE CONSIDERED
    TO BE ACTIVE AND SHALL RETAIN THEIR RESPECTIVE POSITIONS ON
    THE DOVETAILED ACTIVE LISTS. ANY EMPLOYEE ON LONG TERM
    DISABILITY SHALL BE CONSIDERED AS ACTIVE IF HIS SENIORITY
    DATE WOULD HAVE PUT HIM/HER ON THE ACTIVE LIST.

C.  A MASTER ACTIVE/LAID OFF POOL SHALL BE CREATED AND SHALL
    CONSIST OF THOSE OVER-THE-ROAD DRIVERS WHO WERE ACTIVE ON
    AUGUST 11, 1995, AT EITHER ABF, CAROLINA OR RED ARROW AND
    WHO WERE LAID OFF AS A DIRECT RESULT OF IMPLEMENTATION OF
    THIS CHANGE OF OPERATIONS.

    A MASTER INACTIVE/LAID OFF POOL SHALL BE CREATED AND SHALL
    CONSIST OF THOSE OVER-THE-ROAD DRIVERS WHO WERE IN LAYOFF
    STATUS ON AUGUST 11, 1995, AT EITHER ABF, CAROLINA OR RED
    ARROW, REGARDLESS OF WHY THEY WERE LAID OFF.

    AFTER IMPLEMENTATION, ANY ADDITIONAL JOB OPENINGS AT A ROAD
    DOMICILE WHERE EMPLOYEES IN EITHER POOL ARE ON LAYOFF SHALL
    BE OFFERED IN LINE OF SENIORITY TO SUCH EMPLOYEES FROM THAT
    DOMICILE, FIRST TO EMPLOYEES ON THE MASTER ACTIVE/LAID OFF
    POOL AND THEM TO EMPLOYEES ON THE MASTER INACTIVE/LAID OFF
    POOL.

    JOB OPENINGS AT ANY DOMICILE OTHER THAN WHERE EMPLOYEES ARE
    PRESENTLY LAID OFF SHALL BE OFFERED FIRST, DURING THE WINDOW
    PERIOD, IN LINE OF SENIORITY TO THOSE EMPLOYEES ON THE MASTER
    ACTIVE/LAID OFF POOL AND THEN, IF NOT FILLED, IN LINE OF
    SENIORITY TO THOSE EMPLOYEES ON THE MASTER INACTIVE/LAID OFF
    POOL.

    SUCCESSFUL BIDDERS SHALL RELINQUISH THEIR SENIORITY AT THEIR
    PRESENT ROAD DOMICILE UNDER THIS PROVISION AND SHALL BE
    DOVETAILED WITH THEIR CURRENT BIDDING SENIORITY DATE AT THE
    ROAD DOMICILE THEY BID. ALL OF THE PROVISIONS OF ARTICLE 8,

TITAN ELECTRONIC MAIL

E. 09/19/95
E. 15.37 EST
LCL/TERM-ID 373
M. LCL/TERM-ID TPI                    TPI1
. PRINCIPAL OFFICER
E  003      MSG NMBR 431

SECTION 6 SHALL APPLY TO SUCH TRANSFER.

ANY EMPLOYEE IN EITHER POOL WHO REFUSES THE OFFER OF A WORK
OPPORTUNITY UNDER THIS PROVISION SHALL NOT BE OFFERED A SECOND
OPPORTUNITY TO TRANSFER BUT SHALL REMAIN ON THE LIST ONLY FOR
RECALL TO HIS PRESENT ROAD DOMICILE.

THE WINDOW PERIOD SHALL BE FOR ONE (1) YEAR.  THE COMMITTEE SHALL
RETAIN JURISDICTION TO EXTEND THE WINDOW PERIOD IF CIRCUMSTANCES
WARRANT.  AS STATED BY ABF ON THE RECORD, THE WINDOW PERIOD SHALL
ALSO APPLY TO FULL LOCAL CARTAGE POSITIONS THAT BECOME AVAILABLE
AT LOCATIONS WHERE INSUFFICIENT WORK FOR A FULL POSITION WAS
ORIGINALLY TRANSFERRED AT THE TIME OF IMPLEMENTATION OF THIS
DECISION.  ONLY LOCAL CARTAGE EMPLOYEES FROM THE LOCATION FROM
WHICH THE WORK WAS ORIGINALLY TRANSFERRED SHALL BE ELIGIBLE TO FILL
SUCH POSITIONS.  THE PROVISIONS OF ARTICLE 8, SECTION 6 SHALL
APPLY.

PENSION AND HEALTH & WELFARE CONTRIBUTIONS PAID ON BEHALF OF
AN EMPLOYEE TRANSFERRING UNDER THIS DECISION SHALL BE PAID TO THE
FUNDS TO WHICH THE CONTRIBUTIONS WERE MADE PRIOR TO THE
EMPLOYEE'S CHANGE OF DOMICILE.

ANY REBIDDING SHALL BE HANDLED BY THE LOCAL UNION AND ABF.

SOUTHERN MODIFIED SENIORITY SHALL BE EXCERCISED UPON IMPLEMENTATION
OF THE CHANGE OF OPERATIONS.

AN EMPLOYEE REDOMICILING TO AN EASTERN REGION AREA DOMICILE POINT
THAT MAINTAINS A SINGLE SENIORITY BOARD (I.E. COMBINATION ROAD
AND LOCAL) SHALL REMAIN IN THAT JOB CLASSIFICATION WITH WHICH
HE REDOMICILED FOR A PERIOD OF (1) ONE YEAR, UNLESS THE ANNUAL
JOB BID AT THAT DOMICILE TAKES PLACE AT LEAST NINE (9) MONTHS
AFTER REDOMICILE.

THE FOLLOWING PROVISIONS WILL APPLY TO ANY EMPLOYEE LAID-OFF AS
A RESULT OF THIS CHANGE OF OPERATIONS AND TO ANY OTHER EMPLOYEE
CURRENTLY LAID-OFF, AND TO ANY EMPLOYEE LAID OFF AFTER THIS CHANGE
OF OPERATIONS, FOR THE LIFE OF THE 1994-1998 NMFA:

A.   ABF AGREES TO EXTEND THE PROVISIONS OF ARTICLE 5, SECTION 5
     OF THE NMFA TO ANY BARGAINING UNIT EMPLOYEE.  ABF ALSO AGREES
     TO EXTEND THE RIGHT TO TRANSFER UNDER ARTICLE 5, SECTION 5
     OF THE NMFA TO ANY ABF LOCATION IN THE CENTRAL, EASTERN AND
     SOUTHERN REGIONS, AS OPPOSED TO WITHIN THE REGIONAL AREA.
     TRANSFERS SHALL BE OFFERED ON THE BASIS OF BIDDING SENIORITY,
     BY CLASSIFICATION.  THE COMMITTEE APPROVES THESE EXTENSIONS
     OF THE PROVISIONS OF ARTICLE 5, SECTION 5, AND AGREES THAT
     SUCH EXTENSIONS ARE LIMITED SOLELY TO THIS CHANGE OF
     OPERATIONS AND HAVE NO PRECEDENTIAL EFFECT.

AN ELECTRONIC MAIL

```
DATE.  Ø9/19/95
TIME.  15.37 EST
TO.    LCL/TERM-ID 373
FROM.  LCL/TERM-ID TPI              TPI1
FOR.   PRINCIPAL OFFICER
PAGE   ØØ4      MSG NMBR 431
```

B. PENSION AND HEALTH & WELFARE CONTRIBUTIONS PAID ON BEHALF OF AN EMPLOYEE TRANSFERRING UNDER THIS PARAGRAPH SHALL BE PAID TO THE FUNDS TO WHICH THE CONTRIBUTIONS WERE MADE PRIOR TO THE EMPLOYEE'S CHANGE OF DOMICILE.

8. QUALIFIED BIDDERS ON LONG TERM DISABILITY (LTD) AT THE TIME OF ANY BID SHALL BE ALLOWED TO BID.  IF SUCCESSFUL LTD BIDDERS ARE UNABLE TO CLAIM THEIR BID ON THE DATE OF IMPLEMENTATION, A HOLD-DOWN BID WILL BE ALLOWED.  THIS HOLD-DOWN BID WILL BE OFFERED TO THE REMAINING ACTIVE EMPLOYEES AT THE LTD'S CURRENT LOCATION AND CLASSIFICATION.  THE SUCCESSFUL HOLD-DOWN BIDDER SHALL BE DOVETAILED.  WHEN THE LTD RETURNS TO WORK AND CLAIMS HIS BID, THE "HOLD-DOWN" EMPLOYEE MAY EITHER REMAIN AT THE HOLD-DOWN LOCATION UNDER PROVISIONS OF ARTICLE 5, SECTION 5 WITH A BIDDING SENIORITY DATE CONSISTENT WITH THE DATE OF IMPLEMENTATION OF THIS CHANGE OF OPERATIONS OR RETURN TO HIS ORIGINAL LOCATION WITH HIS ORIGINAL BIDDING SENIORITY DATE.  THE "HOLD-DOWN" EMPLOYEE MAY NOT RETURN TO A LOCATION WHERE THE CLASSIFICATION FROM WHICH HE BID HAS BEEN ELIMINATED.

ABF SHALL NOT BE RESPONSIBLE FOR THE MOVING EXPENSES OF THE EMPLOYEE FILLING THE HOLD-DOWN BID UNLESS AND UNTIL SUCH TIME AS IT IS DETERMINED THAT THE EMPLOYEE ON LTD WILL NEVER BE ABLE TO CLAIM HIS BID AND THE HOLD-DOWN BIDDER BECOMES A REGULAR PERMANENT EMPLOYEE AT THE HOLD-DOWN LOCATION.

9. IN RESPONSE TO THE QUESTION RAISED BY LOCAL UNION 41 ON THE RECORD, THE COMMITTEE SPECIFICALLY FINDS THAT ARTICLE 43, SECTION 1 OF THE CENTRAL STATES OVER-THE-ROAD AND LOCAL CARTAGE SUPPLEMENTS SHALL APPLY IN DETERMINING THE RECALL RIGHTS OF LAID-OFF EMPLOYEES.

10. INTERLINING SHALL BE HANDLED AS FOLLOWS:

A. WHERE BOTH ABF AND CAROLINA FREIGHT CARRIERS/RED ARROW ARE INTERLINING TO SERVICE AN AREA, ABF MAY CONTINUE TO INTERLINE.

B. WHERE ABF IS PRESENTLY SERVICING AN AREA WITH ITS OWN EMPLOYEES AND CAROLINA FREIGHT CARRIERS/RED ARROW ARE INTERLINING INTO THAT AREA, ABF SHALL CONTINUE TO SERVICE THE AREA WITH ITS OWN EMPLOYEES.

C. WHERE ABF IS PRESENTLY INTERLINING TO SERVICE AN AREA, AND CAROLINA FREIGHT CARRIERS/RED ARROW ARE SERVICING THAT AREA WITH THEIR OWN EMPLOYEES, ABF SHALL SERVICE THE AREA WITH ITS OWN EMPLOYEES.

D. ABF AND THE LOCAL UNIONS SHALL MEET TO RESOLVE ANY DISPUTES ABOUT WHETHER INTERLINING IS JUSTIFIED IN THE SITUATIONS OUTLINED ABOVE.  IF THE PARTIES FAIL TO RESOLVE THEIR DIFFERENCES, THE DISPUTE WILL BE RESOLVED THROUGH THE GRIEVANCE PROCEDURE.  UNTIL THERE IS A FINAL DISPOSITION OF

TITAN ELECTRONIC MAIL

DATE. 09/19/95
TIME. 15.37 EST
TO.   LCL/TERM-ID 373
FROM. LCL/TERM-ID TPI          TPI1
FOR.  PRINCIPAL OFFICER
PAGE  005    MSG NMBR 431

THE GRIEVANCE, INTERLINING SHALL CONTINUE IN SITUATIONS
OUTLINED IN SUB-PARAGRAPH A. ABOVE, AND SHALL BE PROHIBITED
IN SITUATIONS OUTLINED IN SUBPARAGRAPHS B AND C, ABOVE.

E.  WHERE ABF PROVIDED LOCAL CARTAGE SERVICE WITHIN A CITY WITH
LOCAL CARTAGE/DRAYAGE SUBCONTRACTORS, AND CAROLINA FREIGHT
CARRIERS/RED ARROW SERVICED THAT CITY WITH THEIR OWN
EMPLOYEES, ABF SHALL SERVICE THE AREA SOLELY WITH ITS OWN
EMPLOYEES, INCLUDING BUT NOT LIMITED TO THE AREA CURRENTLY
SERVICED BY LOCAL UNION 707.

11.  THE COMMITTEE FINDS WITH REGARD TO THE CINCINNATI, FLORENCE,
AND DAYTON TERMINALS, THE FOLLOWING SHALL APPLY:

THE CAROLINA, FLORENCE, AND CINCINNATI TERMINAL SENIORITY LISTS
SHALL BE DOVETAILED IN ACCORDANCE WITH CURRENT BIDDING SENIORITY.

DURING THE WINDOW PERIOD, THE FIRST THIRTEEN (13) POSITIONS
ADDED TO THE DAYTON SENIORITY LIST SHALL BE OFFERED IN LINE OF
SENIORITY TO THE CINCINNATI TERMINAL SENIORITY LIST AND THE
SUCCESSFUL BIDDERS SHALL BE DOVETAILED.

12.  THE COMMITTEE FINDS THAT THE ABF INTERMODAL DECISION IN CASE
NO. MR-ICO-1-6/95 WAS BASED ON ABF'S PRESENT AND PROPOSED
INTERMODAL OPERATIONS AT THE TIME OF THE INTERMODAL HEARING,
WHICH OCCURRED BEFORE THE MERGER INVOLVED IN THIS CHANGE OF
OPERATIONS.  THEREFORE, THE COMMITTEE REFERS TO THE NATIONAL
INTERMODAL COMMITTEE THE QUESTION OF WHETHER THE CHANGE OF
OPERATIONS APPROVED BY THE COMMITTEE IN THIS DECISION AFFECTS
THE TERMS OF THE INTERMODAL DECISION IN CASE NO. MR-ICO-1-6/95,
AND IF SO, WHAT MODIFICATIONS SHOULD BE MADE.

AS LONG AS ANY DISPLACED ROAD DRIVER IS ON INVOLUNTARY LAYOFF
STATUS AT DALLAS, TX, THE RESTRICTIONS OF ARTICLE 29, SECTION 1
OF THE NMFA (CLEAN AND DIRTY RULE) SHALL REPLACE THE RAILING
AUTHORITY OF ARTICLE 29, SECTION 3 OF THE NMFA.

THE PROVISIONS OF ARTICLE 29, SECTION 1 SHALL APPLY TO ABF'S NEW
CHICAGO ROAD DOMICILE.

13.  THE COMMITTEE EXPRESSLY DISAPPROVES ABF'S PROPOSAL TO USE VENDORS
TO PERFORM MAINTENANCE WORK WITH MAINTENANCE BARGAINING UNIT
EMPLOYEES ON INVOLUNTARY LAYOFF STATUS.  THE APPLICABLE
COLLECTIVE BARGAINING AGREEMENT OPERATIVE AT THE TIME OF THE
CHANGE OF OPERATIONS SHALL CONTINUE IN EFFECT, INCLUDING THE
CONTRACT'S SUBCONTRACTING PROVISIONS.

14.  ABF SHALL PROTECT THE CAROTRANS WORK OPPORTUNITY PRESENTLY
PERFORMED BY CAROLINA AT JACKSONVILLE, MIAMI, AND HOUSTON WITH
ABF BARGAINING UNIT EMPLOYEES.

15.  AS LONG AS ANY DISPLACED OVER-THE-ROAD DRIVER IS ON INVOLUNTARY

TAN ELECTRONIC MAIL

DATE. 09/19/95
TIME. 15.37 EST
TO.    LCL/TERM-ID 373
FROM. LCL/TERM-ID TPI          TPI1
FOR.   PRINCIPAL OFFICER
PAGE   006    MSG NMBR 431

LAYOFF STATUS AS A RESULT OF THIS CHANGE OF OPERATIONS, THE
COMPANY, ONLY TO THE EXTENT ALLOWED BY AN APPLICABLE SUPPLEMENTAL
AGREEMENT, MAY USE CITY DRIVERS TO RUN THE ROAD, BUT ONLY AT
ESTABLISHED ROAD DOMICILES.  THIS PRACTICE SHALL NOT VIOLATE THE
ESTABLISHED ORDER OF CALL AT THE APPLICABLE ROAD DOMICILE.

16.    EMPLOYEES WHO HAVE BEEN DISCHARGED, AND WHOSE DISCHARGE IS PENDING
       ADJUDICATION UNDER THE GRIEVANCE PROCEDURE, SHALL BE OFFERED
       THE OPPORTUNITY TO BID.

17.    UNION AND NON-UNION OFFICE EMPLOYEES SHALL BE DOVETAILED AS SET
       OUT IN PARAGRAPH 1 OF THIS DECISION.  THE UNION EMPLOYEES SHALL
       CONTINUE TO BE COVERED BY ALL PROVISIONS OF THEIR RESPECTIVE
       COLLECTIVE BARGAINING AGREEMENTS, INCLUDING BUT NOT LIMITED TO,
       WAGES AND BENEFITS.  IN ANY CASE WHERE A FUND WILL NOT ACCEPT
       CONTRIBUTIONS FROM ABF FOR UNION EMPLOYEES, THE COMMITTEE WILL
       DETERMINE THE STEPS NECESSARY TO ASSURE THAT ABF PROVIDES BENEFITS
       EQUIVALENT TO THOSE PROVIDED TO SUCH EMPLOYEES BEFORE TRANSFER.

18.    DOCK EMPLOYEES WHO ARE ADVERSELY AFFECTED BY THIS CHANGE OF
       OPERATIONS AND MUST BE CDL QUALIFIED IN ORDER TO TRANSFER AND
       ELECT TO BID, SHALL BE PROVIDED A 60-DAY PERIOD, COMMENCING
       SEPTEMBER 19, 1995, DURING WHICH PERIOD SUCH EMPLOYEES WILL
       EITHER BECOME CDL QUALIFIED OR FORFEIT ANY RIGHTS TO FILL THE BID
       UNDER THIS DECISION.  DURING THIS PERIOD, ABF IS INSTRUCTED TO
       PROVIDE ADEQUATE EQUIPMENT AND TRAINING PERSONNEL TO COMPLY WITH
       THIS PARAGRAPH.

19.    AS A RESULT OF LOCAL 25'S HAVING ATTAINED BARGAINING UNIT
       JURISDICTION AT THE BURLINGTON, MASSACHUSETTS FACILITY, WHICH
       RESULTS IN TWO FACILITIES BEING UNDER LOCAL UNION 25'S
       JURISDICTION, THE PROVISIONS OF ARTICLE 43, SECTION 1(A) OF THE
       CURRENT NEW ENGLAND SUPPLEMENTAL FREIGHT AGREEMENT SHALL APPLY.

20.    THE COMMITTEE DIRECTS ABF TO GIVE THE LOCAL UNIONS FULL DETAILS
       CONCERNING ANY 401(K) PLAN COVERING CAROLINA FREIGHT CARRIERS OR
       RED ARROW EMPLOYEES AND TO KEEP IN EFFECT ANY SUCH PLAN, UNTIL
       ABF ESTABLISHES AN EQUIVALENT PLAN.  THE COMMITTEE ALSO DIRECTS
       ABF TO PROVIDE THE LOCAL UNIONS FULL DETAILS REGARDING THE
       PRIOR PENSION PLAN FOR RED ARROW EMPLOYEES.

21.    THE REQUEST OF LOCAL UNION 200 TO ALLOW A MEMBER TO EXERCISE
       COMPANY SENIORITY IS DENIED.

22.    THE ISSUED RAISED BY LOCAL UNION 61 REGARDING THE APPLICABLE
       PEDDLE RADIUS FOR CITY DRIVERS (50 OR 75 MILES) IS REFERRED TO
       THE PARTIES FOR RESOLUTION.  ANY DIFFERENCES WILL BE RESOLVED
       THROUGH THE GRIEVANCE PROCEDURE.

23.    ABF'S REQUEST FOR A TRIAL PERIOD TO DETERMINE FREIGHT FLOW FOR
       BIDDING PURPOSES IS REFERRED BACK TO THE LOCAL UNIONS AND ABF

TIT⬤ ELECTRONIC MAIL          ⬤

DATE. 09/19/95
TIME. 15.37 EST
TO.   LCL/TERM-ID 373
FROM. LCL/TERM-ID TPI              TPI1
FOR.  PRINCIPAL OFFICER
PAGE  007     MSG NMBR 431

FOR RESOLUTION, WITH BIDS TO BE POSTED WITHIN 60 DAYS OF
IMPLEMENTATION, OR SOONER WHEREVER POSSIBLE.

24. THE COMMITTEE FINDS THAT THERE ARE NO CIRCUMSTANCES THAT WOULD
    ALLOW ANY EMPLOYEE WHO HAD RELOCATED UNDER A PREVIOUS CHANGE OF
    OPERATIONS DECISION OR UNDER THE PROVISIONS OF ARTICLE 5,
    SECTION 5 OF THE NMFA TO RETREAT TO THE EMPLOYEE'S FORMER
    TERMINAL/DOMICILE.   ACCORDINGLY, THE REQUESTS BY THE VARIOUS
    LOCAL UNIONS TO ALLOW EMPLOYEES TO RETREAT ARE SPECIFICALLY
    DENIED.
25. THIS CHANGE OF OPERATIONS MAY BE IMPLEMENTED NO SOONER THAN
    SEPTEMBER 25, 1995.

26. THIS MULTI-REGION CHANGE OF OPERATIONS COMMITTEE SHALL RETAIN
    JURISDICTION ON ALL ISSUES THAT MAY ARISE UNDER THIS DECISION
    DURING THE TERM OF THE CONTRACT.   ALL GRIEVANCES SHALL BE FILED
    WITH THE APPROPRIATE REGIONAL JOINT AREA COMMITTEE, TO BE HEARD
    BY THE MULTI-REGION CHANGE OF OPERATIONS COMMITTEE.


PLEASE SEND ACKNOWLEDGMENT OF THIS MESSAGE BY TITAN (TITAN TERMINAL
ADDRESS:  IUFD) OR FACSIMILE (TEL. 202/624-8722).



FRATERNALLY,



DENNIS C. SKELTON, DIRECTOR
NATIONAL FREIGHT DIVISION
CC: - RON CAREY, CHAIRMAN, TNFINC
     - CHUCK PISCITELLO, ASSISTANT DIRECTOR, NATIONAL FREIGHT DIVISION
     - FRANK BUSALACCHI, ACTING REGIONAL FREIGHT COORDINATOR
       CENTRAL REGION OF TEAMSTERS. C/O TEAMSTERS LOCAL UNION NO. 200
     - DANIEL W. SCHMIDT, REPRESENTATIVE, EASTERN REGION OF TEAMSTERS
     - FRANK HOPKINS, REGIONAL FREIGHT DIVISION COORDINATOR,
       SOUTHERN REGION OF TEAMSTERS, C/O ANNIE HOPKINS, SECRETARY, LOCAL
       UNION NO. 519
     - JIM ROBERTS, REGIONAL FREIGHT DIVISION COORDINATOR
       WESTERN REGION OF TEAMSTERS
     - BOB KNOX, THE GENERAL PRESIDENT'S PERSONAL REPRESENTATIVE
       CENTRAL REGION OF TEAMSTERS
     - JAMES A. MCCALL, IBT LEGAL DEPT.
     - RICK BANK, SPECIAL COUNSEL TO THE GENERAL PRESIDENT

PROPOSED SENIORITY APPLICATION

The following proposal is based on the general principle that employees who are dovetailed on the date of implementation are those who are bringing work load to follow, so that the list into which they dovetail should not be adversely affected based on the current economic levels.

At common terminal points for local cartage operations, the company will ascertain the work load that ABF can reasonably expect to retain at the time of combining employees. ABF will prepare a Master Active List of its employees and will then prepare a Master Active List of the Carolina employees and the Red Arrow employees, and all three lists will be based on the date this change is implemented. The Company will then offer job opportunity at ABF in numbers equivalent to the work load coming to ABF, by seniority, to the applicable Carolina or Red Arrow Master Active List and they shall be dovetailed into the ABF Master Active List. Those employees on the Carolina or Red Arrow Master Active List who are not offered job opportunity due to insufficient work load to transfer shall remain on such Master Active Seniority List and shall be offered work opportunity as it arises and when permanent job opportunity arises they shall be recalled and dovetailed.

The Company will also establish a Master Inactive List comprised of all employees on lay-off at ABF and Carolina or ABF and Red Arrow on the date this change is implemented. After the Master Active List set forth above has been exhausted, all future job opportunities shall be offered, in line of seniority, to the employees on the Master Inactive List and, upon proper recall, they shall be dovetailed into the Master Active List.

At all other ABF locations which involve Carolina or Red Arrow employees, the same general principle shall apply, i.e., only the number of Carolina or Red Arrow employees equivalent to actual work load transferred will be offered to the Carolina or Red Arrow Master Active List on the first day of the combined operations.

The same principle as outlined above shall apply to combining over-the-road seniority lists, office and/or maintenance groups, where appropriate, as well as to transfer opportunity involving any of those respective classifications.

Therefore, as a general rule:

Where only one (1) of the three (3) companies has a terminal location, the employees at that location will remain as they are. (See Exhibit "A" in the section on local cartage operations.)

Where there are dual facilities in any one location or area, the aforementioned seniority application will prevail. (See Exhibit "B" in the section on local cartage operations.)

Where there are apparent exceptions to the general rule, these will be resolved in Exhibit "C" in the section on local cartage operations.

8/24/95

## Exhibit "A"
### Employee Analysis (Single)
### Local Cartage

| Terminal | | ABF Freight Active | L/O | Total | Carolina/Red Arrow Active | L/O | Total | Empl. Rqmts. |
|---|---|---|---|---|---|---|---|---|
| ABILENE | TX | 2 | 0 | 2 | | | | 2 |
| AKRON | OH | 19 ↓8 | 0 | 19 ↓8 | | | | 19 ↓8 |
| ALEXANDRIA | LA | 3 | 0 | 3 | | | | 3 |
| AMARILLO | TX | 5 | 0 | 5 | | | | 5 |
| ASHTABULA | OH | 3 | 1 | 4 | | | | 4 |
| BEAUMONT | TX | 5 | 0 | 5 | | | | 5 |
| BENTON HARBOR | MI | 3 | 0 | 3 | | | | 3 |
| BILOXI | MS | 4 | 0 | 4 | | | | 4 |
| BINGHAMPTON | NY | 7 | 0 | 7 | | | | 7 |
| BOWLING GREEN | KY | 3 | 0 | 3 | | | | 3 |
| BROOKLYN PARK | MN | 13 | 0 | 13 | | | | 13 |
| BROWNSVILLE | TX | 4 | 0 | 4 | | | | 4 |
| BRYAN | OH | 3 | 0 | 3 | | | | 3 |
| BUTLER | PA | 4 | 0 | 4 | | | | 4 |
| CADILLAC | MI | 3 | 0 | 3 | | | | 3 |
| CAMP HILL | PA | 96 | 0 | 96 | | | | 62 |
| CANTON | OH | 11 | 2 | 13 | 4 | 0 | 4 | 12  — EX #B |
| CAPE GIRARDEAU | MO | ~~8~~5 | ~~0~~3 | 8 | | | | ~~8~~5 |
| CARLISLE | PA | 328 | 0 | 328 | | | | 296 |
| CARLLS CORNER | NJ | 1 | 0 | 1 | | | | 1 |
| CEDAR RAPIDS | IA | 8 | 0 | 8 | | | | 8 |
| CHAMPAIGN | IL | 4 | 0 | 4 | | | | 4 |
| CHARLESTON | SC | 5 | 0 | 5 | | | | 5 |
| CHESTER | PA | 21 | 0 | 21 | | | | 21 |
| COLUMBUS | NE | 2 | 0 | 2 | | | | 2 |
| CORPUS CHRISTI | TX | 2 | 0 | 2 | | | | 2 |
| DAYTON | OH | 227 | 0 | 227 | | | | 227 |
| DECATUR | IL | | | | 4 | 2 | 6 | 0 |
| DUBOIS | PA | 4 | 0 | 4 | | | | 4 |
| DULUTH | MN | 2 | 0 | 2 | | | | 2 |
| EAGAN | MN | 20 | 0 | 20 | | | | 20 |
| EAU CLAIRE | WI | 3 | 0 | 3 | | | | 3 |
| EFFINGHAM | IL | 2 | 0 | 2 | | | | 2 |
| EL DORADO | AR | 3 | 0 | 3 | | | | 3 |
| EL PASO | TX | 15 | 0 | 15 | | | | 15 |
| ELGIN | IL | 11 | 0 | 11 | | | | ~~10~~ 11 |
| ELMIRA | NY | 5 | 0 | 5 | | | | 5 |
| FAIRFIELD | IA | 3 | 1 | 4 | | | | 3 |
| FAIRMONT | WV | 4 | 0 | 4 | | | | 4 |
| FARGO | ND | 3 | 0 | 3 | | | | 3 |
| FAYETTEVILLE | AR | 8 | 0 | 8 | | | | 8 |
| FEDERALSBURG | MD | 5 | 0 | 5 | — 5 — 0 — 5 | | | 5  — EX D |
| FLORENCE | FY | | | | 5 | 0 | 5 | 0 |
| FT. SMITH | AR | 11 | 0 | 11 | | | | 11 |
| GRAND ISLAND | NE | 4 | 0 | 4 | | | | 4 |

 

## EASTERN REGION JOINT AREA COMMITTEE

Established in accordance with the terms and conditions of the National Master Freight Agreement and the
CENT. PA Supplemental Agreement, entered into by and between the Local Union and carriers engaged in
City Pickup and Delivery and/or Over-the-Road Freight Operations.

**DOCKET NO. C-149-00**
ABF# 042-040-MR-00

IN THE MATTER OF THE DISPUTE BETWEEN

TEAMSTERS LOCAL NO. 776
HARRISBURG, PA

**SUBMISSION FORM**

and

ABF FREIGHT SYSTEM, INC.

We, the undersigned, parties to the National Master Freight Agreement and the CENT. PA Supplemental
Agreement, hereby agree to submit the dispute to arbitration under the Rules of Procedure prescribed by
the Eastern Region Joint Area Committee, by virtue of its authority, as set forth in Article 43 and    of
the CENT. PA Supplemental Agreement, the following:

On behalf of Rickey Bechtel, Union alleges violation of Article 5; requesting grievant be returned to
proper seniority with all lost wages, benefits.

The undersigned further agree that a majority decision of the Eastern Region Joint Area Committee in the
above dispute will be final, conclusive and binding with no appeal and, further, that neither party will
attempt through any overt acts, to void the decision rendered.

The undersigned also agree that failure to comply with the decision of a majority of the Committee within
ten (10) days of the date of the decision will result in the loss of all contract rights, privileges and benefits
due them under Article 43 of the CENT. PA Supplemental Agreement.

Date          July 25, 2000

Employer      ABF FREIGHT SYSTEM, INC.        Local Union   776

Signed by     Steven J. Froias, Labor Rels.   Signed by     Charles Shughart, B. A.

### DECISION

The Panel, in executive session, motion made, seconded and carried that this case is
referred to the National Multi-Region Change of Operations Violations Committee.
Cost split.

R. L. SCHAEFFER                    NICHOLAS PICARELLO
Employer Co-Secretary             Union Co-Secretary

JULY 25, 2000                      JULY 25, 2000
Date                              Date



63

* * *

```
 1                              * * *

 2              MRC-10-00-E3:

 3              Local 776, Harrisburg v. ABF Freight System

 4              (Reginald Atkinson)

 5              MRC-10-00-E4:

 6              Local 776, Harrisburg v. ABF Freight System

 7              (Rickey Bechtel)

 8         MR. JOHNSON:  This will be a joint record

 9    with E3 and E4.  MRC-10-00-E4.  Go ahead, Union.

10         MR. SHUGHART:  Chuck Shughart for the

11    union, to the right, the grievant Rick Bechtel, to

12    my left, Tom Griffith, President of Local 776.

13    Grievance No. 94530 reads as follows:

14              "I am filing this grievance due to the fact

15    that I am a laid off ABF employee at Carlisle, PA

16    (see attached letter marked Exhibit 1).  It has come

17    to my attention that ABF is hiring at the Carlisle,

18    PA terminal and I am filing this because I have not

19    been contacted for any available work opportunities.

20    Under the NMFA that was in effect in 1995, I was

21    laid off.  Article 5, Section 2 states, 'If

22    additional employees are required after the active

23    list is exhausted, they shall be recalled from such

24    inactive seniority roster and after recall, such
```

1     employees shall be dovetailed into  the active

2     seniority roster with their continuous

3     classification (road or city) seniority dates they

4     are currently exercising which shall then be

5     exercised for all purposes.' (Exhibit 1)"

6           Before I proceed I'd like to  go through and

7     just identify, explain and point out some of the

8     exhibits that are tabbed for you in the

9     presentation.  Obviously tab number 1 is a copy of

10    the grievance.  Tab number 2 is a letter where we

11    amended the claim of the grievance to include all

12    retroactive pay.  Tab number 3, we had requested and

13    received a copy of a list of employees who had been

14    laid off at the Carlisle terminal.  Tab number 4 is

15    a copy of the transcript from the Change of

16    Operations Committee.

17          I would just like, if you would turn to

18    page 644 that would be in the upper left hand corner

19    of the third page back, I can't read the line.  It

20    is line number 16 under Mr. Franke.  It says,

21         "Mr. Shughart:  With respect to the 323

22    Carolina employees on layoff from the Carlisle, PA

23    terminal, the company has stated that they have no

24    obligation to these employees and that they don't

1    exist.  In the proposed change they are referred to

2    as inactive, laid off employees.  These employees

3    have seniority that ranges from 36 years to 8 months

4    with the company.  Most of them were laid off in May

5    1995, two months before the merger between Carolina

6    and ABF was announced.  By Carolina's own admission,

7    the plans to merge with ABF were well under way at

8    that time.

9            "Under these circumstances it would be

10   grossly unfair to exclude these employees the right

11   to exercise their seniority under this change. Under

12   the terms of the NMFA, these employees have recall

13   rights for five years.  Carolina has contractual

14   obligations to the laid off Carolina employees at

15   Carlisle and elsewhere.  One of those contractual

16   obligations is to provide the recall rights for five

17   years.   ABF is merging with Carolina, thereby

18   assuming Carolina's debts, liabilities, and

19   contractual obligations.  Included among those

20   contractual obligations is the requirement to offer

21   the five year recall rights to  Carolina employees

22   who were previously laid off.  Carolina did not

23   banish from the face of the earth.  They exist.

24   They may be headquartered under a different city,

66

1    they may operate under a different company logo,

2    management, and color scheme, but they do exist.

3    The contractual obligations of the Carolina

4    employees also exist.  The merged company has an

5    obligation to provide the contractual obligations

6    that Carolina employees were entitled to receive."

7    And while I would encourage the Committee

8    to consider all of the testimony that's provided in

9    the transcripts, I did want to point that out.

10    Exhibit number 5 is a letter that was put

11    out by the International Union to all freight locals

12    concerning the Fourth Circuit decision in the ABF

13    Carolina litigation.  And primarily what the

14    grievant would like for you to note is down in the

15    third paragraph.  It's the second sentence here.

16    The court held that the language in the Master

17    portion of the NMFA supersedes any conflicting

18    language and supplemental agreements regarding the

19    dovetail of seniority lists when employer operations

20    are consolidated.

21    And tab number 6 is the letter that

22    Mr. Bechtel received from ABF dated November 1995.

23    The last paragraph in this letter is to confirm that

24    you elected to decline the job offer and to remain

1    in layoff status at Carlisle, PA.

2         Tab number 7, at the local union's request,

3    is a copy of a seniority list dated 4/30/2000 for

4    the ABF employees at the Carlisle terminal, and if

5    you turn back to page 14 you will see that employee

6    number, I believe it's 610, which is Nelson, about a

7    third of the way down the page, terminal seniority

8    date there was April of '95.  That would have been

9    the last person hired prior to the ABF Carolina

10   change of operations, and then the next person hired

11   after the change of operations would be 12 November

12   '98.  That would have been where these employees,

13   based on the claim of the grievant, would be put in

14   for recall.

15        I would like to  proceed with the body of

16   the brief.

17        "Note that the grievant amended the

18   grievance at the company level grievance on April 5,

19   2000 to include a claim for all moneys due.

20   (exhibit 2.)

21        The grievant was a full time dock/jockey

22   employee with Carolina at Carlisle, PA breakbulk

23   terminal.  The seniority date was February 1, 1986.

24   In May 1995 Carolina Freight Carriers terminated the

1    breakbulk operations at the Carlisle, PA terminal.

2    All remaining employees not previously laid off were

3    placed on laid off status.   (Exhibit 3).

4         On July 10, 1995 it was announced that ABF

5    Freight Systems, Inc. would acquire Carolina Freight

6    Carriers and Red Arrow Freight Lines.  On September

7    14 and 15, 1995, the issues concerning  the change of

8    operations were presented at a meeting held in

9    Chicago.  At the change of operations, Local 776

10   addressed the concerns about the previously laid off

11   employees at the Carolina terminal in Carlisle.

12   (Exhibit 4)

13        On December 29, 1998 the Fourth Circuit

14   Court of Appeals issued its decision that the

15   Carolina employees would be dovetailed with the ABF

16   employees, not entailed, and this should finally

17   bring this to an end this seniority dispute.

18   (Exhibit 5)

19        Mr. Bechtel filed this grievance claiming

20   that ABF is violating the terms  of Article 5,

21   Section 2(C)2 of the 1994-1998 NMFA.  That language

22   reads as follows:

23        'In addition, the inactive seniority roster

24   (employees who are on letter of layoff) shall be

1    similarly dovetailed by appropriate classification.

2    If additional employees are required after the

3    active list is exhausted, they shall be recalled

4    from such inactive seniority roster and after recall

5    such employees shall be dovetailed into the active

6    seniority roster with their continuous

7    classification (road or city) seniority dates they

8    are currently exercising which shall then be

9    exercised for all purposes.  Seniority rosters

10   previously combining  job classifications shall be

11   continued unless otherwise agreed.'

12         "Obviously Mr. Bechtel was on a letter of

13   layoff from Carolina Freight at the time the ABF

14   merger acquisition took place.  When that occurred

15   it would seem that ABF assumed the debts,

16   liabilities,, and contractual obligations previously

17   held by Carolina employees who were previously

18   placed in layoff status by Carolina.  As such,

19   Mr. Bechtel should be entitled to recall rights

20   under Article 5, Section 2.

21         Should be there be any question Mr. Bechtel

22   was on letter of layoff, the attached letter clearly

23   indicates his layoff status.  (Exhibit 6).  It reads

24   in part:

1       'This letter is to confirm that you elected

2    to decline the job offer and to remain in layoff

3    status at Carlisle, PA.'

4       "Attached is a copy of the seniority list

5    from the ABF terminal at Carlisle, PA.  (Exhibit 7)

6    It can be determined from the list, ABF has hired

7    108 employees who have a seniority date of 1998 or

8    later.  Approximately 31 of those individuals

9    currently work in the dock/local classification.

10       In view of the clear and undisputable facts

11    related to this grievance, we respectfully request

12    that the Committee uphold the claim of the grievant,

13    placing him on the seniority roster with a date of

14    February 1, 1986.  He should be compensated for lost

15    wages and benefits from November 12, 1998."

16       Is there anything  you would like to add?

17       MR. BECHTEL:  Yes.  I'm Rick Bechtel.  As

18    stated, I'm on a letter of layoff from ABF in

19    Carlisle.  I didn't ask to  be put in front of

20    anybody in '95.   It's just what they're saying is

21    they have no recall rights, and what they're trying

22    to tell me is if they were laid off right now in

23    Carlisle we'd end up with two layoff lists in

24    Carlisle. I can't see how that can ever work or

1    could be happening.  There's definitely freight

2    there because they're adding  onto the doors.  How

3    can you not -- they're just acting like I don't

4    exist.  I mean, I'm there.  I've got the letter

5    saying laid off in Carlisle.  It doesn't say

6    Philadelphia or anything.  It says Carlisle.  I was

7    left under the impression in '95 that I'm on the

8    layoff at the breakbulk in Carlisle.  And I feel I'm

9    waiting my turn to  get called.  If it wouldn't have

10   been for seeing they had an advertisement out in

11   front of the dock I wouldn't have known.  I would

12   have been here sooner.  I just feel I have that

13   layoff letter and I have a recall right.  That's

14   basically all I have to present on this.

15           MR. JOHNSON:  Do you rest, Union?

16           MR. SHUGHART:  Yes.

17           MR. FOREST:  Steve Forest representing ABF,

18   Mr. Chairman.  To my left is John Dale. The union is

19   claiming a violation of Article 5, Section 2 of the

20   NMFA.  They have not provided the company with a

21   date for this alleged violation.  I have attached a

22   copy of the article in question.  This Article deals

23   with "merger of companies-general."  Specifically

24   Section 2(C) reads in part,

72

1          "In the application of this section when

2     terminals or operations of two or more companies are

3     combined as referred to above, the following general

4     rules shall be applied by the employer and the local

5     unions."

6          I've attached a copy of that language from

7     the contract for the committee's perusal.  In this

8     case there was no merger of terminals  in Carlisle,

9     PA area.  Carolina had closed their terminal five

10    months before the ABF/Carolina/Red Arrow  change of

11    operations, and this  fact is not in dispute.

12          Attached is a copy of that change decision

13    MR-CO-38-9/95.  I would like to  review item 1A with

14    the committee.  If you will turn to the change

15    decision, I would like to refer to that please.

16          Item 1A is on the first page and I have

17    highlighted the portion, Item 1A, the portion of

18    this change that tells us how  to apply seniority in

19    the change.  It says,

20          "A.  The Committee directs that in

21    accordance with the provisions of Article 5, Section

22    Section 2A(C), Article 5, Section 3, and Article 8,

23    Section 6G of the NMFA, the seniority lists at the

24    domiciles and terminals affected by this change of

1    operations  shall be grouped for dovetailing as

2    reflected on the exhibits contained in the proposed

3    change of operations as clarified or corrected on

4    the record and as approved in Article 5, Section 2C

5    of the NMFA.  Dovetailing applies to all bargaining

6    unit employees affected by combining or eliminating

7    ABF and Carolina Freight Carriers/Red Arrow

8    facilities and includes all maintenance and office

9    employees.  Every facility whose worked has been

10   merged with the work of another facility must be

11   grouped with that facility."

12              I will go back to the brief.  As you can

13   see, it was very specific about combining  the

14   terminals and seniority lists affected by the

15   change.  It further reads,

16              "Every facility whose work has been merged

17   with the work of another facility."  There was no

18   merger of work.  There was no Carolina terminal in

19   Carlisle, PA.

20              Also attached are copies of pages 5 and 2

21   of that change.  I'd like to refer you to that at

22   this time.  That follows the change decision, and

23   the page number 5 is with a V.  That's the proposed

24   seniority application the company submitted for the

74

1    change of operations. If you will go down to the

2    highlighted portion,

3            "Therefore, as a general rule, where only

4    one of the three companies has a terminal location,

5    the employees at that location will remain as they

6    are. See Exhibit A in the section of local cartage

7    operations."

8            If you will turn to the next page, that is

9    Exhibit A of the local cartage operation. If you go

10   down that page I have highlighted Carlisle, PA, and

11   I will go  column by column.  First name is the

12   terminal, the state Carlisle, PA.  It says ABF,

13   active employees:  328.  Laid off:  Zero.  Total:

14   328.  It says, Carolina/Red Arrow.  Active:  Zero.

15   Laid off:  zero.  Total:  Zero.  And then it lists

16   the employee requirements.

17           These employees were never listed in this

18   change of operations as inactive.  I will go  back to

19   the brief.

20           On October 12, 1995 the union sent the

21   attached letter to all Carolina employees laid off

22   when Carolina closed the Carlisle, PA terminal.

23   This letter reviews the rights of these employees

24   concerning the ABF/Carolina/Red Arrow change

1   decision.  In the change decision all employees from

2   all three companies were afforded Article 5, section

3   5 rights.  This included road, city, mechanic and

4   clerical employees.  The former Carolina employees

5   were not afforded Article 5, Section 2 rights.

6           If you will first turn to the change

7   decision again and go to  the next portion that I

8   have highlighted, you will see it reads,

9           'The following  provisions will apply to any

10  employee laid off as a result of this change of

11  operations and to any other employee currently laid

12  off and to any employee laid off after this change

13  of operations for the life of the 1994-1998 NMFA

14  agreement.

15          A.   ABF agrees to extend the provisions of

16  Article 5, Section 5 of the NMFA to any bargaining

17  unit employee.'

18          If you will go to the last two pages of the

19  brief.  This is a letter that was sent to those

20  employees by Local 776.  It says,

21          "Dear Carolina Employee:"

22          This  is almost a month after the change of

23  operations, and I won't read the entire letter, but

24  the second paragraph says,

76

1       "As a result of the decision from the
2   Change of Operations Committee, the Carolina
3   employees who are laid off at Carlisle, PA will have
4   certain rights to future work opportunities with
5   ABF.  Article 5, Section 5 of the NMFA addresses
6   those rights."
7       That explains to  this Committee how  these
8   employees did get the rights to Article 5, Section
9   5.  They never did get Article 5, Section 2 rights.
10  I will go back to the last paragraph in my brief.
11      "There was  no merger of terminals in
12  Carlisle, PA and  Article 5, Section 2 has no
13  application.  We respectfully request the claim of
14  the union be denied."
15      With that, I will hold for summation and
16  rebuttal, Mr. Chairman.
17      MR. JOHNSON:  Rebut, Union?
18      MR. SHUGHART:  I think this really goes
19  back to the fact that these employees had certain
20  rights under the contract as Carlisle employees, and
21  when Carolina was merged, purchased, or whatever the
22  case may have been, by ABF, those rights just simply
23  didn't evaporate.  They still existed, and ABF had
24  an obligation to fulfill their responsibilities and

1    responsibilities of Carolina under the contract, and

2    as such the recall rights of these employees should

3    have been recognized and they should have had the

4    opportunity and continue to have the opportunity for

5    recall.

6        I think it's just very simple

7    interpretation of the contract language.  We

8    attempted to get some clarification at the change of

9    operations meeting, and I don't know  that it came

10   out quite as clear as we had hoped that it would,

11   but we do feel that these employees should have

12   recall rights.  That's all we have, Mr. Chairman.

13       MR. JOHNSON:  Rebut, Company?

14       MR. FOREST:  Forest for the company,

15   Mr. Chairman.  The issue of these employees was

16   raised on the record at the change of operations by

17   Local 776, as were employees raised by several other

18   local unions in different areas of the country.  The

19   change was not amended in any way to  include these

20   employees.  The decision did not refer to any

21   special privileges for these employees.  The

22   decision did infer special privileges to employees

23   in other areas, not this type.  But if that

24   committee wanted to confer special rights on these

78

1    employees, they would have done so in this decision.

2    The grievant stated he has a layoff letter

3    from ABF Freight System, he has a layoff letter from

4    Carolina Freight, and he has an Article 5, Section 5

5    letter. He requested 5.5 of the company, he was

6    offered transfer under Article 5, he declined. We

7    are required to send him a letter stating that he

8    declined the offer and that he remains in layoff

9    status. That's the way Article 5, Section 5 works.

10   You have the facts, Mr. Chairman.

11   MR. JOHNSON: Questions?

12   MR. STEPHENS: Company, at the time of the

13   change of operations, were the Carlisle employees

14   from Carolina, were they a part of the change on the

15   inactive list or were any of the employees at

16   Carlisle addressed in the change at the time of the

17   change?

18   MR. FOREST: No, sir. They were not listed

19   as inactive employees.

20   MR. STEPHENS: There were no employees in

21   Carlisle that were offered Article 5 transfer

22   rights?

23   MR. FOREST: No, sir. Only 5.5 as

24   specified in the change.

1   MR. JOHNSON:  When the Carolina facility

2   closed, I'm assuming that was done by a proper

3   change of operations?

4   MR. FOREST:  Yes, sir.  That was a Carolina

5   change of operations that closed in two stages in

6   February and May of '95.

7   MR. JOHNSON:  At that time was there any

8   transfer of work or personnel to any other Carolina

9   location at that time.

10   MR. FOREST:  Yes, there was.

11   MR. JOHNSON:  There was?

12   MR. FOREST:  Yes.

13   MR. JOHNSON:  And I am assuming then that

14   those people that could not or did not accept

15   transfer went onto a master inactive list at that

16   time?

17   MR. FOREST:  That's my understanding, Mr.

18   Chairman.

19   MR. JOHNSON:  Okay.

20   MR. STEPHENS:  That was not a part of the

21   change of operations or the merger of the companies

22   when you heard that in Chicago in '95?

23   MR. FOREST:  No, sir, in September of '95

24   they were not a part of that change of operations.

1    MR. JOHNSON:  So that change of operations

2    in Chicago following the acquisition or purchase of

3    Carolina or merger of Carolina, you treated those

4    laid off individuals from Carolina as a result of

5    the closure as just no part of that acquisition?

6    MR. FOREST:  Actually, if you'll go  to the

7    company Exhibit Roman numeral five, I read the

8    section.  That's in company's brief at the top of

9    the page that says, "Proposed seniority

10   application."  It's right after the change decision.

11   What I read into the record was the portion that

12   deals with one terminal location.  ABF has a

13   terminal in Carlisle.  Carolina did not have a

14   terminal in Carlisle.  The next paragraph deals with

15   dual facilities.  ABF had a terminal in Cincinnati.

16   Carolina had a terminal in Cincinnati.  They were

17   shown on Exhibit B, that's where we had dual

18   facilities.  The next paragraph where there are

19   apparent exceptions to the general rule, these will

20   be resolved in Exhibit C, and these are overlap.  In

21   particular, in New Jersey where the area is so dense

22   you might have two  Carolina terminals, and that same

23   area is served by one ABF terminal.

24   MR. JOHNSON:  Where is Exhibit C?

81

1          MR. FOREST:  They didn't apply.  I don't

2     have that.  The only place that Carlisle was listed

3     was in Exhibit A because it was a single facility.

4     There was no Carolina facility.  There was no

5     Carolina terminal in Carlisle.  They were on Exhibit

6     A.

7          MR. ROBERTS:  Might I ask a question?

8          MR. JOHNSON:  Yes.

9          MR. ROBERTS:  Is it not true that at the

10    time that change was heard, it was the position of

11    the company that the Carolina employees that were on

12    layoff at Carlisle, you had no obligation to them

13    whatsoever period?

14         MR. FOREST:  That's correct.

15         MR. ROBERTS:  And the committee ruled

16    otherwise and extended 5.5 rights to those people?

17         MR. FOREST:  That is correct.

18         MR. ROBERTS:  Okay.

19         MR. JOHNSON:  Anything further?

20         MR. SHUGHART:  No, Mr. Chairman.

21         MR. JOHNSON:  Executive session.

22         MR. FOREST:  Thank you, Mr. Chairman.

23         MR. GRIFFITH:  If you'd like, we could

24    present the other case, which is just about

82

1    identical to this case, and then you can decide what

2    you want to do then.

3              MR. JOHNSON:  Do you want to do that?

4              MR. GRIFFITH:  Yes.

5              MR. JOHNSON:  Parties, ABF, we'll go ahead

6    and hear E3 now.  This will be MRC-10-00-E3.   Go

7    right ahead.

8              MR. SHUGHART:  This is John Shughart,

9    Business Agent, Local 776 for the union.  John,

10   before we proceed I believe that the company and

11   union are willing to stipulate that some of the

12   exhibits presented in the earlier case with

13   94530-Bechtal are the same, that will be presented

14   in this grievance for 94542-Atkinson.  The Exhibit

15   No. 2 in the Atkinson case is the same as the

16   Exhibit No. 4 in the Bechtel case, and the Exhibit

17   No. 3 in the Atkinson case is the same as Exhibit

18   No. 3 in the Atkinson case, and we won't make those

19   arguments over again, except as presented in the

20   brief.

21              Gentlemen, grievance 94542 reads as

22   follows:

23              "I am filing this grievance in accordance

24   with Article 5, Section 2 of the NMFA which states

83

1    that inactive employees, (employees who are on

2    letter of layoff) will be recalled if additional

3    employees are required after the active list is

4    exhausted.  I am an inactive employee of ABF Freight

5    due to the Carolina Freight Carrier and ABF merger

6    of 1995.  I have found out that ABF has hired new

7    employees at Carlisle, PA for the local side and has

8    not called me back to work.  This is a direct

9    violation of the NMFA.  Article 5, Section 1 states,

10   'seniority shall be broken only by discharge or

11   voluntary quit, retirement, or more than five years

12   layoff.'  None of these applies to me.  My claim is

13   that I am requesting to be placed on local

14   (seniority) board at ABF Freight Systems at

15   Carlisle, PA under Article 5, Section 2 and all

16   moneys due me.  (Exhibit 1).

17          The grievant was a full-time dock employee

18   with Carolina Freight at the Carlisle breakbulk

19   terminal.  His seniority date March 17, 1978.  In

20   May, 1995, Carolina Freight Carriers terminated

21   their breakbulk operations at the Carlisle, PA

22   terminal.  All remaining employees not previously

23   laid off were placed on layoff status.

24          On July 10, 1995 it was announced that ABF

1    Freight Carriers, Inc. would acquire Red Arrow

2    Freight Lines.  On September 14 and 15, 1995, the

3    issues concerning the change of operations were

4    presented at a meeting held in Chicago.  At the

5    change of operations, Local 776 addressed concerns

6    about the previously laid off employees at the

7    Carolina terminal at Carlisle (Exhibit 2).

8         Mr. Atkinson filed this grievance, claiming

9    that ABF is violating the terms of Article 5,

10   Section 2(c)(2) of the 94-98 NMFA).  That language

11   reads as  follows:

12        'In addition, the inactive seniority

13   rosters (employees who are on letter of layoff)

14   shall be similarly "dovetailed" by appropriate

15   classification.  If additional employees  are

16   required after the active list is exhausted, they

17   shall be recalled from such inactive seniority

18   roster and after recall such employees shall be

19   "dovetailed" into  the active seniority roster with

20   their continuous classification (road or city)

21   seniority dates they are currently exercising which

22   shall then be exercised for all purposes.  Seniority

23   rosters previously combining  job classifications

24   shall be continued unless otherwise agreed.

1    Obviously, Mr. Atkinson was on letter of

2    layoff from Carolina Freight at the time the ABF

3    merger/acquisition took place.  When that occurred,

4    it would seem that ABF assumed the debts,

5    liabilities, and contractual obligations previously

6    held by Carolina Freight.  One aspect of those

7    contractual obligations is the recall rights of

8    Carolina employees who were previously placed in

9    layoff status by Carolina.  As such, Mr. Atkinson

10   should be entitled to recall rights under Article 5,

11   Section 2.

12       Attached is a copy of a seniority list from

13   the ABF terminal at Carlisle, PA (Exhibit 3).  As

14   can be determined from the list, ABF has hired 108

15   employees who have a seniority date of November 1998

16   or later.  Approximately 31 of those individuals

17   currently work in the dock/local classification.

18       In view of the clear and undisputable facts

19   related to  this grievance, we respectfully request

20   that the Committee uphold the claim of the grievant,

21   placing him on the seniority roster with a date of

22   March 17, 1978.  He should be compensated for lost

23   wages and benefits from November 1998."

24       That's all.

1    MR. JOHNSON:  Thank you.  Company?

2    MR. FOREST:  Thank you, Mr. Chairman.

3 Steve Forest for the company, and to my left is John

4 Dale.

5    "The union is claiming a violation of

6 Articles 5, Section 2 of the NMFA.  In the previous

7 case they did give us a date of this alleged

8 violation of November 12, 1998.

9    I have attached a copy of the article in

10 question.  This article deals with the 'Mergers of

11 Companies-General.'  Specifically Section 2(c) reads

12 in part,

13    'In the application of this section, when

14 terminals or operations of two or more companies are

15 combined as referred to above, the following general

16 rules  shall be applied by the employer and local

17 unions.'"  I have attached a copy of that language

18 to my brief for the committee's perusal.

19    In this case there was no merger of

20 terminals in the Carlisle, PA area.  Carolina had

21 closed their terminal five months before the ABF,

22 Carolina, Red Arrow change of operations.  This fact

23 is not in dispute.  Attached is a copy of that

24 change decision MR-CO-38-9/95.  I would like to

1   review Item 1A with the committee."

2          As you can see, if you turn to that first

3   page of that change decision, I won't read it all,

4   but I will read portions of Item 1A.

5          "Dovetailing applies to all bargaining unit

6   employees affected combining or eliminating  ABF and

7   Carolina Freight Carriers, Red facilities and

8   including maintenance and office employees.  Every

9   facility whose work has been merged with the work of

10  another facility must be grouped with that

11  facility," the key words being, in my opinion,

12  "whose work has been merged."  There was no work for

13  Carolina in Carlisle at that time.

14          "As you can see it is very specific about

15  combining  terminal and seniority lists affected by

16  the change.  It further reads 'every facility whose

17  work has been merged with the work of another

18  facility.'

19          Also attached are copies of pages V and 2

20  of that change.  There is no reference to any

21  Carolina facility in Carlisle, PA because none

22  existed at the time of that change.

23          On October 12, 1995 the union sent the

24  attached letter to all Carolina employees laid off

88

1    when Carolina closed the Carlisle, PA terminal.

2    This letter reviews the rights of these employees

3    concerning the ABF, Carolina, Red Arrow  change

4    decision.  In the change decision all employees  from

5    all three companies were afforded Article 5, Section

6    5 rights, this included road, city, mechanics, and

7    clerical employees.  The former Carolina employees

8    were not afforded Article 5, Section 2 rights."

9           And I'd like to review that with the

10   Committee again because I think there may be some

11   confusion on that issue.  It says, "The following

12   provisions will apply to any employee laid off as a

13   result of this change of operations and to any other

14   employee currently laid off and to any employee laid

15   off after this change of operations for the life of

16   the 1994-1998 contract."

17          This grievance is claiming a violation six

18   months after the Article 5, Section 5 rights for

19   these employees had expired.  It is not an Article

20   5.5 grievance.  It is  an Article 5.2 grievance.

21          "There was  no merger of terminals in

22   Carlisle, Pennsylvania and Article 5, Section 2 has

23   no application.

24          We respectfully request the claim of the

1  union be denied."

2       I will hold for summation and rebuttal,

3  Mr. Chairman.

4       MR. JOHNSON:  Rebuttal, union.

5       MR. SHUGHART:  Mr. Chairman, our argument

6  remains the same as the previous case.  We believe

7  these employees should have had recall rights under

8  5.2.  They were laid off by Carolina, and the

9  contractual obligation of ABF should be extended to

10  those people.  That's all I have.  Thank you.

11       MR. ROBERTS:  Just one question for the

12  record.  The Carolina people that were on layoff at

13  Carlisle, were they on voluntary layoff as a result

14  of electing not to follow work when the terminal was

15  closed?

16       MR. GRIFFITH:  My understanding is yes,

17  that they were.

18       MR. ROBERTS:  Thank you.

19       MR. SHUGHART:  I am not absolutely certain

20  if there was work that was extended to everybody on

21  the seniority list, but I am reasonably confident

22  that the individuals who are before us here today

23  would have been offered work.

24       MR. JOHNSON:  And would have had seniority

1  to obtain --

2  MR. SHUGHART:  That's correct.

3  MR. JOHNSON:  -- the initial offer of work

4  with the change closure?

5  MR. SHUGHART:  That is correct.

6  MR. GRIFFITH:  They were afforded work

7  opportunity or to follow the work opportunity when

8  they closed the Carolina terminal.

9  MR. JOHNSON:  They declined that and

10  remained in layoff status.

11  MR. GRIFFITH:  These two based on their

12  seniority would have had an opportunity to follow

13  worked yes.

14  MR. SHUGHART:  I also believe, to add to

15  that, that they had some positions which did go

16  unfilled, but I am not absolutely certain about that

17  without going back to the record.

18  MR. ROBERTS:  Thank you.

19  MR. GRIFFITH:  Yes.

20  MR. JOHNSON:  Well, I gather from the

21  decision and Article 5.5 was intended or negotiated

22  that applied to the particular region that an

23  employee was laid off in and they opened that up to

24  the Eastern, Central and Southern as a result of and

1    identified it as exclusively to that particular

2    change, and that was your merger change.

3            MR. FOREST:  They extended the Article 5

4    provision to include all employees.

5            MR. JOHNSON:  All employees, all

6    classifications, and two additional regions.

7            MR. FOREST:  Future laid off employees,

8    previously laid off employees, anybody anywhere from

9    these two companies, mechanics, everywhere they gave

10   5.5 rights  to, but those 5.5 rights clearly expired

11   at the end of the 94-98 contract.

12           MR. JOHNSON:  And I gather there was a

13   letter in one of the two, I want to say the first

14   one we heard from Gordon Ringberg, offering a number

15   of points, one being Waco, which I assume is Waco,

16   TX.

17           MR. FOREST:  Yes.

18           MR. DALE:  The 5.5 rights were extended to

19   all three regions that were involved in the

20   combination change.

21           MR. JOHNSON:  In the change, yes.  My

22   question is that the one and only 5.5 opportunity

23   that those individuals received from ABF?

24           MR. FOREST:  That question has never been

1   asked of me before, Mr. Chairman.

2           MR. JOHNSON:  Well, the reason I am saying,

3   5.5 is not limited to  a single, one-time

4   opportunity.

5           MR. FOREST:  If I understand 5.5 correctly,

6   once they decline the transfer opportunity, then

7   they can't come up for another six months.

8           MR. JOHNSON:  Only for six months, but at

9   the expiration of six months, they are then subject

10  to additional opportunities under 5.5.

11          MR. FOREST:  Yes.

12          MR. JOHNSON:  And my question is, were they

13  granted those opportunities following six months of

14  decline?

15          MR. SHUGHART:  The answer to that -- and

16  the reason I know is because I am also  a former

17  Carolina employee -- and those employees who did

18  request 5.5 rights and declined them and then

19  requested them again were extended the additional

20  offers.

21          MR. GRIFFITH:  You had to  request them

22  again.

23          MR. JOHNSON:  I understand, but did either

24  of these individuals make a subsequent request for

1    5.5?

2        MR. FOREST:  To my knowledge, no.

3        MR. GRIFFITH:  To my knowledge, no.

4        MR. ROBERTS:  But had they, they would have

5    been offered?

6        MR. FOREST:  Yes.

7        MR. GRIFFITH:  Well, we do know of people

8    who did request them more than once, and they

9    declined once based on where it was going.  They

10   after six months requested it again, and whatever

11   those opportunities came up at the time, I know that

12   ABF did offer those two or three times.

13       MR. FOREST:  I know of some three times.

14       MR. HASSLER:  Till the end of the 1994-1998

15   contract.  Till the end of March 31, 1998.  That's

16   when it stopped.

17       MR. GRIFFITH:  That's correct.

18       MR. STEPHENS:  There was a provision for

19   that to  stop at the end of the '98 contract.

20       MR. FOREST:  Yes, sir.  That is in the

21   change decision.

22       MR. STEPHENS:  That is in the decision?

23       MR. FOREST:  Yes.

24       MR. GRIFFITH:  That is in the decision of

94

1    the change.

2              MR. JOHNSON:  Anything  further?

3              MR. FOREST:  No, sir.

4              MR. GRIFFITH:  No, sir.

5              MR. JOHNSON:  Executive section.

6          (The parties left the room, the Committees

7              went into executive session off the record,

8              after which the following proceedings took

9              place:)

10             MR. ROBERTS:  Mr. Chairman, I move that in

11   accordance with the decision rendered by the Change

12   of Operations Committee in MR-CO-38-9/95, the claims

13   are denied.

14             MR. STANOCH:  Second.

15         (The motion was carried without dissent, the

16             parties returned to the room, and the

17             decision was  read by the reporter.)

18

19

20

21

22

23

24

NATIONAL MULTI-REGION, INTERMODAL, SLEEPER COMMITTEES
OCTOBER 26-27, 2000
DEERFIELD BEACH, FLORIDA

INDEX

| NO. | CASE | DECISION | PAGE |
|---|---|---|---|
| MRC-10-00-E3 | Local 776 v. ABF Freight System | In accordance with the Decision rendered by the Change of Operations Committee in MR-CO-38-9/95, The claims are denied. | 82-94 |
| MRC-10-00-E4 | Local 776 v. ABF Freight System | Same as E3 | 63-94 |

Case 1:01-cv-00789-SHR    Document 24    Filed 04/15/2002    Page 84 of 228

EXHIBIT 3

BECHTEL, RICKEY
3/7/2002

BECHTEL VS
VIRTUE

1

1                    IN THE UNITED STATES DISTRICT COURT
         FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

2

3

    RICKEY A. BECHTEL,                      :
4                   PLAINTIFF               :
                                            :
5              VS.                          : NO. 3:01-CV-789
                                            :
6   DANIEL A. VIRTUE, BUSINESS AGENT OF :
    THE INTERNATIONAL BROTHERHOOD OF      :
7   TEAMSTERS; INTERNATIONAL BROTHERHOOD:
    OF TEAMSTERS; LOCAL 776,               :
8   INTERNATIONAL BROTHERHOOD OF           :
    TEAMSTERS; ABF FREIGHT SYSTEM,         :
9   INCORPORATED,                          :
                        DEFENDANTS         :

10

11

12

13

14

15

                 DEPOSITION OF:   RICKEY A. BECHTEL
16

                 TAKEN BY:        DEFENDANT ABF FREIGHT SYSTEM,
17                                INCORPORATED

18               BEFORE:          LISA A. HANSELL, REPORTER
                                  NOTARY PUBLIC
19

                 DATE:            MARCH 7, 2002, 10:40 A.M.
20

                 PLACE:           MORGAN, LEWIS & BOCKIUS, LLP
21                                417 WALNUT STREET
                                  HARRISBURG, PENNSYLVANIA

22

23

24

25



BECHTEL, RICKEY
3/7/2002

BECHTEL VS
VIRTUE

---

**2**

1  APPEARANCES:
2    AHMAD & MIRIN
3    BY: ROBERT S. MIRIN, ESQUIRE
       FOR - PLAINTIFF
4    IRA H. WEINSTOCK, P.C.
5    BY: JASON M. WEINSTOCK, ESQUIRE
       FOR - DEFENDANTS DANIEL A. VIRTUE AND
         LOCAL 776, INTERNATIONAL BROTHERHOOD
6        OF TEAMSTERS
7    INTERNATIONAL BROTHERHOOD OF TEAMSTERS
     BY: JAMES A. McCALL, SPECIAL COUNSEL
8        FOR - DEFENDANT INTERNATIONAL BROTHERHOOD
         OF TEAMSTERS
9
     MORGAN, LEWIS & BOCKIUS, LLP
10   BY: MARY D. WALSH, ESQUIRE
       JOSEPH E. SANTUCCI, JR., ESQUIRE
11     FOR - ABF FREIGHT SYSTEM, INCORPORATED
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

**4**

1    INDEX TO EXHIBITS (CONT'D.)
2                              PRODUCED
     EXHIBIT NO.              AND MARKED
3
     14 - Electronic Mail dated 9/19/95      63
4
     15 - Memo dated 5/17/00                 66
5
     16 - Letter dated 5/24/00               66
6
     17 - Seniority Roster dated 6/5/00      66
7
     18 - Letter dated 5/24/00               67
8
     19 - Letter dated 6/15/00               68
9
     20 - Electronic mail dated 7/10/00      70
10
     21 - Electronic mail dated 7/16/00      74
11
     22 - Letter dated 7/18/00               76
12
     23 - Brief                              76
13
     24 - Brief                              80
14
     25 - Decision dated 7/25/00             82
15
     26 - Letter dated 9/26/00               82
16
     27 - Handwritten note on La Quinta Inn
          letterhead                         83
17   28 - Letter dated 11/8/00               87
18   29 - Letter dated 12/28/00              89
     30 - Carolina Benefits checklist
20        dated 1/24/86                      97
21
     31 - Employer's Notice of Application   100
22
     32 - National Master Freight Agreement  194
23
24
25

---

**3**

1
2        TABLE OF CONTENTS
3            WITNESS
4    FOR DEFENDANT ABF      DIRECT  CROSS
     Rickey A. Bechtel
5    By Ms. Walsh:        5
     By Mr. McCall:            109
6    By Mr. Weinstock:         146
     By Mr. Mirin:             192
7
8
9
10
11
     EXHIBIT NO.          PRODUCED
12                       AND MARKED
13   1 - Notice of Deposition          7
14   2 - Letter dated 3/21/95          22
15   3 - Letter dated 3/27/95          22
16   4 - Letter dated 10/12/95         31
17   5 - Memo dated 10/15/95           31
18   6 - Letter dated 11/9/95          41
19   7 - Complaint                     43
20   8 - NMFA Grievance dated 2/20/00       45
21   9 - Reason for grievance          54
22   10 - Letter dated 2/29/00         55
23   11 - Letter dated 3/29/00         57
24   12 - Letter dated 3/29/00         57
25   13 - Letter dated 4/5/00          63

---

**5**

1        MS. WALSH:  Can we stipulate that we'll take
2    the deposition pursuant to the federal rules?
3        MR. MIRIN:  Federal rules, and local custom is
4    to reserve all objections except as to form of question.
5        MS. WALSH:  Sounds good.
6
7        RICKEY A. BECHTEL, called as a witness, being
8    sworn, testified as follows:
9
10       DIRECT EXAMINATION
11
12   BY MS. WALSH:
13       Q    Good morning, Mr. Bechtel.  We just met a
14   moment ago.  I'm Mary Walsh, and I work in the firm of
15   Morgan, Lewis & Bockius, and we represent ABF in this case.
16   Let me just ask you first have you ever been deposed before?
17       A    No.
18       Q    Okay.  Well, I'm just going to give you a few
19   ground rules that we tell everybody prior to taking their
20   deposition.  The first most important thing is really just
21   to listen to the question and wait until I'm finished
22   talking to answer.  The court reporter is here trying to
23   take down everything you say, and we just don't want to
24   start talking over each other.  Will you do that today?
25       A    Yes.

---

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**



BECHTEL, RICKEY
3/7/2002

BECHTEL VS
VIRTUE

**6**

1   Q      Okay. It's my job to ask a question that you
2   can understand, so if you don't understand any of my
3   questions please let me know and I can try and rephrase the
4   question for you. If you don't tell me one way or the
5   other, I'm going to assume that you understand the question
6   and that your answer responds to the question. Do you
7   understand that?
8   A      Yes, okay.
9   Q      Okay. Please answer everything verbally. In
10  other words, it's difficult for the court reporter to take
11  down shaking your head and nodding and that kind of thing
12  and even hand gestures, which I'm guilty of, so try and
13  answer everything verbally. And, finally, you're under oath
14  today and, therefore, you're testifying in the same way you
15  would be if you were sitting across the street in a
16  courtroom. Do you understand what it means to testify under
17  oath?
18  A      Yes. I think so anyway.
19  Q      And you agree that you'll be testifying
20  truthfully today?
21  A      Yes.
22  Q      Are you on any medications today?
23  A      No.
24  Q      Is there any reason that you wouldn't be able
25  to testify truthfully today?

**7**

1   A      No.
2   Q      Is there anything that would impair your
3   memory of any of the events?
4   A      Maybe the type lapse of when it occurred till
5   now.
6         MS. WALSH: I think everybody has that problem
7   sometimes. Why don't we mark this as Bechtel Exhibit 1.
8         (Notice of Deposition marked as Bechtel
9   Exhibit 1.)
10  BY MS. WALSH:
11  Q      Mr. Bechtel, have you seen this document
12  before?
13  A      Yes.
14  Q      Okay. And are you appearing pursuant to this
15  notice that you received? Are you here today because you
16  received this notice of deposition?
17  A      Yes, yes.
18  Q      Okay. All right.
19        MR. MIRIN: And because his lawyer told him
20  that that's what it meant.
21  BY MS. WALSH:
22  Q      Can you state your full name for the record?
23  A      Rickey, R-i-c-k-e-y, A., Bechtel,
24  B-e-c-h-t-e-l.
25  Q      What is your date of birth?

**8**

1   A      February 1st, 1959.
2   Q      Okay. What is your Social Security Number?
3   A      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.
4   Q      And can you also state your current address,
5   please?
6   A      2072 Locust Lane, Hummelstown, PA.
7   Q      How long have you been living at that address?
8   A      Since approximately 1980.
9   Q      Okay. Are you currently employed?
10  A      Yes, I am.
11  Q      Where are you employed?
12  A      Stover Fuel Oil, Hershey, PA.
13  Q      How long have you been in that position?
14  A      About 5 of April of '96.
15  Q      And what job do you hold over at Stover?
16  A      I'm a driver, oil technician, installer.
17  Basically I do everything and now also HVAC.
18  Q      Okay. Are you currently a union member?
19  A      Yes, I am.
20  Q      What local is that?
21  A      Teamsters Local 776.
22  Q      When did you first become a member of 776?
23  A      1979.
24  Q      Where were you working at that time?
25  A      Hall's Motor Freight.

**9**

1   Q      Since the time that you have been a member of
2   Local 776, have you held any union positions?
3   A      Steward for awhile.
4   Q      When was that?
5   A      '91 maybe for a year or so. I think. I'm not
6   exactly sure.
7   Q      Okay.
8   A      For awhile.
9   Q      Where were you working at the time?
10  A      Carolina Freight.
11  Q      And you said that was about a year or so that
12  you were a steward?
13  A      Somewhere in there, yeah, a year. I'm not
14  exactly sure how long it was.
15  Q      Okay. Let me go back to your employment prior
16  to the time that you started at Carolina Freight. Can you
17  briefly tell me your employment history prior to the time
18  you went to Carolina?
19  A      I graduated in 1977. I was working for an
20  appliance delivery store, Spire Electric, which is no longer
21  in business. Then I worked -- after TMI came business
22  slacked off, and then I went to the Palmyra Area School
23  District and worked as maintenance and then heard about
24  Hall's and was with Hall's Motor Freight for -- well, till
25  the -- '94 -- not '94, -- '84. Excuse me. That's when they

BECHTEL, RICKEY
3/7/2002

BECHTEL VS
VIRTUE

---

**10**

1  basically went out of business. Then I worked a couple
2  months for -- I want to say approximately six months for Red
3  Star Express. Then I went full-time with Carolina in '85 I
4  think it was or '86 in February. I'm not exactly sure when
5  that was.
6      Q.    Okay. Let me just back up to when you were at
7  Hall's Motor Freight. What position or job classification
8  did you have at that time?
9      A.    I was a dock employee, strictly dock.
10     Q.    And do you remember when you started at
11  Hall's, what year?
12     A.    August of '79.
13     Q.    How long did you work there at that job?
14     A.    About six months or so before they went -- it
15  was '84 just about. I think it was '84 when they -- right
16  around there is when they went out.
17     Q.    So from '79 to '84 you were at Hall's?
18     A.    Correct.
19     Q.    Okay. As a dock worker?
20     A.    As a dock worker.
21     Q.    Okay. And then you said that you worked for
22  about six months at Red Star Express?
23     A.    Correct.
24     Q.    When did you start at Red Star?
25     A.    It would have been probably around October

---

**11**

1  maybe, somewhere in there, of '84. I'm thinking somewhere
2  in there. It wasn't long after Hall's went under.
3      Q.    Okay. Did you do anything in between working
4  at Hall's and working at Red Star Express?
5      A.    No.
6      Q.    Okay. And then at Red Star Express what
7  position or job classification did you hold?
8      A.    Strictly dock.
9      Q.    Strictly dock?
10     A.    (Witness nods head affirmatively).
11     Q.    And you said that you worked at Red Star
12  Express until you went to Carolina; is that right?
13     A.    Right. I was working full-time at Red Star
14  and casual at Carolina. That's the way their policy
15  basically worked. You have to work -- and almost every
16  freight company is that way. You start as a casual. I was
17  getting more time at Carolina so I just made a job -- it
18  wasn't a conflict. It was just where am I going to get more
19  time.
20     Q.    Okay. When did you start as a casual at
21  Carolina?
22     A.    Probably around November of '85.
23     Q.    November --
24     A.    No, that wouldn't be -- Red Star and Carolina
25  were basically around the same time. I just -- I'm not

---

**12**

1  exactly sure of that, but they were pretty close. I worked
2  both of them to fill in so I could get my insurance money.
3  You know, it pays in to get your health and welfare. I was
4  making up my time that way.
5      Q.    Okay. When you were at Red Star, what
6  location were you working at?
7      A.    Harrisburg.
8      Q.    And when you were working casual for Carolina,
9  what location were you working at?
10     A.    Carlisle.
11     Q.    What position or job classification did you
12  hold when you were at Carolina?
13     A.    When I first started?
14     Q.    When you first started at Carolina. Sorry.
15     A.    Strictly dock.
16     Q.    Strictly dock. Okay. Now, you mentioned that
17  at some point you moved from casual to full-time at
18  Carolina. When did that happen?
19     A.    February. I think that might have been '86.
20  It was shortly after I started, probably a couple months
21  after I started.
22     Q.    Okay. And what job classification did you
23  have when you went full-time?
24     A.    When I first started, it was strictly dock.
25     Q.    Strictly dock?

---

**13**

1      A.    (Witness nods head affirmatively).
2      Q.    Were you ever a probationary employee at
3  Carolina?
4      A.    Oh, yes. You have to whenever you start at
5  any freight company. Well, most of them. All of them that
6  I have been to you always got a 30 day probation.
7      Q.    Okay. When did that start, did that start
8  when you became a full time --
9      A.    Correct.
10     Q.    Okay. You've said that when you started you
11  were strictly dock. Throughout the time that you worked at
12  Carolina did you hold any other job classifications?
13     A.    Yes. I got qualified and became a yard
14  jockey.
15     Q.    Okay. Do you remember when that happened,
16  what year?
17     A.    Probably 1990.
18     Q.    Any other positions or classifications?
19     A.    Right around '94 -- right before '94 into '95
20  I got road qualified.
21     Q.    Where were you working?
22     A.    Excuse me. I got my CDL. I got my CDL so
23  that I could run -- what I was trying to do was to be able
24  to run the rail.
25     Q.    Okay. And was that when you were still

---

4 (Pages 10 to 13)

BECHTEL, RICKEY
3/7/2002

BECHTEL VS
VIRTUE

---

**14**

1  working at Carolina?
2  A    Yes. I used their equipment in fact.
3  Q    Did your position ever change after you got
4  that qualification and certification?
5  A    I couldn't hold anything. No, I couldn't hold
6  so I stayed as a yard jockey and dock platform.
7  Q    So throughout the time you were at Carolina
8  you either worked dock or yard jockey?
9  A    Correct.
10  Q    Were you ever a driver at Carolina?
11  A    No.
12  Q    Okay. During the time that you were at
13  Carolina Freight, did you ever file a grievance?
14  A    Oh, yeah.
15  Q    Okay. Approximately how many grievances did
16  you file?
17  A    Well, being a union steward you had to turn
18  grievances in all the time. I wouldn't even be able to
19  venture a guess.
20  Q    Well, let me break that down a little bit.
21  Did you ever file a grievance on your own behalf?
22  A    Yes.
23  Q    Okay. Approximately how many grievances did
24  you file for yourself?
25  A    Maybe four.

---

**15**

1          MR. MIRIN: Objection. Is this altogether or
2  any specific time frame?
3  BY MS. WALSH:
4  Q    Well, during the years that you worked at
5  Carolina Freight, how many grievances did you file on your
6  own behalf?
7  A    I'm just guessing probably around four or
8  five.
9          MR. MIRIN: That would be up to the '94, '95
10  activity closing down?
11          MS. WALSH: During the time that he was at
12  Carolina, right, up until it closed down.
13  BY MS. WALSH:
14  Q    What were the circumstances of each of those
15  grievances? Well, why don't I break that down. Do you
16  recall the first grievance that you filed?
17  A    No, but it was probably for like runaround.
18  Q    Okay. Did you file a grievance for any other
19  reason?
20  A    I was fired once for an accident in the yard.
21  I guess that would be -- you know, I was reinstated.
22  Q    Okay. Any other grievances that you can
23  recall, any other circumstances that you filed a grievance?
24  A    I can't recall any at this time but those are
25  the ones -- I mean, most of the time when you're filing it's

---

**16**

1  for runaround --
2  Q    Right.
3  A    -- or whatever, something of that nature.
4  Q    Okay. You said that you were -- you filed a
5  grievance regarding a yard accident.
6  A    Correct.
7  Q    Can you tell me a little bit about that
8  incident?
9  A    We had a unit that wouldn't scale, and we had
10  it in the shop three times. We were having a hard time
11  sliding the tandems, and when it got out in the yard the
12  doors got busted open or whatever from shifting, you know.
13  What happened was, as testified by the mechanic, from us
14  jostling it around the skids must have gotten moved and then
15  they fell back whenever we got out in the yard.
16  Q    So you were disciplined for that incident; is
17  that right?
18  A    Yes, oh, yeah.
19  Q    What was your discipline?
20  A    Well, I was discharged -- at that time you
21  were discharged till your hearing.
22  Q    Till your hearing?
23  A    Yes.
24  Q    And you filed a grievance because of that?
25  A    Yes, you have to. If you want to get

---

**17**

1  reinstated, you have to.
2  Q    Right. Who were you represented by in the
3  grievance?
4  A    I'm not -- I think it was -- it was Local 776,
5  of course.
6  Q    Okay.
7  A    I think it was Carlos Ramos. I think that's
8  what it -- I think it was Carlos at that time.
9  Q    What level of the grievance process did that
10  go through?
11  A    Local, and then we went to what they call
12  Eight Cities, which they have no more.
13          MR. WEINSTOCK: I'm sorry.
14          MR. SANTUCCI: Eight Cities, which they have
15  no more.
16  A    I think it went to Eight Cities.
17  BY MS. WALSH:
18  Q    And what was the result of that?
19  A    I was reinstated.
20  Q    You were reinstated. Did you receive back pay
21  after your reinstatement?
22  A    Oh, no, no. I'm not sure if it did go to
23  Eight Cities. I'm not exactly sure if we went to Eight
24  Cities or not. I know we went to -- no. It only went to a
25  local hearing. From my memory, I think we only went to a

---

5 (Pages 14 to 17)

BECHTEL, RICKEY
3/7/2002

BECHTEL VS
VIRTUE

18

1  local hearing.
2     Q     Okay.
3     A     No, I didn't get no back pay. It was part of
4  what was agreed upon by the union.
5     Q     You mentioned that you filed maybe four or
6  five grievances. Did any of those grievances also go to the
7  local level?
8     A     A few of them I would think. The runarounds,
9  sometimes they go. You're really testing my memory.
10    Q     Okay.
11    A     I'm just --
12    Q     Other than grievances, have you ever been
13  involved in any other kind of litigation? What I mean by
14  litigation is being either a party or a witness or involved
15  in a court proceeding.
16    A     No, not that I can remember. I don't know of
17  any.
18    Q     Okay. Have you ever filed an NLRB charge?
19        MR. MIRIN: An unfair labor practice charge.
20    A     No, no.
21  BY MS. WALSH:
22    Q     Have you ever filed a grievance against any
23  other employer other than Carolina Freight?
24    A     Oh, probably at Hall's for runaround. Red
25  Star, no, I never had a problem there.

19

1     Q     What about since the time you left Carolina
2  Freight in '95 up until the present time?
3     A     No. I'm in a nonunion job now.
4         MR. MIRIN: Off the record.
5         (Discussion held off the record.)
6  BY MS. WALSH:
7     Q     Why don't we go back on the record. Let me
8  ask you this question: is Stover Fuel Oil represented by
9  Local 776?
10    A     No, it is not.
11    Q     It's not. Okay. You had mentioned that you
12  spent -- and correct me if I'm wrong -- I think you said
13  about a year as a steward?
14    A     Correct.
15    Q     Okay. What were your responsibilities as a
16  steward?
17    A     To file grievances, try to be like the
18  mediator between disputes.
19    Q     Right. What types of incidents or cases did
20  you file grievances over at that time while you were a
21  steward?
22    A     Runarounds, missed load stuff. That covers
23  probably most everything you see. It was mostly like stuff
24  of that nature, yeah.
25    Q     Did you file grievances or handle disputes

20

1  involving seniority or seniority rights?
2     A     The only time we get into seniority rights
3  would have been on runarounds, so I would say yes.
4     Q     As a steward, were you familiar with the
5  National Master Freight Agreement and the supplements?
6     A     I'll be honest with you. I'm not as good at
7  it as I probably should have been. I know of them and can
8  read them. That doesn't mean I always understand whatever I
9  read.
10    Q     When you were processing grievances, did you
11  read the contract?
12    A     A lot of times I would basically help -- get
13  help from the -- union help.
14    Q     Are there any other types of grievances that
15  you have processed while you were a steward?
16    A     I don't know what you're looking for. I don't
17  know. There might be but unless it was presented to me and
18  I could read it and maybe recollect it I don't have -- I'll
19  be honest with you. I really don't know.
20    Q     Okay. Let's jump ahead a little bit here.
21  You were employed at Carolina Freight. When were you laid
22  off from Carolina Freight?
23    A     It should have been probably the end of March
24  of '95, roughly in that area there, because you got -- if
25  you don't work in 30 days I think it was you're laid off.

21

1     Q     So was there a situation where you hadn't
2  worked for a period of time prior to the date of your
3  layoff?
4     A     I was working one or two days. I can't
5  pinpoint it down at this point. I'm not exactly sure
6  without looking at the paperwork when the change actually
7  took effect.
8     Q     Okay. What change are you talking about?
9     A     Well, they were going to move -- break it
10  down. Carolina was going to lose so many people and some --
11  they were supposed to leave like I think 120 there and that
12  was your options. Everybody had options to go, and I chose
13  to stay.
14    Q     You chose to stay?
15    A     (Witness nods head affirmatively).
16    Q     And this was when Carolina was closing its
17  facility; is that right?
18    A     That's when they were doing their change of
19  operation. They weren't -- we were told they were going to
20  keep X amount of people there in Carlisle for X amount of
21  time and possibly it would stay open.
22    Q     And when you're saying that you were told they
23  were going to keep X amount of people there, when were you
24  told this, what date are we looking at here?
25    A     They gave you -- whenever they do a change of

GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577

BECHTEL, RICKEY
3/7/2002

BECHTEL VS
VIRTUE

**22**

1 operations they always -- we had a union meeting, and that's
2 the best that I can understand it anyways.
3          MS. WALSH: Why don't we go ahead and mark
4 these as Bechtel Exhibits 2 and 3.
5          (Letter dated March 21, 1995 to Mr. Griffith
6 and Mr. Carey from Mr. Valitutto marked as Bechtel Exhibit
7 2.)
8          (Letter dated March 27, 1995 to Mr. Griffith
9 from Ms. Caira marked as Bechtel Exhibit 3.)
10 BY MS. WALSH:
11     Q     Let me just jump back for one second here.
12 You mentioned that you -- I believe you were talking in
13 March of '95 a union meeting being held to talk about the
14 changes at Carlisle at Carolina's facility?
15     A     Well, they had it -- well, they would have had
16 it before March. It was in the beginning of the year
17 because -- I don't know how long it takes to do some of this
18 but it was -- the best I remember it was the beginning of
19 the year but -- like I say, around March I think is when --
20 I can't remember when the date was that they put it forward
21 or whatever you want to say.
22     Q     Who put it forward?
23     A     The plan -- well, they were -- what was
24 happening was they were taking freight away. You just can't
25 go up one day and shut it down and not have freight out.

**23**

1 You have to get that freight out, and they were preparing
2 for a shutdown I guess you would say basically. You can't
3 shut down and leave freight there. You've got to get it
4 out.
5     Q     And that was Carolina that you're referring to
6 when you say preparing?
7     A     Correct.
8     Q     Did that facility shut down?
9     A     Yes, they did.
10     Q     Do you recall when that occurred?
11     A     No, I don't. Here it says on or about May
12 21st. That would sound correct because I didn't work up to
13 the last date.
14     Q     Okay. And you were just referring there for a
15 second to what we have marked as Bechtel Exhibit 2, and
16 that's a letter dated March 21st from Carolina Freight
17 Carriers Corporation to Mr. Thomas Griffith, President of
18 Local 776, and Mr. Ron Carey, President of the International
19 Brotherhood of Teamsters. That's the letter you were
20 looking at?
21     A     Yes, yes.
22     Q     Okay. Have you seen this letter before today?
23     A     Oh, I would think so.
24          MR. MIRIN: Don't speculate. If you have a
25 present memory, you're supposed to provide it.

**24**

1 BY MS. WALSH:
2     Q     Let me ask the question again. Have you seen
3 this letter before today?
4     A     I would say yes.
5     Q     Okay.
6     A     I'm pretty sure I have, yes.
7     Q     When did you see it or when do you believe you
8 saw it?
9     A     That I'm not exactly sure of.
10     Q     Would it have been back around the time of
11 March 21st, 1995 when the letter was dated?
12     A     I would assume yes because this more than
13 likely would have been -- I don't know. I would think we
14 had that. It would have had to have been after March 21st,
15 of course, but I would -- I'm pretty sure I've seen this,
16 yes.
17     Q     Okay. What about the next letter? We've
18 marked the second one as Bechtel Exhibit 3. This is a
19 letter dated March 27th, '95. Do you recall if you have
20 seen this letter before?
21     A     Yeah, I'm sure I have seen that one before. I
22 remember hearing about that, and I'm sure I've read that. I
23 don't have it anymore, but I'm sure I have seen that one
24 too. I think that was in the papers, too. I mean the
25 public newspaper, like the Harrisburg Patriot. This was a

**25**

1 big thing back then.
2     Q     How did you receive notice that you were being
3 laid off from Carolina?
4     A     I don't believe I ever received -- I don't
5 remember receiving a layoff. I think if you don't work
6 after 30 days you're --
7     Q     Okay. If you don't work after 30 days what
8 happens?
9     A     You're considered laid off.
10     Q     Okay. At some point were you informed that
11 Carolina Freight was closing the Carlisle terminal or
12 shutting down operations at Carlisle?
13     A     By the letters and this letter, that Number 2
14 and 3, plus the union hall. Like I said, we had a -- I
15 can't give you the date of when it was, but I know there was
16 a union meeting about it.
17     Q     Okay. Was this only a union meeting or was
18 this a meeting that involved the employer as well?
19     A     It was -- let me think. It should -- I think
20 it was just the union hall. It was at the union hall and
21 the -- I don't think anybody from Carolina was there, but
22 ABF was there.
23     Q     ABF was there?
24     A     Yeah. They were actually taking job
25 applications.

7 (Pages 22 to 25)



---

**34**

1  showed you. You said that you thought you had seen this
2  letter; is that right?
3      A      It was showed to me, but I couldn't remember
4  filling it out.
5          MR. MIRIN: Counsel, that's Bechtel
6  Exhibit 4?
7          MS. WALSH: Yes, I'm sorry, Bechtel
8  Exhibit 4.
9  BY MS. WALSH:
10     Q      Do you recall when you would have seen this
11  letter?
12     A      Grievance hearings.
13     Q      Grievance hearings?
14     A      I think that's where I've seen it.
15     Q      Do you recall receiving this letter around the
16  time that it was dated of October 12, 1995?
17     A      I've signed the next paper, so I would have
18  had to have seen it, yes.
19     Q      The attachment, which is Bechtel Exhibit 5,
20  has a date. Well, let me ask you first at the top
21  right-hand corner where there is handwriting and not
22  counting the handwriting in the bottom left-hand corner, is
23  that your writing?
24     A      Yes.
25     Q      Okay. And is that your signature at the

---

**35**

1  bottom right-hand corner?
2      A      Yes.
3      Q      Okay. And it looks like, again, at the top
4  right-hand corner it's dated 10/15 of '95. Do you see that?
5      A      Yes.
6      Q      Do you have any reason to believe that that
7  wasn't the correct date or the date that you signed it?
8      A      It looks like my handwriting.
9      Q      Okay. Is there any reason why you would have
10  signed it on a different date that you can think of?
11     A      You're talking '95. I --
12     Q      Okay. All right. Looking at the first page
13  of the letter and the second full paragraph there where it
14  says as a result of the decision from the change of
15  operations committee, the Carolina employees who are laid
16  off at Carlisle, Pennsylvania will have certain rights to
17  future work opportunities with ABF, Article 5, Section 5 of
18  the NMFA addresses those rights. Do you see that paragraph
19  there?
20     A      Yes.
21     Q      Do you recall reading that paragraph at the
22  time that you received the letter?
23     A      I would say probably.
24     Q      At the time that you received this letter were
25  you familiar with Article 5, Section 5 of the NMFA?

---

**36**

1      A      I would probably have read it sometime along
2  the line. I'm not saying when. I'm not exactly sure. I
3  would say I probably read it somewhere along the line.
4  Being a steward for a year, somewhere along the line some
5  way you're going to run into it.
6      Q      Do you recall what you understood about
7  Article 5, Section 5 back then, back at the time you got the
8  letter?
9      A      No. You're talking almost eight years now,
10  seven years. I've been out of the union full-time since ABF
11  -- I mean Carolina.
12     Q      Okay. And the second page -- and this is
13  marked as Bechtel Exhibit 5 -- this is your -- you said this
14  is your writing here. Did you fill out this form?
15     A      I signed it. I would say yes.
16     Q      Okay. Did you return this form to ABF?
17     A      They got it. I would say yes.
18         MR. MIRIN: For the record, if I might, we're
19  looking at Bechtel Exhibit 5?
20         MS. WALSH: Yes.
21         MR. MIRIN: Do we have the original here for
22  inspection? All I've seen is a copy.
23         MS. WALSH: I don't have it at this moment.
24  This is the best copy that I have right now.
25         MR. MIRIN: Okay. We'll send you a letter on

---

**37**

1  it --
2          MS. WALSH: That's fine.
3          MR. MIRIN: -- asking for an opportunity to
4  inspect those. Thank you.
5  BY MS. WALSH:
6      Q      In the reference line it says Ref: Employment
7  opportunities under Article 5, Section 5 of the NMFA. Do
8  you see that there?
9      A      Yes.
10     Q      Okay. What was your understanding of when you
11  filled out this form what this form was for?
12     A      That if there is any work available I would be
13  called.
14     Q      Prior to the time that you signed and returned
15  the form, did you ask anyone any questions about it?
16     A      I can't truthfully say yes or no. I don't
17  remember for sure.
18     Q      Do you recall if you had any questions about
19  it?
20     A      I can't recall. It's been such a long time.
21  I can't truthfully give you an answer.
22     Q      Okay. Did you request any additional
23  information from ABF about this letter or what your rights
24  were?
25     A      I don't remember ever requesting anything

---

10 (Pages 34 to 37)

BECHTEL, RICKEY
3/7/2002

BECHTEL VS
VIRTUE

**38**

1  because I figured this paper seems to be pretty
2  self-explanatory to me. If there is work available, I will
3  be called.
4      MS. WALSH: Can we take five minutes?
5      (Recess.)
6  BY MS. WALSH:
7      Q      Mr. Bechtel, after you were laid off from
8  Carolina, did you look for other work?
9      A      Of course.
10     Q      Okay. Where did you look?
11     A      I looked a lot of places. I ended up working
12  for Denten. They're out of Michigan. I can't give you an
13  address at this point, but I worked the 581. It was through
14  the union.
15     Q      Which hall?
16     A      Local 776 construction. They have a road or a
17  dock and then they have I think a construction and they
18  might -- I think they have like for the jails and stuff.
19  You know, they have different divisions, in other words,
20  UPS.
21     Q      Okay.
22     A      But this was the construction part of it.
23     Q      What kind of work were you doing?
24     A      I was a driver.
25     Q      How long were you at Denten?

**39**

1      A      Till October.
2      Q      October of '95?
3      A      '95, yeah. It was just for the summer.
4      Q      After you worked at Denten, where did you
5  work?
6      A      Part-time for Roadway and -- yeah, Roadway.
7      Q      What were you doing?
8      A      And maybe Red Star. I'm not exactly sure. I
9  was trying to keep -- you know, you've got to make ends
10  meet.
11     Q      Sure. What were you doing for Roadway?
12     A      A jockey.
13     Q      Was that a full-time position?
14     A      No, casual.
15     Q      Casual?
16     A      (Witness nods head affirmatively.)
17     Q      Was that a local job or where was that
18  located?
19     A      Carlisle.
20     Q      Aside from Denten and Roadway, any other jobs
21  after the time you left Carolina?
22     A      Stover Fuel Oil.
23     Q      I think you said you started at Stover around
24  '96?
25     A      '95, right around April of '95. It was right

**40**

1  after -- I think that's when we had the blizzard, and I
2  started right after that.
3      MR. McCALL: April of '95?
4      A      '96 we had the blizzard. He got to be my oil
5  man. He called me. He knew I was laid off. He said could
6  you help me a couple days, and that transpired into a job.
7  BY MS. WALSH:
8      Q      And you've been at Stover ever since then?
9      A      Yes.
10     Q      Did you ever work for ABF?
11     A      No. I applied two times and never -- when
12  Hall's went under I applied and never was offered any work,
13  and when they were there at the union meeting I applied and
14  never ever was ever offered any work. I guess they just
15  didn't want me. I don't know.
16     Q      When you're talking about the union meeting,
17  is that the same as you were talking about before?
18     A      Yes, yes, when they were talking about closing
19  down Carlisle.
20     Q      Okay. Now, were you ever contacted by ABF
21  regarding a work opportunity?
22     A      The only time I was ever called was -- I don't
23  have my paper in front of me. They called me and offered me
24  work in I think it was November.
25     Q      Do you recall who -- I'm sorry.

**41**

1      A      I'm not sure of the year. I was offered to go
2  I think like Texas or Minnesota or Michigan or take a
3  layoff. It was just strictly on the phone, and you had to
4  make a decision right then. It wasn't call us back in 10
5  days. It was you need to make a decision now, and I wasn't
6  going to Waco, Texas. They offered me a driver job, which I
7  thought that was kind of unusual.
8      Q      They offered you a driver job?
9      A      Yes, it was strictly a driver job.
10     Q      Do you recall who you spoke with?
11     A      No.
12     Q      Okay. Do you know where they were calling
13  from, what location they were calling from?
14     A      Arkansas, is that where -- Arkansas. I can
15  only assume that, you know, I'm talking to them on the phone
16  -- it was strictly a phone call. It wasn't anything --
17  after that I received paperwork saying you will remain in
18  layoff in Carlisle.
19     MS. WALSH: Why don't we go ahead and mark
20  Bechtel Exhibit 6.
21     (Letter dated November 9, 1995 to Rickey
22  Bechtel from Gordon Ringberg marked as Bechtel Exhibit 6.)
23  BY MS. WALSH:
24     Q      Mr. Bechtel, do you recall receiving this
25  letter?

BECHTEL, RICKEY
3/7/2002

BECHTEL VS
VIRTUE

---

**42**

1    A    Without having mine in front of me, I would
2  say this is probably the letter that I got. I do have this
3  one somewhere.
4    Q    This one being Bechtel Exhibit 6?
5    A    This paper that I received a phone call. I
6  can't say if that's the correct places they offered me, but
7  I did decline to stay in layoff in Carlisle.
8    Q    You said you received a phone call; is that
9  right?
10    A    Yes.
11    Q    Okay. What exactly did the caller tell you?
12    A    The best I can remember they offered me jobs
13  as a driver. Do you want to go, if not -- you know, it was
14  kind of brief. There wasn't really no -- what I can
15  remember. I'm just going by what I can remember. It was
16  nothing really -- this is what we're offering you, you need
17  to make a decision like now.
18    Q    Okay. Did you make a decision?
19    A    I stayed in layoff in Carlisle, yes.
20    Q    Okay. Why did you decline the job
21  opportunity?
22    A    Because my roots are in this area, my family
23  is here.
24    Q    After you declined this job offer, did you
25  ever renew your request for work opportunities?

---

**43**

1    A    I don't remember ever -- I don't remember even
2  having to have to do that. I just figured with this letter
3  that is -- you know, I can't -- unless you can provide me
4  something, it's a long time. I don't remember ever doing
5  that, no.
6    Q    Okay. Were you ever contacted about other
7  opportunities at ABF?
8    A    No, not that I can remember, no. This was the
9  last that I was ever -- that I remember ever being contacted
10  was this letter here marked Bechtel Exhibit 6.
11    MS. WALSH: Why don't we mark this as Bechtel
12  Exhibit 7.
13    (Complaint marked as Bechtel Exhibit 7.)
14  BY MS. WALSH:
15    Q    Mr. Bechtel, have you seen this document
16  before?
17    MR. MIRIN: Yes.
18    A    Yes. He would know better than I would. I
19  have seen many papers. I would say yes.
20    MR. MIRIN: I think he's saying he has seen
21  drafts.
22    A    I mean, I'm not a lawyer. I don't remember
23  all this stuff. I just --
24  BY MS. WALSH:
25    Q    That's fine. All I'm asking you is if you

---

**44**

1  have seen this particular document here before.
2    A    I would say yes.
3    Q    Okay. Did you read this document?
4    A    By looking at it, briefly going over it, I
5  would say, yes, it looks like everything.
6    Q    All right. Thank you. At some point did you
7  learn about vacancies at ABF's Carlisle terminal?
8    A    Yes.
9    Q    How did you become aware of vacancies there?
10    A    Actually, I was coming out of Roadway Express
11  and happened to make the left-hand turn -- usually I go
12  right -- and there was a trailer sitting there that said
13  dock -- road and dock or something like that opening. I
14  called a friend of mine and asked him about it, and that's
15  how I found out about it but basically, you know --
16    Q    Basically?
17    A    I seen that and called him because he was also
18  at Carolina and I thought he might know. We got talking.
19  He checked it out, and I filed a grievance.
20    Q    Who was the friend that you talked to?
21    A    Ray Snyder.
22    Q    How long have you known Mr. Snyder?
23    A    Since Hall's.
24    Q    Since Hall's?
25    A    Hall's Motor Freight, yeah, '79, '80. He was

---

**45**

1  a road driver. You know -- I mean, I knew of him.
2    Q    Right. When did you -- you said you were
3  coming out of Roadway and saw a sign. When was that?
4    A    Shortly before I filed my grievance. I don't
5  know the exact date.
6    Q    Do you know the year?
7    A    If you look at my grievance. I'm not sure
8  exactly what the date is, no.
9    MS. WALSH: Well, why don't we go ahead and
10  mark this then. This is Bechtel Exhibit 8.
11    (NMFA Grievance dated February 20, 2000 marked
12  as Bechtel Exhibit 8.)
13  BY MS. WALSH:
14    Q    Mr. Bechtel, is this the grievance that you
15  filed?
16    A    Yes.
17    Q    Okay. And here the date in sort of the upper
18  right-hand corner, the written date, is February 20th of
19  2000. Would you agree with that?
20    A    I would say that's correct.
21    Q    Okay. So going back to what we were talking
22  about earlier, does that refresh your memory as to when you
23  would have seen the sign regarding openings at Carlisle?
24    A    I don't know what you're asking.
25    Q    Seeing the date on the grievance here, does

---

12 (Pages 42 to 45)



BECHTEL, RICKEY
3/7/2002

BECHTEL VS
VIRTUE

46

1 that help you remember what the date might have been that
2 you saw the sign regarding positions at Carlisle?
3    A    It would have been real close to that. I only
4 worked weekends, so it would have been a weekend.
5    Q    By real close, are we talking days or months?
6    A    Oh, as soon as I seen that I got to calling
7 different people, but I only found Ray. In fact, he punched
8 a grievance for me because I don't -- you can't just walk
9 into these places, you know. He actually got me the
10 grievance, and then I filled it out.
11    Q    Ray got you the grievance?
12    A    Correct.
13    Q    When you first -- you said you called Ray or
14 you got a hold of Ray; is that right?
15    A    (Witness nods head affirmatively).
16    Q    Is that a yes? You're nodding.
17    A    Yes. I'm sorry.
18    Q    No problem. I get caught doing it, too. What
19 did you say in the conversation with Ray, what was said in
20 the conversation with Ray?
21    A    I knew he took layoff at Carlisle also, and I
22 didn't realize he even worked for ABF. He said I'm back at
23 ABF. Then he told me that they went back and I said well --
24 I didn't understand why we weren't offered. I just said
25 give me a grievance, I'm filing a grievance. Then I went

47

1 about my grievance procedures.
2    Q    Did he tell you anything else in that
3 conversation?
4    A    As far as --
5    Q    Anything. I'm just trying to get a sense of
6 what your conversation was with him regarding that.
7    A    He just said he came back as a road driver.
8 He found out on his own. I don't know why he didn't call me
9 but -- and then he said they had hired -- he found out they
10 had hired -- he didn't tell me that night he found out but
11 he punched me a grievance and I proceeded with my -- I asked
12 him could he get me a grievance, he's there, and I just
13 filed it.
14    Q    Did you talk to anyone else regarding openings
15 at Carlisle at this time that we're talking about here?
16    A    Not that I can remember. I remember calling
17 Ray.
18    Q    Okay. What were you doing at the time that
19 you learned this information, where were you working?
20    A    Stover Fuel Oil, Hershey.
21    Q    Now, you said Ray got you the grievance form
22 here. Who filled out the form?
23    A    I did.
24    Q    Is that your handwriting there?
25    A    Yes, it is.

48

1       MR. MIRIN: I'm sorry, Counselor. You've
2 marked that number what?
3    A    Eight.
4       MR. SANTUCCI: Eight.
5 BY MS. WALSH:
6    Q    Prior to the time that you filed the grievance
7 form, did you contact anyone at ABF regarding openings at
8 Carlisle?
9    A    No, I don't think so. I don't remember
10 calling anybody up.
11    Q    You never called anyone to get more
12 information -- called anyone at ABF to get more information?
13    A    Not that I remember, no, no. Like I said,
14 with the letter that I had I just figured if they had work
15 they're going to call us. That's why we -- you know,
16 somebody should be watching that. I'm just trying to make a
17 living, you know, and that's why -- one of the reasons I
18 kept my union dues and stuff paid up.
19       MR. MIRIN: Off the record.
20       (Recess.)
21 BY MS. WALSH:
22    Q    Let's turn back here to Bechtel Exhibit 7. If
23 you could just look at what's numbered Paragraph 10 on Page
24 5, I just want to clarify your testimony here. Paragraph 10
25 states Mr. Bechtel learned, by word of mouth, that there

49

1 appeared to and I believe the word should be in there --
2       MR. MIRIN: It was omitted it looks like.
3 BY MS. WALSH:
4    Q    -- vacancies at the "Carlisle Barn" of ABF and
5 undertook to contact ABF in February of 2000. I just wanted
6 to clarify. Did you undertake to contact ABF regarding
7 vacancies at Carlisle Barn in February of 2000?
8    A    By grievance.
9    Q    Your grievance? Okay. And that's your only
10 contact with ABF regarding vacancies at Carlisle?
11    A    That I remember. That I remember, yes.
12    Q    Okay. Let's go back to your grievance. You
13 stated that this is your handwriting; is that right?
14    A    Yes.
15    Q    Did you have any help preparing this
16 grievance?
17    Q    Help?
18    Q    Did anyone assist you to prepare the
19 grievance?
20    A    Yeah.
21    Q    Who was that?
22    A    Ray.
23    Q    Ray?
24    A    Ray Snyder.
25    Q    Is that Mr. Snyder's full name, Ray Snyder?

GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577



BECHTEL, RICKEY
3/7/2002

BECHTEL VS
VIRTUE

---

**54**

1  decision from Local 776. Did you attach those documents to
2  this grievance or include those with this grievance?
3      A    I would think so. I think they all came
4  together. Attachments, yeah. I would say they came with.
5  You don't have those? That would all have been at my
6  grievance hearings. You should have that.
7          MS. WALSH: Okay. Let's mark this as Bechtel
8  Exhibit 9.
9          (Reason for grievance marked as Bechtel
10 Exhibit 9.)
11 BY MS. WALSH:
12     Q    Mr. Bechtel, have you seen this document
13 before?
14     A    Yes.
15     Q    Can you identify this document for me?
16     A    Yeah. It's one -- I think that's the one
17 that's attached to the grievance.
18     Q    Did you write this document, and by writing I
19 mean is this your language as opposed to typing it?
20     A    Yes. Some of it came out of the Master
21 Freight but --
22     Q    When did you draft this document?
23     A    Excuse me?
24     Q    When did you draft this document?
25          MR. WEINSTOCK: By this you're referring to

---

**55**

1  Exhibit 9?
2          MR. SANTUCCI: Right.
3      A    When I was filling out my grievance. I
4  believe it was somewhere in that area there or right after
5  it was. I can't give you a specific time or date.
6  BY MS. WALSH:
7      Q    You sent this to Local 776?
8      A    Yes.
9      Q    Did Local 776 process your grievance?
10     A    Yes, they did.
11         MS. WALSH: Why don't we mark this as Bechtel
12 Exhibit 10.
13         MR. MIRIN: This is Exhibit 9?
14         MR. SANTUCCI: Exhibit 10.
15         MR. MIRIN: Okay. Exhibit 9 being the typed
16 document?
17         MR. SANTUCCI: Correct.
18         (Letter dated February 29, 2000 to Rickey
19 Bechtel from Charles Shughart marked as Bechtel Exhibit 10.)
20 BY MS. WALSH:
21     Q    Mr. Bechtel, have you seen this document
22 before?
23     A    Yes.
24     Q    Do you recall receiving this document?
25     A    Yes.

---

**56**

1      Q    Okay. Did you have conversations with anyone
2  at Local 776 regarding your grievance?
3      A    Well, sure.
4      Q    Okay. Who did you speak with there?
5      A    Charles Shughart.
6      Q    Anyone else?
7      A    I think that was Charles, Chuck as we know
8  him. He's the one that dealt with it. He's the one that --
9  when we went to ABF at the terminal, he was the one that was
10 there.
11     Q    When you went to ABF at the terminal, what are
12 you referring to there?
13     A    Well, we had to go meet with them to discuss
14 my grievance, and they can make a decision there. They can
15 make a decision any time as to whether you'll come back or
16 you won't come back or whatever.
17     Q    When did that meeting take place?
18     A    There should be another letter somewhere
19 saying when that was.
20         MR. MIRIN: Excuse me. In your prior response
21 you indicated they can make a decision at any time, and I'm
22 not certain who the they refers to. For the record, who is
23 they?
24     A    Well, if they agree with my grievance --
25         MR. MIRIN: Who is the they?

---

**57**

1      A    ABF. If ABF would agree with my grievance and
2  say, yes, we missed you, we made a mistake, we can reinstate
3  you, that kind of stuff.
4          MR. MIRIN: Okay. Very good.
5          MS. WALSH: Why don't we mark a couple more
6  here. Mark this one as Exhibit 11. Why don't we just go
7  off the record for a second and mark a bunch of these here.
8          (Discussion held off the record.)
9          (Memorandum dated March 29, 2000 to Charles
10 Shughart from Rickey Bechtel marked as Bechtel Exhibit 11.)
11         (Letter dated March 29, 2000 to Rickey Bechtel
12 from Charles Shughart marked as Bechtel Exhibit 12.)
13 BY MS. WALSH:
14     Q    What we've marked as Bechtel Exhibit 11, have
15 you seen this document before?
16     A    Yes.
17     Q    Did you write this document?
18     A    Yes.
19     Q    And did you send this document to Local 776?
20     A    Yes.
21     Q    Okay. And the date that it's written, is that
22 correct? March 29th, 2000, is that the correct date?
23     A    I would say yes.
24     Q    Okay. Let's move to Bechtel Exhibit 12. Have
25 you seen this letter before?

---

15 (Pages 54 to 57)



BECHTEL, RICKEY
3/7/2002

BECHTEL VS
VIRTUE

---

58

1    A    Yes.
2    Q    Did you receive this letter?
3    A    Yes.
4    Q    And this states that your grievance will be
5    discussed at the company level on Wednesday, April 5th,
6    2000, at 9:30 a.m.  Did that in fact happen?
7    A    Yes.
8    Q    Okay.  Was there a meeting to discuss your
9    grievance?
10    A    As meaning -- what do you mean by that?
11    Q    Let me ask it this way:  did you discuss your
12    grievance with ABF on that date?
13    A    Yes.
14    Q    Okay.  Were you present at that meeting?
15    A    Yes.
16    Q    Who else was present?
17    A    Charles Shughart, whoever the terminal manager
18    was.  Quidort I think his name was.
19         MR. MIRIN:  Spell that for this young lady.
20    A    That I don't know how to spell.
21         MS. WALSH:  That's okay.  Quidort; is that
22    correct?
23         MR. MIRIN:  Quidort or Kidor.
24    A    Yeah.
25         MR. MIRIN:  Phonetic.

---

59

1    A    He's an older gentleman.
2    BY MS. WALSH:
3    Q    And who was Mr. Quidort representing at that
4    meeting?
5    A    ABF.
6    Q    Do you know what his position was or title?
7    A    If I remember him saying, he was partially
8    retired or something.  I don't know exactly what his
9    position was, no.
10    Q    Okay.  Was anyone else at that meeting?
11    A    Thomas Schildt.  I think he was there the same
12    day as I was.  I think he was there, too.
13    Q    Thomas Schildt also filed a grievance?
14    A    Yes.
15    Q    And what was Thomas Schildt's grievance about?
16    A    The same thing as far as I remember.
17    Q    Okay.  What happened at the meeting?
18    A    They said we were denied.  They had no -- we
19    had no recall rights at all and that they said this 5.5, I
20    think it is, saying that that's what we would have to come
21    back under if we were going to come back.
22    Q    Did you say anything at the meeting?
23    A    I'm sure I said something.  I don't know
24    exactly what.  I didn't agree with it.  I said that when we
25    were laid off -- I'm just going by vague memory -- that

---

60

1    there was a layoff list, and they claimed there was no
2    layoff list.
3    Q    Who claimed that?
4    A    ABF.  They said the Carolina guys -- they were
5    given some kind of stuff that Carolina guys basically had no
6    rights is what it came out to.
7    Q    They said that they had no rights?
8    A    As far as dovetailing or whatever, no recall
9    rights.  They were -- like I said, this is the first I heard
10    of all this other stuff, you know, as far as -- I think they
11    showed us two lists.  There was a Carolina list and an ABF,
12    an ABF list, and that's the first I've ever seen that.
13    Q    You were saying all this other stuff, and I
14    just want to be clear what we're talking about here.  What
15    were you referring to when you say you learned all this
16    other stuff?
17    A    Well, I didn't know there was two layoff
18    lists, for one.
19    Q    All right.
20    A    Like I said, I wasn't -- I never knew of a
21    union meeting.  After ABF and Carolina merged, I never knew
22    of anything.  You know, usually when they have merges they
23    call a meeting for the guys.  I never received anything on
24    that that I remember, and I don't know if they ever had a
25    meeting --

---

61

1    Q    Right.
2    A    -- to clarify anything.  Like I said, when I
3    received my letter back from ABF, I just figured they'll
4    call when they need help.  You know, I have to live so I got
5    a job and I was working but I always left -- you know, I
6    always listened waiting for a phone call hopefully.  You
7    always have hopes.
8    Q    And the letter you're referring to was the one
9    that said that you denied -- you declined a position under
10    Article 5, Section 5?
11    A    Declined to move.
12    Q    Declined to move?
13    A    To move, yeah, and I would stay in layoff at
14    Carlisle.
15    Q    You mentioned two lists.  Was your name on
16    either of those lists?
17    A    They didn't even have a list for names.  It
18    was numbers.
19    Q    It was numbers?
20    A    Yes.
21    Q    So there were no names on the list?
22    A    They said they had no list at all.  The way I
23    understood it was there was zero laid off ABF and X amount
24    Carolina, maybe like 300 or something like that, but it
25    didn't -- they didn't have -- they told me they didn't have

---

16 (Pages 58 to 61)

BECHTEL, RICKEY
3/7/2002

BECHTEL VS
VIRTUE

---

62

1  no list.
2      Q      Well, let me just back up because I guess I'm
3  a little confused.  I thought earlier you were talking about
4  there being two lists, an ABF and a Carolina list?
5      A      Yeah.  There was a paper that I seen the
6  grievances and stuff and they showed it to me.  It said when
7  they did the merger or change I guess it was it showed
8  people being -- gaining terminals, losing terminals and it
9  showed, if I understand it correctly, layoff here, like
10 Carlisle, Brattleborough, whatever.  I'm just giving
11 examples of different places --
12     Q      Sure.
13     A      -- who's laid off at them places.  For some
14 reason they had an ABF and then they had a Carolina.  It was
15 a division, and I didn't understand why that was.
16     MS. WALSH:  Okay.  Let's mark this as Bechtel
17 Exhibit 14.
18     MR. MIRIN:  Counsel, I'm looking at the
19 document and it looks as if inadvertently -- and it doesn't
20 appear to change the sense of it -- that the left-hand side
21 has been redacted starting about halfway down the page with
22 the second line of the paragraph starting following is.
23     MS. WALSH:  I believe that's perhaps one
24 letter got cut off in the copying process.
25     MR. MIRIN:  It looks like it, but looking at

---

63

1  the margins I don't know.  Would you have another copy that
2  might have --
3      MR. SANTUCCI:  We'll send you a letter with
4  it.
5      MR. MIRIN:  I don't want to delay us.  It
6  appears to be nominal.
7      MS. WALSH:  We'll get you a copy at the break.
8      MR. MIRIN:  Thank you.
9      MR. McCALL:  Here you go.
10     MR. MIRIN:  Thank you, Counselor.
11     (Letter dated April 5, 2000 to Andy Upchurch
12 from Charles Shughart marked as Bechtel Exhibit 13.)
13     (Electronic mail dated 9/19/95 marked as
14 Bechtel Exhibit 14.)
15 BY MS. WALSH:
16     Q      Mr. Bechtel, have you seen this document
17 marked as Bechtel Exhibit 14 before?
18     A      I believe this is the one that was at the
19 hearings.
20     Q      What hearings are those?
21     A      The grievance hearings down in -- I went to
22 hearings -- I had to go to North Carolina to I think that
23 was the eastern conference, and then I had to go to Florida
24 for change of operations I think it was.  They sent it there
25 to clarify it or try to get an answer on my grievance.

---

64

1      Q      Prior to those hearings, had you seen this
2  decision?
3      A      I don't think so.  I don't remember ever -- I
4  never received one at the house or anything like that.
5      Q      Did you ever read this prior to those hearings
6  -- prior to preparing for those hearings?
7      A      I don't think so.  I'm not sure if I got one
8  of these or not.  It might have been something when I -- I'm
9  note sure if I got this when I requested the answer to the
10 change of operations with the union.  I might have gotten it
11 then.  I do remember seeing this.  I don't recall exactly
12 when I got it though.
13     Q      Okay.  Well, let's turn to the last page of
14 that document.
15     A      Yeah.  That's the list.
16     Q      Is that the list that you were talking about
17 earlier?
18     A      Yeah.  This is what was showed -- yeah, this
19 is the list that was shown to me I think it was at the local
20 hearing.
21     Q      At the local hearing.  Did anything else
22 happen at the local hearing?
23     A      As far as --
24     Q      Well, let me ask you this:  did Mr. Shughart
25 make any statements at the hearing?

---

65

1      A      I'm sure he did, but I'm not exactly sure what
2  all he said anymore.
3      Q      Okay.  Do you recall anyone else speaking at
4  the hearing?
5      A      Everybody said something along the way but I
6  don't -- I can't recollect exactly what everybody said, no.
7      MS. WALSH:  Let's mark this as Bechtel Exhibit
8  15.  Let me back up for a second because I think we marked
9  13 here.  Let's take a look at that.
10     MR. MIRIN:  That's a letter dated April 5th,
11 2000?
12     MS. WALSH:  Right.
13 BY MS. WALSH:
14     Q      Mr. Bechtel, have you seen this letter before?
15     A      Yes.
16     Q      Did you receive this letter from Mr. Shughart?
17     A      Yes.
18     MR. MIRIN:  I'm not trying to be contentious,
19 Counselor, but it jars every time -- up here they call it --
20 they pronounce it Shughart.
21     MS. WALSH:  Shughart, sorry.
22     MR. MIRIN:  That's all right.  He was a judge
23 over in Cumberland -- his daddy was a judge over in
24 Cumberland County.
25     MS. WALSH:  I'll try and be correct.  Let's

---

17 (Pages 62 to 65)



BECHTEL, RICKEY
3/7/2002

BECHTEL VS
VIRTUE

66

1  mark these as 15, 16 and 17.
2  (Memorandum dated May 17, 2000 to Charles
3  Shughart from Rickey Bechtel marked as Bechtel Exhibit 15.)
4  (Letter dated May 24, 2000 to Rickey Bechtel
5  from Charles Shughart marked as Bechtel Exhibit 16.)
6  (Seniority Roster marked as Bechtel Exhibit
7  17.)
8  BY MS. WALSH:
9  Q  Let's just take a look at what we've marked as
10  Bechtel Exhibit 15. Mr. Bechtel, do you recognize this
11  document?
12  A  Yes.
13  Q  Did you write this document?
14  A  Yes.
15  Q  Okay. Did you request a seniority list of
16  union employees in Carlisle, Pennsylvania?
17  A  Yes. That's what is stated in the letter.
18  Q  Did you ever receive the list?
19  A  I got -- yes, somewhere, yeah.
20  Q  Let's jump to Bechtel Exhibit 17 here for a
21  second. Do you recognize this document?
22  A  The front cover -- I've seen the seniority
23  list from Chuck. I don't think it was sent exactly to me.
24  It was showed to me I'm sure in hearings. I've seen it.
25  MS. WALSH: Okay. Actually, let's mark this

67

1  as Exhibit 18.
2  (Letter dated May 24, 2000 to Andy Upchurch
3  from Charles Shughart marked as Bechtel Exhibit 18.)
4  BY MS. WALSH:
5  Q  Let me just quickly ask you about what we've
6  marked as Bechtel Exhibit 16. Do you recognize this letter?
7  A  Yes.
8  Q  Do you recall receiving this letter on or
9  about May 24th, 2000?
10  A  I think I have this one yet.
11  A  I'm sorry. You said you did?
12  A  I think I have this letter.
13  Q  Okay. And then Bechtel Exhibit 18, do you
14  recognize that document or have you seen that document?
15  A  Well, that wasn't addressed to me. I don't
16  know if I've ever seen it personally. I might have.
17  Q  Great. Thank you.
18  A  Because I had -- I probably seen it whenever
19  Chuck sat down with me and we got ready for hearings.
20  Q  Okay.
21  A  That's probably when I seen it. I'm not
22  exactly sure of the date.
23  MS. WALSH: All right. I think we're through
24  with those for now. Why don't we mark this as Bechtel
25  Exhibit 19.

68

1  (Letter dated June 15, 2000 to Rickey Bechtel
2  from Charles Shughart marked as Bechtel Exhibit 19.)
3  MR. MIRIN: Mr. Shughart, I was at what we
4  call Shivas services at 6:45 this morning, and I'm beginning
5  to get a severe blood sugar headache because that's when I
6  had my cup of coffee and --
7  MR. SANTUCCI: If you want to break for lunch,
8  that's fine. Let's go off the record.
9  (Discussion held off the record.)
10  (Luncheon recess.)
11
12  AFTERNOON SESSION
13
14  BY MS. WALSH:
15  Q  Mr. Bechtel, before we broke for lunch I
16  believe we marked what is Bechtel Exhibit 19. Do you have
17  that in front of you there?
18  A  Yes.
19  Q  Do you recognize this letter?
20  A  Yes.
21  Q  Do you recall receiving this letter?
22  A  Yes, I believe, yeah.
23  Q  This letter is advising you that your
24  grievance is going to be presented at the Eastern Region
25  Grievance Committee; is that right?

69

1  A  That is correct.
2  Q  Okay. Did you actually attend the --
3  A  Yes, I did.
4  Q  You did?
5  A  I'm sorry. I didn't mean to interrupt you.
6  Q  No, that's okay. Prior to the time that you
7  attended the Eastern Region meeting, did you have any
8  discussions with the union about your grievance?
9  A  Oh, yes.
10  Q  Okay. And, again, who did you speak to at the
11  union regarding your grievance?
12  A  Charles Shughart.
13  Q  Is there anyone else that you spoke with?
14  A  Chuck was the one that was -- that we sat down
15  and met on I don't remember which date it was and I'm sure
16  somewhere somebody has the -- what was presented down at
17  eastern conference, the information that was given. We sat
18  down and he just -- you know, we went through how we were
19  going to present it.
20  Q  Okay. Did Chuck Shughart ask for any
21  information from you about your grievance?
22  A  He might have. I mean, everything I had was
23  given to him.
24  Q  Okay. How many times did you meet with him?
25  A  Once.

18 (Pages 66 to 69)

BECHTEL, RICKEY
3/7/2002

BECHTEL VS
VIRTUE

70

1    Q      Where did you meet him?
2    A      Union Hall 776.
3    Q      Aside from meeting with him in person, did you
4    have any other conversations -- how many conversations did
5    you have with him?
6    A      It was pretty much everything covered.  I
7    might have talked to him once or twice to make sure of
8    dates, you know, of when we're going and when I got to be
9    there, that kind of thing, but we were there pretty long
10   till we got -- I had to go see him after he had it
11   together.  You know, first it was a rough draft, and then I
12   had to go back but it wasn't -- maybe two or three times at
13   the most.
14   Q      Okay.  By having it all together, what are you
15   referring to?
16   A      What was presented at the Eastern Region
17   Grievance Committee.
18   Q      Are you talking about a written document or
19   something else?
20   A      The paperwork that was presented.  It had like
21   -- it had my grievance and then some of the different
22   papers that we've already been through.
23         MS. WALSH: Okay.  Let me go ahead and mark
24   Bechtel Exhibit 20.
25         (Electronic mail dated 7/10/2000 marked as

71

1    Bechtel Exhibit 20.)
2    BY MS. WALSH:
3    Q      Mr. Bechtel, do you recognize this document?
4    A      Yeah.
5    Q      Can you tell me what this document is?
6    A      It's basically what our brief was.
7    Q      Do you know who wrote this document?
8    A      I think this is when I was sitting with Ray.
9    Q      With Ray?
10   A      Snyder.  I think we sat down or I -- either I
11   wrote it up and sent it to him and let him look at it
12   because it's always nice to have two people looking at
13   something.
14   Q      Let me just ask you about the e-mail addresses
15   here.  The from e-mail address, do you recognize who that
16   is?
17   A      That's Ray Snyder, yeah.
18   Q      Okay.  And the to e-mail address, do you --
19   A      That's me.  As you can see, I'm a wrestler's
20   dad.
21         MR. MIRIN: A high school wrestler's dad.
22   A      Yes.  That's exactly what it stands for.
23   BY MS. WALSH:
24   Q      All right.  So when did you write this
25   document?  Well, let me ask you this way:  was this something

72

1    that you wrote before your meeting with Mr. Shughart or
2    after?
3    A      I don't know whether I met -- I think it was
4    -- I'm not sure if it was before or after.  I'm not exactly
5    sure of that time frame, but I know Chuck wanted me to lay
6    out what we wanted, and we sat down and did what we had to
7    do with it then when we met.  I'm not sure if that was
8    before or after to be honest with you.
9    Q      Okay.  Did you ever give this document to
10   Chuck Shughart?
11   A      I think so.  I believe I did.  If you look in
12   the brief it would probably say at the end there because,
13   you know, I think when I talked to Chuck he said if you want
14   anything, you know, in the end or whatever you have your
15   say.
16   Q      And did you give him information to put into
17   the written documents?
18   A      Oh, yeah.  Whatever he had, him and I both
19   coordinated.
20   Q      Did he take the documents that you gave him
21   and use that in his written documents?
22   A      He took part, yeah.  He took -- I would say
23   yes.
24   Q      Did he get any other information from you
25   regarding what to put in the written documents submitted to

73

1    the Eastern Region conference?
2    A      He knows more about the contract than I do so,
3    you know, I had to put my faith in him.
4    Q      Okay.  In the first line of this e-mail it
5    says I was laid off from Carolina Freight in 1995 and
6    contractually I have 5 years to be recalled back to work
7    with all seniority.  Where does that statement come from or
8    what is the basis for your writing that sentence?
9    A      I think most of that came from -- it probably
10   came out of the Master Freight, but I know when we were laid
11   off when they had the union meeting it was brought to our
12   attention that you had five years.  I think that's pretty
13   much standard.  I don't know the contract inside and out but
14   -- and it might have even come from Chuck.  I'm not --
15   Q      Okay.  I'm sorry.  When you're talking about
16   the union meeting, which meeting are you talking about?
17   A      January of '95 when they were doing the
18   change.  You know, they try to cover as much as they can.
19   Q      And this was prior to --
20   A      Closing.
21   Q      Prior to Carolina closing; is that right?
22   A      Correct.
23   Q      Okay.  You also state in here -- and bear with
24   me to try to find it here.  Midway down there's a sentence
25   that starts after April 2000 stating that I feel I should be

GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577

BECHTEL, RICKEY
3/7/2002

BECHTEL VS
VIRTUE

74

1  offered --
2       MR. MIRIN: Under the contract?
3       MS. WALSH: I'm sorry. Let me move down.
4  BY MS. WALSH:
5    Q    Right under that it says this is the same job
6  I was laid off from. Do you see that phrase in there?
7    A    Yes. Okay.
8    Q    Okay. You were never an ABF employee; is that
9  right?
10   A    I never worked for ABF, no.
11      MS. WALSH: Okay. Let me mark this document
12  here as Bechtel Exhibit 21.
13      (Electronic mail dated 7/16/2000 marked as
14  Bechtel Exhibit 21.)
15  BY MS. WALSH:
16   Q    Mr. Bechtel, do you recognize this document?
17   A    Yeah. It looks like something I handled.
18   Q    Do you recognize the e-mail address in the to
19  line at the top?
20   A    That one I don't recognize offhand.
21      MR. MIRIN: Is counsel referring to Kjsny70?
22      MS. WALSH: Yes. I'm referring to the top
23  left-hand corner.
24  BY MS. WALSH:
25   Q    Under subject date there is to and an e-mail

75

1  address, KJsny70. Do you recognize that?
2    A    I'm not sure. That might be Ray's wife's
3  e-mail. I don't know. I'm not sure of that, but that's
4  probably what it might be. I don't know.
5       MR. McCALL: Was that from Kjsny70?
6       MS. WALSH: Yes. I'm sorry. Thank you.
7  BY MS. WALSH:
8    Q    And in the to line underneath that, is that
9  again your e-mail address?
10   A    You bet.
11   Q    All right. Now, it starts off by saying
12  Gentlemen, in review of the facts which were presented here
13  I would like to summarize what we have discussed. Who are
14  you addressing this to?
15   A    I'm pretty sure this is the letter I was going
16  to use and I probably did use down at the eastern
17  conference.
18   Q    I see. Okay. So is this a -- would you
19  characterize this as a draft of what you wanted to be
20  presented at the eastern conference?
21   A    A summary or whatever you want to say, yeah.
22   Q    Okay. Did you ever provide this to
23  Mr. Shughart?
24   A    I'm not sure if I showed this to him or not
25  because he said whatever you want to -- at the end said

76

1  you'll have your time and you can say -- you know, you can
2  say what you have to say in your defense or whatever.
3    Q    Okay.
4    A    You always get a chance to -- the grievant
5  always gets a chance to have some say or whatever you want
6  -- however you want to put it.
7    Q    Did you actually make a statement at the
8  Eastern Regional conference?
9    A    Oh, yeah. I went off of this. I don't know
10  if I read this completely like that, but I just needed
11  something to go on. Like this, if we're going on I might
12  not remember something quite right. It gives you a
13  guideline to go with.
14   Q    Do you recall aside from this document what
15  you said at the Eastern Region conference?
16   A    It was basically what was on here. No, I
17  don't recall word for word, and I'm sure that was dictated
18  down if you get a draft of that.
19      MS. WALSH: Okay. We'll come back to that.
20  Let me mark the next two.
21      (Letter dated July 18, 2000 to Rickey Bechtel
22  from Charles Shughart marked as Bechtel Exhibit 22.)
23      (Brief marked as Bechtel Exhibit 23.)
24  BY MS. WALSH:
25   Q    Mr. Bechtel, do you recognize what we've

77

1  marked here as Bechtel Exhibit 22?
2    A    Yes. 23?
3    Q    Well, let me start with 22.
4    A    Let's see what we've got here. Yeah, I
5  believe I have seen that before.
6    Q    Okay. And then 23, do you recognize that
7  document?
8    A    Yeah. It looks like the brief.
9       MR. MIRIN: Look at the whole thing.
10   A    I don't understand what the two is. There is
11  nothing on the two. Is that just -- what is that? Does
12  that mean Exhibit 2?
13      MR. MIRIN: One, two.
14   A    Okay. There is nothing on the page. That's
15  why I wondered.
16      MS. WALSH: Yes, I think that's right.
17   A    Exhibit 1 is the grievance. Is that what that
18  means as you're paging through here?
19      MS. WALSH: I believe that's --
20      MR. MIRIN: Those are dividers. It looks like
21  a divider.
22      MS. WALSH: Right.
23   A    Okay. I just want to make sure I know what
24  I'm looking at. This looks like the brief that Chuck and I
25  basically went down through and then my grievance and that

20 (Pages 74 to 77)

GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577

BECHTEL, RICKEY
3/7/2002

BECHTEL VS
VIRTUE

**78**

1  paper there we had earlier and a copy of the want ad.  I
2  think I've seen most of this before, yes.
3  BY MS. WALSH:
4      Q      Okay.  Let me just ask you a couple
5  questions.  Did you read the brief, this document marked as
6  Bechtel 23, prior to the time of the Eastern Region
7  conference?
8      A      Oh, yeah, because Chuck and I sat down and
9  went over it.
10     Q      You did?
11     A      Yes.
12     Q      Okay.  When did you sit down and go over it in
13  relation to when the Eastern Region conference was held?
14     A      I can't give you an exact date, but, like I
15  said, we had two meetings at least.  One we rough drafted
16  it.  Then he filled it out, and then he gave it to me and I
17  looked over it, but this is only part of what he presented.
18  I don't think this is everything that was presented at the
19  hearing.
20     Q      There were additional documents presented?
21     A      I think so.
22     Q      Do you recall what those were?
23     A      I think a decision from Washington.  Without
24  my stuff -- I didn't bring it along.  I didn't know I needed
25  it.

**79**

1      Q      Okay.  No, that's fine.  I just want to focus
2  now on the brief.  Did you have an opportunity to make
3  comments on the brief prior to the time it was submitted at
4  the Eastern Region conference?
5      A      I left it mostly up to Chuck because he knows
6  the contract and basically I can say I briefly -- I believe
7  I understood most of what he had.  It looked like he was
8  fighting for what I wanted.
9      Q      Okay.  Did you discuss the brief with anyone
10  else other than Chuck?
11     A      I probably talked it over with somebody, but I
12  know for sure I talked with Ray about it.
13     Q      Anyone other than Ray?
14     A      It's hard to say.  I probably could have.
15     Q      Did Ray make any comments about the brief?
16     A      Oh, I'm sure he said something somewhere along
17  the line.
18     Q      Did you pass those comments along to Chuck
19  Shughart?
20     A      If I thought there was something, you know,
21  worthwhile.
22     Q      Right.
23     A      It's just that I hadn't been in this for
24  awhile.  I lay my faith -- I try to lay my faith in the
25  union because they're at it every day.  You know, I'm just a

**80**

1  guy trying to make a living.
2          MS. WALSH:  Let me mark this as Bechtel
3  Exhibit 24.
4          (Brief marked as Bechtel Exhibit 24.)
5  BY MS. WALSH:
6      Q      Do you recognize this document that we've
7  marked as --
8      A      This looks like the brief that Chuck and I
9  went through and hacked around and changed this this way,
10  that way, whatever, before the final draft.
11     Q      On this last page, this handwritten page
12  attached to the back of the brief, is that your handwriting?
13     A      Oh, that looks like mine.
14     Q      Okay.  Did Mr. Shughart make all the changes
15  that you wanted made?
16     A      I believe he did, yes.
17     Q      Okay.  And did you approve or agree with the
18  final version of the brief as it was submitted?
19     A      To the best of, you know, whatever I know
20  about this, I thought it was fairly presented.
21     Q      Okay.  Was there anything that he did not put
22  in the brief that you asked him to?
23     A      I don't think so.  I think he was pretty --
24  like I said, I put my faith in him.
25     Q      Okay.  All right.  Now, you said that you

**81**

1  attended the hearing, the Eastern Region joint area
2  committee hearing; is that right?
3      A      (Witness nods head affirmatively).
4      Q      Who else attended the hearing?
5      A      At my hearing?
6      Q      Right, right, regarding your grievance.
7      A      Chuck Shughart was there.  I think Tom
8  Griffith was there.  I'm not sure if there was anybody -- I
9  think Tom was there and maybe a couple BA's.  I'm not sure
10  exactly who all was there.
11     Q      Anyone from ABF that you recall?
12     A      Oh, yeah, they had somebody there.  I don't
13  remember the name.
14     Q      Okay.  Who argued your grievance?
15     A      Chuck.
16     Q      And you said that you also had the opportunity
17  to speak at the hearing?
18     A      Yes.  I'm pretty sure I got to speak at that
19  one, and then I ended up in Florida.  I'm pretty sure you
20  get a chance at the end.
21     Q      Right.  How long did the hearing last
22  approximately?
23     A      Forty-five minutes maybe.  I don't know.  I'm
24  just guessing.
25     Q      Right.  And do you recall about how much time

BECHTEL, RICKEY
3/7/2002

BECHTEL VS
VIRTUE

82

1  the union had to present your case?
2      A      He basically just read through the brief and
3  plugged a few things here and there, but basically he read
4  the brief and fronted any questions they had.
5      Q      Okay.  What was the outcome of that hearing?
6      A      It was sent to -- help me out.  You know what
7  it's called.  Change of operations committee I think it was
8  called.  Was it eastern or whatever?
9      MS. WALSH:  Why don't we mark this one as
10 Exhibit 25, and let's mark this as Exhibit 26 while we're at
11 it.
12      (Decision dated July 25, 2000 marked as
13 Bechtel Exhibit 25.)
14      (Letter dated September 26, 2000 to Rickey
15 Bechtel from Charles Shughart marked as Bechtel Exhibit 26.)
16 BY MS. WALSH:
17      Q      Do you recognize what we've marked as Bechtel
18 Exhibit 25?
19      A      Yeah.  This looks like the letter that was --
20 well, it's a decision.  Yeah, I got this one sometime along
21 the line.  I don't remember what date.
22      Q      Do you recall when you received this decision?
23      A      No, I don't recall when.  It was within their
24 time limit of whatever that would be.  I don't know if it's
25 30 days or what.  I remember getting the paper with the

83

1  decision.  I can't give you an exact date or anything.
2      Q      Okay.  Did they make a ruling at the committee
3  stage while you were there?
4      A      Oh, no.  No, they don't do that I guess
5  because in case somebody freaks out.  Is that an honest
6  answer or what?
7      Q      We've marked Bechtel Exhibit 26.  Do you
8  recognize this document?
9      A      Yes.  This is from -- I think from Chuck
10 telling me when the next step was going to be.
11      Q      Right.  After you received this letter, did
12 you meet with Chuck at all to prepare for the change of
13 operations committee hearing?
14      A      I don't think we met because you've got to
15 present the same thing.  Whatever you presented -- as far as
16 I understand, whatever you present at one you have to
17 present at the other one.
18      MS. WALSH:  Let's mark this as Exhibit 27.
19      (Handwritten notes on La Quinta Inn letterhead
20 marked as Bechtel Exhibit 27.)
21 BY MS. WALSH:
22      Q      Mr. Bechtel, do you recognize this document?
23      A      It looks like my handwriting.
24      Q      Are these your notes?
25      A      Yeah, it looks like my handwriting.

84

1      Q      Do you recall when you made these notes?
2      A      That almost must have been in Florida.
3      Q      And that would be at the change of operations
4  committee meeting?
5      A      Yeah.  I think I stayed at the La Quinta Inn
6  down there.
7      Q      Did you take these notes at the meeting
8  itself?
9      A      I think I might have.  I think I might have.
10 I'm not exactly sure on that.
11      Q      Who argued on your behalf at the change of
12 operations committee meeting -- the change of operations
13 committee?
14      A      I think it was Chuck again, Chuck Shughart,
15 and I'm not sure if Tom was there, Tom the president of the
16 local.  Griffith was there, but I think it was still Chuck
17 doing everything.
18      Q      Okay.  Was anyone there on behalf of ABF?
19      A      Yes.
20      Q      Do you recall who that was?
21      A      No, I don't.
22      Q      Do you know their positions?
23      A      No.  I just don't know what their purpose
24 was.  I'm sure they said and it's in there, you know,
25 because I'm sure they type everything out.

85

1      Q      Right.  Just going back to Exhibit 27 here, on
2  the second page you have a heading that looks like it says
3  attendance and a couple of names.  Does this help you
4  refresh your memory about who was at that meeting?
5      A      That one there I was trying to remember.  It
6  would have been when we were either at eastern conference or
7  when we met with the company.  It almost had to be the
8  company because Quidort was there.  Tom was at eastern
9  conference.
10      Q      So when it says attendance, does this reflect
11 who was in attendance at the change of operations committee
12 or you think that this was something else?
13      A      I know Tom wasn't down there at change of
14 operations.  I was the only one that went down.
15      Q      Okay.  You have a notation on the first page.
16 The first notation looks like it says no layoff list for
17 Carlisle.  You could end up with multiple lists if layoff
18 would come.  What did you mean by that comment?
19      A      I think that's what I heard when I was in when
20 they were having the hearing.  That was I think a statement
21 made by I think ABF.  Don't quote me.  I don't know for
22 sure, but it was something I heard and I jotted it down.
23      Q      Okay.  And the last comment there looks like
24 it says new doors added onto dock showing growth, no call
25 back?

22 (Pages 82 to 85)

BECHTEL, RICKEY
3/7/2002

BECHTEL VS
VIRTUE

**86**

1  A    Yeah. I think that was something that Chuck
2  was arguing that there was show of growth showing that we
3  should have been called back because they knew they were
4  going to have growth at the Carlisle facility and with the
5  layoff list we should have been called back.
6  Q    So you think that was an argument made by
7  Chuck?
8  A    I think so.
9  Q    Did you make a statement at the multi-region
10  change of operations committee?
11  A    Yes.
12  Q    Do you recall what you said?
13  A    Basically the same thing I said at the eastern
14  conference.
15  Q    Let me jump back and ask you who was on the
16  committee.
17  A    You would have to look at the transcripts. I
18  know that it's so many from company and so many from union.
19  Q    Okay. No names stand out?
20  A    I have been out -- I was out of it so long I
21  wouldn't know them.
22  Q    Did the committee make a decision on the day
23  of the hearing?
24  A    No.
25  Q    When were you informed of the committee's

**87**

1  decision?
2  A    It was quite awhile. I think this eastern
3  conference that was -- I think it was close to like December
4  that I got something out of it, heard something. It was
5  quite awhile.
6  Q    Do you recall what the decision was?
7  A    It was denied or we wouldn't be here.
8  MR. MIRIN: Excuse me. Can you put a year
9  with that December?
10  A    It must have been 2000. Yeah, it would have
11  to have been 2000, yeah. I hadn't received it. I wrote a
12  letter I think to Chuck asking for a decision -- if he got a
13  decision. I think that's how it was.
14  MS. WALSH: Let's mark this as the next
15  exhibit.
16  (Letter dated November 8, 2000 to Rickey
17  Bechtel from Charles Shughart marked as Bechtel Exhibit 28.)
18  BY MS. WALSH:
19  Q    Do you recognize this document, Mr. Bechtel?
20  A    Oh, yeah. That's the decision I was given,
21  yeah. I thought I got it later than that.
22  Q    This is dated November 8th, 2000. Does this
23  refresh your memory as to when you received notice of the
24  decision of the committee?
25  A    Well, that would be right. Like I said, I

**88**

1  don't remember when it was. It seemed like it was longer
2  than that between there but it must have been.
3  Q    Going back to the committee, I think you said
4  that Chuck Shughart argued your case. Was there anything
5  that you wanted him to argue that he didn't argue in front
6  of the committee?
7  A    I think he covered everything that was there,
8  and maybe some of that scribbling there might have been, you
9  know, during the hearing. You know how it is, you shuffle
10  back and forth. I think he covered it very well. I mean, I
11  wasn't calling him names afterwards or nothing like that.
12  Q    Okay. You weren't kicking him under the
13  table?
14  A    No.
15  Q    After you got the committee's decision or you
16  received notice of the committee's decision, did you have
17  any reaction to that?
18  A    I thought it was wrong.
19  Q    Okay. Did you do anything about that?
20  A    I presented a letter to Chuck saying is there
21  any other avenues we can resort to now, and he said no.
22  Q    Okay. Did he say anything else about the
23  decision?
24  A    Basically what is he going -- he can't do
25  anything with it. He claimed there was no other avenues

**89**

1  that he knew of to pursue, so I'm at a dead end, that's it.
2  Q    Were there any avenues that you knew of that
3  you asked him to pursue that he didn't do?
4  A    I didn't know of any. That's why I asked him.
5  Q    Right.
6  A    If I knew, I would have proceeded that way.
7  Q    Okay. Did you request information from Chuck
8  Shughart about the hearing and the committee's decision?
9  A    Oh, I'm sure I did.
10  Q    Okay. Did he provide you with that
11  information?
12  A    I think that's what these letters are that I
13  got, yeah.
14  Q    Okay. Let's go one more here.
15  A    The best I can recollect, yeah.
16  Q    Sure.
17  A    If you show them to me, I can tell you if
18  they're factual or not.
19  MS. WALSH: Why don't we mark Bechtel
20  Exhibit 29.
21  (Letter dated December 28, 2000 to Rickey
22  Bechtel from Charles Shughart marked as Bechtel Exhibit 29.)
23  BY MS. WALSH:
24  Q    Mr. Bechtel, did you get a chance to look
25  through this document we've marked as Bechtel Exhibit 29?

23 (Pages 86 to 89)

BECHTEL, RICKEY
3/7/2002

BECHTEL VS
VIRTUE

---

90

1   A    Yeah. It looks like the stuff that Chuck sent
2   me from -- I'm not sure -- change of operations, yeah.
3   Q    Did you read through this document when you
4   received it or this packet of information when you received
5   it?
6   A    As best I could. I'm sure I didn't read
7   through everything.
8   Q    What did you do after you received the
9   committee's decision? I know -- let me start over. You
10  mentioned that you discussed the decision with Chuck
11  Shughart. Is there anything else that you did after you
12  received the committee's decision related to your grievance
13  and the processing of your grievance?
14  A    I just requested if there is any other way we
15  can go, if there is any more avenues basically.
16  Q    Okay. You ended up filing a lawsuit in this
17  case; is that correct?
18  A    Yes.
19  Q    Why did you file a lawsuit?
20  A    Because I think their decision was wrong.
21  They merged as a company and the best I understand it when
22  you merge -- I can only decipher what I know, like I said,
23  and a merger -- whenever you merge you always dovetail. I
24  didn't think -- I don't know if the committee didn't
25  understand that or -- I don't know how that changes. I'm

---

91

1   not a lawyer. I'm not -- I don't know how that -- if I am
2   laid off at Carlisle, you know, it's Carolina and you merge
3   with me, now all of a sudden how things get changed like
4   that but I was going by what I felt was right in my heart.
5   Q    Okay. Now, in your complaint -- and if you
6   need to refer to it, please do -- you allege that the
7   defendants have failed to implement the recall provisions of
8   the labor agreement. Now, what facts do you have that
9   support that allegation?
10  MR. MIRIN: For the record, I always interpose
11  an objection at this point that the crafting of counsel and
12  the analysis of counsel is not necessarily the analysis of
13  the client.
14  MS. WALSH: That's fine. I'm asking
15  Mr. Bechtel what facts he has that support his charge in the
16  complaint.
17  MR. MIRIN: Counsel may have been the one who
18  ascertained facts that he felt were adequate to support that
19  characterization.
20  MR. McCALL: Your deposition is not being
21  taken.
22  BY MS. WALSH:
23  Q    Mr. Bechtel, you can answer the question.
24  A    Well, let's see how I can put this. I have a
25  letter from layoff that says I'm laid off in Carlisle. It

---

92

1   doesn't say you're laid off Carlisle Carolina. It says laid
2   off. It's from ABF. You know, it's from ABF. It wasn't
3   saying -- there is nothing said there that I would never --
4   by that letter it was basically never would ever be recalled
5   because they say they have no layoff list and they merged
6   and they show that there's X amount of people laid off, but
7   they never had a list. How were they ever going to call
8   anybody back?
9   Q    And by anybody, who are you referring to?
10  A    Any of the Carolina guys. How would they ever
11  call them back? If they never had a list, they had no
12  intentions of ever calling anybody back. That's my opinion
13  on that.
14  Q    What basis are you saying that they had no
15  list?
16  A    There has never been one that I know of.
17  Well, I think there is one showing 130 guys, but I don't
18  think -- when we went in the hearings, ABF said they have no
19  such list of anybody laid off, however they want -- they
20  were saying their ABF terminal had nobody laid off and we
21  were -- because we were laid off before the merger we didn't
22  exist basically.
23  Q    Are you alleging that ABF breached the
24  National Master Freight Agreement?
25  A    I would say yeah I guess.

---

93

1   Q    What particular provisions of the agreement
2   are you alleging that ABF breached?
3   MR. MIRIN: I am now going to object to the
4   form of the question. The question calls for a legal
5   conclusion. My client is not an attorney. The language is
6   the language of counsel.
7   MS. WALSH: This is your client's complaint.
8   Your client used this language before.
9   MR. MIRIN: No. Counsel has used this
10  language in discussion based upon what my client told me.
11  Now, if you want to ask him without trying to have him draw
12  a legal conclusion what provisions he feels are in issue, I
13  have no objection to that form of the question.
14  MS. WALSH: Well, that's the question that was
15  asked.
16  MR. MIRIN: No. You asked him what he thought
17  had been breached, and what had been breached is a legal
18  technical conclusion for counsel, so I am objecting to the
19  form of the question. I think it calls for a legal
20  conclusion. My client is not competent or --
21  MS. WALSH: I understand your objection.
22  BY MS. WALSH:
23  Q    Mr. Bechtel, please answer the question.
24  A    Do you want to state that again?
25  Q    Sure. What articles or sections of the

---

BECHTEL, RICKEY
3/7/2002

BECHTEL VS
VIRTUE

94

1 National Master Freight Agreement are you alleging that ABF
2 has violated?
3    A    I don't know how -- I can't make, like he
4 said, a legal determination on what you're saying. All I
5 know is I was laid off in '95. The '95 book basically says
6 -- I feel I'm following what that procedure was and they
7 just never followed it. It's just -- they just put us out
8 there like we were nobody. I'm sitting here. I'm a real
9 person. I was on a layoff list. I'm under the
10 understanding I will be called back whenever there is work
11 available. I filled a paper out which you showed we have in
12 here, and there was never ever anything after that first
13 conversation with them to try to call us back.
14    Q    Okay.
15    A    But I would receive ABF newsletters for buying
16 their stuff. I'm never an employee, but I'm getting this
17 stuff. There is so many confusing signals that are sent.
18 I'm feeling that I'm still on a layoff list and I will be
19 called back. I got -- the union is supposed to be, you
20 know, watching that to make sure things are carried out the
21 right way and also the company should be, you know. So, you
22 know, it said merger, and mergers dovetail to the best of my
23 ability of understanding it. Like I said, I'm not a legal
24 person. That's where I go.
25    Q    Okay. Your complaint -- actually, why don't

95

1 we turn to that. That's Exhibit 7. Your complaint at
2 Page 6, Paragraph 24 says plaintiff has suffered diminished
3 rights, entitlements and earnings, by virtue of the fact
4 that his recall rights were not honored by ABF. What
5 diminished rights have you suffered?
6    A    Diminished rights? What exactly do you mean
7 by that? Can you give me an example of what you're --
8    Q    Well, I'm reading straight from the
9 complaint.
10         MR. MIRIN: Same objection.
11 BY MS. WALSH:
12    Q    What do you mean by that?
13         MR. MIRIN: The same objection as before.
14 Characterization of counsel based upon --
15         MS. WALSH: Duly noted.
16         MR. MIRIN: May I complete myself on the
17 record? Based upon investigation with the client it is the
18 legal conclusion of a trained attorney and not necessarily a
19 layman's conclusion as to the nature of damages.
20 BY MS. WALSH:
21    Q    Mr. Bechtel, have you suffered diminished
22 rights?
23    A    What I know I can answer. I'll try to answer
24 as best I can. My earnings were cut.
25    Q    Your earnings were cut. How were your

96

1 earnings cut?
2    A    Well, I'm not making near as much in a
3 nonunion job as I was at a union job. Entitlements would
4 have been better -- to me better health and welfare
5 benefits, retirement. As far as rights, not being recalled
6 and put in my spot.
7    Q    Well, let me back up. The first thing you
8 said is you're not making as much at a nonunion job as a
9 union job. Is there any reason why you're not now in a
10 union job?
11    A    Now?
12    Q    At any time after your layoff.
13    A    I was keeping -- I was hoping to get back into
14 freight with ABF hopefully. I mean, I'm thinking, you know,
15 after my six years or whatever, five years, if they don't
16 call me back I'm going -- you know, I'm going to stay doing
17 what I'm doing.
18    Q    Did you ever seek a different union job?
19    A    No. Well, I worked casual to keep money going
20 into my retirement, plus to help substitute for not making
21 as much money.
22    Q    Did you ever seek permanent employment in a
23 union job after your layoff?
24    A    I don't -- in the Teamsters or in anything?
25    Q    Well, let's start with the Teamsters.

97

1    A    Not in the Teamsters because I would have
2 probably more than likely have had to resign my position in
3 layoff status. Most of the time when you go from one
4 company to the other they make you resign so that you don't
5 bounce back. You know what I'm saying? You start at one
6 and then you get recalled off of layoff and then you go back
7 and they're stuck. This way they know you're committed, you
8 got to go. As far as other union jobs, I applied to try to
9 get in the Milton Hershey School -- I think they're union --
10 and also the Derry Township Schools as an HVAC.
11    Q    And you actually worked there, didn't you?
12    A    No, no.
13    Q    Okay.
14    A    I was at Palmyra Area Schools way back. That
15 was before freight.
16         MS. WALSH: Let me mark this as Exhibit 30.
17         (Benefits checklist marked as Bechtel Exhibit
18 30.)
19 BY MS. WALSH:
20    Q    Mr. Bechtel, do you recognize this document?
21    A    I don't know about that. 1986.
22    Q    Is that your signature at the bottom?
23    A    That's my signature, yes.
24    Q    When you were working at Carolina did you have
25 health insurance through Carolina or through -- did you

25 (Pages 94 to 97)

BECHTEL, RICKEY
3/7/2002

BECHTEL VS
VIRTUE

114

1    Q    Did you consider Local 776 to be the union
2    that was responsible for processing your grievance?
3    A    Oh, definitely. That's -- I don't know how
4    you would go out of your -- I personally don't know how you
5    would go out of your -- I mean, they're my local. That's
6    where your grievance would be handled. My grievance is for
7    Carlisle, and they're the local that's dealing in that
8    area. If there was a way to go other than that, I don't
9    know of it.
10    Q    Now, did you discuss your grievance with
11    anybody from the international?
12    A    No, no.
13    Q    Do you even know anybody from the
14    international who is an international representative other
15    than myself? I guess I introduced myself.
16    A    Personally, no, no. I guess back in '95 it
17    was Carey and now it's Morris, but, no, I didn't call none
18    of them guys.
19    Q    You didn't call them? And is it true that you
20    didn't call them because you didn't think they were
21    responsible for processing your grievance?
22    A    The local union's responsible for my grievance
23    and I would say the international should be making sure that
24    -- because you see the Teamster magazine all the time where
25    they're looking over and trying to govern over the locals

115

1    that aren't what they should be -- you know what I'm saying
2    -- to make sure that things are going the right way. I
3    just felt that I was wronged.
4    Q    Is it true in your lawsuit that you filed that
5    the main reason why you filed the lawsuit is because you
6    think that -- you disagreed with the grievance panel's
7    decision?
8    MR. MIRIN: I'm going to object to the form of
9    the question. It calls for a legal conclusion on the part
10    of the witness as to the basis for his action.
11    BY MR. McCALL:
12    Q    Okay. You can answer. My question is, the
13    main reason why you filed your lawsuit, is it true it is
14    because of the fact that you disagreed with the change of
15    operations committee's decision on your grievance?
16    A    I would say after I talked to Chuck and he
17    said there is no other provisions to advance through the
18    union I would say it would probably be correct in that I was
19    wronged and not given -- somehow they took it from one
20    context and changed it to another. I don't know how that
21    was done. I was laid off one way and all of a sudden now
22    I'm out in the street with no recall rights, and I don't
23    understand how that happened. I think it should have been
24    -- I was wronged, and it should be corrected.
25    Q    Would you agree that you filed your lawsuit

116

1    because you believe that the grievance -- that the change of
2    operations committee decided your case wrong?
3    A    If they were to decide in favor, we wouldn't
4    be here. I would say you're probably correct. You know
5    what I'm saying? If it would have been in my -- we wouldn't
6    be here -- in my favor we wouldn't be here. If you want to
7    get to where you think you should be, sometimes we have to
8    do alternative routes. The only other thing after asking --
9    and there was nothing left that I knew to do was to get to
10    where I needed to be and get the right wronged or the wrong
11    righted. This is the only avenue I knew.
12    Q    Right. And what you're really trying to do is
13    get the grievance panel's decision and the change of
14    operations committee's decision reversed, is that true,
15    through this lawsuit?
16    A    Get it to in my favor, yes, and get righted
17    for what was wronged as far as what was compensated, yes. I
18    just felt that it wasn't -- some areas got stuff that we
19    didn't get. And I didn't find this out until after the
20    grievances, you know. How can one area get something and we
21    don't get the same thing? We're all local Teamsters. We're
22    all under the United Brotherhood of Teamsters. We should
23    all be treated the same.
24    Q    Now, you attended all the grievance hearings
25    relative to your particular grievance; right?

117

1    A    That's correct.
2    Q    And you felt that all -- you had an
3    opportunity to say everything that you wanted to say at
4    those hearings to support your case; isn't that also
5    correct?
6    A    I think that -- yeah, I would say yes.
7    Q    And you also --
8    A    To the best of my knowledge, you know, of what
9    I know.
10    Q    You also participated in preparing your case
11    for these grievance panels, didn't you?
12    A    Oh, yes.
13    Q    And you felt that Mr. Shughart did a very
14    thorough job in preparing the case?
15    A    To my best of knowledge, I mean, he -- I've
16    got to put my trust in my business agent to know the
17    contract better than -- when I was a shop steward, I would
18    often have to go and ask. You know, shame on me, I should
19    know better, but I don't. I had to put my faith in them.
20    I'm not -- I mean, they have been to schools with the
21    International Brotherhood of Teamsters, you know, they get
22    schooled on all this stuff. They should be able to handle
23    it.
24    Q    You don't have any complaints with the way
25    Mr. Shughart performed his job, do you?

BECHTEL, RICKEY
3/7/2002

BECHTEL VS
VIRTUE

118

1    A    To my knowledge, if he presented everything
2  that he knew and he presented what I wanted, I would say
3  probably not.
4    Q    So as we sit here today do you know anything
5  that Mr. Shughart could have presented that he didn't
6  present?
7        MR. MIRIN:  Form of question.  I think it
8  calls for a legal conclusion.
9  BY MR. McCALL:
10   Q    You can answer.
11   A    I don't know of anything.  Whether he knew
12  something and didn't present it, I can't speak for him, but,
13  you know, as far as -- he knew what I was after.  Like I
14  said, I can't say if he held anything back.  I don't know of
15  anything he held back.
16   Q    Since you don't know of anything Mr. Shughart
17  held back and it's your contention that the international's
18  duty was to oversee the local unions and make sure that they
19  did what they were supposed to do, what is it that you think
20  the international should have done that it did not do?
21   A    I think if they -- I don't know if the
22  international sees everything that goes on but I feel that
23  -- I don't know how they feel about it, how the
24  international feels about it.  Do they feel it was justly --
25  you know, the right call or not, but international is also

119

1  responsible for making sure we get treated equally and if
2  they see -- my opinion is if they saw something that they
3  thought -- I don't know who's watch dogs.  We were pretty
4  much denied all our rights when it comes down to it because
5  they put us on a layoff list that there was no way we were
6  ever getting called back.  You know what I'm saying?
7    Q    My question is, is there anything as we sit
8  here today that the international should have done that it
9  did not do?
10       MR. MIRIN:  Asked and answered.
11   A    Like I said, I don't know -- I would say that
12  I don't know what you guys would know that would help them
13  or not, but if there was something and it wasn't brought up
14  -- I mean, if I knew all the aspects it would be different,
15  but I'm not a lawyer.  I have told you this time and time
16  again.  I'm just a common man, and we need to right the
17  wrong.
18   Q    Okay.  If you would refer to Bechtel
19  Exhibit 7, which is your complaint, on Page 7, Paragraph 29
20  --
21   A    I'm sorry.  What did you say?
22   Q    Page 7.
23   A    Page 7?
24   Q    Yes, Paragraph 29.  Paragraph 29 reads as
25  follows:  The International Union is responsible for Union

120

1  policy, the National Master Freight Agreement and, inter
2  alia, the creation and oversight of the Local Union and has
3  failed to insure the fair representation of plaintiff.  Do
4  you have anything as we sit here today to support that
5  statement?
6    A    The judgment that was given down -- it
7  wouldn't be the first time that something was decided
8  wrongly and righted because as you see in the Philadelphia
9  area where they had that -- ABF said that these guys weren't
10  dovetailed, and they ended up being dovetailed.  That had to
11  go through a court proceeding, so there could be factors I
12  don't know about and how can these guys down there get
13  something and not -- I don't get the same thing.  That's
14  basically what I'm looking at.  I'm not a lawyer.
15   Q    So is it true your support for Paragraph 29 of
16  the complaint is that you're looking at how the ABF and
17  Carolina employees were treated in Philadelphia as opposed
18  to how you believe they should have been treated in
19  Carlisle?  Is that the support?
20   A    The same two companies, the same people.
21   Q    But is that the support what I just said?  Let
22  me rephrase the question again.  Is it true that you believe
23  that the support for Paragraph 29 of the complaint is that
24  you believe the way that the ABF and Carolina employees were
25  treated in Philadelphia was different than the way that the

121

1  ABF and Carolina employees were treated in Carlisle?
2        MR. MIRIN:  I object to the form of the
3  question.  It calls for a legal conclusion on the part of
4  the witness.
5        MR. McCALL:  I'm not asking for a legal
6  conclusion.  I'm only asking for his belief.
7    A    I would say that could be partially right,
8  yeah.  I mean, it helps to -- not being a lawyer to support
9  what -- there was another thing that was decided on by
10  change of operations and then all of a sudden it's -- you
11  know, how does this reverse and I don't get the same
12  treatment.  It's the same -- in my eyes it's the same
13  thing.  And there's -- I'm sure there is other -- I just
14  used that one because that's the one I knew about, and I'm
15  sure there is others out there that were treated -- that
16  were done the wrong way and for them it worked out, and
17  hopefully for me it will work out, too.
18  BY MR. McCALL:
19   Q    Could you give us any other support that you
20  have for Paragraph 29?
21       MR. MIRIN:  I'll take it I have a standing
22  objection on the basis of the form of the question, but I
23  understand what you're asking.
24       MR. McCALL:  Right.
25  BY MR. McCALL:

31 (Pages 118 to 121)

BECHTEL, RICKEY
3/7/2002

BECHTEL VS
VIRTUE

126

1 it true that some of the Carlisle Carolina employees were
2 given work opportunities to go to various locations?
3     A    Oh, yes.
4     Q    Right. And you were one of them. You had an
5 opportunity to leave Carlisle also, didn't you?
6     A    Everybody had an opportunity to leave.
7     Q    They could have gone and taken a job
8 elsewhere?
9     A    That is correct.
10     Q    And is it also true that some of those
11 Carlisle Carolina employees did accept job opportunities in
12 Philadelphia working for Carolina?
13     A    Oh, yeah. They went all over. Some people
14 moved, yes.
15     Q    But some specifically did go to Philadelphia?
16     A    Yes. Oh, yes.
17     Q    Okay. And isn't it also true that in
18 September of 1995 when the Carolina ABF merger took place
19 that those former Carolina Carlisle employees who went to
20 Philadelphia were working for Carolina at the time that the
21 merger took place but working in Philadelphia?
22     A    I would say probably yes to the best of my
23 knowledge.
24     Q    Right. And so then after the merger with ABF
25 and Carolina occurred in September of 1995, is it true that

127

1 some of those employees in Philadelphia who formerly worked
2 for Carolina in Carlisle came back to the ABF facility in
3 Carlisle?
4     A    Somehow I learned of that for my grievance,
5 yeah.
6     Q    Some of them came back?
7     A    Yeah. I heard that they came back, yeah.
8     Q    And you were permitted to begin work at the
9 ABF facility in Carlisle?
10     A    Oh, yeah.
11     Q    They transferred from the Philadelphia
12 Carolina facility to the ABF facility in Carlisle?
13     A    I don't know if it was exactly that way. I
14 think they merged the two together and then -- I don't know
15 exactly how they did that, no. I know that there were some
16 people in Philadelphia that came back.
17     Q    They did come back. And you also know that
18 when they came back they had -- at the time of the merger
19 they were working for Carolina in Philadelphia?
20     A    As far as I know, yes, yes.
21     Q    Okay. You were born and raised in the
22 Carlisle area; is that true?
23     A    The Hershey area.
24     Q    Hershey. Okay. So this is -- your roots are
25 here?

128

1     A    That's correct.
2     Q    And you've been given opportunities to accept
3 jobs away from this Hershey/Carlisle area, but you've
4 elected not to accept any of those jobs?
5     A    That is correct. This has always been a
6 strong turning point for the freight companies, and I didn't
7 feel that Carolina could stay away from this area without
8 bringing something back -- you know what I mean -- opening
9 something up. When I took layoff in Carlisle, I figured
10 there is no way the company will survive without bringing
11 some kind of, you know, operation back here.
12     Q    So based on what you just said, when you took
13 layoff from the Carolina facility in Carlisle you thought
14 that Carolina was going to have to come back and do some
15 business in the Harrisburg area?
16     A    Yeah, because it's always -- the local union
17 hall has always said this is a big wheel to turn for the
18 East Coast and tons of companies have tried not to and they
19 always come back.
20     Q    Now, in part isn't it true that that's the
21 case because you have several interstates, including the
22 Pennsylvania Turnpike, that kind of intersect in this area?
23     A    I would say that's fair.
24     Q    And as a result of that there is a lot of
25 freight that has to come through this area up and down the

129

1 East Coast?
2     A    I would say that's correct.
3     Q    And heading west. Okay.
4     MR. MIRIN: Off the record.
5     (Discussion held off the record.)
6 BY MR. McCALL:
7     Q    Referring to Paragraph 19 of the complaint on
8 Page 6, it says in 1995, at the time of the layoff from
9 Carolina Freight (hereafter referred to as "CF"), the merger
10 between CF and ABF was in process and known to defendants.
11 Do you see that?
12     A    It just says that Carolina and ABF -- that's
13 how I read it -- that they combined -- merged together,
14 yes. It was all in the papers. I mean, it was not a
15 secret.
16     Q    Right, it was not a secret. The question I'm
17 raising is, at the time that you were laid off in May of
18 1995, you didn't have any idea that there was going to be an
19 ABF-Carolina merger at that time, did you?
20     MR. SANTUCCI: May of '95 or March of '95?
21 BY MR. McCALL:
22     Q    Were you laid off in March or May? Let me
23 rephrase the question.
24     A    When I was laid off -- maybe I can keep it.
25 When I was laid off, no, I didn't know that ABF and Carolina

BECHTEL, RICKEY
3/7/2002

BECHTEL VS
VIRTUE

142

1  committee was not the proper place to resolve your
2  grievance?
3           MR. MIRIN: Legal conclusion. You may
4  answer. It calls for a legal conclusion.
5           MR. McCALL: I'm not asking for a legal
6  conclusion. I'm just asking you for any support for a
7  conclusion that the multi-region change of operations
8  committee was not the proper place or proper body to resolve
9  your grievance.
10          MR. MIRIN: That would still require a legal
11  analysis to ascertain competent evidence to support the
12  thesis.
13     A     I just put my hands in the local union to take
14  it where it needed to go. They were the ones that were
15  guiding it for me. I couldn't tell them -- I mean, I
16  couldn't stand here and tell him you got to take it over
17  here to this meeting or that. They have to make that
18  decision, and that's where we went.
19  BY MR. McCALL:
20     Q     Right. And you believe that they took it to
21  the proper body to resolve the case?
22     A     I left that up to my union officials, you
23  know, because that's their job.
24     Q     Okay. Now, your grievance that you filed, do
25  you believe that the issues raised in your grievance

143

1  indicated that there was a violation of this change of
2  operations decision? Is that what you're contesting, that
3  this change of operations decision was not properly
4  administered as far as you are concerned?
5           MR. MIRIN: It calls for a legal conclusion.
6  You may answer.
7     A     I don't think it dealt with Carlisle in the
8  way that I understand it, and it should have been done by
9  what we were told when we were laid off, seeing other things
10  through other years how it was handled -- it seems to me
11  that it was handled a lot different than others and not
12  fairly in my opinion.
13  BY MR. McCALL:
14     Q     Now, you said what you were told when you were
15  laid off. What were you told when you were laid off?
16     A     We have five years recall and anything in the
17  area -- you know what I'm saying. If Carolina would open up
18  a terminal, we're on a recall list and they'll go down
19  through the list. Some guys might have different jobs and
20  not come back, some may have resigned. It's a chance you
21  take. I mean, everybody makes their own decisions, and my
22  decision was stay in the area.
23     Q     And, as you said, you are taking a chance when
24  you decide to stay in the area as opposed to accept a job
25  opportunity someplace else?

144

1     A     Correct. I could go there and they could shut
2  that place down and I would be in a totally different spot
3  with no ties, no -- you know, think about it. You know how
4  it can go. You go into this job, this freight company could
5  be real sound, you go in tomorrow and it's shut down. You
6  see it every day. I thought I had better ties in this area
7  and chances of getting a job, so I stayed here.
8     Q     Are you aware of what union parties or what
9  union entities are party to the National Master Freight
10  Agreement in terms of who signed the agreement? Do you
11  know? I'm just asking do you know.
12     A     I don't know what entities is. I'm sorry.
13     Q     In other words, do you know as you sit here
14  today whether Joint Counsel 53, for example, signs the
15  National Master Freight Agreement?
16     A     To be honest, I'm not sure who signs it. I
17  would think the Master Freight would have to be signed by
18  whoever would be president and it would have to be voted on
19  by the members, any contract.
20     Q     But you're kind of guessing when you say that,
21  aren't you?
22     A     Well, they always -- whenever there is a
23  contract, we always vote on it. It always goes by majority
24  vote.
25     Q     Right. I'm talking about in terms of who

145

1  signs it. You don't know as a matter of fact who actually
2  signs the Master Freight agreement, do you?
3           MR. MIRIN: Asked and answered. I think the
4  gentleman said he didn't know the name of the person signing
5  or the office for that matter as I understood the sense of
6  his response. All he'd have to do is open the National
7  Master Freight Agreement to the signature pages and he would
8  know it.
9  BY MR. McCALL:
10     Q     My question, Mr. Bechtel, was do you know as a
11  matter of fact who signs it or would you merely be guessing?
12     A     My best intelligence --
13     Q     We don't want you to guess. I'm asking you if
14  you know.
15     A     Without guessing, I would say no. If I were
16  to give you an answer, it would probably be president of the
17  international and vice-president and all their people
18  because they're the ones that go out -- well, you know, they
19  have somebody in charge, but I couldn't give you a name, no.
20     Q     Right. Okay. Do you know whether or not Ray
21  Snyder -- when Carolina closed its facility whether Ray
22  Snyder went to Philadelphia? Do you know that? Do you know
23  where he went when Carolina closed in Carlisle?
24     A     I think he stayed in Carlisle. I think so.
25     Q     You think so?

37 (Pages 142 to 145)

BECHTEL, RICKEY
3/7/2002

BECHTEL VS
VIRTUE

154

```
 1    Q    And that was the last step?
 2    A    That's what it was.
 3    Q    Any reason to believe that was not the last
 4  step?
 5    A    I put my faith in them. I've been out of it
 6  for, you know, a long time here, and I put my faith in they
 7  should know what our steps are. Like I said, I specifically
 8  asked him if there were any other avenues to go and he said
 9  he didn't know of any -- he wouldn't know where to point me.
10    Q    Sitting here today, do you know of any other
11  avenues to go?
12    A    No.
13    Q    And you said you put your faith in them. Are
14  you referring to Teamsters Local 776?
15    A    They should know -- in my opinion, they should
16  know where to go. If they don't know, they should know
17  where to ask versus myself knowing where to ask. I would
18  say I put my -- basically my life in their hands.
19    Q    Why did you do that?
20    A    You have to be represented.
21    Q    Okay. Do you trust Chuck Shughart?
22    A    I think he's a decent guy.
23    Q    Mr. Shughart, throughout this entire process
24  from 1995 through present, has he answered all your
25  questions?
```

155

```
 1    A    He has answered my questions. Whether he knew
 2  of anything other than what I didn't know to ask I can't
 3  answer for.
 4    Q    Any reason to believe he knew anything else
 5  besides what he has told you?
 6    A    I'm not sure. One thing that did disturb me
 7  was when we were at company hearing he outright said he quit
 8  ABF because of whatever the change was. That kind of got me
 9  off -- I don't understand why he would say that in front of
10  -- I don't know.
11    Q    Okay. You said the company hearing. Are you
12  referring to the initial level?
13    A    That's correct.
14    Q    Okay. And what was Chuck's comment?
15    A    He said that he had I guess transferred and he
16  just quit.
17    Q    Did he say where he transferred?
18    A    I'm sure -- I'm almost positive he took the
19  layoff in Carlisle and then transferred I think it was like
20  to Minnesota, but he never even went.
21    Q    Any idea what year he was referring to?
22    A    No, I don't.
23    Q    Besides that comment, any other comment that
24  led --
25    A    I don't know. It just seemed like he pretty
```

156

```
 1  much -- he wasn't going to get back into freight, and I just
 2  sort of got a little bit of vibes like it didn't really
 3  matter to him because he wasn't going to go back into
 4  freight. He said he couldn't handle it. When I look at
 5  that I say is the man's heart actually all the way in it.
 6  You know what I'm saying? I'm not trying to bad mouth him
 7  but when you stop and look at that, if you're defending me
 8  and you're not going to be in this thing, you know, it just
 9  seems like -- but through everything I think he -- whatever
10  I wanted he presented. Whether he knew anything else that
11  could have helped me, I don't know.
12    Q    When you were questioned about the layoff in
13  March of 1995 at Carolina, I think your testimony was
14  something to the effect that you indicated Carolina will
15  keep X individuals in Carlisle for X amount of time. Do you
16  remember that comment?
17    A    Yes. That's what we understood. They were
18  going to keep -- you know, it was basically take the
19  freight, get it all moved out. There was talk that they
20  might keep that but the change as -- when you look at it, it
21  says they were closing it as of March 22nd completely, and I
22  think that's what they did do.
23    Q    As of March 22nd, it's your understanding
24  there was no further work being performed at the Carolina
25  facility on One Carolina Way in Carlisle?
```

157

```
 1    A    I don't know that for a fact, if they went
 2  past that date or not. Before summer was up they were -- if
 3  I understand it correctly, they were closed.
 4    Q    Who made that comment, if you recall?
 5    A    That was at the meeting in January.
 6    Q    You keep referring to a January meeting.
 7  Where was this meeting in January?
 8    A    That was -- should have been down at the local
 9  union hall.
10    Q    Okay. I direct your attention to Bechtel
11  Exhibit 3. Do you have your exhibits in front of you?
12    A    Yes.
13    Q    Bechtel 2 and 3. Do you see them?
14    A    Yes, sir.
15    Q    Looking at that, does that help refresh your
16  recollection as to when the meeting would have taken place?
17    A    The meeting would have been after the change
18  and before the close because they can't -- how would they
19  tell us what the change was if they had it before then.
20    Q    So the meeting would have been sometime after
21  these March '95 letters; correct?
22    A    No, no, no. It was before we took the change
23  because you had to -- the change of operations -- I don't
24  know exactly what the date was on it. Then you had to make
25  a decision where you were going, and then there was two
```

40 (Pages 154 to 157)

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**

BECHTEL, RICKEY
3/7/2002

BECHTEL VS
VIRTUE

166

1    A    I just called him and asked him if he heard
2    anything about ABF, what's going on over there. That's when
3    he told me he went back, because the last I knew he was
4    running mail. Through the grapevine you hear. He said he
5    found out by word of mouth that they were hiring drivers or
6    something. I don't know.
7    Q    As far as Exhibit 8, which is your grievance,
8    you already indicated you spoke to Mr. Snyder about the
9    grievance when preparing it. Did you speak to anyone else?
10    A    You're saying Exhibit A?
11    Q    Exhibit 8.
12    A    Oh, excuse me. I would have spoke to Chuck
13    and everything after it was all filed and everything -- when
14    we filed it and everything, yes.
15    Q    I'm referring to the preparation of words so
16    stated on Exhibit 8. Did you talk to anyone at the local
17    union about the wording on Exhibit 8, or was it just the
18    wording of you and Ray Snyder?
19    A    I'm not sure if I talked to Shughart or not on
20    that. I know I talked to Shughart on different occasions,
21    but I'm not sure before I filed it if I did or if I did not.
22    Q    Exhibit 9 is the letter that you sent with the
23    grievance, which is Exhibit 8; is that correct?
24    A    You asked me what again?
25    Q    Exhibit 9, is that the letter that you sent to

167

1    enclose the grievance, which is Exhibit 8?
2    A    When we sent it in to the company, yes.
3    Q    Okay. Well, actually on the bottom it says
4    Teamsters Local 776. Is that who you sent the grievance
5    to? Did you send it to --
6    A    Yeah, okay. Yeah, it would have.
7    Q    And you also sent it to the company at the
8    same time?
9    A    I believe that is correct.
10    Q    And is it fair to say that the letter wasn't
11    addressed to anyone in particular at the union hall?
12    A    I didn't know who to send it to. I think I
13    just sent it to the local.
14    Q    And only after sending this letter is when you
15    heard from Chuck; correct?
16    A    Right, right. Yeah, I think that would be
17    correct.
18    Q    And Mr. Shughart responded to your grievance
19    with Bechtel Exhibit 10? I'm just going to go through these
20    quick.
21    A    Yes.
22    Q    And is it fair to say that Mr. Shughart kept
23    you abreast as to the developments regarding the grievance?
24    A    Well, I would send stuff if I felt it went too
25    long.

168

1    Q    Okay. Is an example of that Exhibit 11?
2    A    Yes.
3    Q    I trust your letter, Exhibit 11, crossed the
4    mail with Mr. Shughart's March 29, 2000 letter, which is
5    marked as Exhibit 12?
6    A    That's the date that we were to meet with the
7    company, yes, as far as I can remember.
8    Q    But Mr. Shughart, again, kept you abreast as
9    to the meeting with the company?
10    A    After I sent him the letter from -- after I
11    sent him Exhibit 11, he sent me 12.
12    Q    Okay. The dates on 11 and 12, can we agree
13    they're the same date?
14    A    Well, it looks like it was signed -- the date
15    of delivery says the 31st. They must have crossed in the
16    mail, so it must have been pretty much simultaneously.
17    Q    And you attended the meeting on April 5?
18    A    Yes, I did.
19    Q    Okay. And you had an opportunity to be heard?
20    A    Yes.
21    Q    Did you speak at the meeting?
22    A    Yes.
23    Q    Did Mr. Shughart allow you to speak?
24    A    Yes.
25    Q    Did anyone stop you from speaking at the

169

1    meeting?
2    A    No, no.
3    Q    After the meeting did Mr. Shughart send a
4    letter to Andy Upchurch, which is Exhibit 13? Did you get a
5    copy of that at that time?
6    A    Yes. I think I did, yes.
7    Q    And during this grievance process you did ask
8    for information from Mr. Shughart to obtain from the
9    company?
10    A    Yes.
11    Q    And Mr. Shughart again responded to your
12    request?
13    A    I got stuff. I don't know if I ever got
14    everything, but yes.
15    Q    Is there anything sitting here today that you
16    can tell us that Mr. Shughart did not provide you that you
17    requested?
18    A    I'm sure that -- off the top of my head, I
19    would say no, that I can think of. I mean, whether he knew
20    something that I didn't know I can't speak to that.
21    Q    I'm not asking you about things you know. I'm
22    asking is there anything that you requested from
23    Mr. Shughart that he didn't provide to you?
24    A    The seniority list I got. Did I get a layoff
25    notice? I think it's safe to assume or to say, yes, that he

43 (Pages 166 to 169)

BECHTEL, RICKEY
3/7/2002

BECHTEL VS
VIRTUE

170

1  gave me what I knew to ask for.
2  Q   Okay. Did you ever ask anyone else from the
3  Teamsters Local 776 or the International Brotherhood of
4  Teamsters that you did not receive, any documents?
5  A   I channeled everything through Chuck. He was
6  to -- he would know better what to ask than I would.
7  Q   Okay. You indicated that you had some
8  meetings I guess at the union hall and you spoke to a
9  variety of business agents, but your main person was Chuck
10  Shughart?
11  A   Correct.
12  Q   These other individuals, is there anything
13  particular you recall from your conversations with the other
14  individuals you've named?
15  A   Danny Virtue was in and out at times and put
16  whatever his input -- you know, whatever he thought should
17  be mentioned, but he didn't agree with the dock workers at
18  all. He's strictly a road driver BA.
19  Q   What did Dan Virtue state that you recall?
20  A   I can't give you any real word for word. You
21  know, I'm not going to stand and give you word for word and
22  then you pick it apart, but I sort of got negative vibes out
23  of it.
24  Q   What comments did he make that gave you these
25  negative vibes?

171

1  A   It's not so much the comments. It's how he
2  would answer questions when you were asking him. It's just
3  he gave me the opinion that he didn't need to talk to me.
4  Q   Okay. But Chuck Shughart was your go to guy
5  at Teamsters Local 776?
6  A   That's why I put everything in Chuck.
7  Q   Did you know Carlos Ramos?
8  A   He was a dock worker, yes, and a business
9  agent.
10  Q   He was a dock worker where?
11  A   Carolina Freight.
12  Q   Did you work with Carlos?
13  A   Oh, yes.
14  Q   Was he also on the seniority list at Carolina?
15  A   If I worked with him I know he was on, yes.
16  Q   And he was still a business agent in this
17  period of 1995?
18  A   He was still in the hall.
19  Q   Is he still in the hall today to the best of
20  your knowledge?
21  A   I think he is.
22  Q   Do you know what happened to Mr. Ramos'
23  seniority?
24  A   No, I don't.
25  Q   Any knowledge as to whether Carlos was treated

172

1  any differently than anyone else?
2  A   I have no idea.
3  Q   Do you know of anyone at Carolina that was
4  treated differently than anyone else?
5  A   Carolina in Carlisle or Carolina guys
6  altogether?
7  Q   Carolina Carlisle.
8  MR. MIRIN: Thank you. You clarified that.
9  A   I don't see these guys, so I can't say that I
10  know of anybody. No, I don't.
11  BY MR. WEINSTOCK:
12  Q   Regarding the grievance, was there any other
13  sections of the contract that you thought were relevant to
14  your grievance besides those stated within the grievance?
15  MR. MIRIN: I object to the term relevant.
16  It's a legal term which requires the witness to make an
17  assessment of the rules of evidence. It's a legal
18  conclusion. It calls for a legal conclusion.
19  MR. WEINSTOCK: I don't think it does call for
20  a legal conclusion. The witness definitely wrote his
21  grievance, and I trust he wasn't represented by any counsel
22  at that time.
23  BY MR. WEINSTOCK:
24  Q   If you could please answer the question?
25  A   When I wrote the grievance, there's always a

173

1  chance to amend it, and Chuck did not see fit to have it
2  amended any different than any way that I had it written
3  up. In speaking with him he knew what my grievances were
4  with how it was handled and he knew where -- you know, what
5  the end result was that I was looking for. Like I said, I
6  channeled everything through Chuck to make the right
7  decisions on what goes in because the BA's actually do have
8  the last say on what goes in and what doesn't go in those.
9  Q   But you wrote this grievance, Exhibit 8,
10  without Chuck or anyone else from the local; correct?
11  A   To get it in time I did but knowing that he
12  can amend it.
13  Q   And there was an amendment made to the
14  grievance?
15  A   I think he did amend a little bit to it, yes.
16  Q   And that was an amendment as to the damages,
17  correct, if you know? If you don't know --
18  A   I'm not sure. I know -- the important thing
19  to me was to get the grievance in and get it -- you know,
20  because I know -- once you know, you've got to get it done.
21  Q   Every brief that Chuck Shughart submitted at
22  the different levels of the grievance process you had an
23  opportunity to review prior to when it was submitted?
24  A   It was the same grievance.
25  Q   Yes, but you had an opportunity to review the

44 (Pages 170 to 173)

BECHTEL, RICKEY
3/7/2002

BECHTEL VS
VIRTUE

174

1  document?
2      A      We sat down and we made that up together, yes.
3      Q      He met with you personally?
4      A      Yes.  We sat and put the thing together
5  situated the way --
6      Q      And, again, Mr. Shughart answered all your
7  questions?
8      A      All that I knew to ask.
9      Q      Okay.  After you received Exhibit 29, did you
10  write any letter to Chuck Shughart?
11      A      I had wrote him a letter before this, and this
12  was his reply back.
13      Q      Okay.  After you received Exhibit 29 I guess
14  approximately at the end of December of 2000, did you write
15  a letter to Chuck Shughart?
16      A      No.  I would have probably talked to him on
17  the phone, and he told me there was no other avenues, that
18  it was basically done that he knew.
19      Q      Did you write a letter to anyone else in the
20  local union or the International Brotherhood of Teamsters?
21      A      I channeled everything through Chuck.
22      Q      Okay.  When you spoke to Chuck and he told you
23  there was nothing else to do, do you recall anything else
24  about that conversation?
25      A      Just that he didn't know of any other ways to

175

1  go and that it was basically in his opinion binding and that
2  was it, we were at the end.
3      Q      The last sheet of Exhibit 14, which is
4  attached to Exhibit A, did you ever talk to anyone about
5  this sheet?
6          MR. MIRIN:  Exhibit 14 or 17?
7          MR. WEINSTOCK:  Exhibit 14, the last page.
8  BY MR. WEINSTOCK:
9      Q      Did you ever talk to anyone about that sheet?
10      A      It was brought up in grievance hearings, yeah.
11      Q      Do you recall anything said about 14?
12      A      They were saying that because we were -- the
13  terminal was closed before ABF acquired or merged with
14  Carolina that we were -- I don't know -- we were on a
15  different list.
16      Q      Okay.  Did you ask any questions about that?
17      A      As far as --
18      Q      This sheet.  After they gave you that
19  explanation, did you ask any further questions that you
20  recall?
21      A      Oh, I'm sure I did, and all the answers kept
22  coming back the same, that you were laid off, the terminal
23  was closed before you were Carolina or ABF acquired Carolina
24  and the committee made this whatever.
25      Q      The change in operations committee, is that

176

1  what you're referring to?
2      A      Well, that's where it came from, yes, I guess
3  a transcript from that meeting.
4      Q      I'm referring to the last sheet of --
5      A      Yeah, well, it's all part of the transcript
6  from -- I think from up in wherever they had -- what,
7  Chicago?
8      Q      Are you referring to the agreement, which is
9  Exhibit 14?
10      A      Exhibit 14.  It came in on the type so that
11  would have been to I guess all the locals.  I guess that's
12  how they do that.
13      Q      Exhibit 22, which is a letter from Chuck
14  Shughart dated July 18th, 2000, is it fair to say that you
15  never responded to that letter?
16      A      I may have had a phone call.
17      Q      Do you recall the phone call if you had one?
18      A      I'm not sure if this was before or after we
19  put everything together.  He sent it to me.  I looked it
20  over, and I think we switched things around.  I thought
21  things should be shifted around.  He thought it was not a
22  problem.
23      Q      And he shifted those things around in the
24  brief?
25      A      Yeah.  It was all the same stuff.  It was just

177

1  the order that it was presented.
2      Q      Is there anything in the brief that you did
3  not want in the brief?
4      A      I don't remember anything.  There might have
5  been, but I'm not sure if there was anything or not.
6      Q      I show you Exhibit 24.  Exhibit 24 is a draft
7  of the brief?
8      A      I think this is what him and I discussed after
9  it was -- after he sent it to the house.
10      Q      The last sheet, is that your handwriting?
11      A      Yes.
12      Q      Okay.  And the typed sheet, which is the
13  second page, is that your typing?
14      A      No.
15      Q      Is that something you discussed with Chuck?
16      A      That was what was sent from Chuck, yes.
17      Q      And the changes referred to on your last
18  sheet, were they included in your brief in the final
19  product?
20      A      Yes, I believe they were.  Again, I'd just
21  state that he knows the ins and outs.  I don't.
22          MR. MIRIN:  Can I have a break to call my
23  office?
24          (Recess.)
25  BY MR. WEINSTOCK:

GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577

**EXHIBIT 4**

CAROLINA FREIGHT CARRIERS CORPORATION
1201 EAST CHURCH STREET
POST OFFICE BOX 697
CHERRYVILLE, NORTH CAROLINA 28021
TELEPHONE: (704) 435-6811
FAX: (704) 435-8981

LEGAL DEPARTMENT

RICHARD E. F. VALITUTTO
VICE PRESIDENT AND
GENERAL COUNSEL

March 21, 1995

**VIA AIRBORNE EXPRESS**

Mr. Thomas Griffith
President
Teamsters Local 776
2552 Jefferson Street
Harrisburg, Pennsylvania   17110

**VIA AIRBORNE EXPRESS**

Mr. Ron Carey, President
International Brotherhood of Teamsters
25 Louisiana Ave. NW
Washington, D. C.   20001

Dear Mr. Griffith and Mr. Carey:

Carolina Freight Carriers Corporation has developed tentative plans to permanently discontinue the Company's freight transportation operation at its facility located at One Carolina Drive, Carlisle, Pennsylvania 17013. In keeping with the Company's tentative plans, employment separations in connection with the proposed permanent shutdown of freight transportation operations are expected to commence on or about May 21, 1995. These plans will affect the entire Carlisle facility.

At this time, the Company anticipates that affected Union-represented employees would be placed on layoff status or have their employment terminated during a 14-day period commencing on May 21, 1995. A list of job titles, the names and number of Union-represented employees currently holding affected positions, and the dates of separation that are presently known accompany this letter as Attachments A and B. This announcement and the above timetable are based on the best information currently available. However, various factors may still affect the timing of any employment separations. You will be informed of any significant changes in these plans as additional information becomes available.

To the extent that the above actions constitute a covered event under the Worker Adjustment and Retraining Notification Act, this letter is intended to fulfill any requirements imposed under

**EXHIBIT**

Bechtel-7

Thomas Griffith
Ron Carey
March 21, 1995
Page -2-

the Act.    By providing this information, the Company does not concede that the Act applies or that notice is otherwise required.

   We remain available to have bargaining concerning any aspect of these plans.

   Should you have any questions concerning this announcement, you may contact me at (704) 435-6811, ext. 2555.

                         Very truly yours,

                         Richard E. F. Valitutto

REFV:vhg

cc:  David P. Kocan,
      Vice President, Labor

warn\union.pa2

CAROLINA FREIGHT CARRIERS CORPORATION

ATTACHMENT B

CARLISLE PLATFORM SENIORITY LIST

MARCH 10, 1995

| | | | |
|---|---|---|---|
| 1 | MALINISH, James | JD | 06/18/59 |
| 2 | WRIGHT, Norman | JD | 04/01/63 |
| 3 | ALVORD, Larry | J | 11/27/69 |
| 4 | MERRIMAN, Jim | JD | 03/16/71 |
| 5 | LANDER, Bert | JD | 10/10/73 |
| 6 | MINICH, Harry | JD | 07/07/75 |
| 7 | SHRIVER, Gary | JD | 07/08/75 |
| 8 | BENNETT, Robert | JD | 07/21/75 |
| 9 | HOOVER, Ronald | J | 08/18/75 |
| 10 | GARNER, David | JD | 08/23/75 |
| 10A | YOST, Charles | JPD | 10/06/75 |
| 11 | RETIRED | | |
| 12 | STOLLAR, Dennis | | 10/05/76 |
| 13 | RAMAGE, Earl | | 05/06/77 |
| 14 | CAMPBELL, Daryl | J | 05/20/77 |
| 15 | GILBERT, Ben | JD | 06/03/77 |
| 16 | LEWIS, Bruce | J | 08/06/77 |
| 17 | RILAND, Ronald | JD | 08/28/77 |
| 18 | RUTH, Charles | JD | 08/28/77 |
| 19 | BUFFINGTON, Ronald | JD | 08/28/77 |
| 20 | BATES Sr., Robert | J | 10/02/77 |
| 21 | STRAWSER, Gerald | JD | 02/04/78 |
| 22 | HOLLAND, David | | 02/23/78 |
| 23 | GOSHORN, Larry | | 03/01/78 |
| 24 | KERR, Ronald | | 03/14/78 |
| 25 | ATKINSON, Reginald | | 03/17/78 |
| 26 | PALMER, Brian | | 04/12/78 |
| 27 | DEITCH, Samuel | JD | 04/23/78 |
| 28 | RUSSELL, Robert L. | | 04/23/78 |
| 29 | GRAVES, Steven | | 07/16/78 |
| 30 | BEEGLE, James | J | 12/01/78 |
| 31 | TODD, John | | 04/25/79 |
| 32 | STRAUB, William | JD | 05/25/79 |
| 33 | BRETZ, R. Michael | JD | 05/27/79 |
| 34 | CAMPBELL, Richard | | 06/17/79 |
| 35 | LEHMAN, Ronald | J | 08/22/79 |
| 36 | SMITH, Thomas | | 12/11/79 |
| 37 | HOWER, James | JD | 09/28/80 |
| 38 | KIRBY, Henry | | 12/21/80 |
| 39 | HEINTZELMAN, Marlin | J | 01/18/81 |
| 40 | TURNS, Henry | J | 04/03/81 |
| 41 | WOODING, James | J | 10/13/81 |
| 42 | KERSTETTER, Doug | JD | 10/30/81 |
| 43 | KUNTZ, Steven | | 11/08/81 |
| 44 | ALLEN, Spencer | | 04/18/82 |
| 45 | BARTLES, Keith | | 04/25/82 |
| 46 | EGENREIDER, Stephen | JD | 10/31/82 |
| 47 | KELLEY, James | | 01/22/83 |
| 48 | HAIR, Kenneth | J | 01/22/83 |
| 49 | GINGRICH, David | | 04/08/83 |
| 50 | ORNER, James | J | 04/10/83 |

CARLISLE PLATFORM SENIORITY LIST

MARCH 10, 1995

| 51 | SHAFFER, Richard | | 06/14/83 |
|----|------------------|---|----------|
| 52 | RESIGNED | | |
| 53 | DEITRICH, Marvin | | 02/24/84 |
| 54 | LINE, Arthur | JD | 04/02/84 |
| 55 | KEHLER, Darrell | | 04/08/84 |
| 56 | KINER, Alan | J | 04/15/84 |
| 57 | MARTIN, Fred | | 05/13/84 |
| 58 | ALBRIGHT, Charles | JD | 05/18/84 |
| 59 | FRITZ, Michael | JD | 05/22/84 |
| 60 | ZUCATTI, Joseph | | 05/27/84 |
| 61 | MALLIN, Mark | J | 06/17/84 |
| 62 | KARBOWSKI, Robert | J | 08/07/84 |
| 63 | PETERS, E. Donald | JD | 08/13/84 |
| 64 | FRY, George | | 08/14/84 |
| 65 | SMITH, Michael | J | 08/19/84 |
| 66 | CONFAIR, Richard | J | 08/28/84 |
| 67 | JEREMIAH, Brian | | 09/06/84 |
| 68 | HARRIS, Ralph | JD | 09/09/84 |
| 69 | ARCHIBALD, William | J | 09/23/84 |
| 70 | MCCANNA, John | JD | 10/21/84 |
| 71 | CORMAN, Michael | | 11/03/84 |
| 72 | BAILOR, Marvin | J | 02/24/85 |
| 73 | RHOADES, Scott | J | 03/24/85 |
| 74 | FISHER, Dallas | | 06/02/85 |
| 75 | DOMANSKI, Peter | J | 09/25/85 |
| 76 | ASKEWS, Richard | J | 11/17/85 |
| 77 | STOUT, Michael | JD | 01/09/86 |
| 78 | HELLER, David | J | 01/10/86 |
| 79 | VANFLEET, Glenn | | 01/11/86 |
| 80 | BECHTEL, Ricky | J | 02/01/86 |
| 81 | MACDUFF, Ken | | 04/14/86 |
| 82 | NODGE, James | J | 04/15/86 |
| 83 | BEAVER, Lynn | | 04/16/86 |
| 84 | STICHLER, Edward | | 04/17/86 |
| 85 | MORRIS, Malcolm | JD | 04/19/86 |
| 86 | BATES, Dale | | 11/18/86 |
| 87 | ALLWEIN, Robert | | 11/19/86 |
| 88 | HANSELL, Charles | JD | 11/21/86 |
| 89 | SHOOP, Robert | J | 08/04/87 |
| 90 | EDWARDS, Douglas | J | 09/19/87 |
| 91 | WALLS, William | | 09/22/87 |
| 92 | ERNEST, Kim | | 09/22/87 |
| 93 | FAGER, Samuel | | 09/25/87 |
| 94 | BLAINE, David | | 09/27/87 |
| 95 | DAWSON, Larry | | 10/05/87 |
| 96 | MORRISON, Steven | | 10/12/87 |
| 97 | ESTEP, Dale | | 10/16/87 |
| 98 | KOONS Sr., James | | 10/25/87 |
| 99 | WOODWARD, Kenneth | J | 11/01/87 |
| 100 | JACKSON, David | J | 12/13/87 |
| 101 | READ, Michael | JD | 12/31/87 |

CARLISLE PLATFORM SENIORITY LIST

MARCH 10, 1995

| 102 | SCHILDT, Thomas | J | 01/11/88 |
| 103 | WHITTAKER, Steve | JD | 01/16/88 |
| 104 | KLIMEK, Alan | | 01/29/88 |

**EXHIBIT 5**

# INTERNATIONAL
# BROTHERHOOD OF TEAMSTERS
### AFL-CIO



LEGAL DEPARTMENT

OFFICE: (202) 624-6945
FAX: (202) 624-6884

*Xhibit # 3*

March 27, 1995

Thomas Griffith, President
Teamsters Local Union No. 776
2552 Jefferson Street
Harrisburg, Pennsylvania   17110

RE:    Carolina Freight Carriers Corporation

Dear Mr. Griffith:

Enclosed you will find a Notice provided by Carolina Freight Carriers Corporation pursuant to the Workers Adjustment and Retraining Notification Act. Carolina Freight Carriers Corporation has developed tentative plans to permanently discontinue the Company's freight transportation operation at its facility located at One Carolina Drive, Carlisle, Pennsylvania 17013. Employment separations are expected to commence on or about May 21, 1995 affecting the entire Carlisle facility.

This letter is being forwarded to you so that you can monitor the employer's actions to assure that they are in compliance with the WARN Act. Please contact the undersigned if you have any questions with regard to the enclosed notice.

Sincerely,

Paula J. Caira

PJC/mk

Enclosure

cc:    Dennis Skelton, Director, Freight Division

**EXHIBIT**
Bechtel-3
3-7-0?

25 LOUISIANA AVENUE N.W.

EXHIBIT 6

## In The Matter Of:

*ABF FREIGHT SYSTEM-MULTI-CHANGE OF OPERATIONS*
*CAROLINA FREIGHT AND RED ARROW FREIGHT*

---

*September 14, 1995*

---

*Cochran Pudlo & Kozlowski, Ltd.*
*312 W. Randolph Street*
*Suite 444*
*Chicago, IL  60606*
*(312) 236-8461*

*Original File abf1.asc, 340 Pages*
*Min-U-Script® File ID: 0041758563*

## Word Index available for this Min-U-Script®

ABF FREIGHT SYSTEM-MULTI-CHANGE OF OPERATIONS
CAROLINA FREIGHT AND RED ARROW FREIGHT

September 15, 1995

Page 636

[1] horse, that's all I have to say.

[2]    CHAIRMAN BUSALACCHI: Okay, go ahead. It's

[3] still your nickel.

[4]    MR. McCAFFREY: We'll make two quick

[5] points. As we said before, there is a possibility

[6] we may be ending up in a situation where there is a

[7] jurisdictional dispute. In the event that we do

[8] lose those members, we would like it on the record

[9] that 707 would like to retain health, welfare, and

[10] pension payments to our funds for these people that

[11] may be redomiciled or turned over to a different

[12] jurisdiction.

[13]    CHAIRMAN BUSALACCHI: Fight nice.

[14]    MR. McCAFFREY: And lastly, I just want to

[15] say that going back the issue of seniority and I

[16] won't touch on the merge/acquisition question again,

[17] but I would just like to turn this over to the

[18] committee. this is a report of a proceedings of a

[19] Multi-Conference Change of Operations between

[20] American Freight Systems and Smith Transfer. It's

[21] very similar in that the stock purchase of Smith

[22] Transfer was purchased by American Carriers which

[23] was the parent company, similar to what Arkansas

[24] Best Corporation is to ABF, and in that decision

Page 637

[1] they applied Article 5, Section 2, dovetailing.

[2]    CHAIRMAN BUSALACCHI: Thank you.

[3]    MR. McCAFFREY: Thank you.

[4]    CHAIRMAN BUSALACCHI: Danny's got a

[5] statement to read from 764.

[6]    MR. SCHMIDT: Local 764 has not objections

[7] to the proposed change of operations, and I will

[8] abide by the committee's decision regarding

[9] seniority.

[10]    MR. VIA: Lee Via, Local 771, Lancaster.

[11] We do not oppose the change of operations, however,

[12] Brother Stocker from Local 430, York, has proposed

[13] that six employees domicile to the Lancaster

[14] terminal under the numbers that Mr. Anderson has

[15] given him. I have checked with the employees at ABF

[16] in Lancaster and the union steward, and they tell me

[17] there are two trucks that come to Lancaster but they

[18] do very little work, and what I believe those those

[19] numbers are, are they're going out to other areas

[20] that that our people do not service and then coming

[21] to Lancaster for pickup or delivery in that county.

[22]    Of course, I am sure there's going to be a

[23] window period, and if so in that window period we

[24] have no problem accepting those Carolina employees

Page 638

[1] into Local 771.

[2]    Of course, in the other situation that we

[3] have is the provision in our supplement where it has

[4] endtailing, which happened to go into the supplement

[5] in 1987 contrary to the New England and New Jersey

[6] area where they have it for at least 24 years that I

[7] I know of. Whether we like endtailing or we don't

[8] and whether we think it's fair or we think it's

[9] unfair, it is in the contract and I think we should

[10] live with the spirit of the contract. I don't know

[11] we can pick and choose in supplemental areas where

[12] some people dovetail and other people endtail, that

[13] is, if this is considered a purchase.

[14]    I'm am not that crazy over endtailing, but

[15] it is in our supplement and I believe that we we

[16] have to live with that, and I feel that if those

[17] Carolina employees do come to Lancaster that they

[18] should be endtailed according to the contract. When

[19] we started letting the National language or a Change

[20] of Operations Committee start changing supplemental

[21] agreements, then we might as well do away with our

[22] supplement agreements. And that's our position from

[23] Local 771.

[24]    CHAIRMAN BUSALACCHI: Thanks, Lee. 773?

Page 639

[1] 776, you're on deck.

[2]    MR. BROWN: Mr. Chairman, my name is Jim

[3] Brown, the business agent for Local 773, Allentown.

[4] PA. Our position is we have no objections to the

[5] change as proposed, and under Article 42, Section

[6] 1,6(d) we propose that to be followed.

[7]    CHAIRMAN BUSALACCHI: We heard your

[8] position.

[9]    MR. BROWN: That's all we got. Thank you.

[10]    CHAIRMAN BUSALACCHI: 776? 822, you will

[11] be next.

[12]    MR. GRIFFETH: Good afternoon.

[13]    CHAIRMAN BUSALACCHI: Good afternoon, Tom.

[14]    MR. GRIFFITH: Mr. Chairman, I'd just like

[15] to state that I know it's been a long two days and

[16] people are tired, but I would ask for your attention

[17] with Local 776 as we do have a facility there, as a

[18] matter of fact, we have three different dock

[19] locations, close to 800 people, also some Carolina

[20] people. I know we do not have a terminal there. but

[21] we do have a Carolina situation. We also are going

[22] to address and we will try to be nonrepetitious in

[23] our statements, but we do have some different and

[24] unique situations involving Local 776, so I'd ask

Page 640

[1] for your patience with us to address those issues.
[1] What we'd like to do is sort of take this in two
[1] separate issues, and we're going to try to address
[1] all the dock issues, local cartage issues first, and
[1] then after we do that we will go into the road
[1] operation.
[1]     And for the dock and local cartage
[1] operations, we have here as business agent George
[1] Smart, Carlos Ramos, and Chuck Shughart, and we have
[1] dock stewards here Brad Lindsay, Robert Schrum,
[1] Angelo Mraz, and Craig Vogelsong. With that I will
[2] turn mike over to Chuck Shughart and let him put his
[3] presentation on.
[4]     MR. SHUGHART: Good morning, Mr. Chairman,
[5] gentlemen. In the interest of time, we had a
[6] meeting with Bob Bell on September 8th and we had a
[7] transcript made of that meeting, and they will
[8] stipulate that transcript is an accurate
[9] reflection of that meeting, we will enter it, and I
[0] don't have to go through the questions.
[1]     MR. LITTLE: Bob says it is.
[2]     CHAIRMAN BUSALACCHI: Give that to the
[3] court reporter, Carlos, and we'll make that part of
[4] the record.

Page 641

[1]     (Exhibit No. 18 marked for identification
[2] and attached to the transcript.)
[3]     MR. SHUGHART: Gentlemen, this local union
[4] represents the employees at ABF Carlisle and Camp
[5] Hill, PA. The company is proposing a loss of 32
[6] jobs at Carlisle and 34 jobs at the Camp Hill
[7] terminal. Local 776 also represents 323 laid off
[8] employees from the Carolina terminal at Carlisle.
[9] ABF claims they have no obligations to offer any
[10] recall right to them claiming they are inactive,
[11] laid off employees.
[12]     With respect to the ABF employees at
[13] Carlisle and Camp Hill, the company has advised us
[14] that much of the current work is being transferred
[15] to another breakbulk-type facility or facilities.
[16] The local union requested a breakdown on the freight
[17] that would be lost to the Carlisle Camp Hill
[18] terminal. As of yet a breakdown has not been
[19] provided. Using a conservative formula one can
[20] easily determine that the proposed loss of jobs
[21] represents the loss of more than 3 millions pounds
[22] of freight per week at each terminal.
[23]     We believe ABF has an obligation to advise
[24] us where the work is being transferred and we

Page 642

[1] believe employees should have the opportunity to
[2] follow that work. I will give the company an
[3] opportunity to respond to that point.
[4]     CHAIRMAN BUSALACCHI: Company?
[5]     MR. LITTLE: The breakbulk work is being
[6] done in the new system that would come about as a
[7] result of the acquisition, as a result of the
[8] combination of these companies on day one, and as
[9] pointed out in the change of operations proposal new
[10] breakbulk facilities are established, which we call
[11] both national distribution centers and regional
[12] distribution centers. At those locations designated
[13] as national and regional distribution centers there
[14] already is sufficient manpower available as a result
[15] of the acquisition. We do the work that's available
[16] there, therefore, there's no gaining breakbulk
[17] facilities as a result of this change of operations
[18] and no opportunity, therefore, to transfer to any
[19] gained jobs at those operations.
[20]     MR. SHUGHART: Nonetheless, Mr. Chairman,
[21] the freight is leaving our terminals and we –
[22]     CHAIRMAN BUSALACCHI: Three million pounds,
[23] yes.
[24]     MR. SHUGHART: And that's a very

Page 643

[1] conservative figure.
[2]     CHAIRMAN BUSALACCHI: Okay.
[3]     MR. SHUGHART: There are several
[4] outstanding issues regarding seniority and other
[5] claims that this committee is being asked to decide.
[6] One of them could be the question of endtailing or
[7] dovetailing on the ABF Carlisle seniority list. It
[8] is the position of this Local union that any
[9] Carolina employee who is offered work at Carlisle or
[10] Camp Hill as a result of this change of operations
[11] should be placed at the bottom of the ABF seniority
[12] list after all laid off ABF employees at each
[13] respective terminal are recalled. This would be in
[14] compliance with Article 42,1(d) of the Central
[15] Pennsylvania Supplement.
[16]     Furthermore, if any Carolina employee
[17] transfers to the ABF Carolina or Camp Hill terminal
[18] in any future change of operations, his or her
[19] seniority should be applied as if the transfer had
[20] occurred under this change, that is after currently
[21] employed ABF employees and merged by Carolina
[22] seniority date with any Carolina employee placed on
[23] the ABF seniority list hereafter.
[24]     To elaborate on that somewhat, for

ABF FREIGHT SYSTEM-MULTI CHANGE OF OPERATIONS
CAROLINA FREIGHT AND RED ARROW FREIGHT



September 15, 1995

Page 644

[1] instance, let's say you have two employees in
[2] Baltimore and you have one with 20 years and one
[3] with two years. The employee with 20 years accepts
[4] work somewhere where he entails. The employee with
[5] two years accepts work somewhere where he dovetails.
[6] Now you have a change of operations that brings both
[7] of those employees to Carlisle. Your men with two
[8] years is going to be senior to the man with 20
[9] years, and that has going to be a problem. It's
[10] bonds to happen somewhere.
[11]    CHAIRMAN BUSALACCHI: It's happened before
[12] and the Change Committee would rule at that time.
[13] It would be up to local unions to raise that point,
[14] but it's happened before.
[15]    MR. FRANKE: Many times.
[16]    MR. SHUGHART: With respect to the 323
[17] Carolina employees on layoff from the Carlisle, PA
[18] terminal, the company has stated that they have no
[19] obligation to these employees as if they don't
[20] exist. In the proposed change they are referred to
[21] as inactive, laid off employees. These employees
[22] have seniority that ranges from 36 years do eight
[23] months with the company. Most of them were laid off
[24] in May 1995, two months before the merger between

Page 645

[1] Carolina and ABF was announced. By Carolina's own
[2] admission, the plans to merge with ABF were well
[3] under way at that time.
[4]    Under these circumstances it would be
[5] horrendously unfair to exclude these employees the
[6] right to exercise their seniority under this change.
[7] Under the terms of the National Master Freight
[8] Agreement these employees have recall rights for
[9] five years. Carolina has contractual obligations to
[10] the laid off Carolina employees at Carlisle and
[11] elsewhere. One of those contractual obligations is
[12] to provide the recall rights for five years. ABF is
[13] merging with Carolina, thereby assuming Carolina's
[14] debts, liabilities, and contractual obligations.
[15] Included among those contractual obligations is the
[16] requirement to offer the five-year recall rights to
[17] Carolina employees who were previously laid off.
[18]    Carolina Freight did not vanish from the
[19] face of the earth. They exist. They may be
[20] headquartered in a different city, they may operate
[21] under a different company logo, management, and
[22] color scheme, but they do exist. The contractual
[23] obligations to Carolina employees also exist. The
[24] merged company has an obligation to provide the

Page 646

[1] contractual obligations that Carolina employees were
[2] entitled to receive.
[3]    With that I would like to submit to you,
[4] this is a copy of information provided by WorldWay
[5] Corporation/Carolina Freight. It was sent out to
[6] the shareholders, and you can see in here if you
[7] look on page 4 where references are made that they
[8] started to discuss this merger back in early 1994,
[9] and they had several meetings in '94 and '95 until
[10] they finally consummated the merger in July. Now,
[11] what I find very, very interesting is on page 7 you
[12] will see where at the top on June 2nd – now, if
[13] these people didn't know this merger was coming
[14] about on June 2, eight of the top officers of the
[15] company exercised the stock options, and in excess
[16] of 480,000 shares just prior to the merger. And if
[17] you go on back, you want to compare that, for
[18] instance, to what they exercised the year prior –
[19] you will find that back on page I-9 – it's a
[20] considerably lesser amount. So I mean I think this
[21] helps to prove that they knew that a merger was on
[22] its way.
[23]    CHAIRMAN BUSALACCHI: Well, I don't think
[24] there's a doubt in anybody's mind.

Page 647

[1]    MR. LITTLE: Just a minute, if I may. He's
[2] reading from page 7?
[3]    CHAIRMAN BUSALACCHI: That's what he said,
[4] page 7.
[5]    MR. LITTLE: On page 7 he read item 6 I
[6] believe, referring to June 2nd, a list of names of
[7] apparently shareholder participants. I don't see
[8] any Arkansas Best employees in there.
[9]    MR. SHUGHART: No, they're not. They're
[10] all Carolina employees, the top officers of Carolina
[11] exercising their stock options.
[12]    CHAIRMAN BUSALACCHI: I mean what he's
[13] saying, Don, is that they knew that the sale was
[14] coming, all right? Let's not get into a big,
[15] dragged out argument.
[16]    MR. SHUGHART: I don't want to argue. I
[17] just want to point that out.
[18]    MR. LITTLE: They knew sale was coming –
[19]    CHAIRMAN BUSALACCHI: Let him go on.
[20]    MR. SHUGHART: In the case of Carlisle, the
[21] merged Carolina/ABF company has a terminal within
[22] the jurisdiction of Local 776 also in Carlisle.
[23] Carolina employees who were laid off should have the
[24] first priority to elect work at the Carlisle, PA

ABF FREIGHT SYSTEM-MULTI-CHANGE OF OPERATIONS
CAROLINA FREIGHT AND RED ARROW FREIGHT

eptember 15, 1995

Page 648

[1] terminal if and when future job opportunities become
[2] available. It is our position that these Carlisle
[3] employees should be be offered work before any other
[4] Carolina employee at any other terminal active or
[5] inactive and us other employees are following work
[6] to Carlisle, which is not the case. These laid off
[7] Carolina and Carlisle employees should maintain
[8] seniority for rate of pay and fringe benefits, and I
[9] said earlier they should be entailed.
[10]    CHAIRMAN BUSALACCHI: Yes, you did.
[11]    MR. SHUGHART: And I heard some discussion
[12] earlier about the Carolina employees whether they
[13] had the opportunity to follow work somewhere. in my
[14] opinion I don't think that's really relevant. They
[15] were laid off. Whether they had an opportunity to
[16] follow work under a prior Carolina change isn't an
[17] issue. They had the right to take the layoff if
[18] they show chose for whatever reason. I talked with
[19] one gentlemen who had a crippled son and he had his
[20] house all redone to accommodate his handicap, and he
[21] was just in no position to move so he took the
[22] layoff. And these people should have the recall
[23] rights for five years regardless of whether or not
[24] they had an opportunity to follow work.

Page 649

[1]    So to go back and recap a little bit, we
[2] think that the ABF, Carlisle, and Camp Hill
[3] employees are entitled to follow work. Secondly, we
[4] think that any Carolina employee offered work as a
[5] result of this change and/or a future change of
[6] operations should be merged into the Carolina
[7] seniority, should merged onto a list by Carlisle
[8] seniority date and placed at the bottom of the ABF
[9] Carlisle seniority list after current ABF employees.
[10] Thirdly, we think that the five-year recall rights
[11] of the laid off Carolina employees should be
[12] respected. The laid off Carolina employees at
[13] Carlisle should have the first opportunity to select
[14] work opportunity at the ABF Carlisle and Camp Hill
[15] terminals for five years from the date of layoff as
[16] provided by Article 8,6(b) and that seniority would
[17] be entailed after current ABF employees.
[18]    We also have some office employees who
[19] previously worked at Carolina who were laid off and,
[20] I would like to ask the company what their position
[21] would be on them.
[22]    CHAIRMAN BUSALACCHI: Company?
[23]    MR. LITTLE: The company's office force in
[24] Carlisle at present is sufficient to meet he meet

Page 650

[1] the needs of the office in Carlisle based on the
[2] reduction of the numbers that we have in employees
[3] there, certainly the offices force is sufficient.
[4]    MR. SHUGHART: Will there be any offer of
[5] future work?
[6]    MR. LITTLE: The employees who you refer to
[7] certainly would have equal opportunity with other
[8] applicants at ABF.
[9]    CHAIRMAN BUSALACCHI: Well, wait a minute
[10] now. Are you telling me that there's laid off
[11] Carolina office people?
[12]    MR. SHUGHART: That's correct, from a prior
[13] Carolina change.
[14]    CHAIRMAN BUSALACCHI: But they're laid off,
[15] and now if you have office work becomes available,
[16] your question is will you offer it to those Carolina
[17] people?
[18]    MR. SHUGHART: That's correct.
[19]    MR. LITTLE: And I think I answered the
[20] question.
[21]    CHAIRMAN BUSALACCHI: Well, you did, but
[22] you said you would consider them along with new
[23] hires.
[24]    MR. LITTLE: In line of their – and first

Page 651

[1] of all, Mr. Chairman, he's talking about office
[2] employees, I presume, and I don't even know what
[3] contract because they were laid off previously.
[4]    CHAIRMAN BUSALACCHI: I don't either. I
[5] don't know.
[6]    MR. SHUGHART: Central Pennsylvania.
[7]    MR. LITTLE: All right. And, of course,
[8] that issue would be that if we need additional
[9] office personnel in line with that we would offer
[10] them in line of seniority and qualifications the
[11] opportunity to come over to ABF's office in that
[12] environment.
[13]    MR. SHUGHART: We would ask them to give
[14] them job preference for the first opportunity to
[15] work.
[16]    CHAIRMAN BUSALACCHI: Well, I think that's
[17] basically what he's saying.
[18]    MR. SHUGHART: We might also point out to
[19] the committee that we have the shop, ABF shop in our
[20] contract. It's a white paper contract with a
[21] vendor.
[22]    CHAIRMAN BUSALACCHI: Supplement to the
[23] National?
[24]    MR. SHUGHART: It's not a supplement, no.

**EXHIBIT 7**

Bechtel    Rickey    A.
(last)      (first)      (m.i.)

2072 Locust Lane
street /P.O. Box

Hummelstown    PA    17036
(city)          (state)    (zip)

717-566-0609    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
(home phone)    (social security #)

10-15-95
(date)

Steve Walters, Terminal Manager
ABF Freight Systems
P.O. Box 1925
New Kingstown, Pa  17072

Ref:    Employment opportunities under Article 5, Section 5 of the NMFA

Dear Mr. Walters:

Please be advised that I am interested in work opportunities that become available at ABF.

I am interested in available work at the below areas:  (Mark only one block).

[✓]    Carlisle/Camp Hill, Pa
[ ]    Other terminals in ABF's system

I am a qualified:    [ ]    Road Driver
                     [✓]    Jockey
                     [✓]    Dockworker

Sincerely,

2-1-86
DU

Rickey a Bechtel
(Signature)

left - msg - 2:10 P.M - 11-8-95
N= 8    11-8-95 -2:45 P.M

**EXHIBIT**
Bechtel-5

EXHIBIT 8



**ABF FREIGHT SYSTEM, INC.**
P. O. Box 10048
Fort Smith, AR 72917-0048
(501) 785-8700

November 9, 1995

Certified Mail No. Z 093 690 533
Return Receipt Requested

Mr. Rickey Bechtel
2072 Locust Lane
Hummelstown, PA 17036

Re:  Article 5, Section 5 Job Offer in Accordance with
     ABF Multi-Region Change of Operations MR-CO-38-9/95

Dear Mr. Bechtel:

In accordance with paragraph 7 of the decision in the above referenced change of operations, on November 8, 1995, you were contacted and offered an opportunity to transfer to permanent employment in your classification at Waco, Omaha, Brattleboro, New Haven, Cedar Rapids, Waterbury, Fairfield, Minneapolis or Newark.

This letter is to confirm that you elected to decline the job offer and to remain in layoff status at Carlisle, PA.

Sincerely yours,

Gordon Ringberg

Gordon Ringberg, Director
Industrial Relations

cbf

cc:  John Dale, Vice President-Transportation/Industrial Relations

     Teamsters Local Union No. 776
     Certified Mail No. Z 093 690 525
     Return Receipt Requested



EXHIBIT
Bechtel-6
3-7-02

EXHIBIT 9

# MFA GRIEVANCE — Teamsters Local 776

94530

me _Rickey A. Bechtel_     Home Phone _717-566-06_  Date of Hire _2-85_

dress _2072 Locust Lane_     City _Hummelstown_  State _PA_  Zip _17036_

ployer _ABF_

ployer's Address _____ _Carlisle_

ad ☑     Dock ☑     Jockey ☑     City ☐     Iron and Steel ☐     Mechanic-Office ☐     Miscellaneous ☐

FEB 24

**PORTANT:** It is the responsibility of the member filing this grievance to ue the proper copies to all parties in a timely manner, as per your contract.     Date: _Feb 20, 2000_  8 59

ATURE OF GRIEVANCE: _I am filing this grievance due to the fact that I am a laid-off ABF employee at Carlisle, Pa. (see attached letter marked exhibit #1). It has come to my attention that ABF is hiring at Carlisle, Pa. terminal and I am filing this because I have not been contacted for any available work opportunities. Under the VMFA that was in affect in 1985 when I was laid off Article #5 sectin 2 states that "If additional employees are required after the active list is exhausted, they shall be recalled from such inactive seniority roster and after recall such employees shall be "dovetailed" into the active seniority roster with their continuous classification (Road or city) seniority dates they are currently exercising which shall then be_

EWARD'S COMMENTS: ~~~~ _exercised for all purposes._

Attachments: 1 grievance, 1 exhibit letter, 1 letter Requesting written decision from Local 776.

accordance with the Grievant's Bill of Rights, I am requesting, in writing, copies of all dis-plinary letters, photos and any other documentation pertaining to this grievance.

_Rickey A Bechtel_
Signature of Member Filing Grievance     Shop Steward

☐ **YOU** must check this box if you want to attend the grievance hearings. If you request to be in attendance, **YOU WILL NOT** be paid for this time.

CTION TAKEN BY BUSINESS AGENT _____

_____

_____

**EXHIBIT**
Bechtel-8
3-7-02

Date: _____

Signature of Business Agent

WHITE—UNION COPY
PINK—EMPLOYER
BLUE—EMPLOYEE REPORTING GRIEVANCE
YELLOW—STEWARD

EXHIBIT 10

PHIL FERRANTE
VICE PRESIDENT
BRAD LINDSAY
RECORDING SECRETARY
HARVEY WHITE
TRUSTEE
MIKE HORD
TRUSTEE
THOMAS VINSON
TRUSTEE

BUSINESS AGENTS

CARLOS N. RAMOS, II
CHARLES SHUGHART
ROBERT J. SNYDER, JR.
RUSSELL A. STEPP
DANIEL A. VIRTUE

# CHAUFFEURS, TEAMSTERS AND HELPERS
## LOCAL UNION NO. 776

"AFFILIATED WITH THE INTERNATIONAL BROTHERHOOD OF TEAMSTERS"

2552 JEFFERSON STREET, HARRISBURG, PA 17110-2505

THOMAS B. GRIFFITH
PRESIDENT AND BUSINESS AGENT

JOHN L. FOGLE, II
SECRETARY TREASURER AND BUSINESS AGENT

February 29, 2000

Rickey A. Bechtel
2072 Locust Lane
Hummelstown, PA 17036

Ref:   Grievance 94530

Dear Thomas:

Your above referenced grievance was received.  It has been forwarded to ABF.  I will advise you of any scheduled meetings or hearings regarding the grievance.

Please contact me if you have any questions.

Sincerely,

Charles Shughart
Business Agent

EXHIBIT
Bechtel-10
_____ 3-7-02

TELEPHONE (717) 233-8766
(800) 692-4380

EXHIBIT 11

. FERRANTE
:E PRESIDENT
JD LINDSAY
CORDING SECRETARY
IVEY WHITE
USTEE
E HORD
USTEE
JMAS VINSON
USTEE

# CHAUFFEURS, TEAMSTERS AND HELPERS
# LOCAL UNION NO. 776

• AFFILIATED WITH THE INTERNATIONAL BROTHERHOOD OF TEAMSTERS •

2552 JEFFERSON STREET • HARRISBURG, PA 17110-2505

BUSINESS AGENTS

CARLOS N. RAMOS, II
CHARLES SHUGART
ROBERT J. SNYDER, JR.
RUSSELL A. STEPP
DANIEL A. VIRTUE

THOMAS B. GRIFFITH
PRESIDENT AND BUSINESS AGENT

JOHN L. FOGLE, II
SECRETARY-TREAUSRER AND BUSINESS AGENT

March 29, 2000

Rickey A. Bechtel
2072 Locust Lane
Hummelstown, Pa 17036

Ref:   Grievance # 94530

This confirms that your above referenced grievance will be discussed at the company level on Wednesday, April 5, 2000 at 9:00 a.m.

The meeting will be held in the conference room at the inbound dock office (Old Smith Terminal).

Contact me if you have any questions.

Fraternally,

Charles W. Shughart
Business Agent

CWS/kad

TELEPHONE 717-233-8766
800-692-6280
FAX: 717-233-6023



EXHIBIT
Bechtel-12
Lu    3-7-02

EXHIBIT 12

PHIL FERRANTE
VICE PRESIDENT
BRAD LINDSAY
RECORDING SECRETARY
HARVEY WHITE
TRUSTEE
MIKE HORD
TRUSTEE
THOMAS VINSON
TRUSTEE

# CHAUFFEURS, TEAMSTERS AND HELPERS
## LOCAL UNION NO. 776
"AFFILIATED WITH THE INTERNATIONAL BROTHERHOOD OF TEAMSTERS"
2552 JEFFERSON STREET, HARRISBURG, PA 17110-2505

BUSINESS AGENTS

CARLOS N. RAMOS, II
CHARLES SHUGHART
ROBERT J. SNYDER, JR.
RUSSELL A. STEPP
DANIEL A. VIRTUE

THOMAS B. GRIFFITH
PRESIDENT AND BUSINESS AGENT

JOHN L. FOGLE, II
SECRETARY TREASURER AND BUSINESS AGENT

April 5, 2000

Andy Upchurch
ABF Freight Systems
P.O. Box 1925
New Kingstown, PA 17072

Ref:    Meeting of April 5, 2000

Dear Andy:

On April 5, 2000, a meeting was held at the Carlisle terminal to discuss grievances 94530 (R. Bechtel) and 94532 (Thomas Schildt). In attendance was David Quidort, both grievants you and me. The following was discussed:

The grievants are claiming recall rights from layoff under Article 5, Section 2 of the NMFA. Mr. Bechtel amended his grievance at the table to include compensation for lost earnings and benefits. The same request was not made by Mr. Schildt. It was the position of the Company that the timeliness of the grievances could be an issue. We were not able to determine the date of layoff for either grievant, but Mr. Schildt provided a pay stub, indicating that he was paid for work performed in the pay period ending 3/18/95. The parties will search for records that will clarify the dates of layoff. It was also the position of the Company that they had no obligation to recall Carolina employees who were in layoff status prior to the merger/purchase by ABF Freight Systems. The provisions of Article 5, Section 5 were discussed. No resolution was reached on either grievance.

The grievances remain pending and will be placed on the docket for the next ERJAGC, unless resolved prior to that date.

Sincerely,

Charles Shughart
Business Agent

cc:
Grievants

EXHIBIT
Bechtel-13
3-7-02

TELEPHONE (717) 233-8766
(800) 692-6280
FAX (717) 233-4022

Exhibit (2)

EXHIBIT 13

Subj:    **Your Brief**
Date:    07/10/2000 8:58:59 AM Pacific Daylight Time
From:    Rschevelle
To:      Hswrestlersdad

Gentlemen,

I was laid off from Carolina Freight in 1995 and contractually I have 5 years to be recalled back to work with all seniority. ABF merged with Carolina in September 1995 and I was offered work elsewhere in ABF's system and the letter here states so and I declined it. When I declined it the letter states I am a laid off employee of ABF at Carlisle, Pa. In 1998 ABF hired new workers at the Carlisle, Pa terminal, never recalling me for such work. Article #5 section #2 of the NMFA states that the active list will be used and when it is exhausted the inactive list will be recalled and dovetailed into their seniority position. The seniority list attached clearly shows that there were new employees hired in 1998- current date as of April, 2000. I feel I should be offered under the contract any work at the Carlisle, Pa terminal before new workers are hired which was not done. This is the same job I was laid off from and to prove this any man who transferred to other terminals throughout the system when it was still Carolina freight who is still at those terminals are carrying seniority dates from Carolina, if this was not the same job and instead a new employment these men would all have seniority dates of 1995 when the merger took place, also ABF is paying compensation claims to this day for employees of Carolina Freight whom went on Compensation when it was still Carolina which shows that ABF has excepted the liabilities of Carolina but did not honor the recall rights of the Carolina Employees. In closing I am asking that you gentlemen see all the documents that are here and realize that I should be working at ABF in my full seniority position as per the contract states. I am asking to be put to work at ABF at Carlisle, Pa with my rightful seniority date of 2/1/86 and for any or all money and benefits due me.
            Thank-You



TEAMSTERS LOCAL 776

VS

ABF FREIGHT SYSTEMS

Grievance 94530
(Rickey A. Bechtel)



**EXHIBIT**
Bechtel-24
3-7-02

Gentlemen of the Committee:

Grievance number 94530 reads as follows:

*I am filing this grievance due to the fact that I am a laid off ABF employee at Carlisle, PA (see attached letter marked Exhibit 1). It has come to my attention that ABF is hiring at the Carlisle, PA terminal and I am filing this because I have not been contacted for any available work opportunities. Under the National Master Freight Agreement that was in effect in 1995 when I was laid off, Article # 5, Section # 2 states that "If additional employees are required after the active list is exhausted, they shall be recalled from such inactive seniority roster and after recall, such employees shall be "dovetailed" into the active seniority roster with their continuous classification (road or city) seniority dates they are currently exercising which shall then be exercised for all purposes".* (Exhibit 1)

Note: The grievant amended the grievance at Company level grievance discussions on April 5, 2000 to include a claim for "all monies due" (Exhibit 2).

The grievant was a full-time dock / jockey employee with Carolina Freight at the Carlisle, Pennsylvania breakbulk terminal. His seniority date was February 1, 1986.

In May,1995, Carolina Freight Carriers terminated
their breakbulk operations at the Carlisle,
Pennsylvania terminal.  All remaining employees not
previously laid-off were placed on layoff status.
(Exhibit 3).

On July 10, 1995, it was announced that ABF
Freight Carriers, Inc. would acquire Carolina Freight
Carriers and Red Arrow Freight Lines.  On September 14
and 15, 1995, the issues concerning the change of
operations were presented at a meeting held in
Chicago.  At the change of operations, Local 776
addressed concerns about the previously laid off
employees at the Carolina terminal at Carlisle
(Exhibit 4).

On December 29, 1998, the Fourth Circuit Court of
Appeals issued its decision that Carolina employees be
dovetailed with the ABF employees, not entailed and
this should finally bring to an end this seniority
dispute (Exhibit 5).

Finish the rest of Brief with previous

In May, 1995, Carolina Freight Carriers terminated their breakbulk operations at the Carlisle, Pennsylvania terminal. All remaining employees not previously laid-off were placed on layoff status.

On July 10, 1995, it was announced that ABF Freight Carriers, Inc would acquire Carolina Freight Carriers and Red Arrow Freight Lines. On September 14 and 15, 1995, the issues concerning the change of operations were presented at a meeting held in Chicago. At the change of operations, Local 776 addressed concerns about the previously laid off employees at the Carolina terminal at Carlisle (Exhibit 3).

*Insert Exhibit 5*        *Change to Exhibit 4*

Mr. Bechtel has filed this grievance, claiming that ABF is violating the term of    ← Article 5, Section 2 (c) (2) (of the 94 - 98 NMFA). That language reads as follows:

> *In addition, the inactive seniority rosters (employees who are on letter of layoff) shall be similarly "dovetailed" by appropriate classification. If additional employees are required after the active list is exhausted, they shall be recalled from such inactive seniority roster and after recall such employees shall be "dovetailed" into the active seniority roster with their continuous classification (road or city) seniority dates they are currently exercising which shall then be exercised for all purposes. Seniority rosters previously combining job classifications shall be continued unless otherwise agreed.*

Obviously, Mr. Bechtel was on a letter of layoff from Carolina Freight at the time the ABF merger / acquisition took place. When that occurred, it would seem that ABF assumed the debts, liabilities and contractual obligations previously held by

Carolina Freight. One aspect of those contractual obligations is the recall rights of Carolina employees who were previously placed in layoff status by Carolina. As such, Mr. Bechtel should by entitled to recall rights under Article 5, Section 2.

Should there be any question that Mr. Bechtel was on layoff from ABF, the attached letter (Exhibit 4) clearly indicates his layoff status. It reads in part:

*Change to Exhibit 6*

*This letter is to confirm that you elected to decline the job offer and to remain in **layoff** status at Carlisle, PA*

Attached is a copy of a seniority list from the ABF terminal at Carlisle, Pennsylvania (Exhibit 5). As can be determined from the list, ABF has hired 108 *Change to Exhibit 7* employees who have a seniority date of November, 1998 or later. Approximately 31 of those individuals currently work in the dock / local classification.

In view of the clear and undisputable facts related to this grievance, we respectfully request that the Committee uphold the claim of the grievant, placing him on the seniority roster with a date of February 1, 1986. He should be compensated for lost wages and benefits from November, 12, 1998 (Ronald Frombaugh).

Respectfully Submitted

Charles Shughart
Business Agent

-3-

Mr. Shughart ●                    ●

I have revised this Brief after reviewing. Please insert all changes. and make copies of Exhibits But I need them back. If you have any questions Feel Free to Call me At 566-0609. Home, or page me At 257-0515

Page 1    Leave as written

Page 2    Revised From beginning of
          Page down to End with
          Exhibit 5 Then procede with
          the Rest of Brief starting
          with (Mr. Bechtel has filed)

          All that has to be changed
          is Exhibit Numbers.

EXHIBIT 15

PHIL FERRANTE
VICE PRESIDENT
BRAD LINDSAY
RECORDING SECRETARY
HARVEY WHITE
TRUSTEE
MIKE HORD
TRUSTEE
THOMAS VINSON
TRUSTEE

# CHAUFFEURS, TEAMSTERS AND HELPERS
## LOCAL UNION NO. 776

"AFFILIATED WITH THE INTERNATIONAL BROTHERHOOD OF TEAMSTERS"

2552 JEFFERSON STREET, HARRISBURG, PA 17110-2505

THOMAS B. GRIFFITH
PRESIDENT AND BUSINESS AGENT

JOHN L. FOGLE, II
SECRETARY TREASURER AND BUSINESS AGENT

BUSINESS AGENTS

CARLOS N. RAMOS, II
CHARLES SHUGHART
ROBERT J. SNYDER, JR.
RUSSELL A. STEPP
DANIEL A. VIRTUE

July 18, 2000

Rickey Bechtel
2072 Locust Lane
Hummelstown, PA 17036

Ref:    Your Grievance 94530

Dear Rickey:

Enclosed is a copy of the brief for the above referenced grievance. I think all the revisions you requested have been accomplished. Please review it and advise me if it is correct or if additional changes are necessary. Since time is short, a prompt response would be appreciated. If I am not available, please leave a message with the office staff.

Sincerely,

Charles Shughart
Business Agent



EXHIBIT
Bechtel-22

EXHIBIT 16

---

**TEAMSTERS LOCAL 776**

**VS**

**ABF FREIGHT SYSTEMS**

**Grievance 94530**
**(Rickey A Bechtel)**

---

Gentlemen of the Committee:

Grievance number 94530 reads as follows:

*I am filing this grievance due to the fact that I am a laid off ABF employee at Carlisle, PA (see attached letter marked Exhibit 1). It has come to my attention that ABF is hiring at the Carlisle, PA terminal and I am filing this because I have not been contacted for any available work opportunities. Under the National Master Freight Agreement that was in effect in 1995 when I was laid off, Article # 5, Section # 2 states that "If additional employees are required after the active list is exhausted, they shall be recalled from such inactive seniority roster and after recall, such employees shall be "dovetailed" into the active seniority roster with their continuous classification (road or city) seniority dates they are currently exercising which shall then be exercised for all purposes".* (Exhibit 1)

Note: The grievant amended the grievance at Company level grievance discussions on April 5, 2000 to include a claim for "all monies due" (Exhibit 2).

The grievant was a full-time dock / jockey employee with Carolina Freight at the Carlisle, Pennsylvania breakbulk terminal. His seniority date was February 1, 1986.

In May, 1995, Carolina Freight Carriers terminated their breakbulk operations at the Carlisle, Pennsylvania terminal. All remaining employees not previously laid-off were placed on layoff status (Exhibit 3).

On July 10, 1995, it was announced that ABF Freight Systems, Inc would acquire Carolina Freight Carriers and Red Arrow Freight Lines. On September 14 and 15, 1995, the issues concerning the change of operations were presented at a meeting held in Chicago. At the change of operations, Local 776 addressed concerns about the previously laid off employees at the Carolina terminal at Carlisle (Exhibit 4).

On December 29, 1998, the Fourth Circuit Court of Appeals issued its decision that Carolina employees be dovetailed with the ABF employees, not entailed and this should finally bring to an end this seniority dispute (Exhibit 5).

Mr. Bechtel has filed this grievance, claiming that ABF is violating the term of Article 5, Section 2 (c) (2) (of the 94 - 98 NMFA). That language reads as follows:

> In addition, the inactive seniority rosters (employees who are on letter of layoff) shall be similarly "dovetailed" by appropriate classification. If additional employees are required after the active list is exhausted, they shall be recalled from such inactive seniority roster and after recall such employees shall be "dovetailed" into the active seniority roster with their continuous classification (road or city) seniority dates they are currently exercising which shall then be exercised for all purposes. Seniority rosters previously combining job classifications shall be continued unless otherwise agreed.

-2-

Obviously, Mr. Bechtel was on a letter of layoff from Carolina Freight at the time the ABF merger / acquisition took place. When that occurred, it would seem that ABF assumed the debts, liabilities and contractual obligations previously held by Carolina Freight. One aspect of those contractual obligations is the recall rights of Carolina employees who were previously placed in layoff status by Carolina. As such, Mr. Bechtel should by entitled to recall rights under Article 5, Section 2.

Should there be any question that Mr. Bechtel was on layoff from ABF, the attached letter clearly indicates his layoff status (Exhibit 6). It reads in part:

> *This letter is to confirm that you elected to decline the job offer and to remain in **layoff** status at Carlisle, PA*

Attached is a copy of a seniority list from the ABF terminal at Carlisle, Pennsylvania (Exhibit 7). As can be determined from the list, ABF has hired 108 employees who have a seniority date of November, 1998 or later. Approximately 31 of those individuals currently work in the dock / local classification.

In view of the clear and undisputable facts related to this grievance, we respectfully request that the Committee uphold the claim of the grievant, placing him on the seniority roster with a date of February 1, 1986. He should be compensated for lost wages and benefits from November 12, 1998.

Respectfully Submitted

Charles Shughart

Business Agent

-3-

1

# NMFA GRIEVANCE — Teamsters Local 776          94530

Name **Rickey A. Bechtel**          Home Phone **717-566-06**   Date of Hire **2-85**

Address **2072 Locust Lane**          City **Hummelstown**   State **PA**   Zip **17036**

Employer **ABF**

Employer's Address _____**Carlisle**_____          FEB 24

Road ☑   Dock ☑   Jockey ☑   City ☐   Iron and Steel ☐   Mechanic-Office ☐   Miscellaneous ☐

**IMPORTANT:** It is the responsibility of the member filing this grievance to issue the proper copies to all parties in a timely manner, as per your contract.          Date: **Feb 26, 2000**   **8 53**

**NATURE OF GRIEVANCE:** I am filing this grievance due to the fact that I am a laid-off ABF employee at Carlisle, Pa. (see attached letter marked exhibit #1). It has come to my attention that ABF is hiring at Carlisle, Pa. terminal and I am filing this because I have not been contacted for any available work opportunities. Under the NMFA that was in affect in 1995 when I was laid off Article #5 section 2 states that "If additional employees are required after the active list is exhausted, they shall be recalled from such inactive seniority roster and after recall such employees shall be "dovetailed" into the active seniority roster with their continuous classification (road or city) seniority dates they are currently excersing which shall then be

**STEWARD'S COMMENTS:** ~~~~ exersised for all purposes.

Attachments: 1 grievance, 1 exhibit letter, 1 letter requesting written decision from Local 776

In accordance with the Grievant's Bill of Rights, I am requesting, in writing, copies of all disciplinary letters, photos and any other documentation pertaining to this grievance.

_Rickey A Bechtel_
Signature of Member Filing Grievance                    Shop Steward

☑ **YOU** must check this box if you want to attend the grievance hearings. If you request to be in attendance, **YOU WILL NOT** be paid for this time.

**ACTION TAKEN BY BUSINESS AGENT** _____

_____

_____

Date: _____          _____
                                          Signature of Business Agent

1—WHITE—UNION COPY
2—PINK—EMPLOYER
3—BLUE—EMPLOYEE REPORTING GRIEVANCE
4—YELLOW—STEWARD

Exhibit (1)

**INSTRUCTIONS ON BACK OF YELLOW SHEET**

**2**

PHIL FERRANTE
VICE PRESIDENT
BRAD LINDSAY
RECORDING SECRETARY
HARVEY WHITE
TRUSTEE
MIKE HORD
TRUSTEE
THOMAS VINSON
TRUSTEE

BUSINESS AGENTS

CARLOS N. RAMOS, II
CHARLES SHUGHART
ROBERT J. SNYDER, JR.
RUSSELL A. STEPP
DANIEL A. VIRTUE

# CHAUFFEURS, TEAMSTERS AND HELPERS
## LOCAL UNION NO. 776
"AFFILIATED WITH THE INTERNATIONAL BROTHERHOOD OF TEAMSTERS"
2552 JEFFERSON STREET, HARRISBURG, PA 17110-2505

THOMAS B. GRIFFITH
PRESIDENT AND BUSINESS AGENT

JOHN L. FOGLE, II
SECRETARY TREASURER AND BUSINESS AGENT

April 5, 2000

Andy Upchurch
ABF Freight Systems
P.O. Box 1925
New Kingstown, PA 17072

Ref:    Meeting of April 5, 2000

Dear Andy:

On April 5, 2000, a meeting was held at the Carlisle terminal to discuss grievances 94530 (R. Bechtel) and 94532 (Thomas Schildt). In attendance was David Quidort, both grievants you and me. The following was discussed:

The grievants are claiming recall rights from layoff under Article 5, Section 2 of the NMFA. Mr. Bechtel amended his grievance at the table to include compensation for lost earnings and benefits. The same request was not made by Mr. Schildt. It was the position of the Company that the timeliness of the grievances could be an issue. We were not able to determine the date of layoff for either grievant, but Mr. Schildt provided a pay stub, indicating that he was paid for work performed in the pay period ending 3/18/95. The parties will search for records that will clarify the dates of layoff. It was also the position of the Company that they had no obligation to recall Carolina employees who were in layoff status prior to the merger/purchase by ABF Freight Systems. The provisions of Article 5, Section 5 were discussed. No resolution was reached on either grievance.

The grievances remain pending and will be placed on the docket for the next ERJAGC, unless resolved prior to that date.

Sincerely,

Charles Shughart
Business Agent

cc:
Grievants

TELEPHONE (717) 233-8766
(800) 692-6280
FAX (717) 233-6023

Exhibit (2)

**3**

# INTERNATIONAL
# BROTHERHOOD OF TEAMSTERS
### AFL-CIO



LEGAL DEPARTMENT

OFFICE: (202) 624-6945
FAX: (202) 624-6884

March 27, 1995

Thomas Griffith, President
Teamsters Local Union No. 776
2552 Jefferson Street
Harrisburg, Pennsylvania 17110

RE: Carolina Freight Carriers Corporation

Dear Mr. Griffith:

Enclosed you will find a Notice provided by Carolina Freight Carriers Corporation pursuant to the Workers Adjustment and Retraining Notification Act. Carolina Freight Carriers Corporation has developed tentative plans to permanently discontinue the Company's freight transportation operation at its facility located at One Carolina Drive, Carlisle, Pennsylvania 17013. Employment separations are expected to commence on or about May 21, 1995 affecting the entire Carlisle facility.

This letter is being forwarded to you so that you can monitor the employer's actions to assure that they are in compliance with the WARN Act. Please contact the undersigned if you have any questions with regard to the enclosed notice.

Sincerely,

Paula J. Caira

PJC/mk

Enclosure

cc: Dennis Skelton, Director, Freight Division

Exhibit (3)

CAROLINA FREIGHT CARRIERS CORPORATION
1201 EAST CHURCH STREET
POST OFFICE BOX 697
CHERRYVILLE, NORTH CAROLINA 28021

TELEPHONE: (704) 435-6811
FAX: (704) 435-8981

LEGAL DEPARTMENT

RICHARD E. F. VALITUTTO
VICE PRESIDENT AND
GENERAL COUNSEL

March 21, 1995

**VIA AIRBORNE EXPRESS**

Mr. Thomas Griffith
President
Teamsters Local 776
2552 Jefferson Street
Harrisburg, Pennsylvania  17110

**VIA AIRBORNE EXPRESS**

Mr. Ron Carey, President
International Brotherhood of Teamsters
25 Louisiana Ave. NW
Washington, D. C.  20001

Dear Mr. Griffith and Mr. Carey:

Carolina Freight Carriers Corporation has developed tentative plans to permanently discontinue the Company's freight transportation operation at its facility located at One Carolina Drive, Carlisle, Pennsylvania 17013.  In keeping with the Company's tentative plans, employment separations in connection with the proposed permanent shutdown of freight transportation operations are expected to commence on or about May 21, 1995.  These plans will affect the entire Carlisle facility.

At this time, the Company anticipates that affected Union-represented employees would be placed on layoff status or have their employment terminated during a 14-day period commencing on May 21, 1995.  A list of job titles, the names and number of Union-represented employees currently holding affected positions, and the dates of separation that are presently known accompany this letter as Attachments A and B.  This announcement and the above timetable are based on the best information currently available.  However, various factors may still affect the timing of any employment separations.  You will be informed of any significant changes in these plans as additional information becomes available.

To the extent that the above actions constitute a covered event under the Worker Adjustment and Retraining Notification Act, this letter is intended to fulfill any requirements imposed under

Mr. Thomas Griffith
Mr. Ron Carey
March 21, 1995
Page -2-


the Act.  By providing this information, the Company does not concede that the Act applies or that notice is otherwise required.

    We remain available to have bargaining concerning any aspect of these plans.

    Should you have any questions concerning this announcement, you may contact me at (704) 435-6811, ext. 2555.

                    Very truly yours,



                    Richard E. F. Valitutto


REFV:vhg

cc:  David P. Kocan,
        Vice President, Labor




warn\union.pa2

ATTACHMENT A

## CAROLINA FREIGHT CARRIERS CORPORATION

As explained in the accompanying letter, we anticipate that the job titles and the number of employees listed below would be affected by the proposed shutdown of the Company's transportation operations located at One Carolina Drive, Carlisle, Pennsylvania 17013.

Job Position Eliminations Tentatively Scheduled to Occur During a 14-Day Period Commencing on May 21, 1995.

| Mechanics | - | 65 |
|-----------|---|-----|
| Office | - | 6 |
| Dock | - | 91 |
| Drivers | - | 86 |
| Total | - | 248 |

### Number of Union-Represented Employees on Layoff or Leave From the Positions Identified Below

| Mechanics | - | 4 |
|-----------|---|-----|
| Office | - | 3 |
| Dock | - | 13 |
| Drivers | - | 41 |
| Total | - | 61 |

* * * * *

CARLISLE PLATFORM SENIORITY LIST

MARCH 10. 1995

| 102 | SCHILDT. Thomas | J | 01/11/88 |
| 103 | WHITTAKER. Steve | JD | 01/16/88 |
| 104 | KLIMEK. Alan | | 01/29/88 |

ARLISLE OFFICE REGULAR SENIORITY LIST          MARCH 10. 1995

1.   PAYLOR. Betty              07/07/75

2.   BUFFINGTON. Edith         01/22/84

3.   SEYLAR. Brian             01/06/88

4.   HOOVER. Tammy             04/10/90

5.   REEDY. Lori               07/12/90   LAID OFF (NO CALL)

5.   MORRISON, Deborah         08/24/90   LAID OFF (NO CALL)

7.   TATSCH. Kelly             07/17/91   LAID OFF (NO CALL)



 ᴾrobationary as of typing


rotest of any employee's seniority date or position on list
ust be made in writing to Employer within thirty (30) days
fter posting of list, and if no protests are timely made the
ates and positions posted shall be deemed correct.  Any such
rotest which is timely made may be submitted through the
rievance procedure.

CARLISLE OFFICE PART-TIME SENIORITY LIST    MARCH 10, 1995

1.  SENNETT, Angela              09/04/90

2.  BEAM, Teresa               09/10/90

Protest of any employee's seniority date or position on list
must be made in writing to Employer within thirty (30) days
after posting of list. and if no protests are timely made the
dates and positions posted shall be deemed correct.  Any such
protest which is timely made may be submitted through the
grievance procedure.

SENIORITY LIST
CARLISLE SHOP   1994

| | NAME | / DOH | RACE | SEX | JOB TITLE | GROUP |
|---|---|---|---|---|---|---|
| 01. | YOUNG, CARL | 03\17\75 | W | M | W.FOREMAN | 5 |
| 02. | MILLER HARRY | 07\03\75 | W | M | MECHANIC | 5 |
| 03. | MCNEELY, KIM | 07\03\75 | W | M | MECHANIC | 5 |
| 04. | WALBORN, RON | 07\03\75 | W | M | MECHANIC | 5 |
| 05. | GORA, DOMINICK | 07\03\75 | W | M | MECHANIC | 5 |
| 06. | ERDMAN, DONALD | 07\07\75 | W | M | MECHANIC | 5 |
| 07. | PATTERSON, RICHARD (SICK) | 07\20\75 | W | M | MECHANIC | 5 |
| 08. | CAMERON, JOHN | 07\20\75 | W | M | TIRE MAN | 2 |
| 09. | HOLTRY, RON | 07\31\75 | W | M | MECHANIC | 5 |
| 10. | FIRESTONE, KENNETH | 09\09\75 | W | M | MECHANIC | 5 |
| 11. | STRAWSER, GARY | 09\12\75 | W | M | MECHANIC | 5 |
| 12. | FROWNFELTER, TERRY | 09\15\75 | W | M | MECHANIC | 5 |
| 13. | LEPLEY, HAROLD | 09\15\75 | W | M | MECHANIC | 5 |
| 14. | RUDY, DAVID | 09\15\75 | W | M | MECHANIC | 5 |
| 15. | FLOYD, GLENN | 11\05\75 | W | M | MECHANIC | 5 |
| 16. | WERT, JOHN | 11\13\75 | W | M | MECHANIC | 5 |
| 17. | KING, STEVEN | 02\15\77 | W | M | MECHANIC | 5 |
| 18. | ANTOINE, JOSEPH | 10\31\77 | W | M | MECHANIC | 5 |
| 19. | MCNAUGHTON, JOHN | 03\05\78 | W | M | MECHANIC | 5 |
| 20. | SLEBODA, GEORGE | 03\07\78 | W | M | MECHANIC | 5 |
| 21. | MEALS, ROY | 03\15\78 | W | M | MECHANIC | 5 |
| 22. | HAHN, JOHN | 04\09\78 | W | M | MECHANIC | 5 |
| 23. | MINICH, ERIC | 05\29\78 | W | M | MECHANIC | 5 |
| 24. | GREENFIELD, DOUG | 05\04\80 | W | M | MECHANIC | 5 |
| 25. | JONES, CHARLES | 10\28\80 | W | M | MECHANIC | 5 |
| 26. | TENNIS, NELSON | 10\28\80 | W | M | MECHANIC | 5 |
| 27. | SCHMIEDEL, BRIAN | 01\24\84 | W | M | MECHANIC | 5 |
| 28. | JACKSON, ROBERT | 02\19\84 | B | M | MECHANIC | 5 |
| 29. | FLEISCHER, EDWARD | 07\17\84 | W | M | MECHANIC | 5 |
| 30. | SHULLER, MICHAEL | 07\22\84 | W | M | MECHANIC | 5 |
| 31. | WICKARD, KEVIN | 06\11\85 | W | M | MECHANIC | 5 |
| 32. | SEMDER, BRIAN | 06\20\85 | W | M | MECHANIC | 5 |
| 33. | DECKER, DAVID | 11\23\86 | W | M | MECHANIC | 5 |
| 34. | CHRISTIE, DAVID | 01\17\88 | W | M | MECHANIC | 5 |
| 35. | MCQUISTON, GEORGE | 01\19\88 | W | M | MECHANIC | 5 |
| 36. | STEINER, DONALD | 05\10\88 | W | M | MECHANIC | 5 |
| 37. | KOGOVSEK, MARK | 06\19\88 | W | M | MECHANIC | 5 |

.ongterm)

/2- (94)

| | NAME | DOH | RACE | SEX | JOB TITLE | GROUP |
|---|---|---|---|---|---|---|
| 38. | SHIFFER, RICKY | 06\22\88 | W | M | MECHANIC | 5 |
| 39. | KELLICHNER, WILLIAM | 06\22\88 | W | M | MECHANIC | 5 |
| 40. | KLUSMAN, WILLIAM | 09\15\88 | W | M | MECHNAIC | 5 |
| 41. | WATERS, BARRY | 09\22\88 | W | M | MECHANIC | 5 |
| 42. | SPECK, LESTER | 11\13\88 | W | M | MECHANIC | 5 |
| 43. | GRIM, GEORGE | 11\22\88 | W | M | MECHANIC | 5 |
| 44. | SCHAFFER, JOSEPH | 01\08\89 | W | M | MECHANIC | 5 |
| ~~45.~~ | ~~ZIPAY, JOHN~~ | ~~07\16\89~~ | ~~W~~ | ~~M~~ | ~~MECHANIC~~ | ~~5~~ |
| 46. | ABRAMS, JAMES 03/25/84 | 11\28\89 | W | M | MECHANIC | 5 |
| 47. | YOHE, AMOS | 12\14\89 | W | M | MECHANIC | 5 |
| 48. | WERT, ALAN | 01\12\90 | W | M | MECHANIC | 5 |
| 49. | BLANKENSHIP, JAMES | 02\04\90 | W | M | MECHANIC | 5 |
| 50. | MCCORMICK, DONALD | 02\15\90 | W | M | MECHANIC | 5 |
| 51. | HANSHAW, PERRY | 03\29\90 | W | M | MECHANIC | 5 |
| 52. | MYERS, JOHN | 04\01\90 | W | M | TIRE MAN | 2 |
| 53. | MCCORMICK, RONALD | 04\02\90 | W | M | MECHANIC | 5 |
| 54. | KRONE, ROBERT | 04\03\90 | W | M | MECHANIC | 5 |
| 55. | BAKER, MARK | 04\04\90 | W | M | MECHANIC | 5 |
| 56. | FINKENBINDER, JAMES | 04\05\90 | W | M | MECHANIC | 5 |
| 57. | LONG, DONALD | 04\06\90 | W | M | MECHANIC | 5 |
| 58. | CRAIG, CHAD | 04\07\90 | W | M | MECHNAIC | 5 |
| 59. | VANTIRES, TOM | 04\09\90 | W | M | MECHANIC | 5 |
| 60. | HINE, STEVEN | 04\11\90 | W | M | MECHANIC | 5 |
| 61. | CAMP, RONALD | 04\12\90 | W | M | MECHANIC | 5 |
| 62. | BENSON, JAMES | 04\17\90 | W | M | MECHANIC | 5 |
| 63. | MARTIN, DOUGLAS | 04\19\90 | W | M | MECHANIC | 5 |
| 64. | PETERSON, FRANK | 04\23\90 | W | M | MECHANIC | 5 |
| 65. | WECKESSER, NORMAN | 04\24\90 | W | M | MECHANIC | 5 |
| 66. | HETZENDORF, DAVID | 04\26\90 | W | M | MECHANIC | 5 |
| 67. | RIDGEWAY, JOHN 9/17/94 LO | 06\07\90 | W | M | MECHANIC | 5 |
| 68. | HAMMON, TONY 7/16/94 LO | 09\02\90 | W | M | MECHANIC | 5 |
| 69. | WISNIESKI, FRANK 7/16/94 LO | 08\12\93 | W | M | MECHANIC | 5 |

## CARLISLE LINE DRIVER SENIORITY LIST

Effective 1/30/95
REVISED 3/9/95

| # | Name | Date | | # | Name | Date |
|---|------|------|---|---|------|------|
| 1. | Keough, Thomas | May 05 62 | | 51. | Cone, John | Nov 09 78 |
| 2. | Sivak, Ronald | Mar 02 65 | | 52. | Devincent, Edward | Nov 13 78 |
| 3. | Flock, Donald | Apr 21 66 | | 53. | Holt, Howard | Jan 13 79 |
| 4. | Kinsinger, Richard | Sep 24 68 | | 54. | Lentvorsky, John | Feb 14 79 |
| 5. | Pechart, William | Sep 29 69 | | 55. | Frey, Donald | Apr 18 79 |
| 6. | Zerance, Ronald | Feb 02 70 | | 56. | Dickerson, James | Sep 27 79 |
| 7. | Quigley, Christian | Oct 08 70 | | 57. | Nivens, Carlton | Oct 05 79 |
| 8. | Moore, Jack | Feb 01 71 | | 58. | Usko, David | Apr 06 80 |
| 9. | Black, William | Sep 02 71 | | 59. | Peterson, Darrell | Apr 06 80 |
| 10. | Frombaugh, A. Ron | Feb 27 72 | | 60. | Smith, Jeff | Apr 06 80 |
| 11. | Sommerville, Melvin | Aug 03 72 | | 61. | Snyder, Randall | Apr 06 80 |
| 12. | Jamison, John T. | Apr 18 73 | | 62. | Boltz, Herman | Apr 06 80 |
| 13. | Kimble, George | Aug 12 73 | | 63. | Browne, Dennis | Sep 26 80 |
| 14. | Welker, Lawrence | Sep 20 73 | | 64. | Eckenroad, Floyd | Sep 26 80 |
| 15. | Burns, Robert | Sep 27 73 | | 65. | Sheaffer, Ronald | Sep 26 80 |
| 16. | Carter, Theodore | Feb 28 74 | | 66. | Reynolds, John | May 12 82 |
| 17. | Blatnik, Victor | Oct 06 74 | | 67. | Whetstone, Sam | Jun 17 82 |
| 18. | McDade, Donald | Jul 07 75 | | 68. | Barry, Richard | Jul 06 82 |
| 19 | Minich, Walter | Jul 07 75 | | 69. | Hartz, Randall | Mar 04 83 |
| 20. | Hoover, Merle | Jul 08 75 | | 70. | Long, Randy | Mar 08 83 |
| 21. | Fox, Gary | Jul 22 75 | | 71. | Murphy, Carl | Apr 20 83 |
| 22. | Dietz, Gary | Aug 25 75 | | 72. | Robinson, Ralph | Jul 28 83 |
| 23. | Bray, William | Sep 15 75 | | 73. | Smith, Richard | Jul 28 83 |
| 24. | Landis, Allen | Nov 03 75 | | 74. | Trollinger, Larry | Jul 28 83 |
| 25. | Couch, James | Oct 31 76 | | 75. | Ramos, Carlos | Aug 21 83 |
| 26. | Hines, Lee Roi | Oct 31 76 | | 76. | Mills, Lathan | Aug 28 83 |
| 27. | Bucher, Edwin | Feb 05 77 | | 77. | Nye, Stanley | Oct 30 83 |
| 28. | Macke, David | May 20 77 | | 78. | Burchfield, Charles | Dec 06 83 |
| 29. | Carter, Harvey | Jun 05 77 | | 79. | Wynn, Paul | Jan 04 84 |
| 30. | Moore, Lloyd | Aug 08 77 | | 80. | McGuire, Lowell | Feb 12 84 |
| 31. | Heisse, Robert | Aug 28 77 | | 81. | Reinard, George | Mar 30 84 |
| 32. | McMullen, Dennis | Aug 28 77 | | 82. | Warfel, Richard | Apr 13 84 |
| 33. | Brown, Howard | Oct 02 77 | | 83. | Snyder, Donald | Apr 13 84 |
| 34. | Meek, Dennis | Oct 02 77 | | 84. | Runk, Norman | Apr 24 84 |
| 35. | Altizer, Farley | Feb 21 78 | | 85. | Clark, Thomas | Jun 06 84 |
| 36. | Reall, Wade | Feb 26 78 | | 86. | Varner, Robert | Aug 13 84 |
| 37. | Cordell, Ronald | Feb 27 78 | | 87. | Boire, Norman | Aug 26 85 |
| 38. | Arnold, Richard | Mar 02 78 | | 88. | Snyder, Ray | Sep 04 85 |
| 39. | Snyder, Daniel | Mar 05 78 | | 89. | Kahley, John | Sep 04 85 |
| 40. | Wharam, Dewey | Mar 06 78 | | 90. | Munson, Doug | Sep 20 85 |
| 41. | Brinkerhoff, Carl | Mar 09 78 | | 91. | Ramirez, Vincent | May 24 86 |
| 42. | Barnett, John | Mar 20 78 | | 92. | Kissinger, Gary | Aug 09 87 |
| 43. | Sgrignoli, Keith | Apr 03 78 | | 93. | Bodkin, Jack | Aug 31 87 |
| 44. | Morgan, Harry | May 05 78 | | 94. | Nevins, Raymond | Nov 02 87 |
| 45. | Perkey, John | Jun 12 78 | | 95. | Reinoehl, Russ | Nov 16 87 |
| 46. | Kenee, Larry | Jun 12 78 | | 96. | Goudy, David | Jan 18 88 |
| 47. | Keiter, Robert | Jun 21 78 | | 97. | Miller, Thomas | Feb 20 88 |
| 48. | Metzger, John | Jul 19 78 | | 98. | Keck, Roy | Mar 02 88 |
| 49. | Zeigler, Barry | Aug 21 78 | | 99. | Hahn, Robert | Mar 10 88 |
| 50. | Roush, Ronald | Aug 28 78 | | 100. | Heavner, Perry | Mar 10 88 |

Effective 1/30/95
Revised 3/9/95

| | |
|---|---|
| 101.Klink, Jerry | Apr 04 88 |
| 102.Albright, Jeffrey | Apr 09 88 |
| 103.Swartz, Timothy | Apr 18 88 |
| 104.Kloch, Donald | Apr 22 88 |
| 105.Bowman, Carl | May 06 88 |

ALL LISTED BELOW ARE ON LAY OFF

| | |
|---|---|
| 106.Thomas, George | Aug 12 88 |
| 107.Charles, Leroy | Aug 12 88 |
| 108.Peterson, Robert | Aug 20 88 |
| 109.Collins, Charles | Aug 20 88 |
| 110.Stouffer, Ray | Aug 20 88 |
| 111.Markle, Harold | Aug 20 88 |
| 112.Erdman, William | Apr 09 90 |
| 113.Kush, William | Apr 09 90 |
| 114.Geib, Troy | Apr 12 90 |
| 115.Hess, Jr.Warren | Apr 12 90 |
| 116.Boettger, Don | Apr 15 90 |
| 117.Carpenter, David | Apr 16 90 |
| 118.Leach Jr.,Edison | Apr 19 90 |
| 119.Hewitt, William | May 11 90 |
| 120.Waltman, Charles | Jun 02 90 |
| 121.Growden, Victor | Jun 06 90 |
| 122.Logan, Wyndham | Jun 06 90 |
| 123.Christian, Thomas | Aug 07 90 |
| 124.Sipe, Robert | Aug 07 90 |
| 125.MacMurray, Fred | Aug 10 90 |
| 126.Hamilton, Roger | Aug 13 90 |
| 127.Sauder, Melvin | Aug 08 94 |

**4**



Page 636

[1] horse, that's all I have to say.

[2]    CHAIRMAN BUSALACCHI: Okay, go ahead. It's

[3] still your nickel.

[4]    MR. McCAFFREY: We'll make two quick

[5] points. As we said before, there is a possibility

[6] we may be ending up in a situation where there is a

[7] jurisdictional dispute. In the event that we do

[8] lose those members, we would like it on the record

[9] that 707 would like to retain health, welfare, and

[10] pension payments to our funds for these people that

[11] may be redomiciled or turned over to a different

[12] jurisdiction.

[13]    CHAIRMAN BUSALACCHI: Fight nice.

[14]    MR. McCAFFREY: And lastly, I just want to

[15] say that going back the issue of seniority and I

[16] won't touch on the merge/acquisition question again.

[17] but I would just like to turn this over to the

[18] committee. this is a report of a proceedings of a

[19] Multi-Conference Change of Operations between

[20] American Freight Systems and Smith Transfer. It's

[21] very similar in that the stock purchase of Smith

[22] Transfer was purchased by American Carriers which

[23] was the parent company, similar to what Arkansas

[24] Best Corporation is to ABF, and in that decision

Page 637

[1] they applied Article 5, Section 2, dovetailing.

[2]    CHAIRMAN BUSALACCHI: Thank you.

[3]    MR. McCAFFREY: Thank you.

[4]    CHAIRMAN BUSALACCHI: Danny's got a

[5] statement to read from 764.

[6]    MR. SCHMIDT: Local 764 has not objections

[7] to the proposed change of operations, and I will

[8] abide by the committee's decision regarding

[9] seniority.

[10]    MR. VIA: Lee Via, Local 771, Lancaster.

[11] We do not oppose the change of operations, however,

[12] Brother Stocker from Local 430, York, has proposed

[13] that six employees domicile to the Lancaster

[14] terminal under the numbers that Mr. Anderson has

[15] given him. I have checked with the employees at ABF

[16] in Lancaster and the union steward, and they tell me

[17] there are two trucks that come to Lancaster but they

[18] do very little work, and what I believe those those

[19] numbers are, are they're going out to other areas

[20] that that our people do not service and then coming

[21] to Lancaster for pickup or delivery in that county.

[22]    Of course, I am sure there's going to be a

[23] window period, and if so in that window period we

[24] have no problem accepting those Carolina employees

Page 638

[1] into Local 771.

[2]    Of course. in the other situation that we

[3] have is the provision in our supplement where it has

[4] endtailing, which happened to go into the supplement

[5] in 1987 contrary to the New England and New Jersey

[6] area where they have it for at least 24 years that I

[7] I know of. Whether we like endtailing or we don't

[8] and whether we think it's fair or we think it's

[9] unfair, it is in the contract and I think we should

[10] live with the spirit of the contract. I don't know

[11] we can pick and choose in supplemental areas where

[12] some people dovetail and other people endtail, that

[13] is. if this is considered a purchase.

[14]    I'm am not that crazy over endtailing, but

[15] it is in our supplement and I believe that we we

[16] have to live with that, and I feel that if those

[17] Carolina employees do come to Lancaster that they

[18] should be endtailed according to the contract. When

[19] we started letting the National language or a Change

[20] of Operations Committee start changing supplemental

[21] agreements, then we might as well do away with our

[22] supplement agreements. And that's our position from

[23] Local 771.

[24]    CHAIRMAN BUSALACCHI: Thanks, Lee. 773?

Page 639

[1] 776, you're on deck.

[2]    MR. BROWN: Mr. Chairman, my name is Jim

[3] Brown, the business agent for Local 773, Allentown,

[4] PA. Our position is we have no objections to the

[5] change as proposed, and under Article 42, Section

[6] 1.6(d) we propose that to be followed.

[7]    CHAIRMAN BUSALACCHI: We heard your

[8] position.

[9]    MR. BROWN: That's all we got. Thank you.

[10]    CHAIRMAN BUSALACCHI: 776? 822, you will

[11] be next.

[12]    MR. GRIFFETH: Good afternoon.

[13]    CHAIRMAN BUSALACCHI: Good afternoon, Tom.

[14]    MR. GRIFFITH: Mr. Chairman, I'd just like

[15] to state that I know it's been a long two days and

[16] people are tired, but I would ask for your attention

[17] with Local 776 as we do have a facility there, as a

[18] matter of fact, we have three different dock

[19] locations, close to 800 people, also some Carolina

[20] people. I know we do not have a terminal there, but

[21] we do have a Carolina situation. We also are going

[22] to address and we will try to be nonrepetitious in

[23] our statements, but we do have some different and

[24] unique situations involving Local 776, so I'd ask

Exhibit (4)

Page 640

r your patience with us to address those issues.
..t we'd like to do is sort of take this in two
separate issues, and we're going to try to address
all the dock issues, local cartage issues first, and
then after we do that we will go into the road
operation.

And for the dock and local cartage
operations, we have here as business agent George
Smart, Carlos Ramos, and Chuck Shughart, and we have
dock stewards here Brad Lindsay, Robert Schrum,
Angelo Mraz, and Craig Vogelsong. With that I will
turn mike over to Chuck Shughart and let him put his
presentation on.

MR. SHUGHART: Good morning, Mr. Chairman,
gentlemen. In the interest of time, we had a
meeting with Bob Bell on September 8th and we had a
transcript made of that meeting, and they will
stipulate that the transcript is an accurate
reflection of that meeting, we will enter it, and I
don't have to go through the questions.

MR. LITTLE: Bob says it is.

CHAIRMAN BUSALACCHI: Give that to the
..rt reporter, Carlos, and we'll make that part of
record.

Page 641

1  (Exhibit No. 18 marked for identification
2  and attached to the transcript.)
3  MR. SHUGHART: Gentlemen, this local union
4  represents the employees at ABF Carlisle and Camp
5  Hill PA. The company is proposing a loss of 32
6  jobs at Carlisle and 34 jobs at the Camp Hill
7  terminal. Local 776 also represents 323 laid off
8  employees from the Carolina terminal at Carlisle.
9  ABF claims they have no obligations to offer any
10  recall right to them claiming they are inactive,
11  laid off employees.
12  With respect to the ABF employees at
13  Carlisle and Camp Hill, the company has advised us
14  that much of the current work is being transferred
15  to another breakbulk-type facility or facilities.
16  The local union requested a breakdown on the freight
17  that would be lost to the Carlisle Camp Hill
18  terminal. As of yet a breakdown has not been
19  provided. Using a conservative formula one can
20  ..ily determine that the proposed loss of jobs
21  ..presents the loss of more than 3 millions pounds
22  of freight per week at each terminal.
23  We believe ABF has an obligation to advise
24  us where the work is being transferred and we

Page 642

[1] believe employees should have the opportunity to
[2] follow that work. I will give the company an
[3] opportunity to respond to that point.
[4] CHAIRMAN BUSALACCHI: Company?
[5] MR. LITTLE: The breakbulk work is being
[6] done in the new system that would come about as a
[7] result of the acquisition, as a result of the
[8] combination of these companies on day one, and as
[9] pointed out in the change of operations proposal new
[10] breakbulk facilities are established, which we call
[11] both national distribution centers and regional
[12] distribution centers. At those locations designated
[13] as national and regional distribution centers there
[14] already is sufficient manpower available as a result
[15] of the acquisition. We do the work that's available
[16] there, therefore, there's no gaining breakbulk
[17] facilities as a result of this change of operations
[18] and no opportunity, therefore, to transfer to any
[19] gained jobs at those operations.
[20] MR. SHUGHART: Nonetheless, Mr. Chairman.
[21] the freight is leaving our terminals and we –
[22] CHAIRMAN BUSALACCHI: Three million pounds,
[23] yes.
[24] MR. SHUGHART: And that's a very

Page 643

[1] conservative figure.
[2] CHAIRMAN BUSALACCHI: Okay.
[3] MR. SHUGHART: There are several
[4] outstanding issues regarding seniority and other
[5] claims that this committee is being asked to decide.
[6] One of them could be the question of endtailing or
[7] dovetailing on the ABF Carlisle seniority list. It
[8] is the position of this Local union that any
[9] Carolina employee who is offered work at Carlisle or
[10] Camp Hill as a result of this change of operations
[11] should be placed at the bottom of the ABF seniority
[12] list after all laid off ABF employees at each
[13] respective terminal are recalled. This would be in
[14] compliance with Article 42,1(d) of the Central
[15] Pennsylvania Supplement.
[16] Furthermore, if any Carolina employee
[17] transfers to the ABF Carolina or Camp Hill terminal
[18] in any future change of operations, his or her
[19] seniority should be applied as if the transfer had
[20] occurred under this change, that is after currently
[21] employed ABF employees and merged by Carolina
[22] seniority date with any Carolina employee placed on
[23] the ABF seniority list hereafter.
[24] To elaborate on that somewhat, for

**ABF FREIGHT SYSTEM-MULTI CHANGE OF OPERATIONS**
**CAROLINA FREIGHT AND RED ARROW FREIGHT**



September 15, 1995

Page 644

[1] instance, let's say you have two employees in
[2] Baltimore and you have one with 20 years and one
[3] with two years. The employee with 20 years accepts
[4] work somewhere where he endtails. The employee with
[5] two years accepts work somewhere where he dovetails.
[6] Now you have a change of operations that brings both
[7] of those employees to Carlisle. Your man with two
[8] years is going to be senior to the man with 20
[9] years, and that has going to be a problem. It's going
[10] bonds to happen somewhere.
[11]    CHAIRMAN BUSALACCHI: It's happened before
[12] and the Change Committee would rule at that time.
[13] It would be up to local unions to raise that point,
[14] but it's happened before.
[15]    MR. FRANKE: Many times.
[16]    MR. SHUGHART: With respect to the 323
[17] Carolina employees on layoff from the Carlisle, PA
[18] terminal, the company has stated that they have no
[19] obligation to these employees as if they don't
[20] exist. In the proposed change they are referred to
[21] as inactive, laid off employees. These employees
[22] have seniority that ranges from 36 years to eight
[23] months with the company. Most of them were laid off
[24] in May 1995, two months before the merger between

Page 645

[1] Carolina and ABF was announced. By Carolina's own
[2] admission, the plans to merge with ABF were well
[3] under way at that time.
[4]    Under these circumstances it would be
[5] horrendously unfair to exclude these employees the
[6] right to exercise their seniority under this change.
[7] Under the terms of the National Master Freight
[8] Agreement these employees have recall rights for
[9] five years. Carolina has contractual obligations to
[10] the laid off Carolina employees at Carlisle and
[11] elsewhere. One of those contractual obligations is
[12] to provide the recall rights for five years. ABF is
[13] merging with Carolina, thereby assuming Carolina's
[14] debts, liabilities, and contractual obligations.
[15] Included among those contractual obligations is the
[16] requirement to offer the five-year recall rights to
[17] Carolina employees who were previously laid off.
[18]    Carolina Freight did not vanish from the
[19] face of the earth. They exist. They may be
[20] headquartered in a different city, they may operate
[21] under a different logo, management, and
[22] color scheme, but they do exist. The contractual
[23] obligations to Carolina employees also exist. The
[24] merged company has an obligation to provide the

Page 646

[1] contractual obligations that Carolina employees were
[2] entitled to receive.
[3]    With that I would like to submit to you,
[4] this is a copy of information provided by WorldWay
[5] Corporation/Carolina Freight. It was sent out to
[6] the shareholders, and you can see in here if you
[7] look on page 4 where references are made that they
[8] started to discuss this merger back in early 1994,
[9] and they had several meetings in '94 and '95 until
[10] they finally consummated the merger in July. Now,
[11] what I find very, very interesting is on page 7 you
[12] will see where at the top on June 2nd – now, if
[13] these people didn't know this merger was coming
[14] about on June 2, eight of the top officers of the
[15] company exercised the stock options, and in excess
[16] of 480,000 shares just prior to the merger. And if
[17] you go on back, you want to compare that, for
[18] instance, to what they exercised the year prior –
[19] you will find that back on page I-9 – it's a
[20] considerably lesser amount. So I mean I think this
[21] helps to prove that they knew that a merger was on
[22] its way.
[23]    CHAIRMAN BUSALACCHI: Well, I don't think
[24] there's a doubt in anybody's mind.

Page 647

[1]    MR. LITTLE: Just a minute, if I may. He's
[2] reading from page 7?
[3]    CHAIRMAN BUSALACCHI: That's what he said,
[4] page 7.
[5]    MR. LITTLE: On page 7 he read item 6 I
[6] believe, referring to June 2nd, a list of names of
[7] apparently shareholder participants. I don't see
[8] any Arkansas Best employees in there.
[9]    MR. SHUGHART: No, they're not. They're
[10] all Carolina employees, the top officers of Carolina
[11] exercising their stock options.
[12]    CHAIRMAN BUSALACCHI: I mean what he's
[13] saying, Don, is that they knew that the sale was
[14] coming, all right? Let's not get into a big,
[15] dragged out argument.
[16]    MR. SHUGHART: I don't want to argue. I
[17] just want to point that out.
[18]    MR. LITTLE: They knew sale was coming –
[19]    CHAIRMAN BUSALACCHI: Let him go on.
[20]    MR. SHUGHART: In the case of Carlisle, the
[21] merged Carolina/ABF company has a terminal within
[22] the jurisdiction of Local 776 also in Carlisle.
[23] Carolina employees who were laid off should have the
[24] first opportunity to elect work at the Carlisle, PA

ABF FREIGHT SYSTEM-MUL-CHANGE OF OPERATIONS
CAROLINA FREIGHT AND RED ARROW FREIGHT

eptember 15, 1995

---

Page 648

[1] ...inal if and when future job opportunities become
[2] available. It is our position that these Carlisle
[3] employees should be be offered work before any other
[4] Carolina employee at any other terminal active or
[5] inactive and us other employees are following work
[6] to Carlisle, which is not the case. These laid off
[7] Carolina and Carlisle employees should maintain
[8] seniority for rate of pay and fringe benefits. and I
[9] said earlier they should be endtailed.
[10]    CHAIRMAN BUSALACCHI: Yes. you did.
[11]    MR. SHUGHART: And I heard some discussion
[12] earlier about the Carolina employees whether they
[13] had the opportunity to follow work somewhere. In my
[14] opinion I don't think that's really relevant. They
[15] were laid off. Whether they had an opportunity to
[16] follow work under a prior Carolina change isn't an
[17] issue. They had the right to take the layoff if
[18] they show chose for whatever reason. I talked with
[19] one gentlemen who had a crippled son and he had his
[20] house all redone to accommodate his handicap, and he
[21] was just in no position to move so he took the
[22] layoff. And these people should have the recall
[23] rights for five years regardless of whether or not
[24] ...ley had an opportunity to follow work.

---

Page 649

[1]    So to go back and recap a little bit, we
[2] think that the ABF, Carlisle, and Camp Hill
[3] employees are entitled to follow work. Secondly, we
[4] think that any Carolina employee offered work as a
[5] result of this change and/or a future change of
[6] operations should be merged into the Carolina
[7] seniority, should merged onto a list by Carlisle
[8] seniority date and placed at the bottom of the ABF
[9] Carlisle seniority list after current ABF employees.
[10] Thirdly, we think that the five-year recall rights
[11] of the laid off Carolina employees should be
[12] respected. The laid off Carolina employees at
[13] Carlisle should have the first opportunity to select
[14] work opportunity at the ABF Carlisle and Camp Hill
[15] terminals for five years from the date of layoff as
[16] provided by Article 8,6(b) and that seniority would
[17] be entailed after current ABF employees.
[18]    We also have some office employees who
[19] previously worked at Carolina who were laid off and,
[20]    would like to ask the company what their position
[21] would be on them.
[22]    CHAIRMAN BUSALACCHI: Company?
[23]    MR. LITTLE: The company's office force in
[24] Carlisle at present is sufficient to meet he meet

---

Page 650

[1] the needs of the office in Carlisle based on the
[2] reduction of the numbers that we have in employees
[3] there. certainly the offices force is sufficient.
[4]    MR. SHUGHART: Will there be any offer of
[5] future work?
[6]    MR. LITTLE: The employees who you refer to
[7] certainly would have equal opportunity with other
[8] applicants at ABF.
[9]    CHAIRMAN BUSALACCHI: Well, wait a minute
[10] now. Are you telling me that there's laid off
[11] Carolina office people?
[12]    MR. SHUGHART: That's correct. from a prior
[13] Carolina change.
[14]    CHAIRMAN BUSALACCHI: But they're laid off,
[15] and now if you have office work becomes available,
[16] your question is will you offer it to those Carolina
[17] people?
[18]    MR. SHUGHART: That's correct.
[19]    MR. LITTLE: And I think I answered the
[20] question.
[21]    CHAIRMAN BUSALACCHI: Well, you did, but
[22] you said you would consider them along with new
[23] hires.
[24]    MR. LITTLE: In line of their – and first

---

Page 651

[1] of all, Mr. Chairman, he's talking about office
[2] employees, I presume, and I don't even know what
[3] contract because they were laid off previously.
[4]    CHAIRMAN BUSALACCHI: I don't either. I
[5] don't know.
[6]    MR. SHUGHART: Central Pennsylvania.
[7]    MR. LITTLE: All right. And, of course,
[8] that issue would be that if we need additional
[9] office personnel in line with that we would offer
[10] them in line of seniority and qualifications the
[11] opportunity to come over to ABF's office in that
[12] environment.
[13]    MR. SHUGHART: We would ask them to give
[14] them job preference for the first opportunity to
[15] work.
[16]    CHAIRMAN BUSALACCHI: Well. I think that's
[17] basically what he's saying.
[18]    MR. SHUGHART: We might also point out to
[19] the committee that we have the shop, ABF shop in our
[20] contract. It's a white paper contract with a
[21] vendor.
[22]    CHAIRMAN BUSALACCHI: Supplement to the
[23] National?
[24]    MR. SHUGHART: It's not a supplement, no.

ABF FREIGHT SYSTEM-MULTI CHANGE OF OPERATIONS
CAROLINA FREIGHT AND RED ARROW FREIGHT 

September 15, 1995

Page 652

[1]    MR. GRIFFITH: No, a separate agreement.

[2]    CHAIRMAN BUSALACCHI: All right. Go ahead.

[3] So noted for the record.

[4]    MR. SHUGHART: Also let's take, for

[5] instance, the Camp Hill terminal where we have

[6] currently 96 employees. The company is proposing to

[7] lay off 34 of them. If somewhere between the time

[8] that you made the proposal to lay off 34 and the

[9] time the actual layoff takes effect, if say, for

[10] instance, two employees terminates employment for

[11] one reason or another, does that reduce the number

[12] of laid off employees to 32?

[13]    MR. LITTLE: The number of employees – the

[14] real determinate number of employees necessary in

[15] this operation is going to come about as of the day

[16] one accommodation of these operations, and the

[17] employees will be maintained to meet the needs based

[18] on the workload.

[19]    MR. SHUGHART: But, Mr. Chairman, he made a

[20] proposal in his change of operations to lay off 34

[21] employees. That's 34 of 96, and you have two

[22] employees, say, for instance, quit in the meantime.

[23] Now there is no longer any need to lay off 34. You

[24] have a need to layoff 32 now because you already

Page 653

[1] lost two.

[2]    MR. LITTLE: Once again, I think I can

[3] explain the proposal since we did make it, and that

[4] is that with regard to the number of job

[5] opportunities – and this again is on a projection

[6] basis for Camp Hill, just as it's been for every

[7] other local union that's come before the committee

[8] in the last two days, and that figure is subject to

[9] an up and down number based on the workload that's

[10] going to be available on an unpredictable basis

[11] regardless of whose crystal ball you're looking in.

[12] And based on our projected need, we said how many

[13] employees were needed. Of course, the balance would

[14] be laid off. Certainly if the work is there over

[15] and above that number, there would be fewer laid

[16] off.

[17]    MR. SHUGHART: You have our position.

[18]    CHAIRMAN BUSALACCHI: I understand. Next?

[19]    MR. SHUGHART: There was some question

[20] earlier about whether or not this might be a merger

[21] or not, and I don't want to dwell on the issue, but

[22] I would like to submit to the committee here, it was

[23] sent out to Carolina stockholders from the ABC

[24] Acquisition Corporation. It explains the offer to

Page 654

[1] purchase the outstanding shares of common stock for

[2] WorldWay, and you'll see referenced in here dozens

[3] and dozens and dozens of times references to the

[4] merger.

[5]    CHAIRMAN BUSALACCHI: Yes, I think we have

[6] a document similar, but pass it up just to make

[7] sure.

[8]    MR. SHUGHART: I'll pass the microphone

[9] onto George Smart.

[10]    MR. SMART: Mr. Chairman, my name is George

[11] Smart, and I represent the 90 people at the Carlisle

[12] facility. We also at this time have one, possibly

[13] two people who are on the preferential hire list,

[14] and I'm sure that ABF will abide by the contract

[15] under Article 42, Section 1 and afford those

[16] gentlemen the right to work at the bottom of the

[17] list ahead of casuals.

[18]    MR. SCHMIDT: You will comply with the

[19] contract?

[20]    MR. LITTLE: Definitely.

[21]    MR. SMART: Also we have requested from

[22] Mr. Bell for the tonnage and the bills pertaining to

[23] the Carlisle facility, and as of this date we have

[24] not gotten those. However, we went one step further

Page 655

[1] and contacted the system terminal manager at Camp

[2] Hill, and he had given us some figures that reflect

[3] a 3.5 per bill per hour at the Camp Hill facility.

[4] If you put the figures to that, that would equate

[5] over a week's period to approximately 12,000 bills

[6] going to cross that dock. Their proposal proposes

[7] to cut a third of my work force over there, which

[8] would be roughly 4,000 bills. I would like to know

[9] where those 4,000 bills disappeared to.

[10]    CHAIRMAN BUSALACCHI: Good question.

[11]    MR. SMART: Because we now handle the south

[12] freight in the Camp Grove facility, and it comes out

[13] of the area of Philadelphia, Newark, and I think

[14] Enfield, CT where the company proposes to open up

[15] regional distribution centers. It's my position

[16] that – and I understand that they may have an

[17] efficiency gain – however, an efficiency gain of

[18] 4,000 bills? I think that's highly unlikely.

[19]    CHAIRMAN BUSALACCHI: Well, let's let him

[20] answer.

[21]    MR. LITTLE: I think he very well describes

[22] what's happened here. This is a change of

[23] operations proposal. As is normal in a change of

[24] operations proposal, when a company is required to

ABF FREIGHT SYSTEM-MU    CHANGE OF OPERATIONS
CAROLINA FREIGHT AND RED ARROW FREIGHT

**Page 656**

nge the nature of its operations by the business
...itions – in this case brought about by the
acquisition of Carolina – and establishes the
breakbulk operations as we describe in the change in
Philadelphia and Newark and other locations in the
system, and the new company created by the combining
of these operations requires to us break freight in
a different manner, it flows in a different manner,
and to that extent, just as those locations are
affected by the increase in personal, that is an
increase in personnel to the ABF complement, it
impacts on Camp Hill, it impacts on Carlisle to the
extent that there is a work loss.

But here again, there are more people in
the combining of these three companies than there
are jobs available on the first day of operation.
Everyone is impacted, and Carlisle and Camp Hill are
no exceptions to the extent they're involved in the
breakbulk work in our system, and to the extent that
the work is available, the contract will cover them
regarding the recall rights in that area.

MR. SMART: Well, Mr. Little, I understand
... however, that doesn't do anything for the 34
...ople that are laid off in our local union. The

**Page 657**

] freight now – and I understand what you're trying
] to do with the freight now. You're going to run
] down the I-95 corridor. That freight originally
] came through our dock, and therefore, I think that
] our people should have the opportunity to follow
] that freight.

] MR. LITTLE: And that freight was
] eliminated, wasn't it?

] CHAIRMAN BUSALACCHI: Well, okay, I think
] you've stated your case, and you're making a very
] good case I might add, but go on.

2] MR. SMART: You know, I think I've heard
3] you say several times over the last few days that
4] were you trying to protect the people. That doesn't
5] reflect that in this change of operation. This
6] change of operations is taking – it's totally going
7] against the contract and eliminating people. I have
8] yet to hear anybody say in this room how many people
9] are going to lose their job over this change of
] eration?

:1] MR. LITTLE: Because I've said – and I
:2] repeat – that this change of operation is an
:3] opportunity for the Carolina employees to gain jobs
:4] that they would have lost by virtue of the fact that

**Page 658**

[1] Carolina was operating at 117 and they were losing
[2] money and, in fact, they continue to lose money to
[3] the extent that they would no longer be able to stay
[4] in business, and the acquisition by ABF in our
[5] opinion saved jobs.

[6]    MR. SMART: Well, I understand that, but
[7] that doesn't give you the right to cut your own boys
[8] I don't think.

[9]    CHAIRMAN BUSALACCHI: Move on.

[10]    MR. SMART: That's all I have.

[11]    CHAIRMAN BUSALACCHI: All right. Next?

[12]    MR. RAMOS: Carlos Ramos. I don't handle

[13] ABF, but I did handle Carolina. One question

[14] pertaining to the ABF employees that are going to be

[15] laid off or may be laid of because of this change,

[16] in Central Pennsylvania an employee that gets laid

[17] off has the right to exercise intermittent work or

[18] choose intermittent work, so he basically has three

[19] choices, and I will give just you a quick example.

[20]    If I'm a road driver and I'm laid off, I

[21] happen to be one of those 30 couple or whatever, I

[22] could choose intermittent work on the road and I

[23] would be called before casuals, or I can take a full

[24] layoff, or of course if my seniority provides I can

**Page 659**

[1] bump in on the dock, and I would assume that that
[2] would apply in this case?

[3]    MR. LITTLE: The contract would apply to
[4] the extent it meets the decision of this Change of
[5] Operations Committee.

[6]    MR. RAMOS: Well, I may be speaking wrong
[7] here, but I don't believe that's covered in the
[8] contract. I believe that was a prior decision?

[9]    MR. GRIFFITH: Intermittent work is covered
[10] under the interpretation of the Central Pennsylvania
[11] Supplemental Agreement, and you will abide by that?

[12]    MR. LITTLE: I will abide by the contract

[13] and this committee's decision.

[14]    MR. GRIFFITH: That wasn't what I was

[15] asking.

[16]    CHAIRMAN BUSALACCHI: You didn't answer the

[17] question, Don.

[18]    MR. SCHMIDT: I don't know that the

[19] decision is going to have anything to do with that.

[20]    MR. LITTLE: Well, I think the decision has

[21] a lot to do with with the right of the city employee

[22] to work on the road prior to an employee – you

[23] might as the Change of Operation Committee deem a

[24] new job opportunity at Carlisle, for example, where

ABF FREIGHT SYSTEM-MULTI-CHANGE OF OPERATIONS
CAROLINA FREIGHT AND RED ARROW FREIGHT



September 15, 1995

Page 660

ABF was going to be fully employed based on the number of employees presently there.

MR. SCHMIDT: But he's talking about right now. If somebody is affected by the change at implementation, do they have a right to exercise their seniority immediately in that terminal to go one place or the other, road or dock? After they do that, yeah, then the decision applies. They can get recalled to go there ahead of somebody that we may put in there.

MR. LITTLE: But, Danny, there are no openings on the road right now, and there is no one laid on the road as a result of this change of operations. That's why I am making that distinction.

MR. SCHMIDT: Yeah, but they have a single seniority list.

MR. LITTLE: I understand that.

MR. SCHMIDT: Seniority applies whether there's any openings or not, and if I'm a senior dock guy, number one, and I'm going to get laid off, which would be the case, then I have the right to go to the road and knock the junior road guy off and he would be the one that's laid off initially when the

Page 661

change is implemented. That's what they're asking.

MR. LITTLE: All right. Then their seniority practice is going to apply. We're not trying to do anything to disturb that.

MR. FRANKE: That's the contract.

CHAIRMAN BUSALACCHI: Stop. Next question? Go on.

MR. RAMOS: Okay. The other thing that I wanted to ask about was the copy of the change that was mailed out to the local unions – I don't know about all of them, but ours – they included a copy of a seniority list of the laid off Carolina employees in Carlisle. That list was missing a page. We had requested that page and we still haven't gotten that page, I guess page 2.

CHAIRMAN BUSALACCHI: Is the page relevant to what we're talking about here, Carlos – and I don't mean to be flippant about it – but is it?

MR. RAMOS: Well, I think it could be relevant down the road. I think it should be made part of the record.

CHAIRMAN BUSALACCHI: Are you telling me that they have left names – on that page there could be names that were left off that you don't

Page 662

have?

MR. RAMOS: We don't know that because we doesn't have the page, so we can't verify if the seniority list is proper.

CHAIRMAN BUSALACCHI: Okay. Now that we got the question, where is the page?

MR. RAMOS: It's page 2.

MR. LITTLE: Where?

MR. RAMOS: Of the laid off Carolina employees local side. That complete page in our change, the copy that we received is –

MR. LITTLE: I would appreciate it if the local union would have supplied me with a copy of inasmuch as these are Carolina employees he's talking about, and if anyone in this room has a copy of the list, I'll be happy to produce it if it's not in the change of operations proposal. We attempted to provide all the lists.

MR. FRANKE: He's saying that there's a page missing out of his change.

CHAIRMAN BUSALACCHI: Out of the change.

MR. FRANKE: That's all he's saying to you.

CHAIRMAN BUSALACCHI: One of the Carolina people are here. Do you got one? Have you got the

Page 663

page? Bring the page up. We'll get a copy page for you.

MR. SCHMIDT: Go on, go on.

MR. RAMOS: I would assume that based on the decision that the committee makes pertaining to the laid off employees at Carolina at Carlisle – and I'm just going to throw you a for instance. You know what our request is, that they should be called back prior to anybody else coming in, that the intermittent work scenario that we threw out there should at that time, if that was the decision of the panel, apply to those employees also before non-Carolina employees or non-ABF employees are worked as casuals.

MR. FRANKE: I'm sure that will be done.

MR. RAMOS: That's all I have.

MR. SMART: This is George Smart again. Also in that proposal that's missing from 46 to 96 the seniority list. They only show 46 people in there, and there's actually 96.

MR. FRANKE: Give him that page too.

MR. LITTLE: That sounds like the page you are talking about.

MR. SMART: No, it's a different page.

ABF FREIGHT SYSTEM-MULTI-CHANGE OF OPERATIONS
CAROLINA FREIGHT AND RED ARROW FREIGHT

Page 664

[1] MR. FRANKE: He's looking for the page over
[2] here.
[3] CHAIRMAN BUSALACCHI: When we get that
[4] page, we'll get you that page. He's coming to get
[5] the page.
[6] MR. GRIFFITH: I just have two things,
[7] Frank. Tom Griffith here. First of all, I have
[8] heard of a lot of issues about the seniority. I
[9] won't dwell on that, and I'm not going to run the
[10] fence either because we do have 323 Carolina people.
[11] So I'm not going to run the fence. The supplements
[12] calls for the endtail on a merger for an
[13] acquisition, also for an endtail. That is the
[14] position of the contract; we should stay with that.
[15]     On the other hand, I do want to say
[16] something on behalf of the Carolina employees, these
[17] 323 that they say no longer exist. That company and
[18] that company back there knew, they knew, and they
[19] did this, and they whacked a lot of people up before
[20] this change, and 323 people are whacked up. Now,
[21] they can sit there and say they didn't know. We
[22] know they knew. They knew, and they did this, and
[23] those Carolina changes – and I don't have to go
[24] into the history of them – they had a Carolina

Page 665

[1] change that said people would not be affected in
[2] Carlisle at that time. Those senior people chose to
[3] stay there thinking they were going to have a job.
[4] Two months later ran in, had another one, and
[5] whacked them people, and almost all of them, those
[6] senior people at the Carlisle facility, had very
[7] limited places to go and chose to take a layoff, and
[8] now we're going to sit in here and this company is
[9] going to say that those 323 people don't have
[10] anyplace to go.
[11]     I urge you, Frank, to take that into
[12] consideration in your executive session. These
[13] people are part of this merger or acquisition or
[14] whatever you want to call it. They're part of it,
[15] it is in our record, and they should be afforded the
[16] opportunity to be called in and before anybody comes
[17] from that street, and we want that on the record.
[18] CHAIRMAN BUSALACCHI: Okay. He's not so
[19] sure what seniority list you're looking for, so
[20] sometime just get with them and they'll provide you
[21] with whatever you need. We can get copies made for
[22] you, okay?
[23] MR. RAMOS: Okay.
[24] CHAIRMAN BUSALACCHI: Okay. Next?

Page 666

[1] MR. GRIFFITH: We're going to let these
[2] dock people get up and we're going to take the road
[3] then.
[4] CHAIRMAN BUSALACCHI: Okay.
[5] MR. GRIFFITH: For the road, Dan Virtue,
[6] business agent, is going to present for the record.
[7] I also have road stewards here, Ron Hicks, Bill
[8] Hyland, Bill Thompson, and Jim Thorton. And we have
[9] some presentations to hand out.
[10] MR. VIRTUE: I have a couple of questions
[11] before I start out to the Company. The canceling of
[12] the bids on. I believe it's page 7, where they want
[13] 90 days of canceling of the bids, that would not
[14] apply to the Carlisle break because at this time the
[15] work that the company has assigned us will not
[16] change. Our bid structure would basically stay the
[17] same, is that correct?
[18] MR. LITTLE: Basically I think that's
[19] probably correct, but there may be some changes in
[20] the head haul points to the extent that those bids
[21] could be affected.
[22] MR. VIRTUE: I believe the head haul
[23] changed – I'll get into that. So basically my bids
[24] will stay the same. They will not go under the

Page 667

[1] 90-day provision. If the Change of Operation
[2] Committee could, when they do put that on the
[3] record, I'd appreciate that, that they would not
[4] comply with the 90 days.
[5] CHAIRMAN BUSALACCHI: And what he's asking
[6] you, Company, and what he's waiting for you to
[7] respond to is because he has no changes, with the
[8] exception of a few minor things that you say you're
[9] going to do, you're going to leave his bids intact?
[10] MR. LITTLE: And to the extent that needs
[11] to be modified, Mr. Chairman, we would meet with the
[12] local union and discuss the need to do that. We're
[13] not interested in abolishing the bids if it's not
[14] necessary to so in order that the seniority of the
[15] employees is properly dealt with here. If it's not
[16] necessary, we won't, but if it becomes necessary and
[17] to what degree it becomes necessary, we will talk to
[18] the local union about that.
[19] CHAIRMAN BUSALACCHI: Well, he's just
[20] concerned that you're going to walk in and if this
[21] change is implemented you're going to nuke his bids,
[22] and then you're going to say, well, under the change
[23] decision we've got 60 or 90 days or whatever it is,
[24] and therefore, we don't have any bids any more.

ABF FREIGHT SYSTEM-MULTI-CHANGE OF OPERATIONS
CAROLINA FREIGHT AND RED ARROW FREIGHT



September 15, 1995

Page 668

[1]   MR. LITTLE: I think I explained that, and
[2] the purpose through in the proposal was in those
[3] areas where it is necessary to do so we've asked for
[4] 90 days.
[5]   MR. FRANKE: I'd like to make a statement
[6] on that situation, and that would apply to everybody
[7] in the room, that because we give a time period for
[8] adjustment of bids we don't expect the company to go
[9] in and throw all the bids out of the damn window
[10] that they can use at the present time, only those
[11] that need adjustment, and I think that's what the
[12] company has said here.
[13]   MR. VIRTUE: The only reason why I'm trying
[14] to clarify that, in the company's proposal they are
[15] talking about the Carolina road domiciles. To me
[16] the road domicile in Carlisle for their proposal
[17] said the head haul has not changed except for
[18] Cincinnati. So to me there's no need for this
[19] company to come in and hack the bids up.
[20]   MR. FRANKE: And you will so advise them.
[21]   MR. VIRTUE: And I would like to submit a
[22] copy of the bids to the committee and have them for
[23] the record.
[24]   CHAIRMAN BUSALACCHI: Okay. Move it along

Page 669

[1]   Page 16 of the change, basically I need a statement
[2] from the company. They reference in there that city
[3] drivers would be utilized to move overflow freight
[4] or freight to different points. It's our position
[5] that as long as there's a Harrisburg, a Carlisle
[6] road driver available at the time of dispatch, it's
[7] a violation of the contract.
[8]   MR. LITTLE: I believe if you would have
[9] read the entire sentence it states city drivers or
[10] over-the-road drivers as dictated by operational
[11] needs in accordance with the contract and local
[12] agreements between ABF and the local union.
[13]   MR. VIRTUE: I read it. I'm just asking
[14] you to get it on the record if you're going to
[15] comply with the contract.
[16]   CHAIRMAN BUSALACCHI: Well, let's not start
[17] jousting over this stuff. I mean the change itself
[18] is part of record. He's saying that he's going to
[19] comply with the contract, so let's go on.
[20]   MR. VIRTUE: Page 18, my next question will
[21] be to the company. Approximately how much did it
[22] cost the company or do they allot for moving
[23] expenses to move the road drivers from one point to
[24] the other? I know in major changes like this the

Page 670

[1] coast of moving is very great. I was wondering
[2] exactly how much money do they figure it is going to
[3] cost to move the road people in position?
[4]   MR. LITTLE: We treated that in the same
[5] manner we did the coffee bill for this meeting. We
[6] didn't make any allotment for any such allocation as
[7] that. We have tremendous expenses, tremendous
[8] expenses in areas that cannot being predictable as a
[9] result of this acquisition. And whatever expenses
[10] those are to the extent that our company can afford
[11] to pay those bills, we will pay them.
[12]   MR. VIRTUE: You misunderstand the whole
[13] question. You're pretty good. You keep on talking
[14] around and around. My question is simply this. How
[15] much money is going to go to us road drivers being
[16] moved, or how many road drivers are actually being
[17] moved in this change of operations? Zero.
[18]   MR. LITTLE: Then I don't understand the
[19] first question.
[20]   MR. VIRTUE: Zero
[21] CHAIRMAN BUSALACCHI: That's right, zero.
[22]   MR. LITTLE: That's correct .
[23]   CHAIRMAN BUSALACCHI: Okay. Let's go on.
[24] Zero, now go on Danny.

Page 671

[1]   MR. VIRTUE: This company today, the issue
[2] here in this room is seniority, but they're issue is
[3] that their screen is seniority.
[4]   CHAIRMAN BUSALACCHI: Danny, I understand
[5] that, all right? But let's stay with the issues
[6] within this change, okay?
[7]   MR. VIRTUE: That's what I'm coming up to.
[8]   CHAIRMAN BUSALACCHI: All right. Then get
[9] to the point.
[10]   MR. VIRTUE: I am working on it. I'd like
[11] to go to page 1 of my brief, if you look at my
[12] brief. Members of the committee, attached is a map
[13] of the Carlisle, PA road operation that I will go
[14] over with the panel, and what I want to try to show
[15] the panel today – do you have a copy of it?
[16]   MR. LITTLE: I guess, is this it?
[17]   MR. VIRTUE: Yes. If you look at Exhibit 1
[18] of the road operation at the Carlisle area there's a
[19] map that I made and why I passed the bids out to you
[20] to try to explain that right now we service
[21] everything in the west, and the east, in the
[22] northeast, and the south. We service everything.
[23] In the present operation Carolina has the head haul
[24] to the south, north, east, and west, and at this

ABF FREIGHT SYSTEM-MU??-CHANGE OF OPERATIONS
CAROLINA FREIGHT AND RED ARROW FREIGHT

September 15, 1995

Page 672

[1] ? after this change of operation we will still be

[2] ? head haul to most of the same points.

[3] CHAIRMAN BUSALACCHI: Just to correct you,

[4] Danny, you mean Carlisle?

[5] MR. VIRTUE: Right.

[6] CHAIRMAN BUSALACCHI: You said Carolina,

[7] just to get the record straight.

[8] MR. VIRTUE: All right. I've been known to

[9] screw up. The next one will on Boston. Exhibit one

[10] is a map, Boston, MA road operation that I will with

[11] over with the panel. Exhibit 1-A is a copy of two

[12] Carolina change of operations that show Boston as no

[13] road drivers, and the reason why I'm going over this

[14] point is right now today ABF is stating that they

[15] will have road drivers, two road drivers in Boston,

[16] MA. If you look at the two change of operations,

[17] one that was heard in December of 1994 and one was

[18] heard in the Eastern Conference on April 25, 1995,

[19] and if you look down at the first change it will

[20] show Boston, MA as a breakbulk will be gaining 20

[21] people on the dock. If you look to the road

[22] operation, there were no gains on the road.

[23] If you go to the next change of April, the

[24] ?? change that Carolina had, again if you look at

Page 673

[1] that there are no changes to put two road drivers

[2] into the Boston terminal. It is our position that

[3] due to the fact that we service the head haul to

[4] Boston we have 88 bids to these points, that there

[5] was never a road domicile established in Boston in

[6] the change of operations, therefore, this Change of

[7] Operation Committee should let one or two people

[8] move from the Carlisle breakbulk into the Boston

[9] area if so desired.

[10] CHAIRMAN BUSALACCHI: We'll take it under

[11] consideration, Danny. We'll make it part of the –

[12] he doesn't have to respond. We will go into

[13] executive session and we will discuss it.

[14] MR. VIRTUE: All right, when we met I also

[15] requested from the company a copy of the change of

[16] operations putting the road drivers into Boston.

[17] CHAIRMAN BUSALACCHI: Who put the road

[18] drivers in Boston, Don?

[19] MR. LITTLE: Mr. Chairman, when we bought

[20] Carolina we became aware of the seniority list.

[21] There were two road drivers in Boston.

[22] CHAIRMAN BUSALACCHI: They were Carolina

[23] people?

[24] MR. LITTLE: Yes, sir.

Page 674

[1] CHAIRMAN BUSALACCHI: All right.

[2] MR. VIRTUE: And what I am trying to show

[3] you is that they never had a change of operation to

[4] put two road drivers in Boston. You can even ask

[5] the Carolina people. They are right here. The labor

[6] people. That people change was never done.

[7] CHAIRMAN BUSALACCHI: All right. We'll

[8] take it under consideration.

[9] MR. VIRTUE: And if you look at the

[10] Boston – I hate to drone on this – but if you look

[11] at the Boston, Boston has the head haul into Camp

[12] Hill, York, and Lancaster. They're head hauling

[13] into our area, and also have the backup to Carlisle,

[14] Pennsylvania. So it's a very important issue. They

[15] do not do that now because we service all them

[16] points.

[17] Also, if Boston, MA drivers come to

[18] Carlisle, they should not be permitted to work off

[19] the Carlisle road boards as long as the Carlisle

[20] road driver is off rest, and the reason is that is

[21] not – none of our people are moving there to follow

[22] our work, so they should have no right to come into

[23] our road domicile and do our work.

[24] Next would be Buffalo, which would be page

Page 675

[1] 27 in the change of operations that we're referring

[2] to. Exhibit 2 is a map of Buffalo that we will go

[3] over with the panel. Again, if you you look at

[4] these points there's Buffalo, New York, I draw the

[5] map, it would show Buffalo running into all our

[6] areas that we service today.

[7] CHAIRMAN BUSALACCHI: Well, I guess this is

[8] going to be the appropriate time to ask the

[9] question, so we might as well ask it. How many road

[10] drivers do you have, 776?

[11] MR. VIRTUE: It fluctuates. I think if you

[12] look at the bid thing I think it was 396 on there.

[13] It could be 384. It goes up and down with that

[14] amount of road drivers.

[15] CHAIRMAN BUSALACCHI: Are you going to

[16] protect the number of road drivers that you have in

[17] this domicile?

[18] MR. LITTLE: Based on the current economic

[19] condition, Mr. Chairman, we propose to protect 384

[20] drivers.

[21] CHAIRMAN BUSALACCHI: So the issue,

[22] however, is that you feel that somebody is

[23] infringing on your work or is going to infringe on

[24] your work?

ABF FREIGHT SYSTEM-MULTI-CHANGE OF OPERATIONS
CAROLINA FREIGHT AND RED ARROW FREIGHT 
September 15, 1995

Page 676

[1]    MR. VIRTUE: That's correct, and it's very
[2] simple.
[3]    CHAIRMAN BUSALACCHI: I'm just trying to
[4] get to the meat of this thing, Danny.
[5]    MR. VIRTUE: Okay.
[6]    CHAIRMAN BUSALACCHI: If they infringe on
[7] your work, the company has gone on the record as
[8] saying that they are going to protect your work, and
[9] therefore, your people are going to be paid. I
[10] mean, Tom, on the previous grievance decisions, if
[11] that happens you're going to file a grievance and
[12] it's going to go in front of the Multi-Region Change
[13] Committee, and we're going to rule that they said
[14] they would protect X number of jobs. You're going
[15] to show to the change committee that they didn't do
[16] that because they had these other areas running into
[17] what is your area.
[18]    MR. VIRTUE: Again, Mr. Chairman, I am not
[19] saying that you're not correct on that. I want to
[20] get all this on the record for when it does come
[21] time for me to hear this grievance, and which it is
[22] going to come, because whether they want to agree or
[23] whether they don't want to agree, they found a way
[24] of not paying any moving expenses, they set this

Page 677

[1] change up prior with Carolina, and they're not going
[2] to change my mind on that, and they don't have to
[3] pay one cent to move anybody.
[4]    CHAIRMAN BUSALACCHI: If you feel that it's
[5] imperative that you get this information on the
[6] record, proceed.
[7]    MR. VIRTUE: Thank you.
[8]    MR. FRANKE: I'd like to point out one time
[9] here. This is an ABF change, and they have a right
[10] to reposition people in order to accommodate their
[11] system, and in my opinion your men will be protected
[12] under normal protections offered under a change of
[13] operations, but other local unions and other
[14] Teamsters involved in this goddamn change have a
[15] right to the same kind of protection. He's going to
[16] protect the Boston people as well as your people.
[17] And Teamsters have to understand that.
[18]    MR. VIRTUE: So is it all right if I go
[19] back and tell them that or what? That's our work.
[20] I'm not going to get in no argument here –
[21]    CHAIRMAN BUSALACCHI: Danny, that's what
[22] we don't want.
[23]    MR. VIRTUE: all right.
[24]    CHAIRMAN BUSALACCHI: We want you to

Page 678

[1] proceed with your testimony here. I want you to
[2] leave here knowing that you got what you wanted to
[3] get in the record into the record, so go ahead.
[4]    MR. VIRTUE: All I want to keep on saying
[5] is what people got to understand is we service every
[6] one of them points today.
[7]    MR. FRANKE: Under Carolina.
[8]    CHAIRMAN BUSALACCHI: No, under ABF.
[9]    MR. VIRTUE: ABF.
[10]    CHAIRMAN BUSALACCHI: Not Carolina, it's
[11] ABF.
[12]    MR. VIRTUE: At this time the Carolina road
[13] operation bids to – you got me messed up too. At
[14] this time the Carlisle road operation bids to
[15] Buffalo, NY and to the northeast. Will that stay
[16] the same after this change, and if not, it is our
[17] position that the Carlisle road drivers should have
[18] the right to follow their work.
[19]    I got a question of the company. Will that
[20] stay as the bids we have today?
[21]    CHAIRMAN BUSALACCHI: Company?
[22]    MR. LITTLE: Your question respecting bids
[23] we already addressed in terms of the local union and
[24] the company meeting to determine the needs and the

Page 679

[1] bid requirements. I said that earlier.
[2]    MR. VIRTUE: That isn't the question. The
[3] protection of my work here, if they're not going to
[4] say that I continue to run to this – I don't care
[5] whether it's on bid or an extra board. If I don't
[6] continued to run this, then I should have the right
[7] to follow the work to Buffalo, NY.
[8]    MR. LITTLE: Well, I guess maybe it's time
[9] for you to look at the description of the Carlisle
[10] operation as outlined in the change of operations on
[11] pages 31 and 32 – I'm sorry, 31, it's all offered.
[12] To the extent it's covered on page 31, it is
[13] self-defined and if you taking your time to read it,
[14] it says no change in the present number of drivers
[15] domiciled at Carlisle and the operation will
[16] continue and involve the dispatching of drivers in
[17] the same manner and to the same points as in the
[18] present operation, except that Carlisle will no
[19] longer serve as the head haul on dispatches to the
[20] Cincinnati, Ohio domicile. Then it continues to
[21] describe the points to which Carlisle operates
[22] presently and the points to which they would operate
[23] pursuant to the change of operations implementation.
[24]    In the next paragraph it says additionally

Page 680

[1] Carlisle will serve as the head haul of dispatches
[2] the following new domicile points: Enfield, CT.
[3] Boston, Massachusetts, Detroit, Michigan,
[4] Philadelphia, Pennsylvania, and Burlington, Vermont.
[5] Then it goes on to say that further as a supportive
[6] operation Carlisle will continue to be utilized on
[7] dispatches to Cincinnati and other points in the
[8] system as required by the balance of freight based
[9] on customer demands, seasonal business cycles.
[10] weather conditions, and other unusual factors. Also
[11] they will be utilized on supportive operations to
[12] the following new domiciles: Buffalo, NY, Rocky
[13] Mount, Winston-Salem, and Youngstown, OH.
[14]    Now, that's the description of the Carlisle
[15] road operation, and to the extent the Carlisle
[16] drivers have operated to these points that they can
[17] reach a tour of duty on dispatches originating in
[18] Carlisle as in the past, they will continue to do so
[19] in the future. And I don't know how any better I
[20] can describe it. It certainly is not anything new.
[21] This is a continuation of an ABF operation that's
[22] been in existence since approximately 1978, as I
[23] recall. And the only thing that really has happened
[24] over the last 20 some odd years is that Carlisle has

Page 681

[1] continued to grow in the road operation.
[2]    The argument that you seem to make applies
[3] to the Carlisle operation as compared to Boston and
[4] the Burlington where there are two drivers and one
[5] driver, in Buffalo there are three drivers, as
[6] compared to a board in Carlisle with what, 384.
[7]    MR. VIRTUE: What is the point?
[8]    CHAIRMAN BUSALACCHI: Well, Danny –
[9]    MR. VIRTUE: No, hold it. That's what I'm
[10] trying to argue he is 100 percent right. We have
[11] the head haul to all these points. Now they are
[12] going to turn the head haul around and run people
[13] from Buffalo and other areas of the country into us,
[14] and that is our work. We should have a right under
[15] the change of operation to follow our work.
[16]    CHAIRMAN BUSALACCHI: Danny, proceed with
[17] your presentation and let's try to cut down the
[18] arguing back and forth. Get your information into
[19] the record.
[20]    MR. VIRTUE: Thank you. Also if a Buffalo
[21] drivers comes to Carlisle, he or she should not be
[22] permitted to work off the Carlisle board as long as
[23] a Carlisle road driver is off rest.
[24]    CHAIRMAN BUSALACCHI: Go on.

Page 682

[1]    MR. VIRTUE: Page 29 of the change would be
[2] on the Burlington. Exhibit 3 is a map of the
[3] Burlington, Vermont road operation that we will go
[4] over with the panel. Again, if you look at the
[5] Burlington road operation it's an area that also has
[6] the head haul to York, Camp Hill, and Carlisle
[7] Pennsylvania.
[8]    MR. SCHMIDT: Is that Burlington, Dan?
[9]    MR. VIRTUE: That's correct.
[10]    MR. SCHMIDT: Let's just go back to that.
[11] Would you turn to page 22, please. See if we can
[12] get over this. The way I understand the change –
[13] and you and the company can correct me – Carlisle
[14] has 384 drivers that have the primary or head haul
[15] into those locations: Buffalo, Boston, Burlington,
[16] VT Enfield, CT. Am I correct, Don?
[17]    MR. LITTLE: I think that –
[18]    MR. SCHMIDT: And also you have the change
[19] written that Buffalo, Burlington, and Enfield also
[20] have the primary head haul to Carlisle. Now, there
[21] is a big different there as you point out. Boston
[22] has three road drivers; Burlington, VT has one road
[23] driver; and Enfield, VT has what?
[24]    MR. VIRTUE: Ten, I believe.

Page 683

[1]    MR. SCHMIDT: I don't know. How many do
[2] they have?
[3]    MR. VIRTUE: Ten.
[4]    MR. LITTLE: Right.
[5]    MR. SCHMIDT: So you're saying you're going
[6] to protect them people up there to them numbers
[7] under this change –
[8]    MR. LITTLE: Yes, sir.
[9]    MR. SCHMIDT: And you're also going to
[10] protect the 384 in Carlisle under this change?
[11]    MR. LITTLE: Yes, sir, based on the current
[12] level of business.
[13]    MR. SCHMIDT: And if you are going to
[14] increase in those areas that are going to take
[15] freight away from Carlisle, you're going to go
[16] through another change, correct?
[17]    MR. LITTLE: Well, that will certainly be
[18] true.
[19]    MR. SCHMIDT: Does that give you any
[20] satisfaction?
[21]    MR. GRIFFITH: No.
[22]    CHAIRMAN BUSALACCHI: We said that already.
[23] We said that already. Get your presentation into
[24] the record.

ABF FREIGHT SYSTEM-MULTI-CHANGE OF OPERATIONS
CAROLINA FREIGHT AND RED ARROW FREIGHT 

September 15, 1995

Page 684

[1] MR. VIRTUE: I'm am trying to. Also on the
[2] Burlington, when I met with the company I requested
[3] to the mileages from different points in the ABF and
[4] Carolina systems that would affect the Carlisle, PA.
[5] The company told me they would not give me this
[6] information, and it's my position that we are at
[7] this change right now, they should have to submit
[8] this to me at this time, on the mileage from
[9] Burlington to Carlisle, Burlington to Camp Hill, and
[10] Burlington to York, PA. The contract is clear. If
[11] I feel that these runs are excessive length, they
[12] must apply by the contract and give me that
[13] information at the time of the change of operations
[14] being heard. i would like to have that information
[15] now.
[16] MR. SCHMIDT: Company, do you want to
[17] respond to the runs that he just designed and are
[18] they makeable in D.O.T. hours, is that your
[19] question?
[20] MR. LITTLE: Well, I don't have the
[21] mileages between those points. Apparently,
[22] according to Mr. Bell here, you have them. And if I
[23] may through the Chair, I'd like to ask the local
[24] union. Did you ever run from Carlisle to

Page 685

[1] Burlington?
[2] MR. VIRTUE: No. What the problem is, I
[3] have a grievance on that right now and we are trying
[4] to get that established that the run can be made
[5] from Carlisle to Burlington. The company told me
[6] they don't believe it can be.
[7] MR. LITTLE: With all due respect, if there
[8] is a grievance pending I don't believe this is the
[9] appropriate venue to vent your desires with regard
[10] to that grievance. In terms of the legitimacy of
[11] any run in terms of the DOT regulation and in terms
[12] of the practicability of operating that run, we
[13] either can or can't make the dispatch, and if we
[14] can't, we won't; if we can, we will.
[15] MR. GRIFFITH: Mr. Chairman, under the 8,6
[16] it says where the union raises the question is
[17] whether or not certain proposed runs of excessive
[18] length could be made, the employer must be prepared
[19] to submit objective evidence, including DOT,
[20] certification or logs, and state that such runs have
[21] been tested dollar and were made within the DOT
[22] hours of services and regulations. We requested
[23] that at the meeting, we requested it in writing, we
[24] have not gotten it, and we are requesting it now,

Page 686

[1] and they are telling us that they do not have it.
[2] MR. LITTLE: And your request is so noted
[3] and we will respond to your request prior to
[4] implementation of the change.
[5] MR. GRIFFITH: For the record, Mr.
[6] Chairman, that is a violation of 8,6 because it does
[7] not say prior to implementation. It says when the
[8] union asks for it they will give it to them.
[9] MR. FRANKE: All right. It's on the
[10] record.
[11] MR. VIRTUE: Okay. The next would be
[12] Cincinnati, 32 in the change. Exhibit 4 is a map of
[13] Cincinnati road operation on the head haul to the
[14] Carlisle, PA, and again, if you look at the map you
[15] will see points from Cincinnati to the east. What
[16] our problem with that is, we had the head haul, and
[17] the company even says the head haul will be changed,
[18] to run Cincinnati into Carlisle or Cincinnati into
[19] Camp Hill or east. It is our position because we
[20] had the head haul before that we should have a right
[21] to move drivers to Cincinnati.
[22] MR. FRANKE: It's on the record.
[23] MR. VIRTUE: I'd like to read into the
[24] record. (Reading.) At the present time Carlisle

Page 687

[1] runs the head haul to Cincinnati, Ohio, and when
[2] Cincinnati drivers come to Carlisle he then runs to
[3] Dayton and back to Cincinnati. And that is an issue
[4] I'd like to talk about because right now we have the
[5] head haul and we have bids into the Dayton and west,
[6] and we have numbers showing basically on overflow
[7] freight Cincinnati runs roughly 109 Cincinnati men
[8] with dispatch to Carlisle, 63 would send via through
[9] Dayton, 46 go straight back to Cincinnati. These
[10] numbers are an overflow, so the amount of bids that
[11] we have going to the west if you look at the bid
[12] structure again extra board are very high. What we
[13] are saying now with Cincinnati coming to Carlisle,
[14] they will now take the loads that we enjoy running
[15] to the west on bids and now we will sit home and
[16] wait while they run the Cincinnati men to Carlisle
[17] and back to Dayton. It is our position that we
[18] should have the right to move to Cincinnati.
[19] CHAIRMAN BUSALACCHI: It's on the record.
[20] Go on.
[21] MR. VIRTUE: Does the company –
[22] CHAIRMAN BUSALACCHI: No.
[23] MR. VIRTUE: Can I ask a question of the
[24] company? Does the company still contend that



Page 688

th~~'ll protect my bids to the west?

.AIRMAN BUSALACCHI: Oh, they've said that. We're going to hold their feet to the fire on that. They have to protect your board, period.

MR. LITTLE: That's right, but he bids, Mr. Chairman. We're not going to protect any bids to Cincinnati.

CHAIRMAN BUSALACCHI: No.

MR. VIRTUE: Oh. no. I'm talking about the bids to Dayton and West. I understand I wouldn't have bids but I would have the head haul.

MR. SCHMIDT: He's talking about when the Cincinnati guys come in and take the Dayton Freight out and he has work at the head haul in Dayton, he wants to know if his board's going to be moving?

MR. LITTLE: Mr. Chairman, I suppose that I must have fallen off a potato wagon at this meeting based on the questions that this local union is asking me considering our years of operation in Carlisle, and considering the fact it's most unusual that after two days of testimony from the unions that we now have a local union that is not involved in the Carolina acquisition to the extent of impact he ABF road domicile in Carlisle, and that

Page 689

operation from Carlisle to Dayton and continuing to Cincinnati is not predicated on where the load was going. It's predicated on where the dispatch is going, and that issue is paramount in the ABF road operation and has been for many, many years. These dispatches from Carolina to Cincinnati via Dayton, they are Cincinnati dispatches. They're not Dayton dispatches. And contrariwise if it's a dispatch to Dayton that ultimately ends in Dayton, it's a Dayton dispatch. If it's a dispatch from Carlisle to Cincinnati and it ultimately ends in Cincinnati it's a Cincinnati dispatch subject to via. And this local union understands that, this member understands that.

CHAIRMAN BUSALACCHI: I think I tried – I'll try to state it one more time. I think if the company is saying that they are going to protect the number of drivers that you have and they don't protect those drivers and you feel that they haven't ... ne that, you have got the right to grieve and have .. at grievance brought through the channels in front of the Multi-Region Change Committee. And on all of these issues – and I've let all the local unions say exactly what they have to say – but on this

Page 690

[1] particular issue with your domicile, if they are
[2] violating you or they do violate you once this
[3] change is implemented, I'm sure, knowing Tom
[4] Griffith you, that you will grieve and you will
[5] bring that grievance up through the proper channels.
[6] If they are eliminating work in various lanes, then
[7] you will grieve that. And I understand you want to
[8] get it on the record, but I can't put it any plainer
[9] than that.
[10]      Now. if you do want to get this on the
[11] record, let's get it on the record then let the
[12] grievances answer the questions. We'll let you get
[13] it on the record, and then if there are grievances
[14] later on. you can make references to the transcript
[15] and that you did get it on the record. Okay? I
[16] mean I'm trying to do the best I can for you here.
[17]    MR. VIRTUE: I appreciate that. Next will
[18] be page 3⁷, Dayton. Exhibit 5 is a map of Dayton,
[19] Ohio road operation I will go over with the panel.
[20] Again, I'd like to go over the Dayton that we do
[21] have the head haul to Dayton at this time, but if
[22] you look at the map they have given Dayton the head
[23] haul to Camp Hill, York, and Hazelton. Now,
[24] gentlemen. the Camp Hill has roughly, after this

Page 691

[1] change, will be 66 city or dock people working
[2] there. They are adding 44 doors – I don't know
[3] about after this change – but right now they are
[4] adding 44 doors on at Carlisle. They are going to
[5] move the freight from Camp Hill to Carlisle. Now,
[6] how can I have a head haul in Dayton that enjoyed
[7] for years and years, like he said, but yet they're
[8] going to bring freight from Dayton to Camp Hill that
[9] is nine miles away? I don't understand that, why I
[10] wouldn't have an option to move.
[11]    MR. FRANKE: You're on the record.
[12]    CHAIRMAN BUSALACCHI: Go on.
[13]    MR. VIRTUE: Page 39 of the change, Exhibit
[14] 6 is a map of the road operation in Detroit,
[15] Michigan. Again I will show you Detroit, Michigan.
[16] If you go to Detroit, Michigan they are running into
[17] Lancaster, Camp Hill and York and Wheeling. Again,
[18] I enjoyed the bids to these points. They do not
[19] have any road drivers there from ABF. They're
[20] Carolina road drivers. How can they possibly take
[21] my head haul and now run into me?
[22]      I will give you some of the mileages.
[23] Detroit, Michigan to Allentown, Plackard load, 551
[24] miles; Lancaster, Pennsylvania, 514 miles; York,

ABF FREIGHT SYSTEM-MULTI-CHANGE OF OPERATIONS
CAROLINA FREIGHT AND RED ARROW FREIGHT



September 15, 1995

Page 692

[1] Pennsylvania, 504 miles; Reading, 535 miles. We
[2] might as well go over to Burlington. Burlington to
[3] Carlisle is 540 miles; Camp Hill is 534 miles;
[4] Lancaster is 527 miles; York is 557 miles. And if
[5] they go Plackard out of Cincinnati, they can't make
[6] it. It's 554 miles, 559 miles, and 542 miles to
[7] Reading.
[8]     So that's why I requested all this
[9] information prior to the meeting when we met with
[10] Mr. Bell, and I also sent a letter requesting this
[11] information because these runs can't legally be made
[12] by DOT. Now, if they have the records, I have no
[13] problem. I have no problem with them running people
[14] Detroit to here, but it should be our people should
[15] have the right to follow that work up to Detroit.
[16]     CHAIRMAN BUSALACCHI: All right, go on.
[17]     MR. VIRTUE: Exhibit 7 will be page 42.
[18] Enfield, Connecticut. Exhibit 7 is a map of
[19] Enfield, CT that will go up with the panel. Again
[20] if you look at the map, the head haul that they will
[21] do again of the same areas that we service day in
[22] and day out at ABF. We service all them areas.
[23]     Will the bids in the eastern and
[24] northeastern stay the same after this change? If

Page 693

[1] not, it is our position that the Carlisle road
[2] drivers should have the right to follow this work to
[3] Enfield, CT. Also if an Enfield, CT driver comes to
[4] Carlisle, they should not be permitted to work off
[5] the Carlisle road board as long as the Carlisle road
[6] driver is off rest. The reason I'm saying that is
[7] because that work that is done by the Carlisle ABF
[8] drivers are not having the option to follow the work
[9] to Enfield.
[10]     Page 58, Orlando, Florida. I'd like to
[11] read this into the record. (Reading.) The Central
[12] Pennsylvania Supplement Agreement does not have any
[13] language on sleeper teams running over established
[14] relay operations. We are asking this panel to
[15] establish this in their decision on this change of
[16] operations. So basically what we are saying is our
[17] supplemental agreement does not have anything
[18] that –
[19]     CHAIRMAN BUSALACCHI: Company, are you
[20] going to comply with the contract?
[21]     MR. LITTLE: Yes, sir.
[22]     MR. VIRTUE: We don't have anything in our
[23] contract.
[24]     CHAIRMAN BUSALACCHI: There's nothing in

Page 694

[1] your contract on sleepers?
[2]     MR. VIRTUE: Not on teams, no, and what
[3] we're saying is that they could actually run over
[4] our established relay.
[5]     MR. FRANKE: Is that your intention?
[6]     MR. LITTLE: My intentions are outlined in
[7] the Orlando section of the proposed change of
[8] operations with respect to relay teams. They run to
[9] the Philadelphia and they come back out of
[10] Philadelphia back to Orlando.
[11]     CHAIRMAN BUSALACCHI: So you have
[12] intentions of running them over their relay?
[13]     MR. LITTLE: Correct.
[14]     CHAIRMAN BUSALACCHI: That's on the record.
[15]     MR. VIRTUE: Can I ask one question on
[16] this? So in other words, what he's basically is –
[17] because like I say, I'm a little slow – that if
[18] they go off them lanes and run into our established
[19] relay operation that would be a grievance under –
[20]     CHAIRMAN BUSALACCHI: Absolutely.
[21]     MR. VIRTUE: Thank you. Page 60, Exhibit 8
[22] is a map of Philadelphia road operation that I will
[23] go over with the panel. Again if you look at the
[24] map you can see Philadelphia the points they are

Page 695

[1] running from Philadelphia again is the exact same
[2] points that are being run by the ABF road drivers
[3] today. At the present time Carlisle runs all loads
[4] from the west to the east and from the south to the
[5] east on lay bids and fast turns or by the extra
[6] board drivers. With the opening of the Philadelphia
[7] road operation, they will run the south loads to
[8] some of the New England States and the New York
[9] States and the New Jersey and Enfield, Connecticut.
[10] The west loads will be relayed to the Youngstown and
[11] points west. All this work is done by the Carlisle
[12] road drivers at the present time.
[13]     The question is will the bids to the west,
[14] to the east on lay downs and fast turn bids stay the
[15] same as they are today after this change, and if so,
[16] it is our position that the Carlisle road drivers
[17] have the right to follow the work to Philadelphia.
[18] Also, if any Philadelphia drivers come to Carlisle,
[19] they should not be permitted to work off the
[20] Carlisle road board as long as the Carlisle road
[21] drivers is off rest.
[22]     CHAIRMAN BUSALACCHI: It's on the records,
[23] Danny.
[24]     MR. VIRTUE: Page 62, Rocky Mount. Exhibit



Page 696

map of the road operation out of Rocky Mount. Again, if you look at the map, and I hate to keep own stating it, but you can see if you just start putting these maps together the amount of work that we do now and how much work is going to be done by other road domiciles that we are not going to have the option to move to.

At the present time Carlisle road drivers bids to Rocky Mount and south. Will that stay the same after this change? The question is supposed to say to the company. If not it is our position that the Carlisle road drivers should have the right to following their work to Rocky Mount.

CHAIRMAN BUSALACCHI: Go on.

MR. VIRTUE: Page 69, Exhibit 10 is a map of Winston-Salem, North Carolina road operation I will go over with the panel. Again if you look at the road operation, the areas that they will be going to, again it's an area that we have bids to and service right now every day out of the Carlisle ABF road run. At the present time Carlisle road drivers bid with Wytheville, VA and points to the north and meet with the Asheville drivers at Hagerstown, MD with loads from East and parts of the

Page 697

country. With the Winston-Salem road operation they will now have the head haul to one of the terminals that are now run by Carlisle road drivers. Will this change the bids that we have today to the south and if so it's our position that the Carlisle road drivers would have the right to follow work to Winston-Salem.

CHAIRMAN BUSALACCHI: Go on.

MR. VIRTUE: 71 is the key to the whole operation. Exhibit 12 is a map of the Youngstown, Ohio road operation. At the present time Carlisle has the head haul to the West and East. With the Youngstown road operation in the ABF system, will that change our East and West lay bids and fast turn bids to Carlisle? I'd like to stop right there and have them answer that.

MR. LITTLE: We've answered it earlier in the record regarding the bids and to the extent that the bids would suit the new operation – or the revised operation in Carlisle, they will be maintained.

MR. VIRTUE: I'd like to give you a little overview on this, what I feel is going to be done.

MR. FRANKE: You know, we've heard

Page 698

throughout this change that the Carolina people would like some protection under this change also, and some of freight is coming from Carolina. I assume you understand that.

MR. VIRTUE: Oh, I understand all that. I understand what I do now.

MR. FRANKE: And the company has pointed out that they're going to do their best to take care of those people too. So I think they have some rights in this change.

CHAIRMAN BUSALACCHI: Go on, Dan.

MR. VIRTUE: First of all, number one, if you take all the maps and put them together and look at them maps, you will see basically what's going to happen. Number one today, Dayton turns all freight into Chicago. That will no longer happen because why would you turn Dayton into Chicago and then have Harrisburg come to Dayton get the freight to go to New England when they can triple it up along the triple lanes, triple it up, bring it into Youngstown, and run it straight across into New England or meet with Enfield. It will wipe out basically Dayton's relay, and when they're done with mine I will have nothing left because Philadelphia

Page 699

serviced all the metro area. Now, all that freight comes back in, they run it straight, straight from Philadelphia into Youngstown, Youngstown triples it up, and brings it into Chicago.

Now, if you can't see that in this overlay, someone is blind. And I have no problem with him doing that because it makes sense, but don't come here and say that none of my people should have a right to move to these domiciles.

CHAIRMAN BUSALACCHI: If they do that, Danny –

MR. VIRTUE: They're going to do it.

CHAIRMAN BUSALACCHI: Well, wait a minute. If they do do that and your people have not been protected, this company is pretty knowledgeable on the contract and what could happen under that situation. Now, they're going to have to protect your people. I think we've said that time and time again. If that doesn't happen and you turn out to be a profit on this thing, then they're going to be back in front of this committee with one hell of a pay claim. There's going to be a real problem with it, Danny.

MR. VIRTUE: Also if you look at the South

ABF FREIGHT SYSTEM-MULTI-CHANGE OF OPERATIONS
CAROLINA FREIGHT AND RED ARROW FREIGHT



September 15, 1995

Page 700

[1] freight. the same thing can happen to the South
[2] freight that's coming from New England now. It
[3] comes into Camp Hill. It will no longer do that –
[4] or go into Philadelphia and be meet and turned with
[5] either Winston and then to the south, and they'll
[6] have the teams come up and get the same amount of
[7] freight into Florida. They'll be crazy if they
[8] don't. I'd like to ask the company is that their
[9] plan to do that?
[10]    MR. LITTLE: Our plans are described in the
[11] change of operations proposal with respect to the
[12] domiciles designated and which you have carefully
[13] enumerated with respect to their relationships to
[14] Carlisle.
[15]    CHAIRMAN BUSALACCHI: You know. Article 8,
[16] Section 6. which is really what we're talking about
[17] here, has been tested many, many times. and if you
[18] think that Harrisburg is the first location to ever
[19] test it, you're wrong. It has been tested many,
[20] many times, and if they do as you're saying that
[21] they're going to do, they're going to have a
[22] problem.
[23]    I mean Mr. Little would know that
[24] operationally if they're going to make attempts to

Page 701

[1] this, I mean I certainly don't want to see the
[2] grievance come back in front of this committee,
[3] Danny, and say, "Well, you know, Danny was right.
[4] He was right." That's why I've let you put all this
[5] information in. But if they do do it and not
[6] protect the people, I mean, they would be crazy. I
[7] wouldn't see any point in them doing it. Why would
[8] they want to do that?
[9]    MR. VIRTUE: One question. Tonight when
[10] you're all done and you get on your plane to go
[11] home –
[12]    CHAIRMAN BUSALACCHI: I'm not going to get
[13] on a plane tonight, guarantee you that much.
[14]    MR. VIRTUE: Well, I'm just saying, you
[15] look at that map, and they say it right in their
[16] change. It gives the head haul that way. Look at
[17] the change. It there. It's all lined up. It's
[18] lined up to do it that way.
[19]    CHAIRMAN BUSALACCHI: If they are going to
[20] make the significant numbers of changes that you say
[21] they are going to make, they are going to have to
[22] propose another change because they can't hear a
[23] change and have a change within the change because
[24] there's a lot of companies out there that have tried

Page 702

[1] to do that and have been stopped.
[2]    MR. FRANKE: They have got to protect your
[3] people.
[4]    CHAIRMAN BUSALACCHI: Go on.
[5]    MR. VIRTUE: Can I have two minutes,
[6] please?
[7]    CHAIRMAN BUSALACCHI: Go ahead.
[8]    MR. VIRTUE: The only other thing I'd like
[9] to ask of the company is any that any new mileages
[10] or anything that's going to be run that they submit
[11] to the local union under the Central Pennsylvania
[12] Supplement Agreement. They should submit that so we
[13] can get them run and get them known. Will the
[14] company comply?
[15]    MR. LITTLE: We'll do the best we can.
[16]    MR. VIRTUE: At least you could have said
[17] you will comply by the contract. That's 15 days.
[18]    CHAIRMAN BUSALACCHI: Anything else?
[19]    MR. GRIFFITH: Frank, I'd just like to sum
[20] this thing up, and basically what I see in this
[21] change is ABF has proposed that there would be no
[22] change in the present road operation in Carlisle,
[23] but yet back in their change when those ones that we
[24] just presented there is definitely a reversal of the

Page 703

[1] head haul, and what's got us confused is they got
[2] head hauls out of two locations. They got a head
[3] haul out of Carlisle to these places and they have a
[4] head haul coming in, and they use Camp Hill, which
[5] they will via through Carlisle. And you know the
[6] man in motion stays in motion.
[7]    The other thing I want to define is I know
[8] it's nice to say they will be protected. We have
[9] never had language in the supplemental agreement for
[10] protection because we have always focused on the
[11] mother terminal feeding out. and now we have just
[12] the opposite where they are feeding into the mother
[13] terminal, and that has never been an issue before
[14] because we have never had that type of operation.
[15]    So it's nice to say there is protection,
[16] but I still haven't heard what kind of protection
[17] we're going to get. I mean are we protected if we
[18] don't get laid off? Our position is that whatever
[19] the four week average earning is for every road
[20] driver in Carlisle must be maintained after this
[21] change. If we don't, that's the monetary claim.
[22] That's the only protection I can feel. If they're
[23] running this down, they got a four week average
[24] earning of what they have now, and that average

Page 704

[1] ...arning drops per individual after this change, then

[2] ...ey are not protecting those road drivers because

[3] you know what the contract says about 25 percent of

[4] the board and 700 for a layoff. That would be a

[5] dramatic decrease in earnings for these road

[6] drivers, and that's what I am saying about its nice

[7] to say you're protected, but if there's no language

[8] to say what that protection is –

[9]    CHAIRMAN BUSALACCHI: All I was trying to

[10] say. Tom – and I'm not trying to make light of what

[11] you're saying here because I got a couple of old

[12] friends that sit on that Road Board there – but

[13] what I've been trying to tell you is that even

[14] though it's not spelled out, the decisions of this

[15] committee are probably as powerful as we have in the

[16] contract, and we will apply those decisions to what

[17] happens here.

[18]    Now, I let Danny get the information in,

[19] and I hope that puts your mind at ease, but if this

[20] company is going to impact that board based on what

[21] Danny has put here, we've got extensive testimony

[22] that is not going to be in this company's favor, and

[23] ...this Change Committee is going to have jurisdiction

[24] ...ver those claims

Page 705

[1]    MR. GRIFFITH: I appreciate that, Frank,

[2] but we just never had that situation happen on the

[3] protection, and that's why it's a little new to me.

[4]    CHAIRMAN BUSALACCHI: All right.

[5]    MR. VIRTUE: We got to catch our flight.

[6] See you later.

[7]    CHAIRMAN BUSALACCHI: Okay. 822? Danny

[8] has a statement from 992.

[9]    MR. HALEY: My name is Bill Haley. I am

[10] the business agent and Secretary-Treasurer for

[11] Teamsters Local 822, Norfolk, Virginia. I won't

[12] bore you with a lot of boring details. Most

[13] everything that I have to say has already been said.

[14] I just have a couple of notations. One is in the

[15] exhibit package there you will notice that I have

[16] both seniority lists from Carolina Freight in

[17] Norfolk and ABF, and I take exception with ABF's

[18] seniority list that they had in their book. It

[19] called for 15, and as you will notice on this

[20] seniority list of August the 14th, 1995 there were

[21] only 13 on their seniority board, and I got this

[22] from their steward.

[23]    MR. SCHMIDT: What town are we talking

[24] about?

Page 706

[1]    MR. HALEY: Norfolk.

[2]    MR. SCHMIDT: No. in the change what town

[3] are we talking about?

[4]    MR. HALEY: Chesapeake and Virginia Beach,

[5] Norfolk, Virginia.

[6]    CHAIRMAN BUSALACCHI: Part of the Change

[7] Committee's decision in this change of operations is

[8] that we get ABF a new calculator.

[9]    MR. HALEY: Thank you.

[10]    MR. LITTLE: I need that after all that

[11] mileage discussion.

[12]    MR. HALEY: Looking at Exhibit 6, Danny, on

[13] my exhibits. That basically tells the story.

[14]    MR. SCHMIDT: Okay.

[15]    MR. HALEY: The only other objection I have

[16] in the numbers is the required amount of number of

[17] people that's going to be required to man that

[18] facility. ABF is very adamant about the fact that

[19] it's going to be 22. If you compile numbers off of

[20] my Exhibit 6 you will notice I have 28 back there.

[21] I would respectfully request that the committee take

[22] that number 28 into account and under advisement.

[23]    And that basically wraps it up other than

[24] the one bottom line is at the bottom of my brief,

Page 707

[1] which the rest of it is pretty much self-

[2] explanatory – and I have given the reporter a copy

[3] of it for the record. The bottom line is a new ABF

[4] seniority list with 28 names should be applied here,

[5] a combined inactive list of the remaining employees

[6] to be used at and recalled in order and to be

[7] dovetailed. We are requesting Article 5, Section 2

[8] dovetail and the restricted use of casuals until the

[9] inactive list has been exhausted. And that

[10] finalizes mine. Thank you.

[11]    CHAIRMAN BUSALACCHI: Thank you. 992,

[12] Danny?

[13]    MR. SCHMIDT: 992's position is as follows:

[14] This is to advise that Local 992 has no objections

[15] to the change of operations as proposed by ABF

[16] Freight Systems. 992 has seven members employed at

[17] ABF and none employed at Carolina Freight or Red

[18] Arrow Freight. The seven ABF members are still

[19] required per the proposed change of operations. For

[20] us there is no proposed impact or change in our

[21] jurisdiction.

[22]    In view of the above, Local 992 will not

[23] send a representative to the Multi-Change Committee

[24] to be held in Rosemont, Illinois on September 14 and

5



# INTERNATIONAL
# BROTHERHOOD OF TEAMSTERS
### AFL-CIO



January 7, 1999

TO:        All Freight Local Unions

RE:        Fourth Circuit Decision in the ABF/Carolina Litigation

Dear Sisters and Brothers:

On December 29, 1998, the Fourth Circuit Court of Appeals issued its decision in the ABF/Carolina litigation, affirming the district court's dismissal of the Plaintiffs' claims that the Union and ABF wrongfully dovetailed, rather than entailed, the ABF, Carolina and Red Arrow seniority lists. A copy of the decision is enclosed.

The ABF litigation arose following the September 1995 decision of the Multi-Region Change of Operations Committee to dovetail the seniority of the ABF Freight System, Carolina Freight Carriers and Red Arrow employees after the companies were merged. Five separate lawsuits were filed by former ABF employees contending that the IBT breached its duty of fair representation and ABF violated the contract by agreeing to a dovetail and not an endtail. The five cases were consolidated in the U.S. District Court in Baltimore, Maryland under the name *Harry Gorge, et al. v. Ron Carey, Dennis Skelton, IBT and Local 557*.

In its decision, the Fourth Circuit noted that the NMFA endorses the dovetail of seniority lists when employers' operations are combined and further noted that the Change of Operations Committee has broad discretion to resolve the seniority application. The Court held that the language in the Master portion of the NMFA supercedes any conflicting language in Supplemental Agreements regarding the dovetail of seniority lists when employer operations are consolidated. The Fourth Circuit stated that the dovetailing of seniority is an equitable means of resolving the conflicting seniority interests of a group of employees in merger or absorption cases.

The Fourth Circuit's decision should finally bring an end to this seniority dispute.

Fraternally yours,

*Richard W. Nelson*

Richard W. Nelson
National Freight Director

RWN:jmr

**Teamsters Local 512**

Enclosure

JAN 12 1999

Exhibit (5)

25 LOUISIANA AVENUE, N.W. • WASHINGTON, D.C. 20001 • (202) 624-6800

where a collective bargaining agreement "covers a group or several groups of employees, the sole inquiry should be whether, under all the circumstances, the union has considered the interests of all whom it represents." Ekas, 602 F.2d at 667. Faced with a conflict among own members, Local 557's neutral position was a reasonable one.

III.

For the foregoing reasons, we affirm the judgment of the district court.

AFFIRMED

Source: All Sources : States Legal - U.S. : Maryland : MD Federal and State Cases
Terms: gorge, et al. v. ron carey   (Edit Search)
View: Full
Date/Time: Tuesday, October 19, 1999 - 7:54 PM EDT

About LEXIS-NEXIS | Terms and Conditions

Copyright © 1999 LEXIS-NEXIS Group. All rights reserved.

Operations Committee has final and binding authority to approve the consolidation plan, id. art. 5, § 2(b), art. 8, § 6(a), (d), and has the discretion to tailor the consolidation plan to the circumstances before it, id. art. 8, § 6(g).

Given this express endorsement of dovetailing and this broad grant of discretion to the Committee, nothing in the IBT's conduct was "arbitrary, discriminatory, or in bad faith." Vaca v. Sipes, 386 [*8] U.S. 171, 190, 17 L. Ed. 2d 842, 87 S. Ct. 903 (1967). Dovetailing "is a familiar and frequently equitable solution to the inevitably conflicting interests which arise in the wake of a merger or an absorption such as occurred here." Humphrey v. Moore, 375 U.S. 335, 347, 11 L. Ed. 2d 370, 84 S. Ct. 363 (1964); see also Ekas v. Carling Nat'l Breweries, Inc., 602 F.2d 664, 667-68 (4th Cir. 1979). The IBT was therefore not unreasonable in sanctioning a dovetail of the consolidated workforce. Moreover, even assuming that they are subject to the same duties as the IBT, the Committee and its union members likewise acted reasonably. n2

- - - - - - - - - - - - - - -Footnotes- - - - - - -

n2 Although plaintiffs contend that the IBT violated its own constitution by allegedly ignoring the area supplements, the district court correctly dismissed this argument as without merit. First, the union's constitution does not affect the terms of this collective bargaining agreement. Second, as the district court found, the specific provision cited by the plaintiffs does not even apply to the seniority questions at issue in this case.



Plaintiffs additionally argue that the Change of Operations Committee's grievance procedure violated the union's duty of fair representation. Again assuming arguendo that the Committee is subject to this duty, its actions were reasonable. The Committee met, considered one grievance fully, and denied it and all similar grievances. As the district court found, this procedure was simply not "so far outside a wide range of reasonableness as to be irrational." Air Line Pilots Ass'n, Int'l v. O'Neill, 499 U.S. 65, 67, 113 L. Ed. 2d 51, 111 S. Ct. 1127 (1991) (internal quotation marks omitted); see also Marquez v. Screen Actors Guild, Inc., 142 L. Ed. 2d 242, 119 S. Ct. 292, 300 (1998).

- - - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - [*9]

Furthermore, as the district court found, the consolidation of the trucking companies was the result of the merger of ABF, Carolina Freight, and Red Arrow, not the result of an acquisition. The dovetail was therefore consistent even with the area supplements as interpreted by the plaintiffs and was not arbitrary.

B.

The resolution of plaintiffs' other claims flows directly from this discussion of their claims against the IBT. As to ABF, there was no breach of the collective bargaining agreement. As the district court noted, the company's adherence to the final decision of the Committee was not itself a breach. Moreover, ABF had no independent duty to deadlock the Change of Operations Committee to achieve a particular outcome.

As to the IBT officers, the district court appropriately found first, that they are not liable under the LMRA for money damages, see 29 U.S.C. § 185(b); Complete Auto Transit, Inc. v. Reis, 451 U.S. 401, 415-17, 68 L. Ed. 2d 248, 101 S. Ct. 1836 (1981), and second, that no equitable relief would be effective or appropriate in these circumstances.

Finally, it was not arbitrary for Local 557 to decline to insist on an endtail. Not only does the contract [*10] expressly authorize a dovetail, there is also no evidence that a different approach on the part of Local 557 would have changed the decision of the Committee.

Local 557 represented employees of both ABF and Carolina Freight, and thus had members who favored each plan. Local 557 handled this dilemma by declining to take a position, stating instead that "the issue of the endtail or the dovetail remains within the confines of the committee and we know your decision will be a fair one." Local 557's president also quoted language from his region's area supplement suggesting that [*5] a dovetail should apply in the case of a merger and an endtail should apply in the case of an acquisition.

After the hearings and several days of negotiations, on September 19, 1995, the Committee approved a uniform dovetail of all employees. The companies approved articles of merger, and ABF began operating using the dovetailed seniority lists. The consolidated company closed several terminals and laid off a number of employees.

After the merger several individuals, including Harry **Gorge**, a member of Local 557 and an ABF employee, filed unfair labor practice charges against ABF and IBT with the National Labor Relations Board (NLRB). The NLRB dismissed these claims.

The ABF employees also challenged the dovetail in grievances with the Committee. Upon consideration of one of the grievances the Committee declared that the September 19 decision was final and binding. The Committee denied that grievance and those of all similarly situated union members.

In February 1996 **Gorge** presented a grievance to a union-management committee for the Maryland/D.C. region. This committee determined that it lacked jurisdiction to review decisions of the Change of Operations Committee and dismissed [*6] the grievance.

**Gorge** and other members of Local 557 then filed suit against IBT, Local 557, ABF, and two IBT officers -- its president and vice-president, Ronald **Carey** and Dennis Skelton -- in the United States District Court for the District of Maryland. **Gorge** charged that ABF broke its collective bargaining agreement and that the IBT, its officers, and Local 557 violated their duty of fair representation under section 301 of the Labor Management Relations Act, 29 U.S.C. § 185 (LMRA). **Gorge** sought back pay, money damages, and the imposition of an endtail. The Judicial Panel on Multi-district Litigation transferred four similar suits to the District of Maryland, and the cases were consolidated. After discovery the district court found for all defendants on cross-motions for summary judgment.

II.

Our review of the briefs and our consideration of the arguments of the parties have revealed that this appeal is without merit. Accordingly, we affirm the judgment of the district court for the reasons stated in that court's thorough opinion.

A.

With regard to the claims against the IBT, plaintiffs' principal argument is that the ABF consolidation was an acquisition, and that the area [*7] supplements therefore required an endtail of the seniority lists of the combining companies. In light of the language of the NMFA and its area supplements, however, the IBT's actions were reasonable.

The "Supplemental Agreements are subject to and controlled by the terms of this Master Agreement." NMFA art. 2, § 2(a); see also, e.g., Md.-D.C. Supp. Agreement, preamble ("[The] Master Agreement shall prevail over the provisions of this Supplement in any case of conflict between the two . . . ."). The master agreement expressly authorizes a dovetail regardless of "whether the transaction is called a merger, purchase, acquisition, sale, etc." NMFA art. 5, § 2(a), (c). Moreover, when freight terminals are combined the Change of

**PER CURIAM:**

Trucking company employees, laid off or reduced in seniority as a result of a merger, sued their employer, their local union, and the International Brotherhood of Teamsters (IBT) and its officers. The employees charged that the method for calculating seniority in the merged corporation violated [*2] their collective bargaining agreement, and that the IBT, its officers, and its locals breached their duty of fair representation. The district court held that the seniority calculation was not inconsistent with the collective bargaining agreement and that the union's actions were not arbitrary. The court therefore granted summary judgment to all defendants on all of the employees' claims. We affirm.

*Holding* ✓

**I.**

In the summer of 1995 Arkansas Best Corporation (ABC), corporate parent of Arkansas Best Freight System, Inc. (ABF), purchased the stock of Worldway Corporation, the parent of Carolina Freight Carriers Corporation and Red Arrow Freight Lines. ABC acquired Worldway's stock through a subsidiary and then merged Carolina Freight and Red Arrow into ABF. ABF, Carolina Freight, and Red Arrow were unionized trucking companies with a total of over 16,000 employees and 500 freight terminals in overlapping regions throughout the United States. With the merger, ABF intended to close several terminals and to lay off a number of workers.

The employees of the three companies were members of local unions affiliated with the IBT. The IBT local unions and ABF, Red Arrow, and Carolina Freight were each [*3] signatories to the National Master Freight Agreement (NMFA), a collective bargaining agreement covering over 100,000 Teamsters in the trucking industry. The NMFA consists of thirty-nine master articles and a number of area supplemental agreements covering particular geographic regions.

The NMFA requires employers who combine their operations to obtain the approval of a Change of Operations Committee (the Committee) made up of an equal number of union and employer representatives. Consistent with this requirement, on September 14 and 15, 1995, ABF and the union convened a Committee and held hearings to consider the consolidation plan for the proposed merger. Approximately 160 local unions participated in the hearings.

Among the issues the Committee considered, and the primary issue in this case, was the seniority treatment of the consolidated workforce. n1 ABF and the union supported different plans. ABF suggested a hybrid plan designed to protect the jobs of current ABF employees. The plan proposed to dovetail only those Carolina Freight and Red Arrow employees into the ABF seniority list that were needed to do the additional work of the combined entity, while the remaining Carolina [*4] Freight and Red Arrow employees would be endtailed. The IBT, on the other hand, claimed that a straight dovetail would be fairest to all of its members. The local unions were split -- some supported a dovetail and some supported an endtail.

*Issue*



- - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - -

n1 Two general methods are used for calculating employee seniority after a consolidation: a "dovetail," in which the seniority lists of the combining companies are merged and each employee's seniority is determined by his actual date of hire; and an "endtail," in which the seniority list of one company is tacked onto the end of the seniority list of the other.

*Definition*

- - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - -

DOUGHERTY; DANIEL E. ZIOLKOWSKI; DAVID J. LEINBACK; THOMAS G. ROSKO; WILLIAM F. GATLING; PETER L. DONOVAN; PAUL A. DOUGLAS; EARL SHOOP; MARYTE WYE; ROBERT HELTEBRIDLE; KENNETH SMITH; WILLIAM TORELLA; CHARLES HERSH; RAY SPAGUE; DAVID HERBER; KENNETH SHUE; HAROLD KOCH; GORDON L. WAGNER; WILLIAM WHITE; HAROLD LYNN; LESTER MILLER; DALE FLOYD; STEPHEN HOBDAY; DAVE LAUDENSLAGER; ROBERT AUKAMP; LYNN KIMBLE; ROBERT SHERICK; DONALD NEIDERMYER; KENNETH SCHELLHAMER; PAUL AMBROSE, JR.; JESSE E. DIXON; RICHARD J. BACHMAN; WILLIAM KELLY; RICHARD LICHTENWALNER; SIDNEY M. GERMAN; RICHARD MOSER; LARRY HALLMAN; DENNIS WANAMAKER; TERRY SILFIES; JOE MUDLOCK; BOB MAKARAVAGI, Plaintiffs-Appellants, v. RONALD **CAREY**, General President of the International Brotherhood of Teamsters; DENNIS SKELTON, Vice-President of the International Brotherhood of Teamsters; INTERNATIONAL BROTHERHOOD OF TEAMSTERS; LOCAL 557, INTERNATIONAL BROTHERHOOD OF TEAMSTERS; ABF FREIGHT SYSTEM, INCORPORATED, Defendants-Appellees.

No. 98-1022

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

1998 U.S. App. LEXIS 32556

October 28, 1998, Argued
December 29, 1998, Decided

**NOTICE:** [*1] RULES OF THE FOURTH CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**SUBSEQUENT HISTORY:** Reported in Table Case Format at: 1998 U.S. App. LEXIS 37632.

**PRIOR HISTORY:** Appeal from the United States District Court for the District of Maryland, at Baltimore. Alexander Harvey II, Senior District Judge. (CA-96-813-H, CA-96-1120).

**DISPOSITION:** AFFIRMED.

**CORE TERMS:** seniority, freight, dovetail, merger, grievance, collective bargaining agreement, endtail, consolidation, consolidated, acquisition, trucking, terminals, duty of fair representation, duty, region, merged, summary judgment, dovetailing, workforce, calculating, combining, covering, combined, stock

**COUNSEL:** ARGUED: Joseph Schiffer Kaufman, SCHULMAN & KAUFMAN, L.L.C., Baltimore, Maryland, for Appellants.

James Arthur McCall, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, Washington, D.C.; Joseph Edward Santucci, Jr., MORGAN, LEWIS & BOCKIUS, L.L.P., Washington, D.C., for Appellees.

ON BRIEF: Steven K. Hoffman, JAMES & HOFFMAN, P.C., Washington, D.C.; Alissa A. Horvitz, Lisa J. Gitnik, MORGAN, LEWIS & BOCKIUS, L.L.P., Washington, D.C., for Appellees.

**JUDGES:** Before WILKINSON, Chief Judge, and LUTTIG and MOTZ, Circuit Judges.

**OPINION: OPINION**

Local Union 375; WAYNE MILLER, Local Union 375; MAURICE DONINI; MIKE MOGAVERO, Local Union 375; EDWARD ALEXANDROVICH; JOSEPH JOHNSON; ROLAND DUQUETTE; LARRY NOONAN, Local Union 375; LEE PELCZNSKI, Local Union 375; RICHARD KUPSELATIS; DARYL LEJEUNE; TOM PHILLIPS, Local Union 375; ROCCO NOTARANGELO; DON PIATEK, Local Union 375; PAUL STARON; PETER STARON; SAM PINTO, Local Union 375; WILLIAM RITCHIE; PETE SCHREIBER, Local Union 375; ROBERT MCLEOD; ROBERT SMITH; SAM SCIUMECA, Local Union 375; BOB SLIWANSKI, Local Union 375; AL CLARKSON; TOM TEREBEEL; GEORGE URBINO, Local Union 375; RAY YAW, Local Union 375; TERRY MCALLISTER; BILL SEIFER; ARNOLD BUTTON, Local Union 649; FRANCIS MULCAHEY; JIM HUNTER, Local Union 649; MARK MULCAHEY; EUGENE LAWRENCE, Local Union 649; TOM FORDHAM; DOUG LENT, Local Union 649; JEFF PIERCE, Local Union 649; HOBAN SANFORD; CRAWFORD **CAREY;** DAVE RACKETT, Local Union 649; JOHN HOPKINS; JOHN B. HART; BOB WAKEMAN; BOB HINES; MIKE HINES; JACK ALVERSON, Local Union 317; WALTER C. ALGER, JR., Local Union 317; STEVE KINDLE; JOSEPH FERENZI; RONALD J. BARNES, Local Union 317; RAY DEMARTNO; ALBERT D. BUSH, Local Union 317; JOHN DEPOTO; ANDREW MONTGOMERY; ROGER W. COSTANZO, Local Union 317; RAY W. COLE, Local Union 317; JOSEPH M. HART; JAMES OBEREMBT; DAVID R. FARRANCE, SR., Local Union 317; LEO FULLER, Local Union 317; TERRY D. GEBMAN, Local Union 317; TED LAND; JAMES GEORGES, Local Union 317; EDWARD M. HENRY, Local Union 317; CHARLES B. HLADUN, Local Union 317; JOSEPH M. LAGUZZA, Local Union 317; THOMAS G. LARMON, JR., Local Union 317; DONALD G. PALMER, Local Union 317; CARLOS J. VENTURA; TIMOTHY H. REED, Local Union 317; WILLIAM ARIAS; TOMASZ BOCHENSKI; GREGORZ BOCHENSKI; DARIUSZ DUDKIEWICZ; KEN EGAN; JOSEPH A. CAPUTO, JR.; THOMAS P. CIAPPIO; TONY KULISH; JIM LEDWITH; THOMAS MCGINLEY; MAUREEN MCLELLAN; ANGELA MELIBRUDA; LEE R. NUTT; JOE PENA; LAWRENCE RYAN; CHARLES A. SOJKA; JAME TRACEY; LORRAINE VENDOLA; WAYNE WEBB; GEORGE A. WOODS; GEORGE BRODBECK; DAVID FABIAN; BLACEY FARINA; GEORGE FIELD; HAROLD SAYNE; ROBERT VOLMAR; ROBERT BLANCHARD; WILLIAM DASKING; THOMAS DONOHUE; DONALD FALCO; CHARLES GRANT; GEORGE KNEER; ALFRED LAURIE; GERRY LEMORE; FRANK PACE; MICHAEL PAWLUKOWICZ; STANLEY ULIKOWSKI; MARTIN WALTERS; FRANK YAGER; JOHN YAPREM; ROBERTA BLOZEN; DANIEL BOYLE; MIKE BYRNES; CHRIS CALABRESE; FRANK DELUCA; WILLIAM EPPS; GREG GIROUX; FRANK GROELING; HAROLD HANSON; ALLAN B. JACOBSON; AUGUST KLEIN; JOHN E. LEWIS; PAUL MISERENDINO; MARTY O'NEILL; HENRY A. PELUSO; JOHN TOLERICO; HERBERT VROEGINDAY; ALLARD ATTMAN; RICHARD COLACICCO; RUDOLPH A. ELMQUIST; MICHAEL FARRELLY; JAMES B. FINAN; GLENN A. GERBOUNKIA; GLENN GRAHAM; RICHARD HINTERSTEIN; EVAN HUGHES; JOHN KOCIBAN; MIKE LEWIS; JOHN S. MANDELA; PETER J. MORRISON; WILLIAM MURPHY; FRANK G. PAHEGHI; WILLIAM K. PARKER; WALTER S. PRZYBYLSKI; FRED QUARTUCCIO; MARK REED; JOSEPH G. STABILE; ANDREW E. STOLTZ; JOHN F. TIEDMANN; WILLIAM VOLK; GORDON WRIGHT; MIKE YAWKOWSKI; CATHY ESSIG; JAMES J. FLESCH; DAVID FRYER; ROBERT D. GROSINSKI; RONALD A. KRYSTOFLAK; PETER MICELI; JOSEPH MOTA; RICHARD MURRAY; ROSE ANN MUSTACHIO; PHILIP V. PECORA; TONY PERROLLI; THOMAS ROY; JAMES SINATRA; DONNA ZURITA; CHARLES D'ANGELO; DANIEL A. DELISA; STEPHEN GIBKI; ANTHONY J. GIGLIO; GEORGE HYDE; LINDA KELLY; JOHN A. KOCH; JAMES T. MCDYER; JAMES P. MEDLEY; PETER M. OZELAS, JR.; PERCY PETERMAN; ROBERT PHILLIPS; KEVIN PISCAL; EDWIN L. TERON; LUDWIG THEN; THOMAS P. BORCHERT; KENNETH EGAN; STEPHEN JOHN FINAN; JAMES KUHL; ANTHONY F. KURC; JOHN MARIANI; ROBERT W. SOEHL; GEORGE M. TERNINKO; KENNETH ZASTOCKI; FRANCIS FARRELL; WILLIAM REILLY; KEVIN RYDER; STUART NEEDLEMAN; DANIEL FEENEY; PAUL BENOIT; HERBERT MCALLISTER; MICHAEL ALLEN; RAYMOND MAKSUT; GARY CORMIER; CARL DOUGHERTY; BILL MOORE; TOM BERNIER; TIMOTHY NILE; ART VEZINA; HARRY CLARK; ALEX F. KLEINER; JAMES J. LINDNER; WILLIAM H. COBB; MICHAEL BERNARD; WILLIAM F. MYCHAYLEW; CLYDE P. BEST; JOHN DOWSE; CHARLES J. HUNTER; JOSEPH W. VELEHOSKI; WILLARD T. MURRAY; THOMAS PRENDERGAST; DENNIS B. ZURAWSKI; WALTER SHEDLOCK; MICHAEL F. MURNIN; ROY L. FOLLWEILER; WALLACE D. WETHERHOLD; LEE A. MENGEL; LEE H. SCHAPPEL; DENNIS A.

s.com(SM) | Search - 100 Results - Gorge et al. v. Ron Carey



1998 U.S. App. LEXIS 32556, *

HARRY **GORGE**; DANIEL WILLIAMS; THOMAS JONES; BILLY KNEE; GEORGE MINOR; KENNETH MOORE; GEORGE BLOOM; RONALD WOMICK; EMANUEL ZIEGLER; JAMES CHANEY; STANLEY JOHNSON; THOMAS WINGROVE; WILEY SMITH; JEROME BRACEY; FRANK MILESKY; DAVID PEARSON; HAVON BIRCHEN; FRED DAHLKE; GEORGE ERHARDT; RANDY GROVES; CHARLEY PARKER; JOE COED; TIM CADY, Local Union 182; WAYNE MITTELSTADT; DOUG DAILY, Local Union 182; LOUIS ALAVA; MOHAMMAD STIF; BARRY HIEN, Local Union 182; TONY PETRELLI, Local Union 182; NELSON CORTOS; MICHAEL DOLAN; ROBERT ROSS, Local Union 182; ERIC GOMEZ; BRUCE SCHILLING, Local Union 182; PATRICK HOLOHAN; ROGER VANSLYKE, Local Union 182; ANTHONY KANCELER; CALVIN BECKER, Local Union 687; THOMAS J. KERSTEN; DAVE BURDICK, Local Union 687; DALE MOSER, Local Union 687; BRUCE KRAMER; WILLIAM MCMANUS; VERNAL PARKS, Local Union 687; RICHARD VERITY; DALE REMINGTON, Local Union 687; PHIL SMITH, Local Union 687; MICHAEL J. CIRINCIONE; BILL KAUFMAN; STEVE BALDES, Local Union 294; AL BISHOP, Local Union 294; ROBERT LAXER; BOS RABIDOUX; RICH KERR; JIM COOPER, Local Union 294; PAT MUSTERIA; JAMES FUDALA; DICK CORMIER, Local Union 294; GARY J. RIEHL; JOE RUSSO; JIM DE RUSSO, Local Union 294; KEVIN SCOTT HARIS, Local Union 294; STEVEN HUBBARD; LES SELF; JOHN STEVENSON; DONALD TENNEY; FRANK KEARNEY, Local Union 294; ARTHUR HEBERT; MIKE LEMIEUX, Local Union 294; THOMAS BERGER; GEORGE MCGARRY; ROBERT BOUWICH; ROMEO LEVESQUE; BOB HYDE; HANK MEAD, Local Union 294; DONALD GOSSELIN; GRAHAM JENKINS; DAVE CLAY; JAMES MILNE, Local Union 294; KEITH KONZEN; MARK IANUZZI; BILL MONTAGUE, Local Union 294; DENNIS MELLO; NORM MORRISSETTE, Local Union 294; WILLIAM LANDY; ROBERT REISER; JOHN NILES, Local Union 294; WILLIAM LEEK; WAYNE PECK, Local Union 294; EDWARD GILLIS; JOHN MONACO; GERRY NAPPI; MIKE SADDLER, Local Union 294; THOMAS FERRARO; RICHARD LENNERTON; JOHN D. OGRASS; LEN TAYLOR, Local Union 294; JOHN PATTON; DAMMON AMESBURY, Local Union 118; WILLIAM CUNHA; DAVID DEMONICO; JOHN SAMUALSEN; FRANK CUTAIAR, Local Union 118; ALBERTO SANTOS; ROBERT ENSMAN, Local Union 118; WILLIAM ALEY; BRUCE REID; EVERETT SCHUMANN; ROBERT FLECK, Local Union 118; JOE VIRUCT; KENNETH GOUGH; PAUL FRITSCH, Local Union 118; WILLIAM WHITMAN; ROBERT LUONGO; JOE GALANTE, Local Union 118; WILLIAM BROCK; LINDA S. ARIAS; RUSSELL GOODENOUGH, Local Union 118; CLARK GRICIOUS, Local Union 118; JOHN R. BECK; JACK IVESTER; EDWARD NEWSOME; RAYMOND J. BITTMAN; JOHN KILEY, Local Union 118; JIM LING, Local Union 118; GLADSTONE BROWN; DAVE SAHRELE, Local Union 118; CHRIS FOWLER; ALEX RANKIN; TERRY SCHEINER, Local Union 118; GEORGE DAVIS; STUART F. ENDRESS; ROB CUNNINGHAM; JULIS SUMIZE, Local Union 118; GERALD JACOVELLI; JOHN AYLWARD; STEVE THAYER, Local Union 118; RONALD WHEELER; BOB TOURVILLE, Local Union 118; MIKE ERELLI; SAM AMICO, Local Union 375; RICK FRANSON; DON BARTON, Local Union 375; TOM GIORDANO; JIM BELL, Local Union 375; PAUL LEAVITT; CHRIS BENNETT, Local Union 375; THEODORE CARR; TONY BETTI, Local Union 375; RICHARD MARTIN; KEITH BLOUNT, Local Union 375; JOHN WASHWELL; TOM BOBAK, Local Union 375; HERMAN SCHARK; CHARLES DAVIS, Local Union 375; PAUL BOYLE; JOHN GREENWOOD; RICH DEPCZYNSKI, Local Union 375; SAM CHIASSON; RICHARD DUBICK, Local Union 375; JAMES ERNEWEIN, Local Union 375; DAVE HOWLAND; CHARLES BATES; RAY GERWITZ, Local Union 375; PAUL BELAIR; PAUL GOLAB, Local Union 375; PAUL VALOIS; DAVID GOOD, Local Union 375; MIKE GRAZER, Local Union 375; HAL TYREE; BOB HARRINGTON, Local Union 375; DON HERZOG; JOHN HASLAM, Local Union 375; FRED CRABBE; PRENTICE HINTON, Local Union 375; EDDIE CASSADY; ROBERT TRAVERS; LARRY HYMAN, Local Union 375; ROBERT VOLLMAR; JAMES BEHAN; THOMAS AULENBACH; BOB JUREK, Local Union 375; KEARNEY, Local Union 375; PHIL MALOUIN; BOB KOCH, Local Union 375; THOMAS FORDHAM; HOBAN SANDFORD JR.; JOSEPH DEFALCO; SAM LEONE, Local Union 375; PETE LOSTRACCO, Local Union 375; FRANCIS J. MULCAHEY; NICK SINOTTE; FRED MCCUBBIN,

**6**



**ABF FREIGHT SYSTEM, INC.**
P. O. Box 10048
Fort Smith, AR 72917-0048
(501) 785-8700

November 9, 1995

Certified Mail No. Z 093 690 533
Return Receipt Requested

Mr. Rickey Bechtel
2072 Locust Lane
Hummelstown, PA 17036

Re:  Article 5, Section 5 Job Offer in Accordance with
     ABF Multi-Region Change of Operations MR-CO-38-9/95

Dear Mr. Bechtel:

In accordance with paragraph 7 of the decision in the above referenced change of operations, on November 8, 1995, you were contacted and offered an opportunity to transfer to permanent employment in your classification at Waco, Omaha, Brattleboro, New Haven, Cedar Rapids, Waterbury, Fairfield, Minneapolis or Newark.

This letter is to confirm that you elected to decline the job offer and to remain in layoff status at Carlisle, PA.

Sincerely yours,

Gordon Ringberg, Director
Industrial Relations

cbf

cc:  John Dale, Vice President-Transportation/Industrial Relations

     Teamsters Local Union No. 776
     Certified Mail No. Z 093 690 525
     Return Receipt Requested

Exhibit (6)

A Subsidiary of Arkansas Best Corporation



 **ABF FREIGHT SYSTEM, INC.**
P. O. BOX 1925
NEW KINGSTOWN, PA. 17072-1925

June 5, 2000

Charles Shughart
TEAMSTERS LOCAL 776
2552 JEFFERSON ST.
HARRISBURG, PA. 17110

Dear Chuck:

Attached is our most current seniority roster you requested in your letter
dated May 24, 2000.  As you are aware, there  is no lay-off list.

Sincerely,

Andy Upchurch
Branch Manager

AU/cf

Exhibit (7)



**ABF**
**Seniority List**

**CAR-04**
**Road & Local**

Date Rev:    **4/30/2000**

| S/N | First Name | Last Name | Class | Ter Sen Date | Co Sen Date |
|-----|------------|-----------|-------|--------------|-------------|
| 1 | Charles | Weddington | R | 16-Jul-68 | 16-Jul-68 |
| 2 | Kenneth | House | R | 03-Jul-69 | 13-Jul-69 |
| 3 | Norman | Sipek | R | 08-Aug-72 | 08-Aug-72 |
| 4 | Roger | Pederson | L | 06-Jan-73 | 06-Jan-73 |
| 5 | Ronald | Langley | R | 15-May-73 | 15-May-73 |
| 6 | Roy | Frazel | L | 17-Aug-73 | 17-Aug-73 |
| 7 | William | Hahn | R | 13-Oct-73 | 13-Oct-73 |
| 8 | Larry | Smith | L | 20-Jun-74 | 20-Jun-74 |
| 9 | Harvey | Carter | R | 05-Jun-77 | 05-Jun-77 |
| 10 | Thomas | Beck | L | 08-Jan-78 | 08-Jan-78 |
| 11 | Horace | Crum | L | 12-Jan-78 | 12-Jan-78 |
| 12 | John | Zerance | L | 15-Jan-78 | 15-Jan-78 |
| 13 | Rich | Webber | R | 15-Jan-78 | 15-Jan-78 |
| 14 | Vincent | Bennett | R | 19-Jan-78 | 19-Jan-78 |
| 15 | Robert | Sanderson | L | 19-Jan-78 | 19-Jan-78 |
| 16 | Willie | Hendrickes | R | 28-Mar-78 | 28-Mar-78 |
| 17 | Patrick | Dinunzio | R | 01-Apr-78 | 01-Apr-78 |
| 18 | Robert | Carolina | R | 09-Apr-78 | 09-Apr-78 |
| 19 | Leonard | Radle | R | 24-Apr-78 | 24-Apr-78 |
| 20 | Robert | Graham | R | 29-Apr-78 | 29-Apr-78 |
| 21 | Roscoe | Lesh | R | 30-Apr-78 | 30-Apr-78 |
| 22 | Glenn | Gauker | R | 03-May-78 | 03-May-78 |
| 23 | Kenneth | Wheeler | R | 04-May-78 | 04-May-78 |
| 24 | Keith | Richard | L | 27-May-78 | 27-May-78 |
| 25 | Harold | Radle | L | 19-Jun-78 | 19-Jun-78 |
| 26 | Donald | Wilt | R | 24-Jun-78 | 24-Jun-78 |
| 27 | John | Roth | R | 08-Jul-78 | 08-Jul-78 |
| 28 | John | Metzger | L | 19-Jul-78 | 19-Jul-78 |
| 29 | Vance | Goodall | R | 09-Oct-78 | 09-Oct-78 |
| 30 | Randy | Fields | L | 09-Dec-78 | 09-Dec-78 |
| 31 | Frank | Reasner | L | 21-Feb-79 | 21-Feb-79 |
| 32 | John | Hoke | L | 21-Feb-79 | 21-Feb-79 |
| 33 | Bradley | Lindsay | L | 10-Mar-79 | 10-Mar-79 |
| 34 | Bruce | Raker | R | 10-Mar-79 | 10-Mar-79 |
| 35 | William | Conklin | R | 11-Mar-79 | 11-Mar-79 |
| 36 | Dwight | Shaver | L | 13-Mar-79 | 13-Mar-79 |
| 37 | Ronald | Cigic | L | 18-Mar-79 | 18-Mar-79 |
| 38 | T. Lee | Boyer | R | 18-Mar-79 | 18-Mar-79 |
| 39 | Dale | Searer | R | 17-Apr-79 | 17-Apr-79 |
| 40 | Ronald | Peffer | R | 03-May-79 | 03-May-79 |
| 41 | Joseph | Hawkins | R | 14-Jun-79 | 14-Jun-79 |
| 42 | Bernard | Nail | L | 23-Jul-79 | 23-Jul-79 |
| 43 | William | Daum | L | 28-Jul-79 | 28-Jul-79 |

| S/N | First Name | Last Name | Class | Ter Sen Date | Co Sen Date |
|---|---|---|---|---|---|
| 136 | Gerald | Held | L | 31-Oct-84 | 31-Oct-84 |
| 137 | Earl | Gates | L | 07-Nov-84 | 07-Nov-84 |
| 138 | Thomas | Reeder | L | 13-Nov-84 | 13-Nov-84 |
| 139 | Edwin | Barsis Jr | R | 25-Jan-85 | 25-Jan-85 |
| 140 | Donald | Sommer | R | 12-Feb-85 | 12-Feb-85 |
| 141 | Steve | Powell | L | 12-Feb-85 | 12-Feb-85 |
| 142 | John | Nelson | L | 16-Feb-85 | 16-Feb-85 |
| 143 | Charles | Forbes | R | 23-Feb-85 | 23-Feb-85 |
| 144 | Carmen | Smith | R | 01-Apr-85 | 01-Apr-85 |
| 145 | Kenneth | Snyder | R | 01-Apr-85 | 01-Apr-85 |
| 146 | Edward | Wertz | R | 01-Apr-85 | 01-Apr-85 |
| 147 | Donald | Hivner | L | 07-May-85 | 07-May-85 |
| 148 | Steven | Ney | R | 07-May-85 | 07-May-85 |
| 149 | Cleon | Detweiler | L | 14-May-85 | 14-May-85 |
| 150 | Burton | Rudy | L | 28-May-85 | 28-May-85 |
| 151 | Edwin | Roberts | R | 20-Jul-85 | 20-Jul-85 |
| 152 | Vernon | Osgood | R | 26-Jul-85 | 26-Jul-85 |
| 153 | John | Scheaffer | R | 05-Aug-85 | 05-Aug-85 |
| 154 | Mahlon | Warfel | R | 08-Aug-85 | 08-Aug-85 |
| 155 | Richard | Dechert | R | 24-Aug-85 | 24-Aug-85 |
| 156 | Darrell | Zerbe | L | 04-Sep-85 | 04-Sep-85 |
| 157 | Donald | Blumenschein | L | 08-Sep-85 | 08-Sep-85 |
| 158 | George | Stokes | R | 11-Sep-85 | 11-Sep-85 |
| 159 | Norman | Munson | L | 19-Sep-85 | 19-Sep-85 |
| 160 | Dale | Lander | L | 06-Oct-85 | 06-Oct-85 |
| 161 | David | Parthemore | R | 25-Oct-85 | 25-Oct-85 |
| 162 | Michael | Hempt | L | 18-Nov-85 | 18-Nov-85 |
| 163 | Dennis | Wilson | L | 15-Dec-85 | 15-Dec-85 |
| 164 | Bernard | Ranker | R | 17-Jan-86 | 17-Jan-86 |
| 165 | Robert F. | Miller | R | 21-Jan-86 | 21-Jan-86 |
| 166 | Paul | New-Day | R | 24-Jan-86 | 24-Jan-86 |
| 167 | Joseph | Cerisano | R | 25-Jan-86 | 25-Jan-86 |
| 168 | Carl | Clark | R | 25-Jan-86 | 25-Jan-86 |
| 169 | David | Burton | L | 25-Jan-86 | 25-Jan-86 |
| 170 | Richard | Hitzler | L | 25-Jan-86 | 25-Jan-86 |
| 171 | David | Giltz | R | 27-Jan-86 | 27-Jan-86 |
| 172 | William | Smith | L | 29-Jan-86 | 29-Jan-86 |
| 173 | Terry | Drawbaugh | L | 30-Jan-86 | 30-Jan-86 |
| 174 | Michael | Bender | L | 02-Feb-86 | 02-Feb-86 |
| 175 | William | Thompson | R | 03-Feb-86 | 03-Feb-86 |
| 176 | Mark | Parquette | L | 04-Feb-86 | 04-Feb-86 |
| 177 | William | Seckman | R | 06-Feb-86 | 06-Feb-86 |
| 178 | Larry | Johnson | R | 08-Feb-86 | 08-Feb-86 |
| 179 | Glen | Pogue | L | 28-Feb-86 | 28-Feb-86 |
| 180 | John | Deslaurier | L | 10-Mar-86 | 10-Mar-86 |
| 181 | Harry | Lockley | R | 10-Mar-86 | 10-Mar-86 |

| S/N | First Name | Last Name | Class | Ter Sen Date | Co Sen Date |
|-----|-----------|-----------|-------|--------------|-------------|
| 182 | Michael | Hoffman | L | 11-Mar-86 | 11-Mar-86 |
| 183 | Harry | McGuire | L | 11-Mar-86 | 11-Mar-86 |
| 184 | Robert | Schrum | L | 12-Mar-86 | 12-Mar-86 |
| 185 | Ken | Mullen | L | 13-Mar-86 | 13-Mar-86 |
| 186 | Jeffrey | Schaeffer | R | 14-Mar-86 | 14-Mar-86 |
| 187 | Thomas | Blatt | R | 14-Mar-86 | 14-Mar-86 |
| 188 | Flint | Mahanes | R | 14-Mar-86 | 14-Mar-86 |
| 189 | Nelson | Alleman | R | 14-Mar-86 | 14-Mar-86 |
| 190 | Jack | Matthews | R | 14-Mar-86 | 14-Mar-86 |
| 191 | Norman | Anderson | L | 14-Mar-86 | 14-Mar-86 |
| 192 | Mark | Hassinger | L | 19-Mar-86 | 19-Mar-86 |
| 193 | Steve | Heckman | L | 19-Mar-86 | 19-Mar-86 |
| 194 | Steve | Silcox | L | 19-Mar-86 | 19-Mar-86 |
| 195 | Merle | Wert | R | 20-Mar-86 | 20-Mar-86 |
| 196 | Robert | Shaffer | R | 23-Mar-86 | 22-Mar-86 |
| 197 | Harry | Baker | L | 02-Apr-86 | 02-Apr-86 |
| 198 | Harold | Raley | R | 05-Apr-86 | 05-Apr-86 |
| 199 | David | Motter | L | 05-Apr-86 | 05-Apr-86 |
| 200 | John | Miller | L | 08-Apr-86 | 08-Apr-86 |
| 201 | Dennis | Meyers | L | 08-Apr-86 | 08-Apr-86 |
| 202 | Charles | Fye | L | 26-Apr-86 | 26-Apr-86 |
| 203 | James | Stafford | R | 04-Jul-86 | 04-Jul-86 |
| 204 | Paxton | Clark | R | 14-Jul-86 | 14-Jul-86 |
| 205 | James | Testerman | R | 26-Jul-86 | 26-Jul-86 |
| 206 | James | Keatts | R | 26-Jul-86 | 26-Jul-86 |
| 207 | Alden | Sours | R | 16-Aug-86 | 16-Aug-86 |
| 208 | Edward | Lawrence | R | 23-Aug-86 | 23-Aug-86 |
| 209 | Jim | Cox | R | 06-Sep-86 | 06-Sep-86 |
| 210 | Dale | McCormick | L | 16-Sep-86 | 16-Sep-86 |
| 211 | Angelo | Mraz | L | 23-Sep-86 | 23-Sep-86 |
| 212 | Charles | Bowers | L | 30-Sep-86 | 30-Sep-86 |
| 213 | Clint | Troutman | L | 20-Oct-86 | 20-Oct-86 |
| 214 | Robert | Huff | L | 20-Oct-86 | 20-Oct-86 |
| 215 | Richard | Uhrin | L | 20-Oct-86 | 20-Oct-86 |
| 216 | Robert | Martin | L | 27-Oct-86 | 27-Oct-86 |
| 217 | Tom | Kough | L | 18-Nov-86 | 18-Nov-86 |
| 218 | Glen | Hershey | R | 25-Nov-86 | 25-Nov-86 |
| 219 | Michael | Osborne | R | 02-Apr-87 | 02-Apr-87 |
| 220 | Ivan Max | Helman | R | 02-Apr-87 | 02-Apr-87 |
| 221 | John | Knadig | R | 02-Apr-87 | 02-Apr-87 |
| 222 | Ronald | Bingaman | R | 02-Apr-87 | 02-Apr-87 |
| 223 | Warren | Batdorf | R | 02-Apr-87 | 02-Apr-87 |
| 224 | Ronald | Morgan | R | 02-Apr-87 | 02-Apr-87 |
| 225 | Paul | Sprankle | R | 21-Apr-87 | 21-Apr-87 |
| 226 | Ron | Hicks | R | 25-Apr-87 | 25-Apr-87 |
| 227 | John | Dobies | R | 01-May-87 | 01-May-87 |

| S/N | First Name | Last Name | Class | Ter Sen Date | Co Sen Date |
|-----|-----------|-----------|-------|-------------|-------------|
| 228 | Harold | Hamilton | L | 04-May-87 | 04-May-87 |
| 229 | Scott | Griffith | R | 29-May-87 | 29-May-87 |
| 230 | Albert | Minnich | R | 05-Jun-87 | 05-Jun-87 |
| 231 | James | Salisbury | R | 20-Jul-87 | 20-Jul-87 |
| 232 | Earl | Deshong | R | 21-Jul-87 | 21-Jul-87 |
| 233 | David | Davis | R | 21-Jul-87 | 21-Jul-87 |
| 234 | Erwin | Demko | R | 21-Jul-87 | 21-Jul-87 |
| 235 | Charles | Moser | R | 10-Aug-87 | 10-Aug-87 |
| 236 | Michael | Davis | R | 15-Aug-87 | 15-Aug-87 |
| 237 | Duane | Stahl | L | 09-Sep-87 | 09-Sep-87 |
| 238 | Amos | Stoneberger | R | 09-Sep-87 | 09-Sep-87 |
| 239 | Eugene | Carnes | R | 06-Oct-87 | 06-Oct-87 |
| 240 | Robert | Knott | L | 09-Oct-87 | 09-Oct-87 |
| 241 | Robert | Baetz | R | 30-Oct-87 | 30-Oct-87 |
| 242 | Daniel | Crusey | L | 02-Nov-87 | 02-Nov-87 |
| 243 | Buddy | Redden | L | 02-Nov-87 | 02-Nov-87 |
| 244 | Blaine | Grove | R | 05-Nov-87 | 05-Nov-87 |
| 245 | Charles | Vaughn | L | 16-Nov-87 | 16-Nov-87 |
| 246 | Walter | Dennis | L | 16-Nov-87 | 16-Nov-87 |
| 247 | Linus | Swegar | R | 29-Nov-87 | 29-Nov-87 |
| 248 | Daniel | Hurrell | R | 05-Jan-88 | 05-Jan-88 |
| 249 | Mark | Stevens | L | 07-Feb-88 | 07-Feb-88 |
| 250 | Earl L. Jr. | Bigler | L | 09-Feb-88 | 09-Feb-88 |
| 251 | Brian | Swope | L | 09-Feb-88 | 09-Feb-88 |
| 252 | William | Leopold | R | 09-Mar-88 | 09-Mar-88 |
| 253 | Richard | Albertini | R | 11-Mar-88 | 11-Mar-88 |
| 254 | Amos | Seiders | L | 11-Mar-88 | 11-Mar-88 |
| 255 | Ronald | Knaub | R | 23-Mar-88 | 23-Mar-88 |
| 256 | Ronney | Conrad | R | 26-Mar-88 | 26-Mar-88 |
| 257 | John | Paduhovich | L | 26-Mar-88 | 26-Mar-88 |
| 258 | David | Reinard | R | 26-Mar-88 | 26-Mar-88 |
| 259 | Gregory | Miracle | R | 03-Apr-88 | 03-Apr-88 |
| 260 | Robert D. | Miller | L | 05-Apr-88 | 05-Apr-88 |
| 261 | Bernard | Beese | L | 07-Apr-88 | 07-Apr-88 |
| 262 | Tom | West | L | 11-Apr-88 | 11-Apr-88 |
| 263 | Timothy H. | Strupp | R | 12-Apr-88 | 12-Apr-88 |
| 264 | David | Newell | L | 16-Apr-88 | 16-Apr-88 |
| 265 | John A. | Winner | R | 16-Apr-88 | 16-Apr-88 |
| 266 | Douglas A. | Goodine | R | 16-Apr-88 | 16-Apr-88 |
| 267 | Michael | Startzman | R | 16-Apr-88 | 16-Apr-88 |
| 268 | Wayne | Burkett | R | 16-Apr-88 | 16-Apr-88 |
| 269 | Charles | Peterman | L | 30-Apr-88 | 30-Apr-88 |
| 270 | James | High | R | 30-Apr-88 | 30-Apr-88 |
| 271 | Jay | Dyarman | L | 30-Apr-88 | 30-Apr-88 |
| 272 | Edward | Spears | R | 06-May-88 | 06-May-88 |
| 273 | Brett | Rininger | L | 07-May-88 | 07-May-88 |

| S/N | First Name | Last Name | Class | Ter Sen Date | Co Sen Date |
|---|---|---|---|---|---|
| 274 | Roderick | Percival | R | 21-May-88 | 21-May-88 |
| 275 | Michael | Lentvorsky | L | 21-May-88 | 21-May-88 |
| 276 | Terry J. | Robinson | R | 18-Jun-88 | 18-Jun-88 |
| 277 | David | Crum | R | 18-Jun-88 | 18-Jun-88 |
| 278 | Robbie C. | Parker | L | 18-Jun-88 | 18-Jun-88 |
| 279 | Randy | Geistwite | L | 21-Jun-88 | 21-Jun-88 |
| 280 | John | Beaston | R | 21-Jun-88 | 21-Jun-88 |
| 281 | Craig | Vogelsong | L | 21-Jun-88 | 21-Jun-88 |
| 282 | Jonas | Smith | L | 21-Jun-88 | 21-Jun-88 |
| 283 | David | Swoyer | L | 21-Jun-88 | 21-Jun-88 |
| 284 | Rod S. | Garman | R | 21-Jun-88 | 21-Jun-88 |
| 285 | Dale | Cruz | L | 21-Jun-88 | 21-Jun-88 |
| 286 | Jeffrey | Funck | L | 23-Jun-88 | 23-Jun-88 |
| 287 | John | Stager | L | 23-Jun-88 | 23-Jun-88 |
| 288 | David S. | Bond | L | 23-Jun-88 | 23-Jun-88 |
| 289 | Harold | Hostetter | R | 23-Jun-88 | 23-Jun-88 |
| 290 | Richard | Paxson | L | 28-Jun-88 | 28-Jun-88 |
| 291 | Donald J. | Ponatoski | R | 28-Jun-88 | 28-Jun-88 |
| 292 | Michael | Sullivan | L | 19-Jul-88 | 19-Jul-88 |
| 293 | Robert | McGugin | L | 03-Aug-88 | 03-Aug-88 |
| 294 | Thomas R. | Grundon | R | 04-Aug-88 | 04-Aug-88 |
| 295 | Larry | McLaughlin | R | 05-Aug-88 | 05-Aug-88 |
| 296 | Scott E. | Bowman | L | 08-Aug-88 | 08-Aug-88 |
| 297 | Christopher J. | Wilkerson | L | 09-Aug-88 | 09-Aug-88 |
| 298 | John M. | Ivanoff | L | 09-Aug-88 | 09-Aug-88 |
| 299 | Gary W. | Martin | R | 09-Aug-88 | 10-Aug-88 |
| 300 | Leroy | Charles | R | 12-Aug-88 | 12-Aug-88 |
| 301 | Terry L. | Heckman | L | 14-Aug-88 | 14-Aug-88 |
| 302 | Don F. | Walker | R | 18-Aug-88 | 18-Aug-88 |
| 303 | James V. | Miller | R | 18-Aug-88 | 18-Aug-88 |
| 304 | Delmas R. | Covert | L | 22-Aug-88 | 22-Aug-88 |
| 305 | James | Kneasel | R | 29-Aug-88 | 29-Aug-88 |
| 306 | Roger | Bouder | L | 02-Sep-88 | 02-Sep-88 |
| 307 | Barry L. | Bupp | L | 12-Sep-88 | 12-Sep-88 |
| 308 | Morris | Brooks | L | 13-Sep-88 | 13-Sep-88 |
| 309 | Jeffrey A. | McCauslin | L | 19-Sep-88 | 19-Sep-88 |
| 310 | Dave | Snyder | L | 21-Sep-88 | 21-Sep-88 |
| 311 | Girard | Deibler | L | 21-Sep-88 | 21-Sep-88 |
| 312 | Dorman L. | Godlove | R | 23-Sep-88 | 23-Sep-88 |
| 313 | James | Robinson | L | 24-Sep-88 | 24-Sep-88 |
| 314 | Frank | Nissel | L | 02-Oct-88 | 02-Oct-88 |
| 315 | Emerson | Morrison | L | 04-Oct-88 | 04-Oct-88 |
| 316 | Roy D. | Hicks | R | 16-Oct-88 | 19-Feb-78 |
| 317 | Jeffrey A. | Nickle | R | 23-Oct-88 | 12-Jun-87 |
| 318 | James B. | Choffel | L | 25-Oct-88 | 25-Oct-88 |
| 319 | Kent | Williard | L | 25-Oct-88 | 25-Oct-88 |

| S/N | First Name | Last Name | Class | Ter Sen Date | Co Sen Date |
|---|---|---|---|---|---|
| 320 | Daniel J. | Maurer | L | 08-Nov-88 | 08-Nov-88 |
| 321 | Charles M. | Edmiston | R | 29-Nov-88 | 29-Nov-88 |
| 322 | Steven | Koncar | L | 13-Dec-88 | 13-Dec-88 |
| 323 | Robert L. Jr. | Browell | L | 26-Dec-88 | 26-Dec-88 |
| 324 | Ross E. | Schell | L | 26-Dec-88 | 26-Dec-88 |
| 325 | Gary L. | Myers | R | 03-Jan-89 | 03-Jan-89 |
| 326 | Edward R. Jr | Glosek | L | 10-Jan-89 | 10-Jan-89 |
| 327 | Walter | Brooks | R | 16-Jan-89 | 16-Jan-89 |
| 328 | John | Fortna | L | 03-Feb-89 | 03-Feb-89 |
| 329 | James | Baker | R | 19-Feb-89 | 19-Feb-89 |
| 330 | Kendall | Pierson | R | 19-Feb-89 | 19-Feb-89 |
| 331 | James | Moody | R | 19-Feb-89 | 19-Feb-89 |
| 332 | James | Thornton | R | 19-Feb-89 | 19-Feb-89 |
| 333 | Warren | Cyrus | R | 19-Feb-89 | 19-Feb-89 |
| 334 | Harold | Cole | R | 19-Feb-89 | 19-Feb-89 |
| 335 | Nathaniel | Herbert | R | 19-Feb-89 | 19-Feb-89 |
| 336 | Frederick | Sipe | R | 19-Feb-89 | 19-Feb-89 |
| 337 | Todd | Stiely | L | 24-Feb-89 | 24-Feb-89 |
| 338 | Mike | Hahn | L | 24-Feb-89 | 24-Feb-89 |
| 339 | Richard | Miller | R | 25-Feb-89 | 25-Feb-89 |
| 340 | Raymond | Aleman | L | 05-Mar-89 | 05-Mar-89 |
| 341 | Allen | Lucas | L | 02-Apr-89 | 02-Apr-89 |
| 342 | Roy | Camasta | L | 02-Apr-89 | 02-Apr-89 |
| 343 | Dave | Kissinger | L | 02-Apr-89 | 02-Apr-89 |
| 344 | Dave | Reckner | L | 02-Apr-89 | 02-Apr-89 |
| 345 | Chester | Lerch | L | 02-Apr-89 | 02-Apr-89 |
| 346 | John | Barbee | R | 03-Apr-89 | 03-Apr-89 |
| 347 | Paul | Lamantia | R | 03-Apr-89 | 03-Apr-89 |
| 348 | Grady | Patterson | R | 03-Apr-89 | 03-Apr-89 |
| 349 | Robert | Mallon | R | 03-Apr-89 | 03-Apr-89 |
| 350 | William | Hyland | R | 04-Apr-89 | 04-Apr-89 |
| 351 | Richard | Bibb | R | 05-Apr-89 | 05-Apr-89 |
| 352 | Peter | Boele | R | 31-Jul-89 | 31-Jul-89 |
| 353 | Jack C. | Leach | L | 03-Dec-89 | 03-Dec-89 |
| 354 | Mike | Miller | L | 03-Dec-89 | 03-Dec-89 |
| 355 | Ray | Hammaker | L | 03-Dec-89 | 03-Dec-89 |
| 356 | Mark | Wilt | L | 05-Dec-89 | 05-Dec-89 |
| 357 | Chris | Fortenbaugh | L | 11-Dec-89 | 11-Dec-89 |
| 358 | Jeffrey K. | Pechart | L | 13-Dec-89 | 13-Dec-89 |
| 359 | Robert A. | Johnson | L | 17-Dec-89 | 17-Dec-89 |
| 360 | Thomas P. | Warcholak | L | 17-Dec-89 | 17-Dec-89 |
| 361 | James G. | Matolyak | L | 07-Jan-90 | 07-Jan-90 |
| 362 | Charles R. | McDermott | L | 07-Jan-90 | 07-Jan-90 |
| 363 | Ronald D. | Wilde | L | 21-Jan-90 | 21-Jan-90 |
| 364 | James | Hunter | R | 03-Feb-90 | 03-Feb-90 |
| 365 | Frank | Weiser | L | 03-Feb-90 | 03-Feb-90 |

| S/N | First Name | Last Name | Class | Ter Sen Date | Co Sen Date |
|-----|-----------|-----------|-------|--------------|-------------|
| 366 | Ronald | Fitch | R | 04-Feb-90 | 04-Feb-90 |
| 367 | Ralph A. | Lovern | R | 09-Feb-90 | 09-Feb-90 |
| 368 | Eric C. | Simmons | L | 18-Feb-90 | 18-Feb-90 |
| 369 | John | Roney | R | 20-Feb-90 | 20-Feb-90 |
| 370 | Samuel S. | Reider | R | 24-Feb-90 | 24-Feb-90 |
| 371 | Michael T. | Rosini | L | 24-Feb-90 | 24-Feb-90 |
| 372 | Richard | Quigley | L | 25-Feb-90 | 25-Feb-90 |
| 373 | James | Fanning | R | 03-Mar-90 | 03-Mar-90 |
| 374 | Philip | Bollman | R | 17-Mar-90 | 17-Mar-90 |
| 375 | Charles | Copeland | R | 18-Mar-90 | 18-Mar-90 |
| 376 | Bob | Haller | L | 01-Apr-90 | 01-Apr-90 |
| 377 | Robert | Laubenstein | L | 01-Apr-90 | 01-Apr-90 |
| 378 | Marc | Abrahams | L | 02-Apr-90 | 02-Apr-90 |
| 379 | Vincent | Johnson | L | 03-Apr-90 | 03-Apr-90 |
| 380 | Carl | Ford | R | 04-Apr-90 | 04-Apr-90 |
| 381 | Carl | Boltz | R | 13-Apr-90 | 13-Apr-90 |
| 382 | Mark | Keiter | L | 24-Apr-90 | 24-Apr-90 |
| 383 | Barry | Murphy | L | 29-Apr-90 | 29-Apr-90 |
| 384 | Eugene | Kennedy | L | 29-Apr-90 | 29-Apr-90 |
| 385 | Larry | Snyder | L | 01-May-90 | 01-May-90 |
| 386 | Terry | Gramm | L | 01-May-90 | 01-May-90 |
| 387 | Joseph | Yontz | R | 01-May-90 | 01-May-90 |
| 388 | Vern | Vandevender | L | 01-May-90 | 01-May-90 |
| 389 | John | Purdue | R | 01-May-90 | 01-May-90 |
| 390 | Donald | Markle | L | 01-May-90 | 01-May-90 |
| 391 | William | Savage | L | 01-May-90 | 01-May-90 |
| 392 | George | Poleshock | L | 01-May-90 | 01-May-90 |
| 393 | James | Carpenter | L | 08-May-90 | 08-May-90 |
| 394 | Darryl | Tait | L | 08-May-90 | 08-May-90 |
| 395 | Ray | Diehl | R | 08-May-90 | 08-May-90 |
| 396 | Nick | Chennault | R | 12-May-90 | 12-May-90 |
| 397 | Roy | Hess | L | 12-May-90 | 12-May-90 |
| 398 | Peter | Kovaschetz | R | 17-May-90 | 17-May-90 |
| 399 | Berlin | Hutson | R | 22-May-90 | 22-May-90 |
| 400 | Al | Rhodes | R | 02-Jun-90 | 02-Jun-90 |
| 401 | Robert | Harbaugh | R | 04-Jun-90 | 04-Jun-90 |
| 402 | Dan | Jones | R | 22-Jun-90 | 22-Jun-90 |
| 403 | Gerald | Fogelsanger | R | 26-Jun-90 | 26-Jun-90 |
| 404 | Kenneth | Springfield | L | 26-Jun-90 | 26-Jun-90 |
| 405 | Blaine | Morrison | L | 26-Jun-90 | 26-Jun-90 |
| 406 | Frank | Dozier | L | 04-Jul-90 | 04-Jul-90 |
| 407 | Charles | Goers | R | 11-Jul-90 | 11-Jul-90 |
| 408 | Harry | Hoover | R | 06-Aug-90 | 06-Aug-90 |
| 409 | Donald | Huss | L | 14-Aug-90 | 14-Aug-90 |
| 410 | Randy | May | L | 14-Aug-90 | 14-Aug-90 |
| 411 | Donald | Wert | R | 20-Aug-90 | 20-Aug-90 |

| S/N | First Name | Last Name | Class | Ter Sen Date | Co Sen Date |
|-----|-----------|-----------|-------|-------------|-------------|
| 412 | John | McKeehan | R | 20-Aug-90 | 20-Aug-90 |
| 413 | Larry | Greenawalt | R | 20-Aug-90 | 20-Aug-90 |
| 414 | Cecil | Tolley | R | 20-Aug-90 | 20-Aug-90 |
| 415 | Danny | Edwards | R | 20-Aug-90 | 20-Aug-90 |
| 416 | Roland | Williams | L | 21-Aug-90 | 21-Aug-90 |
| 417 | Stephen | Michael | L | 21-Aug-90 | 21-Aug-90 |
| 418 | Carl | Shippey | L | 21-Aug-90 | 21-Aug-90 |
| 419 | Bryan | Jarrett | L | 21-Aug-90 | 21-Aug-90 |
| 420 | Clinton | Bishop | L | 21-Aug-90 | 21-Aug-90 |
| 421 | James | Wagner | L | 27-Aug-90 | 27-Aug-90 |
| 422 | Boyd | Welker | L | 28-Aug-90 | 28-Aug-90 |
| 423 | Maynard | Bertolet II | L | 28-Aug-90 | 28-Aug-90 |
| 424 | Garland | Mauck | R | 29-Aug-90 | 29-Aug-90 |
| 425 | Richard | Nagle | R | 07-Sep-90 | 07-Sep-90 |
| 426 | Michael | Bircher | L | 07-Sep-90 | 07-Sep-90 |
| 427 | Scott | Hahn | L | 07-Sep-90 | 07-Sep-90 |
| 428 | Gregory | Harris | L | 18-Sep-90 | 18-Sep-90 |
| 429 | Daniel | Straub | R | 23-Sep-90 | 23-Sep-90 |
| 430 | Paul | Force | L | 23-Sep-90 | 23-Sep-90 |
| 431 | Herman | Kinter | R | 23-Sep-90 | 23-Sep-90 |
| 432 | Garrett | Rager | R | 29-Sep-90 | 29-Sep-90 |
| 433 | Roy | Hicks Jr. | R | 02-Oct-90 | 02-Oct-90 |
| 434 | Ronald | Romanoski | L | 07-Oct-90 | 07-Oct-90 |
| 435 | Brian | Deibler | L | 19-Oct-90 | 19-Oct-90 |
| 436 | Steven | Sanders | L | 19-Oct-90 | 19-Oct-90 |
| 437 | Edward | Fekette | L | 28-Oct-90 | 28-Oct-90 |
| 438 | Dave | Fox | L | 28-Oct-90 | 28-Oct-90 |
| 439 | Doug | Kohr | L | 28-Oct-90 | 28-Oct-90 |
| 440 | Edward | Beard | L | 02-Apr-91 | 02-Apr-91 |
| 441 | Larry | Yohn | L | 02-Apr-91 | 02-Apr-91 |
| 442 | Richard | Hoffman | L | 02-Apr-91 | 02-Apr-91 |
| 443 | Walter T. | Lynch | L | 02-Apr-91 | 02-Apr-91 |
| 444 | Daniel | Linn | R | 02-Apr-91 | 02-Apr-91 |
| 445 | Robert | Burton | L | 02-Apr-91 | 02-Apr-91 |
| 446 | Roland | Ricker | L | 02-Apr-91 | 02-Apr-91 |
| 447 | James | Tracey | L | 02-Apr-91 | 02-Apr-91 |
| 448 | Ronald | Weaver | L | 02-Apr-91 | 02-Apr-91 |
| 449 | Charles | Burk | L | 02-Apr-91 | 02-Apr-91 |
| 450 | Gary | Wagaman | R | 02-Apr-91 | 02-Apr-91 |
| 451 | Gene | Creager | L | 02-Apr-91 | 02-Apr-91 |
| 452 | Michael | Burleson | L | 02-Apr-91 | 02-Apr-91 |
| 453 | Vito | Renno | L | 07-Apr-91 | 07-Apr-91 |
| 454 | Ted | Sechler | R | 26-Jun-91 | 26-Jun-91 |
| 455 | Jack | Worley | R | 26-Jun-91 | 26-Jun-91 |
| 456 | Paul | Whitfield | R | 27-Jun-91 | 27-Jun-91 |
| 457 | Harold | James | R | 28-Jun-91 | 28-Jun-91 |

| S/N | First Name | Last Name | Class | Ter Sen Date | Co Sen Date |
|-----|-----------|-----------|-------|--------------|-------------|
| 458 | Wayne | Gray | R | 28-Jun-91 | 28-Jun-91 |
| 459 | James | Stutzman | R | 02-Jul-91 | 02-Jul-91 |
| 460 | Orville | See, Jr | R | 16-Aug-91 | 16-Aug-91 |
| 461 | Jerell | Crowder | R | 16-Aug-91 | 16-Aug-91 |
| 462 | Richard | Lipps | R | 16-Aug-91 | 16-Aug-91 |
| 463 | John | Heitsenrether | R | 16-Aug-91 | 16-Aug-91 |
| 464 | Cloyd | Myers | R | 30-Aug-91 | 30-Aug-91 |
| 465 | Chester | Grove | R | 30-Aug-91 | 30-Aug-91 |
| 466 | A. G. | Rollman | R | 30-Aug-91 | 30-Aug-91 |
| 467 | Rickey | Baumert | L | 08-Sep-91 | 08-Sep-91 |
| 468 | Dave | Pogue | L | 08-Sep-91 | 08-Sep-91 |
| 469 | Jeff | Kost | L | 08-Sep-91 | 09-Sep-91 |
| 470 | Terry | Starner Sr | R | 21-Sep-91 | 21-Sep-91 |
| 471 | Donald | Yost | R | 21-Sep-91 | 21-Sep-91 |
| 472 | Ronald | Patrick | L | 27-Sep-91 | 27-Sep-91 |
| 473 | Anthony | King | L | 27-Sep-91 | 27-Sep-91 |
| 474 | John | Pellman | L | 27-Sep-91 | 27-Sep-91 |
| 475 | Jari | Whitesel | L | 27-Sep-91 | 27-Sep-91 |
| 476 | John | Hafner | L | 27-Sep-91 | 27-Sep-91 |
| 477 | Brady | Carbaugh | L | 27-Sep-91 | 27-Sep-91 |
| 478 | Charles | Heimbaugh | L | 27-Sep-91 | 27-Sep-91 |
| 479 | David | Bowser | L | 27-Sep-91 | 27-Sep-91 |
| 480 | Michael | Ferry | R | 03-Oct-91 | 03-Oct-91 |
| 481 | Allen | Dixon | R | 03-Oct-91 | 03-Oct-91 |
| 482 | Glenn | Laverty | R | 06-Oct-91 | 06-Oct-91 |
| 483 | Chris | Martin | L | 19-Apr-92 | 19-Apr-92 |
| 484 | Robert | Clouser | L | 24-Apr-92 | 24-Apr-92 |
| 485 | Gerald | Wagaman | L | 24-Apr-92 | 24-Apr-92 |
| 486 | James | Clymer | L | 24-Apr-92 | 24-Apr-92 |
| 487 | Richard | Yost | R | 24-Apr-92 | 24-Apr-92 |
| 488 | Ronald | Fisher | L | 24-Apr-92 | 24-Apr-92 |
| 489 | Paul | Sharp | L | 24-Apr-92 | 24-Apr-92 |
| 490 | Bryan | Copenhaver | L | 16-Jun-92 | 16-Jun-92 |
| 491 | Daniel | Hammaker | R | 28-Jul-92 | 28-Jul-92 |
| 492 | Barry | Theurer | L | 28-Jul-92 | 28-Jul-92 |
| 493 | Donald | Izer | R | 28-Jul-92 | 28-Jul-92 |
| 494 | Jeffrey | Baker | L | 28-Jul-92 | 28-Jul-92 |
| 495 | Dennis | Darr | L | 28-Jul-92 | 28-Jul-92 |
| 496 | William | Cook | L | 04-Aug-92 | 04-Aug-92 |
| 497 | Roger | Mooney | L | 11-Aug-92 | 11-Aug-92 |
| 498 | James | Metzker | R | 15-Aug-92 | 15-Aug-92 |
| 499 | Edwin | Hoch | R | 15-Aug-92 | 15-Aug-92 |
| 500 | Edward | Jones | R | 15-Aug-92 | 15-Aug-92 |
| 501 | Douglas | Harshman | R | 15-Aug-92 | 15-Aug-92 |
| 502 | James | Goodyear | R | 15-Aug-92 | 15-Aug-92 |
| 503 | Jackie | Shanahan | R | 16-Aug-92 | 16-Aug-92 |

| S/N | First Name | Last Name | Class | Ter Sen Date | Co Sen Date |
|-----|-----------|-----------|-------|--------------|-------------|
| 504 | William | Gross | L | 18-Aug-92 | 18-Aug-92 |
| 505 | Robert | Kessler | L | 28-Aug-92 | 28-Aug-92 |
| 506 | Bryan | Miracle | L | 01-Sep-92 | 01-Sep-92 |
| 507 | Lee | Burgett | L | 01-Sep-92 | 01-Sep-92 |
| 508 | Larry | Smith | L | 01-Sep-92 | 01-Sep-92 |
| 509 | Charles | Tranum | R | 11-Sep-92 | 12-Sep-92 |
| 510 | Keith | Miller | L | 13-Oct-92 | 13-Oct-92 |
| 511 | Tom | Priar | L | 13-Oct-92 | 13-Oct-92 |
| 512 | Thomas | Apple | L | 20-Oct-92 | 20-Oct-92 |
| 513 | Brian | Stellar | R | 20-Oct-92 | 20-Oct-92 |
| 514 | Carl | Johnston | L | 27-Oct-92 | 27-Oct-92 |
| 515 | Daniel | Kilheffer | L | 03-Nov-92 | 03-Nov-92 |
| 516 | Kenley | House | L | 26-Apr-93 | 26-Apr-93 |
| 517 | Taft | Hoffman | L | 18-Jun-93 | 18-Jun-93 |
| 518 | Samuel | Reed | R | 16-Jul-93 | 16-Jul-93 |
| 519 | Blain | David | L | 18-Jul-93 | 18-Jul-93 |
| 520 | Quinn | McLaughlin | L | 18-Jul-93 | 18-Jul-93 |
| 521 | Jennifer | Squire | L | 29-Jul-93 | 29-Jul-93 |
| 522 | Wayne | Kline | L | 14-Sep-93 | 14-Sep-93 |
| 523 | Andrew | Kepner | L | 19-Oct-93 | 19-Oct-93 |
| 524 | Jamie | Martin | L | 19-Oct-93 | 19-Oct-93 |
| 525 | Jeff | Keller | R | 20-Oct-93 | 20-Oct-93 |
| 526 | Michael | Sewalk | L | 20-Oct-93 | 20-Oct-93 |
| 527 | Eric | Wise | L | 02-Nov-93 | 02-Nov-93 |
| 528 | Harry | Lingenfelter | L | 02-Nov-93 | 02-Nov-93 |
| 529 | Ronald | Klacik | L | 02-Nov-93 | 02-Nov-93 |
| 530 | Mark | Sayres | R | 02-Nov-93 | 02-Nov-93 |
| 531 | Eugene | Snyder | L | 02-Nov-93 | 02-Nov-93 |
| 532 | Daniel | Daisley | L | 16-Nov-93 | 16-Nov-93 |
| 533 | Robert | Allen | R | 16-Nov-93 | 16-Nov-93 |
| 534 | Joseph | Kenepp | L | 16-Nov-93 | 16-Nov-93 |
| 535 | Douglas | Hechler | L | 16-Nov-93 | 16-Nov-93 |
| 536 | Keith | Johnston | L | 16-Nov-93 | 16-Nov-93 |
| 537 | John | Garland | L | 17-Dec-93 | 17-Dec-93 |
| 538 | Sid | Secrist | L | 19-Dec-93 | 19-Dec-93 |
| 539 | Marlin | Ritter | L | 20-Dec-93 | 20-Dec-93 |
| 540 | Robert | Curran | R | 06-Jan-94 | 23-Aug-93 |
| 541 | Joseph | Gaiski | L | 25-Jan-94 | 25-Jan-94 |
| 542 | Robert | Bansemer | R | 01-Mar-94 | 01-Mar-94 |
| 543 | Donald | Failor | R | 01-Mar-94 | 01-Mar-94 |
| 544 | Henry | Tomkosky | R | 01-Mar-94 | 01-Mar-94 |
| 545 | Donald | Wivell | R | 01-Mar-94 | 01-Mar-94 |
| 546 | George | Prates | L | 22-Mar-94 | 22-Mar-94 |
| 547 | Edward | Margraff | R | 07-May-94 | 07-May-94 |
| 548 | Thomas | Wright | R | 07-May-94 | 07-May-94 |
| 549 | Charles | Craig | R | 07-May-94 | 07-May-94 |

| S/N | First Name | Last Name | Class | Ter Sen Date | Co Sen Date |
|-----|------------|-----------|-------|--------------|-------------|
| 550 | John | Lauver | R | 07-May-94 | 07-May-94 |
| 551 | Howlen | Pottorff, Sr. | R | 07-May-94 | 07-May-94 |
| 552 | Harvey | Hissner | R | 10-May-94 | 10-May-94 |
| 553 | Chester | Taylor | R | 13-May-94 | 13-May-94 |
| 554 | John | Eisley | L | 20-May-94 | 20-May-94 |
| 555 | John | Alleman III | R | 26-May-94 | 26-May-94 |
| 556 | Frederick | Payne | R | 26-May-94 | 26-May-94 |
| 557 | Edward | Waidley | R | 26-May-94 | 26-May-94 |
| 558 | Gerald | Jones | R | 26-May-94 | 26-May-94 |
| 559 | Jay | Crane | L | 09-Jun-94 | 09-Jun-94 |
| 560 | Paula | Klinger | R | 22-Jun-94 | 22-Jun-94 |
| 561 | Peter | Supsic | R | 09-Jul-94 | 09-Jul-94 |
| 562 | John | Drey | L | 24-Jul-94 | 24-Jul-94 |
| 563 | Westley | Lippy | L | 24-Jul-94 | 24-Jul-94 |
| 564 | Howard | Bullock | L | 24-Jul-94 | 24-Jul-94 |
| 565 | John | Estes | L | 26-Jul-94 | 26-Jul-94 |
| 566 | Cindy | Horvath | L | 26-Jul-94 | 26-Jul-94 |
| 567 | Thomas | Daugherty | R | 30-Jul-94 | 30-Jul-94 |
| 568 | Michelle | Neumeister | L | 31-Jul-94 | 31-Jul-94 |
| 569 | Gary | Whitfield | R | 03-Aug-94 | 03-Aug-94 |
| 570 | Sheldon | Pennington | R | 14-Aug-94 | 14-Aug-94 |
| 571 | Charles | Alleman | L | 14-Aug-94 | 14-Aug-94 |
| 572 | Gregory | Hartman | R | 18-Aug-94 | 18-Aug-94 |
| 573 | Dean | Shuman | L | 23-Aug-94 | 23-Aug-94 |
| 574 | Timothy | Wert | R | 26-Aug-94 | 26-Aug-94 |
| 575 | William | Blair | R | 26-Aug-94 | 26-Aug-94 |
| 576 | Robert | Reichert | R | 02-Sep-94 | 02-Sep-94 |
| 577 | Leroy | Negley | R | 02-Sep-94 | 02-Sep-94 |
| 578 | Daniel | Ocker | R | 02-Sep-94 | 02-Sep-94 |
| 579 | Al | Kruger | R | 16-Sep-94 | 16-Sep-94 |
| 580 | Robert | Conroy | R | 16-Sep-94 | 16-Sep-94 |
| 581 | Michael | Seabrooks | R | 19-Sep-94 | 19-Sep-94 |
| 582 | James | Ford | R | 30-Sep-94 | 30-Sep-94 |
| 583 | Daniel | Bowers | R | 30-Sep-94 | 30-Sep-94 |
| 584 | Richard | Stine | L | 05-Oct-94 | 05-Oct-94 |
| 585 | Douglas | Mengle | L | 13-Oct-94 | 13-Oct-94 |
| 586 | Travis | McCulloch | L | 13-Oct-94 | 13-Oct-94 |
| 587 | Michael | Hickey | L | 14-Oct-94 | 14-Oct-94 |
| 588 | John | Yarina | L | 14-Oct-94 | 14-Oct-94 |
| 589 | Ruben | Russell Jr | L | 14-Oct-94 | 14-Oct-94 |
| 590 | Colleen | Finn | L | 14-Oct-94 | 14-Oct-94 |
| 591 | Donald | Long | L | 27-Oct-94 | 27-Oct-94 |
| 592 | Brian | Gerber | L | 27-Oct-94 | 27-Oct-94 |
| 593 | Kenneth | Wynn | L | 27-Oct-94 | 27-Oct-94 |
| 594 | Stephen | Lucas | L | 27-Oct-94 | 27-Oct-94 |
| 595 | Ralph | Rehm | R | 12-Nov-94 | 12-Nov-94 |

| S/N | First Name | Last Name | Class | Ter Sen Date | Co Sen Date |
|---|---|---|---|---|---|
| 596 | Mark | Vallie | R | 12-Nov-94 | 12-Nov-94 |
| 597 | David | Magaro | R | 18-Nov-94 | 18-Nov-94 |
| 598 | Howard | Gouse | L | 22-Nov-94 | 22-Nov-94 |
| 599 | Dorman | Godlove, Jr. | R | 27-Nov-94 | 27-Nov-94 |
| 600 | Larry | Bechtel | L | 20-Jan-95 | 20-Jan-95 |
| 601 | Jo-Ann | Lauffer | L | 21-Jan-95 | 21-Jan-95 |
| 602 | George | Amsbaugh | L | 09-Apr-95 | 09-Apr-95 |
| 603 | Paul | Vandergrift | L | 09-Apr-95 | 09-Apr-95 |
| 604 | Ronald | Snowberger | L | 09-Apr-95 | 09-Apr-95 |
| 605 | Rex | Bragg | L | 09-Apr-95 | 09-Apr-95 |
| 606 | Robert | Yost Jr | L | 09-Apr-95 | 09-Apr-95 |
| 607 | Stephen | Gaiski Jr | L | 09-Apr-95 | 09-Apr-95 |
| 608 | William | Mielke | L | 09-Apr-95 | 09-Apr-95 |
| 609 | Paul | Hall | L | 09-Apr-95 | 09-Apr-95 |
| 610 | Irv | Nelson | L | 09-Apr-95 | 09-Apr-95 |
| 611 | Ronald | Frombaugh | R | 12-Nov-98 | 27-Feb-72 |
| 612 | Gary | Dietz | R | 20-Nov-98 | 25-Aug-75 |
| 613 | Larry | Trollinger | R | 20-Nov-98 | 28-Jul-83 |
| 614 | Michael | Fritz | R | 21-Nov-98 | 22-May-84 |
| 615 | Lawrence | Welker | R | 27-Nov-98 | 20-Sep-73 |
| 616 | Ray | Snyder | R | 27-Nov-98 | 04-Sep-85 |
| 617 | Vincent | Ramirez | R | 27-Nov-98 | 24-May-86 |
| 618 | Carl | Murphy | R | 30-Nov-98 | 20-Apr-83 |
| 619 | Keith | Sgrignoli | R | 05-Dec-98 | 03-Apr-78 |
| 620 | Douglas | Kerstetter | R | 06-Dec-98 | 30-Oct-81 |
| 621 | Ralph | Harris | L | 07-Dec-98 | 09-Sep-84 |
| 622 | Norman | Runk | R | 11-Dec-98 | 24-Apr-84 |
| 623 | Walter | Minich | R | 13-Dec-98 | 07-Jul-75 |
| 624 | Jeffrey | Albright | R | 14-Dec-98 | 09-Apr-88 |
| 625 | Roy | Keck | R | 20-Dec-98 | 02-Mar-88 |
| 626 | Norman | Boire | R | 08-Jan-99 | 26-Aug-85 |
| 627 | Allen | Landis | R | 15-Jan-99 | 03-Nov-75 |
| 628 | Charles | Albright | R | 10-Feb-99 | 18-May-84 |
| 629 | Raymond | Nevins | R | 10-Feb-99 | 02-Nov-87 |
| 630 | Lowell | McGuire | R | 11-Feb-99 | 12-Feb-84 |
| 631 | William | Erdman | R | 11-Feb-99 | 09-Apr-90 |
| 632 | Stanley | Nye | R | 27-Feb-99 | 30-Oct-83 |
| 633 | Roger | Wiles | R | 27-Apr-99 | 27-Apr-99 |
| 634 | Donald | Bixler | R | 27-Apr-99 | 27-Apr-99 |
| 635 | Phillip | Frazer | R | 27-Apr-99 | 27-Apr-99 |
| 636 | Ronald | Mangus | R | 27-Apr-99 | 27-Apr-99 |
| 637 | John | Bosley | R | 27-Apr-99 | 27-Apr-99 |
| 638 | Randall | Hartz | R | 27-Apr-99 | 04-Mar-83 |
| 639 | Roger | Hockensmith | L | 21-May-99 | 21-May-99 |
| 640 | James | Rutter | R | 22-Jun-99 | 22-Jun-99 |
| 641 | David | Albertson | R | 22-Jun-99 | 22-Jun-99 |

| S/N | First Name | Last Name | Class | Ter Sen Date | Co Sen Date |
|-----|-----------|-----------|-------|--------------|-------------|
| 642 | David | Jackson | R | 23-Jun-99 | 23-Jun-99 |
| 643 | Floyd C. | Smith | R | 23-Jun-99 | 23-Jun-99 |
| 644 | Carl | Shoup | R | 23-Jun-99 | 23-Jun-99 |
| 645 | George | Grubbs | R | 23-Jun-99 | 23-Jun-99 |
| 646 | Thomas | Myers | R | 23-Jun-99 | 23-Jun-99 |
| 647 | Terry | Irvin | R | 29-Jul-99 | 29-Jul-99 |
| 648 | Raymond | Hoover | R | 29-Jul-99 | 29-Jul-99 |
| 649 | Ronald | Conrad | R | 29-Jul-99 | 29-Jul-99 |
| 650 | Russell | Reinoehl | R | 05-Aug-99 | 16-Nov-87 |
| 651 | James | Downs | R | 06-Aug-99 | 06-Aug-99 |
| 652 | Stephen | McGinnis | R | 06-Aug-99 | 06-Aug-99 |
| 653 | Dennis | Robinson | R | 06-Aug-99 | 06-Aug-99 |
| 654 | Thurman | Lewis | R | 06-Aug-99 | 06-Aug-99 |
| 655 | William | Noel | R | 06-Aug-99 | 06-Aug-99 |
| 656 | Gordon | Kline | L | 10-Aug-99 | 10-Aug-99 |
| 657 | Nathan | Dravk | L | 17-Aug-99 | 17-Aug-99 |
| 658 | Scott | Fekette | L | 17-Aug-99 | 17-Aug-99 |
| 659 | Irvin | Snyder | R | 18-Aug-99 | 18-Aug-99 |
| 660 | Leo | Weller | R | 18-Aug-99 | 18-Aug-99 |
| 661 | Charles | Zufall | R | 18-Aug-99 | 18-Aug-99 |
| 662 | Duane | Grove | R | 25-Aug-99 | 25-Aug-99 |
| 663 | Keith | McKeever | R | 31-Aug-99 | 31-Aug-99 |
| 664 | Mikel | Sherbo | L | 31-Aug-99 | 31-Aug-99 |
| 665 | Spencer | Lomison | L | 31-Aug-99 | 31-Aug-99 |
| 666 | Howard | Leonti | L | 31-Aug-99 | 31-Aug-99 |
| 667 | Terry | Runshaw | L | 31-Aug-99 | 31-Aug-99 |
| 668 | Chalmer | Edgin | L | 31-Aug-99 | 31-Aug-99 |
| 669 | William | Bowen | L | 31-Aug-99 | 31-Aug-99 |
| 670 | Ronald | Decker | L | 31-Aug-99 | 31-Aug-99 |
| 671 | Curt | Mills | L | 01-Sep-99 | 01-Sep-99 |
| 672 | Douglas | Ebur | R | 08-Sep-99 | 08-Sep-99 |
| 673 | Roderick | Campbell | L | 08-Sep-99 | 08-Sep-99 |
| 674 | Mark J. | Anderson | L | 14-Sep-99 | 14-Sep-99 |
| 675 | Terry | Beaver | R | 26-Sep-99 | 26-Sep-99 |
| 676 | Troy E. | Snyder | L | 28-Sep-99 | 28-Sep-99 |
| 677 | Leon W. | Deihl | L | 28-Sep-99 | 28-Sep-99 |
| 678 | Gary | Kissinger | R | 29-Sep-99 | 09-Aug-87 |
| 679 | Richard | Vrabel | R | 29-Sep-99 | 29-Sep-99 |
| 680 | Michael G. | Hamman | L | 05-Oct-99 | 05-Oct-99 |
| 681 | Clifford | Jones | L | 05-Oct-99 | 05-Oct-99 |
| 682 | Timothy | Miess | R | 07-Oct-99 | 07-Oct-99 |
| 683 | Robert | Reichert, Jr. | R | 27-Oct-99 | 27-Oct-99 |
| 684 | Joel | Sharp | L | 09-Nov-99 | 09-Nov-99 |
| 685 | James | Crone | L | 09-Nov-99 | 09-Nov-99 |
| 686 | Robert | Mallette | R | 16-Nov-99 | 16-Nov-99 |
| 687 | Bengamin | Witmer | R | 17-Nov-99 | 17-Nov-99 |

| S/N | First Name | Last Name | Class | Ter Sen Date | Co Sen Date |
|-----|-----------|-----------|-------|--------------|-------------|
| 688 | Laramie | Cahoj | L | 23-Nov-99 | 23-Nov-99 |
| 689 | Rodney D. | Maus | L | 23-Nov-99 | 23-Nov-99 |
| 690 | Steven | Najdek | L | 14-Dec-99 | 14-Dec-99 |
| 691 | Keith | McPherson | L | 14-Dec-99 | 14-Dec-99 |
| 692 | Bradley | Miller | L | 14-Dec-99 | 14-Dec-99 |
| 693 | Eric | Costella | L | 14-Dec-99 | 14-Dec-99 |
| 694 | Larry | Shultz | R | 29-Dec-99 | 29-Dec-99 |
| 695 | Dallis | Laudenslager | R | 14-Jan-00 | 14-Jan-00 |
| 696 | Mark | Notbohm | R | 14-Jan-00 | 14-Jan-00 |
| 697 | Michael | Irvin | R | 08-Feb-00 | 08-Feb-00 |
| 698 | Charles | Lindeman | R | 01-Mar-00 | 01-Mar-00 |
| 699 | Bruce | Wiker | R | 01-Mar-00 | 01-Mar-00 |
| 700 | John | Moore | R | 01-Mar-00 | 01-Mar-00 |
| 701 | Cecil | Davis | R | 03-Mar-00 | 03-Mar-00 |
| 702 | Larry | Palmer | R | 03-Mar-00 | 03-Mar-00 |
| 703 | Bruce | Groff | R | 07-Mar-00 | 07-Mar-00 |
| 704 | Ronald | Reber | R | 07-Mar-00 | 07-Mar-00 |
| 705 | Robert | Chappel | R | 07-Mar-00 | 07-Mar-00 |
| 706 | Wayne | Tamkin | R | 17-Mar-00 | 15-Mar-00 |
| 707 | Randall | Whitehouse | R | 25-Mar-00 | 25-Mar-00 |
| 708 | Lonnie | Holtzapple | R | 25-Mar-00 | 25-Mar-00 |
| 709 | Duane | Taylor | R | 28-Mar-00 | 28-Mar-00 |
| 710 | Jack | Henry | R | 28-Mar-00 | 28-Mar-00 |
| 711 | Nathan | Kuhns | R | 29-Mar-00 | 29-Mar-00 |
| 712 | Michael | Pitzi | R | 29-Mar-00 | 29-Mar-00 |
| 713 | Glen | Roush | R | 08-Apr-00 | 08-Apr-00 |
| 714 | Dean | Sarver | L | 14-Apr-00 | 14-Apr-00 |
| 715 | Michael | Malosky | L | 14-Apr-00 | 14-Apr-00 |
| 716 | Stuart | Stough | R | 21-Apr-00 | 21-Apr-00 |
| 717 | Kenneth | Davenport | R | 21-Apr-00 | 21-Apr-00 |
| 718 | Edward | Kauffman | L | 01-Jun-00 | 01-Jun-00 |
| 719 | David | Varner | L | 01-Jun-00 | 01-Jun-00 |
| 720 | | | | | |
| 721 | | | | | |
| 722 | | | | | |
| 723 | | | | | |
| 724 | | | | | |
| 725 | | | | | |
| 726 | | | | | |
| 727 | | | | | |
| 728 | | | | | |
| 729 | | | | | |
| 730 | | | | | |
| 731 | | | | | |
| 732 | | | | | |
| 733 | | | | | |

7

**EXHIBIT 17**

PHIL FERRANTE
VICE PRESIDENT
BRAD LINDSAY
RECORDING SECRETARY
HARVEY WHITE
TRUSTEE
MIKE HORD
TRUSTEE
THOMAS VINSON
TRUSTEE

# CHAUFFEURS, TEAMSTERS AND HELPERS
## LOCAL UNION NO. 776

"AFFILIATED WITH THE INTERNATIONAL BROTHERHOOD OF TEAMSTERS"

2552 JEFFERSON STREET, HARRISBURG, PA 17110-2505

BUSINESS AGENTS

CARLOS N. RAMOS, II
CHARLES SHUGHART
ROBERT J. SNYDER, JR.
RUSSELL A. STEPP
DANIEL A. VIRTUE

THOMAS B. GRIFFITH                JOHN L. FOGLE, II
PRESIDENT AND BUSINESS AGENT      SECRETARY TREASURER AND BUSINESS AGENT

June 15, 2000

Rickey Bechtel
2072 Locust Lane
Hummelstown, PA 17036

Ref:    Your Grievance 94530

Dear Rickey:

Be advised, your above referenced grievance is scheduled to be presented at the Eastern Region Grievance Committee during the week of July 24th - 27th. You are welcome and invited to attend.

Whether or not you plan to attend the hearing, I must prepare a written brief to present to the grievance panel. Please contact me to schedule a date that you will be available to review your case and prepare a brief.

At this time, I'm available on the following dates:

June 21st - pm
June 22nd - pm
June 23rd - am
June 27th - all day

Please advise me as soon as possible at 233-8766. If I'm not available, please leave a message.

Enclosed is a copy of the seniority list you requested. I still have not found what would normally be considered a layoff list, but I did find a list that was submitted to the IBT by Carolina to comply with the WARN Act. If it's what you're looking for, you are welcome to a copy.

Sincerely,

Charles Shughart
Business Agent



**EXHIBIT**
Bechtel-19
3-7-02

**EXHIBIT 18**

Subj:  **Brief**
Date:  07/16/2000 9:02:06 PM Pacific Daylight Time
From:  Kjsny70
To:  Hswrestlersdad

Gentlemen,
   In review of the facts which were presented here I would like to summarize what we have discussed. First of all I have a paper from ABFstating that I declined work elsewhere and would remain laid off at Carlisle, Pa ( hold up the paper ). Second contractually I have recall rights for 5 years from date of lay off which was still in effect when I addressed this situation. I was made aware of this situation on February 18,2000 and imediataly proceeded to file this grievance.When the grievance was heard at the local level it was at that point that I was made aware that ABF had hired employees on the local side as far back as 1998 so then I proceeded to send a letter to Mr. Schugart and requested a copy of the April,2000 seniority list from ABF freight at the Carlisle, Pa terminal. This is a copy of the seniority list ( hold the list up ). There is something else that is very important in rendering a decision on this case and that is this document (hold up the court case) which states that the United States court of appeals for the Fourth district heard this case involving this same situation on seniority where the ABF employees had filed against the Carolina Employees claiming the Employees from Carolina should not "DOVETAIL", however the Fourth district court argued the case on October 28,1998 and renderred a decision on the case on December 29,1999. It was docoketed under the title of George,et al v Ron Carey The judges who heard the case were Wilkinson, chief judge, and Luttig and Motz, circuit judges.These judges made the decision that the Carolina Employees will be DOVETAILED into their seniority positions.
   In closing gentlemen I ask that you review all the facts present here and make a decision in favor of me the grievant and I be placed back to work on the local side at ABF Freight at Carlisle,Pa with my original seniority date of February 01, 1986 and for any money due me.
                    Thank You for your time.

**EXHIBIT 19**

PHIL FERRANTE
VICE PRESIDENT
BRAD LINDSAY
RECORDING SECRETARY
HARVEY WHITE
TRUSTEE
MIKE HORD
TRUSTEE
THOMAS VINSON
TRUSTEE

# CHAUFFEURS, TEAMSTERS AND HELPERS
## LOCAL UNION NO. 776
"AFFILIATED WITH THE INTERNATIONAL BROTHERHOOD OF TEAMSTERS"
2552 JEFFERSON STREET, HARRISBURG, PA 17110-2505

THOMAS B. GRIFFITH                JOHN L. FOGLE, II
PRESIDENT AND BUSINESS AGENT      SECRETARY TREASURER AND BUSINESS AGENT

BUSINESS AGENTS

CARLOS N. RAMOS, II
CHARLES SHUGHART
ROBERT J. SNYDER, JR.
RUSSELL A. STEPP
DANIEL A. VIRTUE

November 8, 2000

Rickey Bechtel
2072 Locust Lane
Hummelstown, PA 17036

Ref:  Your Grievance 94530

Dear Rickey:

Your above referenced grievance was presented at the Change of Operations Committee on October 27, 2000.  It was the decision of that Committee that your grievance be denied.

Sincerely,

Charles Shughart
Business Agent



TELEPHONE (717) 233-8766
(800) 692-6280

**EXHIBIT 20**

PHIL FERRANTE
VICE PRESIDENT

BRAD LINDSAY
RECORDING SECRETARY

HARVEY WHITE
TRUSTEE

MIKE HORD
TRUSTEE

THOMAS VINSON
TRUSTEE

# CHAUFFEURS, TEAMSTERS AND HELPERS
## LOCAL UNION NO. 776

*"AFFILIATED WITH THE INTERNATIONAL BROTHERHOOD OF TEAMSTERS"*

2552 JEFFERSON STREET, HARRISBURG, PA 17110-2505

THOMAS B. GRIFFITH
PRESIDENT AND BUSINESS AGENT

JOHN L. FOGLE, II
SECRETARY TREASURER AND BUSINESS AGENT

BUSINESS AGENTS

CARLOS N. RAMOS, II

CHARLES SHUGHART

ROBERT J. SNYDER, JR.

RUSSELL A. STEPP

DANIEL A. VIRTUE

December 28, 2000

Rickey Bechtel
2072 Locust Lane
Hummelstown, PA 17036

Ref:   Grievance 94530

Dear Rickey:

In reply to your letter dated December 6, 2000, it is my understanding that the decision issued by the Change of Operations Committee is final. The grievance procedure does not provide for the appeal of a decision that is issued by a majority of the Committee members.

I have enclosed the papers presented by the Company at the hearing.

Please contact me if you have any questions.

Sincerely,

Charles Shughart
Business Agent



EXHIBIT
Bechtel-29
3-7-02

TELEPHONE (717) 233-8766

# ABF
# EMPLOYER BRIEF

MRC COMMITTEE
CASE NO. ERJAC C-149-00
ABF CASE NO. 042-040-MR-00
LOCAL UNION 776 VS ABF (RICKEY BETCHEL)

The Union is claiming a violation of Article 5, Section 2 of the NMFA. They have not provided the Company with a date for this alleged violation.

I have attached a copy of the article in question. This article deals with "MERGERS OF COMPANIES-GENERAL". Specifically Section 2 © reads in part "IN THE APPLICATION OF THIS SECTION, WHEN TERMINALS OR OPERATIONS OF TWO OR MORE COMPANIES ARE COMBINED. AS REFERRED TO ABOVE. THE FOLLOWING GENERAL RULES SHALL BE APPLIED BY THE EMPLOYER AND LOCAL UNIONS".

In this case there was no merger of terminals in the Carlisle, PA area. Carolina had closed their terminal 5 months before the ABF, Carolina, Red Arrow, Change of Operations. This fact is not in dispute.

Attached is a copy of that Change decision (MR-CO-38-9/95). I would like to review Item #1A with the Committee. As you can see it is very specific about combining terminals and seniority lists affected by the Change. It further reads "EVERY FACILITY WHOSE WORK HAS BEEN MERGED WITH THE WORK OF ANOTHER FACILITY".

Also attached are copies of pages V and -2- of that Change. There is no reference to any Carolina facility in Carlisle, PA because none existed at the time of the Change.

On October 12, 1995 the Union sent the attached letter to all Carolina employees layed off when Carolina closed the Carlisle, PA terminal. This letter reviews the rights of these employees concerning the ABF, Carolina, Red Arrow Change decision. In the Change decision all employees from all three Companies were afforded Article5, Section 5 rights, this included road,

city, mechanics and clerical employees. The former Carolina employees were not afforded Article5, Section 2 rights.

There was no merger of terminals in Carlisle, PA, and Article 5, Section 2 has no application. We respectfully request the claim of the Union be denied.

# ARTICLE 5.

## Section 1. Seniority Rights

(a) The application of seniority which has been accrued herein shall be established in the Supplemental Agreements.

(b) Seniority shall be broken only by discharge, voluntary quit, retirement, or more than a five (5) - year layoff.

(c) This Section shall apply to all Supplemental Agreements.

## Section 2. Mergers of Companies-General

(a) In the event the Employer is a party to a merger of lines, seniority of the employees who are affected thereby shall be determined by mutual agreement between the Employer and the Local Unions involved.

In the application of this Section, it is immaterial whether the transaction is called a merger, purchase, acquisition, sale, etc. Further, it is also immaterial whether the transaction involves merely the purchase of stock of one (1) corporation by another, with two (2) separate corporations continuing in existence.

(b) If such merger of companies results in the combination of terminals or over-the-road operations, a change of operations shall be submitted to the Co-Chairmen of the National Grievance Committee for assignment to an appropriate Change of Operations Committee established pursuant to Article 8, Section 6. The Change of Operations Committee shall retain jurisdiction for one (1) year after the effective date of the Committee decision and shall have the authority to amend its decision in the event of a substantial change in the amount of work to be performed at the terminals or over-the-road operations which were combined.

## Combining of Terminals or Operations as a Result of Merger of Companies

(c) In the application of this Section, when terminals or operations of two (2) or more companies are combined, as referred to above, the following general rules shall be applied by the Employer and the Local Unions, which general rules are subject to modification pursuant to the provisions of Section 4 of this Article:

21

TITAN ELECTRONIC MAIL

09/19/95
15.37 EST
LCL/TERM-ID 373
LCL/TERM-ID TPI                    TPI1
PRINCIPAL OFFICER
001      MSG NMBR 431


THE PRINCIPAL OFFICERS OF THE FOLLOWING LOCAL UNIONS:

7, 20, 24, 26, 40, 41, 43, 50, 75, 89, 92, 100, 116, 120, 135, 147, 160, 164, 200, 215, 236  238, 245, 279, 299, 301, 325, 332, 339, 346, 364, 371, 377, 406, 407, 413, 414, 460, 534, 544, 554, 563, 574, 580, 600, 614, 627, 637, 651, 662, 673, 688, 695, 696, 697, 705, 710, 722, 749, 795, 823, 833, 908, 916, & 957 OF THE CENTRAL REGION

22, 25, 28, 29, 30, 42, 59, 61, 71, 107, 110, 118, 170, 171, 175, 182, 191, 229, 249, 251, 294, 312, 317, 340, 355, 375, 384, 391, 397, 401, 404, 429, 430, 437, 443, 445, 449, 470, 493, 500, 509, 529, 538, 557, 560, 592, 597, 633, 639, 649, 653, 671, 676, 677, 687, 693, 701, 707, 764, 771, 773, 776, 789, 822, & 992 OF THE EASTERN REGION

5, 79, 217, 270, 373, 385, 390, 402, 480, 512, 515, 519, 523, 528, 549, 568, 577, 612, 657, 667, 728, 745, 878, 886, 891, 920, 969, 988, & 991 OF THE SOUTHERN REGION

961 OF THE WESTERN REGION


ABF FREIGHT SYSTEM, INC. — MULTI-REGION CHANGE OF OPERATIONS DECISION IN CASE NO. MR-CO-38-9/95

SISTERS AND BROTHERS:

FOLLOWING IS THE DECISION RENDERED BY THE MULTI-REGION CHANGE OF TIONS COMMITTEE IN THE ABOVE REFERENCED CASE.  UPON RECEIPT OF THIS ION PLEASE COPY AND DISTRIBUTE TO ALL ABF AND CAROLINA FREIGHT SITES FOR IMMEDIATE POSTING:

MULTI-REGION CHANGE OF OPERATIONS COMMITTEE ADOPTED A MOTION THAT OMPANY'S PROPOSED CHANGE OF OPERATIONS BE APPROVED AS MODIFIED LARIFIED BY THE COMPANY ON THE RECORD WITH THE FOLLOWING PROVISOS:

THIS CHANGE OF OPERATIONS INVOLVES A TRANSACTION WITHIN THE MEANING OF ARTICLE 5, SECTION 2(A)-(C) OF THE NMFA:

A.   THE COMMITTEE DIRECTS THAT, IN ACCORDANCE WITH THE PROVISIONS OF ARTICLE 5, SECTION 2(A)-(C), ARTICLE 5, SECTION 3, AND ARTICLE 8, SECTION 6(G) OF THE NMFA, THE SENIORITY LISTS AT DOMICILES AND TERMINALS AFFECTED BY THIS CHANGE OF OPERATIONS SHALL BE GROUPED FOR DOVETAILING AS REFLECTED ON THE EXHIBITS CONTAINED IN THE PROPOSED CHANGE OF OPERATIONS, (AS CLARIFIED OR CORRECTED ON THE RECORD), AND AS PROVIDED IN ARTICLE 5, SECTION 2(C) OF THE NMFA.  DOVETAILING APPLIES TO ALL BARGAINING UNIT EMPLOYEES AFFECTED BY COMBINING OR ELIMINATING

TITAN ELECTRONIC MAIL

```
:: 09/19/95
:. 15.37 EST
   LCL/TERM-ID 373
1. LCL/TERM-ID TPI              TPI1
.  PRINCIPAL OFFICER
:  002    MSG NMBR 431
```

ABF AND CAROLINA FREIGHT CARRIERS/RED ARROW FACILITIES AND
INCLUDES ALL MAINTENANCE AND OFFICE EMPLOYEES. EVERY FACILITY
WHOSE WORK HAS BEEN MERGED WITH THE WORK OF ANOTHER FACILITY
MUST BE GROUPED WITH THAT FACILITY. THIS PARAGRAPH DOES NOT
APPLY TO LOCAL UNIONS 673, 705 AND 710 (DOCK AND OFFICE),
WHICH ARE NOT SIGNATORY TO THE NMFA.

B. DOVETAILING SHALL BE ACTIVE TO ACTIVE, INACTIVE TO INACTIVE, BY
   CLASSIFICATION. THOSE EMPLOYEES WHO WERE ON LETTER OF LAYOFF
   (OR THE EQUIVALENT THEREOF UNDER THOSE SUPPLEMENTS WHERE
   LETTERS OF LAYOFF ARE NOT UTILIZED) ON AUGUST 11, 1995, SHALL
   BE CONSIDERED AS INACTIVE FOR THE PURPOSES OF THIS DECISION,
   EVEN IF THEY HAVE BEEN USED FOR TEMPORARY WORK OR RECALLED
   PRIOR TO THE EFFECTIVE DATE OF THE CHANGE OF OPERATIONS. ANY
   EMPLOYEES LAID OFF AFTER AUGUST 11, 1995, BUT BEFORE THE
   EFFECTIVE DATE OF THE CHANGE OF OPERATIONS SHALL BE CONSIDERED
   TO BE ACTIVE AND SHALL RETAIN THEIR RESPECTIVE POSITIONS ON
   THE DOVETAILED ACTIVE LISTS. ANY EMPLOYEE ON LONG TERM
   DISABILITY SHALL BE CONSIDERED AS ACTIVE IF HIS SENIORITY
   DATE WOULD HAVE PUT HIM/HER ON THE ACTIVE LIST.

C. A MASTER ACTIVE/LAID OFF POOL SHALL BE CREATED AND SHALL
   CONSIST OF THOSE OVER-THE-ROAD DRIVERS WHO WERE ACTIVE ON
   AUGUST 11, 1995, AT EITHER ABF, CAROLINA OR RED ARROW AND
   WHO WERE LAID OFF AS A DIRECT RESULT OF IMPLEMENTATION OF
   THIS CHANGE OF OPERATIONS.

   A MASTER INACTIVE/LAID OFF POOL SHALL BE CREATED AND SHALL
   CONSIST OF THOSE OVER-THE-ROAD DRIVERS WHO WERE IN LAYOFF
   STATUS ON AUGUST 11, 1995, AT EITHER ABF, CAROLINA OR RED
   ARROW, REGARDLESS OF WHY THEY WERE LAID OFF.

   AFTER IMPLEMENTATION, ANY ADDITIONAL JOB OPENINGS AT A ROAD
   DOMICILE WHERE EMPLOYEES IN EITHER POOL ARE ON LAYOFF SHALL
   BE OFFERED IN LINE OF SENIORITY TO SUCH EMPLOYEES FROM THAT
   DOMICILE, FIRST TO EMPLOYEES ON THE MASTER ACTIVE/LAID OFF
   POOL AND THEM TO EMPLOYEES ON THE MASTER INACTIVE/LAID OFF
   POOL.

   JOB OPENINGS AT ANY DOMICILE OTHER THAN WHERE EMPLOYEES ARE
   PRESENTLY LAID OFF SHALL BE OFFERED FIRST, DURING THE WINDOW
   PERIOD, IN LINE OF SENIORITY TO THOSE EMPLOYEES ON THE MASTER
   ACTIVE/LAID OFF POOL AND THEN, IF NOT FILLED, IN LINE OF
   SENIORITY TO THOSE EMPLOYEES ON THE MASTER INACTIVE/LAID OFF
   POOL.

   SUCCESSFUL BIDDERS SHALL RELINQUISH THEIR SENIORITY AT THEIR
   PRESENT ROAD DOMICILE UNDER THIS PROVISION AND SHALL BE
   DOVETAILED WITH THEIR CURRENT BIDLINE SENIORITY DATE AT THE
   ROAD DOMICILE THEY BID. ALL OF THE PROVISIONS OF ARTICLE 8,

09/19/95
15.37 EST
LCL/TERM-ID 373
LCL/TERM-ID TPI                    TPI1
PRINCIPAL OFFICER
003        MSG NMBR 431

SECTION 6 SHALL APPLY TO SUCH TRANSFER.

ANY EMPLOYEE IN EITHER POOL WHO REFUSES THE OFFER OF A WORK OPPORTUNITY UNDER THIS PROVISION SHALL NOT BE OFFERED A SECOND OPPORTUNITY TO TRANSFER BUT SHALL REMAIN ON THE LIST ONLY FOR RECALL TO HIS PRESENT ROAD DOMICILE.

THE WINDOW PERIOD SHALL BE FOR ONE (1) YEAR.  THE COMMITTEE SHALL RETAIN JURISDICTION TO EXTEND THE WINDOW PERIOD IF CIRCUMSTANCES WARRANT.  AS STATED BY ABF ON THE RECORD, THE WINDOW PERIOD SHALL ALSO APPLY TO FULL LOCAL CARTAGE POSITIONS THAT BECOME AVAILABLE AT LOCATIONS WHERE INSUFFICIENT WORK FOR A FULL POSITION WAS ORIGINALLY TRANSFERRED AT THE TIME OF IMPLEMENTATION OF THIS DECISION.  ONLY LOCAL CARTAGE EMPLOYEES FROM THE LOCATION FROM WHICH THE WORK WAS ORIGINALLY TRANSFERRED SHALL BE ELIGIBLE TO FILL SUCH POSITIONS.  THE PROVISIONS OF ARTICLE 8, SECTION 6 SHALL APPLY.

PENSION AND HEALTH & WELFARE CONTRIBUTIONS PAID ON BEHALF OF AN EMPLOYEE TRANSFERRING UNDER THIS DECISION SHALL BE PAID TO THE FUNDS TO WHICH THE CONTRIBUTIONS WERE MADE PRIOR TO THE EMPLOYEE'S CHANGE OF DOMICILE.

ANY REBIDDING SHALL BE HANDLED BY THE LOCAL UNION AND ABF.

SOUTHERN MODIFIED SENIORITY SHALL BE EXCERCISED UPON IMPLEMENTATION OF THE CHANGE OF OPERATIONS.

AN EMPLOYEE REDOMICILING TO AN EASTERN REGION AREA DOMICILE POINT THAT MAINTAINS A SINGLE SENIORITY BOARD (I.E. COMBINATION ROAD AND LOCAL) SHALL REMAIN IN THAT JOB CLASSIFICATION WITH WHICH HE REDOMICILED FOR A PERIOD OF (1) ONE YEAR, UNLESS THE ANNUAL JOB BID AT THAT DOMICILE TAKES PLACE AT LEAST NINE (9) MONTHS AFTER REDOMICILE.

THE FOLLOWING PROVISIONS WILL APPLY TO ANY EMPLOYEE LAID-OFF AS A RESULT OF THIS CHANGE OF OPERATIONS AND TO ANY OTHER EMPLOYEE CURRENTLY LAID-OFF, AND TO ANY EMPLOYEE LAID OFF AFTER THIS CHANGE OF OPERATIONS, FOR THE LIFE OF THE 1994-1998 NMFA:

A.    ABF AGREES TO EXTEND THE PROVISIONS OF ARTICLE 5, SECTION 5 OF THE NMFA TO ANY BARGAINING UNIT EMPLOYEE.  ABF ALSO AGREES TO EXTEND THE RIGHT TO TRANSFER UNDER ARTICLE 5, SECTION 5 OF THE NMFA TO ANY ABF LOCATION IN THE CENTRAL, EASTERN AND SOUTHERN REGIONS, AS OPPOSED TO WITHIN THE REGIONAL AREA. TRANSFERS SHALL BE OFFERED ON THE BASIS OF BIDDING SENIORITY, BY CLASSIFICATION.  THE COMMITTEE APPROVES THESE EXTENSIONS OF THE PROVISIONS OF ARTICLE 5, SECTION 5, AND AGREES THAT SUCH EXTENSIONS ARE LIMITED SOLELY TO THIS CHANGE OF OPERATIONS AND HAVE NO PRECEDENTIAL EFFECT.

TITAN ELECTRONIC MAIL

DATE. 09/19/95
TIME. 15.37 EST
TO.   LCL/TERM-ID 373
FROM. LCL/TERM-ID TPI                    TPI1
FOR.  PRINCIPAL OFFICER
PAGE  004    MSG NMBR 431

B.  PENSION AND HEALTH & WELFARE CONTRIBUTIONS PAID ON BEHALF
    OF AN EMPLOYEE TRANSFERRING UNDER THIS PARAGRAPH SHALL BE
    PAID TO THE FUNDS TO WHICH THE CONTRIBUTIONS WERE MADE PRIOR
    TO THE EMPLOYEE'S CHANGE OF DOMICILE.

8.  QUALIFIED BIDDERS ON LONG TERM DISABILITY (LTD) AT THE TIME OF ANY
    BID SHALL BE ALLOWED TO BID.  IF SUCCESSFUL LTD BIDDERS ARE UNABLE
    TO CLAIM THEIR BID ON THE DATE OF IMPLEMENTATION, A HOLD-DOWN BID
    WILL BE ALLOWED.  THIS HOLD-DOWN BID WILL BE OFFERED TO THE
    REMAINING ACTIVE EMPLOYEES AT THE LTD'S CURRENT LOCATION AND
    CLASSIFICATION.  THE SUCCESSFUL HOLD-DOWN BIDDER SHALL BE
    DOVETAILED.  WHEN THE LTD RETURNS TO WORK AND CLAIMS HIS BID,
    THE "HOLD-DOWN" EMPLOYEE MAY EITHER REMAIN AT THE HOLD-DOWN
    LOCATION UNDER PROVISIONS OF ARTICLE 5, SECTION 5 WITH A BIDDING
    SENIORITY DATE CONSISTENT WITH THE DATE OF IMPLEMENTATION OF THIS
    CHANGE OF OPERATIONS OR RETURN TO HIS ORIGINAL LOCATION WITH HIS
    ORIGINAL BIDDING SENIORITY DATE.  THE "HOLD-DOWN" EMPLOYEE MAY
    NOT RETURN TO A LOCATION WHERE THE CLASSIFICATION FROM WHICH HE
    BID HAS BEEN ELIMINATED.

    ABF SHALL NOT BE RESPONSIBLE FOR THE MOVING EXPENSES OF THE
    EMPLOYEE FILLING THE HOLD-DOWN BID UNLESS AND UNTIL SUCH TIME
    AS IT IS DETERMINED THAT THE EMPLOYEE ON LTD WILL NEVER BE ABLE
    TO CLAIM HIS BID AND THE HOLD-DOWN BIDDER BECOMES A REGULAR
    PERMANENT EMPLOYEE AT THE HOLD-DOWN LOCATION.

9.  IN RESPONSE TO THE QUESTION RAISED BY LOCAL UNION 41 ON THE
    RECORD, THE COMMITTEE SPECIFICALLY FINDS THAT ARTICLE 43, SECTION 1
    OF THE CENTRAL STATES OVER-THE-ROAD AND LOCAL CARTAGE SUPPLEMENTS
    SHALL APPLY IN DETERMINING THE RECALL RIGHTS OF LAID-OFF EMPLOYEES.
10. INTERLINING SHALL BE HANDLED AS FOLLOWS:

    A.  WHERE BOTH ABF AND CAROLINA FREIGHT CARRIERS/RED ARROW ARE
        INTERLINING TO SERVICE AN AREA, ABF MAY CONTINUE TO INTERLINE.

    B.  WHERE ABF IS PRESENTLY SERVICING AN AREA WITH ITS OWN
        EMPLOYEES AND CAROLINA FREIGHT CARRIERS/RED ARROW ARE
        INTERLINING INTO THAT AREA, ABF SHALL CONTINUE TO SERVICE
        THE AREA WITH ITS OWN EMPLOYEES.

    C.  WHERE ABF IS PRESENTLY INTERLINING TO SERVICE AN AREA, AND
        CAROLINA FREIGHT CARRIERS/RED ARROW ARE SERVICING THAT AREA
        WITH THEIR OWN EMPLOYEES, ABF SHALL SERVICE THE AREA WITH
        ITS OWN EMPLOYEES.

    D.  ABF AND THE LOCAL UNIONS SHALL MEET TO RESOLVE ANY DISPUTES
        ABOUT WHETHER INTERLINING IS JUSTIFIED IN THE SITUATIONS
        OUTLINED ABOVE.  IF THE PARTIES FAIL TO RESOLVE THEIR
        DIFFERENCES, THE DISPUTE WILL BE RESOLVED THROUGH THE
        GRIEVANCE PROCEDURE.  UNTIL THERE IS A FINAL DISPOSITION OF

TITAN ELECTRONIC MAIL

TE. 09/19/95
ME. 15.37 EST
.   LCL/TERM-ID 373
OM. LCL/TERM-ID TPI                TPI1
R.  PRINCIPAL OFFICER
GE  005    MSG NMBR 431

THE GRIEVANCE, INTERLINING SHALL CONTINUE IN SITUATIONS
OUTLINED IN SUB-PARAGRAPH A. ABOVE, AND SHALL BE PROHIBITED
IN SITUATIONS OUTLINED IN SUBPARAGRAPHS B AND C, ABOVE.

E.  WHERE ABF PROVIDED LOCAL CARTAGE SERVICE WITHIN A CITY WITH
    LOCAL CARTAGE/DRAYAGE SUBCONTRACTORS, AND CAROLINA FREIGHT
    CARRIERS/RED ARROW SERVICED THAT CITY WITH THEIR OWN
    EMPLOYEES, ABF SHALL SERVICE THE AREA SOLELY WITH ITS OWN
    EMPLOYEES, INCLUDING BUT NOT LIMITED TO THE AREA CURRENTLY
    SERVICED BY LOCAL UNION 707.
THE COMMITTEE FINDS WITH REGARD TO THE CINCINNATI, FLORENCE,
AND DAYTON TERMINALS, THE FOLLOWING SHALL APPLY:

THE CAROLINA, FLORENCE, AND CINCINNATI TERMINAL SENIORITY LISTS
SHALL BE DOVETAILED IN ACCORDANCE WITH CURRENT BIDDING SENIORITY.

DURING THE WINDOW PERIOD, THE FIRST THIRTEEN (13) POSITIONS
ADDED TO THE DAYTON SENIORITY LIST SHALL BE OFFERED IN LINE OF
SENIORITY TO THE CINCINNATI TERMINAL SENIORITY LIST AND THE
SUCCESSFUL BIDDERS SHALL BE DOVETAILED.
THE COMMITTEE FINDS THAT THE ABF INTERMODAL DECISION IN CASE
NO. MR-ICO-1-6/75 WAS BASED ON ABF'S PRESENT AND PROPOSED
INTERMODAL OPERATIONS AT THE TIME OF THE INTERMODAL HEARING,
WHICH OCCURRED BEFORE THE MERGER INVOLVED IN THIS CHANGE OF
OPERATIONS.   THEREFORE, THE COMMITTEE REFERS TO THE NATIONAL
INTERMODAL COMMITTEE THE QUESTION OF WHETHER THE CHANGE OF
OPERATIONS APPROVED BY THE COMMITTEE IN THIS DECISION AFFECTS
THE TERMS OF THE INTERMODAL DECISION IN CASE NO. MR-ICO-1-6/95,
AND IF SO, WHAT MODIFICATIONS SHOULD BE MADE.

AS LONG AS ANY DISPLACED ROAD DRIVER IS ON INVOLUNTARY LAYOFF
STATUS AT DALLAS, TX, THE RESTRICTIONS OF ARTICLE 29, SECTION 1
OF THE NMFA (CLEAN AND DIRTY RULE) SHALL REPLACE THE RAILING
AUTHORITY OF ARTICLE 29, SECTION 3 OF THE NMFA.

THE PROVISIONS OF ARTICLE 29, SECTION 1 SHALL APPLY TO ABF'S NEW
CHICAGO ROAD DOMICILE.

THE COMMITTEE EXPRESSLY DISAPPROVES ABF'S PROPOSAL TO USE VENDORS
TO PERFORM MAINTENANCE WORK WITH MAINTENANCE BARGAINING UNIT
EMPLOYEES ON INVOLUNTARY LAYOFF STATUS.   THE APPLICABLE
COLLECTIVE BARGAINING AGREEMENT OPERATIVE AT THE TIME OF THE
CHANGE OF OPERATIONS SHALL CONTINUE IN EFFECT, INCLUDING THE
CONTRACT'S SUBCONTRACTING PROVISIONS.

ABF SHALL PROTECT THE CAROTRANS WORK OPPORTUNITY PRESENTLY
PERFORMED BY CAROLINA AT JACKSONVILLE, MIAMI, AND HOUSTON WITH
ABF BARGAINING UNIT EMPLOYEES.

AS LONG AS ANY DISPLACED OVER-THE-ROAD DRIVER IS ON INVOLUNTARY

TION ELECTRONIC MAIL

DATE. 09/19/95
TIME. 15.37 EST
TO.   LCL/TERM-ID 373
FROM. LCL/TERM-ID TPI                    TPI1
FOR.  PRINCIPAL OFFICER
PAGE  006    MSG NMBR 431

LAYOFF STATUS AS A RESULT OF THIS CHANGE OF OPERATIONS, THE
COMPANY, ONLY TO THE EXTENT ALLOWED BY AN APPLICABLE SUPPLEMENTAL
AGREEMENT, MAY USE CITY DRIVERS TO RUN THE ROAD, BUT ONLY AT
ESTABLISHED ROAD DOMICILES.  THIS PRACTICE SHALL NOT VIOLATE THE
ESTABLISHED ORDER OF CALL AT THE APPLICABLE ROAD DOMICILE.

.6.   EMPLOYEES WHO HAVE BEEN DISCHARGED, AND WHOSE DISCHARGE IS PENDING
      ADJUDICATION UNDER THE GRIEVANCE PROCEDURE, SHALL BE OFFERED
      THE OPPORTUNITY TO BID.

.7.   UNION AND NON-UNION OFFICE EMPLOYEES SHALL BE DOVETAILED AS SET
      OUT IN PARAGRAPH 1 OF THIS DECISION.  THE UNION EMPLOYEES SHALL
      CONTINUE TO BE COVERED BY ALL PROVISIONS OF THEIR RESPECTIVE
      COLLECTIVE BARGAINING AGREEMENTS, INCLUDING BUT NOT LIMITED TO,
      WAGES AND BENEFITS.  IN ANY CASE WHERE A FUND WILL NOT ACCEPT
      CONTRIBUTIONS FROM ABF FOR UNION EMPLOYEES, THE COMMITTEE WILL
      DETERMINE THE STEPS NECESSARY TO ASSURE THAT ABF PROVIDES BENEFITS
      EQUIVALENT TO THOSE PROVIDED TO SUCH EMPLOYEES BEFORE TRANSFER.

.8.   DOCK EMPLOYEES WHO ARE ADVERSELY AFFECTED BY THIS CHANGE OF
      OPERATIONS AND MUST BE CDL QUALIFIED IN ORDER TO TRANSFER AND
      ELECT TO BID, SHALL BE PROVIDED A 60-DAY PERIOD, COMMENCING
      SEPTEMBER 19, 1995, DURING WHICH PERIOD SUCH EMPLOYEES WILL
      EITHER BECOME CDL QUALIFIED OR FORFEIT ANY RIGHTS TO FILL THE BID
      UNDER THIS DECISION.  DURING THIS PERIOD, ABF IS INSTRUCTED TO
      PROVIDE ADEQUATE EQUIPMENT AND TRAINING PERSONNEL TO COMPLY WITH
      THIS PARAGRAPH.

.9.   AS A RESULT OF LOCAL 25'S HAVING ATTAINED BARGAINING UNIT
      JURISDICTION AT THE BURLINGTON, MASSACHUSETTS FACILITY, WHICH
      RESULTS IN TWO FACILITIES BEING UNDER LOCAL UNION 25'S
      JURISDICTION, THE PROVISIONS OF ARTICLE 43, SECTION 1(A) OF THE
      CURRENT NEW ENGLAND SUPPLEMENTAL FREIGHT AGREEMENT SHALL APPLY.

10.   THE COMMITTEE DIRECTS ABF TO GIVE THE LOCAL UNIONS FULL DETAILS
      CONCERNING ANY 401(K) PLAN COVERING CAROLINA FREIGHT CARRIERS OR
      RED ARROW EMPLOYEES AND TO KEEP IN EFFECT ANY SUCH PLAN, UNTIL
      ABF ESTABLISHES AN EQUIVALENT PLAN.  THE COMMITTEE ALSO DIRECTS
      ABF TO PROVIDE THE LOCAL UNIONS FULL DETAILS REGARDING THE
      PRIOR PENSION PLAN FOR RED ARROW EMPLOYEES.

11.   THE REQUEST OF LOCAL UNION 200 TO ALLOW A MEMBER TO EXERCISE
      COMPANY SENIORITY IS DENIED.

12.   THE ISSUED RAISED BY LOCAL UNION 61 REGARDING THE APPLICABLE
      PEDDLE RADIUS FOR CITY DRIVERS (50 OR 75 MILES) IS REFERRED TO
      THE PARTIES FOR RESOLUTION.  ANY DIFFERENCES WILL BE RESOLVED
      THROUGH THE GRIEVANCE PROCEDURE.

13.   ABF'S REQUEST FOR A TRIAL PERIOD TO DETERMINE FREIGHT FLOW FOR
      BIDDING PURPOSES IS REFERRED BACK TO THE LOCAL UNIONS AND ABF

TITAN ELECTRONIC MAIL

E.  09/19/95
E.  15.37 EST
    LCL/TERM-ID 373
M.  LCL/TERM-ID TPI                    TPI1
.   PRINCIPAL OFFICER
E   007    MSG NMBR 431

FOR RESOLUTION, WITH BIDS TO BE POSTED WITHIN 60 DAYS OF
IMPLEMENTATION, OR SOONER WHEREVER POSSIBLE.

THE COMMITTEE FINDS THAT THERE ARE NO CIRCUMSTANCES THAT WOULD
ALLOW ANY EMPLOYEE WHO HAD RELOCATED UNDER A PREVIOUS CHANGE OF
OPERATIONS DECISION OR UNDER THE PROVISIONS OF ARTICLE 5,
SECTION 5 OF THE NMFA TO RETREAT TO THE EMPLOYEE'S FORMER
TERMINAL/DOMICILE.  ACCORDINGLY, THE REQUESTS BY THE VARIOUS
LOCAL UNIONS TO ALLOW EMPLOYEES TO RETREAT ARE SPECIFICALLY
DENIED.
THIS CHANGE OF OPERATIONS MAY BE IMPLEMENTED NO SOONER THAN
SEPTEMBER 25, 1995.

THIS MULTI-REGION CHANGE OF OPERATIONS COMMITTEE SHALL RETAIN
JURISDICTION ON ALL ISSUES THAT MAY ARISE UNDER THIS DECISION
DURING THE TERM OF THE CONTRACT.  ALL GRIEVANCES SHALL BE FILED
WITH THE APPROPRIATE REGIONAL JOINT AREA COMMITTEE, TO BE HEARD
BY THE MULTI-REGION CHANGE OF OPERATIONS COMMITTEE.

ASE SEND ACKNOWLEDGMENT OF THIS MESSAGE BY TITAN (TITAN TERMINAL
RESS:  IUF2) OR FACSIMILE (202 224-6722).

TERNALLY,

NIS C. SKELTON, DIRECTOR
IONAL FREIGHT DIVISION
 - RON CAREY, CHAIRMAN, TNFINC
 - CHUCK PISCITELLO, ASSISTANT DIRECTOR, NATIONAL FREIGHT DIVISION
 - FRANK BUSALACCHI, ACTING REGIONAL FREIGHT COORDINATOR
   CENTRAL REGION OF TEAMSTERS, C/O TEAMSTERS LOCAL UNION NO. 200
 - DANIEL W. SCHMIDT, REPRESENTATIVE, EASTERN REGION OF TEAMSTERS
 - FRANK HOPKINS, REGIONAL FREIGHT DIVISION COORDINATOR,
   SOUTHERN REGION OF TEAMSTERS, C/O ANNIE HOPKINS, SECRETARY, LOCAL
   UNION NO. 519
 - JIM ROBERTS, REGIONAL FREIGHT DIVISION COORDINATOR
   WESTERN REGION OF TEAMSTERS
 - BOB KNOX, THE GENERAL PRESIDENT'S PERSONAL REPRESENTATIVE
   CENTRAL REGION OF TEAMSTERS
 - JAMES A. MCCALL, IBT LEGAL DEPT.
 - RICK BANK, SPECIAL COUNSEL TO THE GENERAL PRESIDENT

## PROPOSED SENIORITY APPLICATION

The following proposal is based on the general principle that employees who are dovetailed on the date of implementation are those who are bringing work load to follow, so that the list into which they dovetail should not be adversely affected based on the current economic levels.

At common terminal points for local cartage operations, the company will ascertain the work load that ABF can reasonably expect to retain at the time of combining employees. ABF will prepare a Master Active List of its employees and will then prepare a Master Active List of the Carolina employees and the Red Arrow employees, and all three lists will be based on the date this change is implemented. The Company will then offer job opportunity at ABF in numbers equivalent to the work load coming to ABF, by seniority, to the applicable Carolina or Red Arrow Master Active List and they shall be dovetailed into the ABF Master Active List. Those employees on the Carolina or Red Arrow Master Active List who are not offered job opportunity due to insufficient work load to transfer shall remain on such Master Active Seniority List and shall be offered work opportunity as it arises and when permanent job opportunity arises they shall be recalled and dovetailed.

The Company will also establish a Master Inactive List comprised of all employees on lay-off at ABF and Carolina or ABF and Red Arrow on the date this change is implemented. After the Master Active List set forth above has been exhausted, all future job opportunities shall be offered, in line of seniority, to the employees on the Master Inactive List and, upon proper recall, they shall be dovetailed into the Master Active List.

At all other ABF locations which involve Carolina or Red Arrow employees, the same general principle shall apply, i.e., only the number of Carolina or Red Arrow employees equivalent to actual work load transferred will be offered to the Carolina or Red Arrow Master Active List on the first day of the combined operations.

The same principle as outlined above shall apply to combining over-the-road seniority lists, office and/or maintenance groups, where appropriate, as well as to transfer opportunity involving any of those respective classifications.

Therefore, as a general rule:

> Where only one (1) of the three (3) companies has a terminal location, the employees at that location will remain as they are. (See Exhibit "A" in the section on local cartage operations.)

> Where there are dual facilities in any one location or area, the aforementioned seniority application will prevail. (See Exhibit "B" in the section on local cartage operations.)

> Where there are apparent exceptions to the general rule, these will be resolved in Exhibit "C" in the section on local cartage operations.

8/24/95

## Exhibit "A"
### Employee Analysis (Single)
### Local Cartage

| Terminal | | ABF Freight | | | Carolina/Red Arrow | | | Empl. |
|---|---|---|---|---|---|---|---|---|
| | | Active | L/O | Total | Active | L/O | Total | Rqmts. |
| ABILENE | TX | 2 | 0 | 2 | | | | 2 |
| AKRON | OH | 19\8 | 0 | 19\8 | | | | 19\8 |
| ALEXANDRIA | LA | 3 | 0 | 3 | | | | 3 |
| AMARILLO | TX | 5 | 0 | 5 | | | | 5 |
| ASHTABULA | OH | 3 | 1 | 4 | | | | 4 |
| BEAUMONT | TX | 5 | 0 | 5 | | | | 5 |
| BENTON HARBOR | MI | 3 | 0 | 3 | | | | 3 |
| BILOXI | MS | 4 | 0 | 4 | | | | 4 |
| BINGHAMPTON | NY | 7 | 0 | 7 | | | | 7 |
| BOWLING GREEN | KY | 3 | 0 | 3 | | | | 3 |
| BROOKLYN PARK | MN | 13 | 0 | 13 | | | | 13 |
| BROWNSVILLE | TX | 4 | 0 | 4 | | | | 4 |
| BRYAN | OH | 3 | 0 | 3 | | | | 3 |
| BUTLER | PA | 4 | 0 | 4 | | | | 4 |
| CADILLAC | MI | 3 | 0 | 3 | | | | 3 |
| CAMP HILL | PA | 96 | ~ | 96 | | | | 62 |
| CANTON | OH | 11 | 2 | 13 | 4 | 0 | 4 | 12 |
| CAPE GIRARDEAU | MO | 8 5 | 0 3 | 8 | | | | 8 5 |
| CARLISLE | PA | 328 | 0 | 328 | | | | 296 |
| CARLLS CORNER | NJ | 1 | 0 | 1 | | | | 1 |
| CEDAR RAPIDS | IA | 8 | 0 | 8 | | | | 8 |
| CHAMPAIGN | IL | 4 | 0 | 4 | | | | 4 |
| CHARLESTON | SC | 5 | 0 | 5 | | | | 5 |
| CHESTER | PA | 21 | 0 | 21 | | | | 21 |
| COLUMBUS | NE | 2 | 0 | 2 | | | | 2 |
| CORPUS CHRISTI | TX | 2 | 0 | 2 | | | | 2 |
| DAYTON | OH | 227 | 0 | 227 | | | | 227 |
| DECATUR | IL | | | | 4 | 2 | 6 | 0 |
| DUBOIS | PA | 4 | 0 | 4 | | | | 4 |
| DULUTH | MN | 2 | 0 | 2 | | | | 2 |
| EAGAN | MN | 20 | 0 | 20 | | | | 20 |
| EAU CLAIRE | WI | 3 | 0 | 3 | | | | 3 |
| EFFINGHAM | IL | 2 | 0 | 2 | | | | 2 |
| EL DORADO | AR | 3 | 0 | 3 | | | | 3 |
| EL PASO | TX | 15 | 0 | 15 | | | | 15 |
| ELGIN | IL | 11 | 0 | 11 | | | | 10 11 |
| ELMIRA | NY | 5 | 0 | 5 | | | | 5 |
| FAIRFIELD | IA | 3 | 1 | 4 | | | | 3 |
| FAIRMONT | WV | 4 | 0 | 4 | | | | 4 |
| FARGO | ND | 3 | 0 | 3 | | | | 3 |
| FAYETTEVILLE | AR | 8 | 0 | 8 | | | | 8 |
| FEDERALSBURG | MD | 5 | 0 | 5 | 5 | 0 | 5 | 5 |
| FLORENCE | KY | | | | 5 | 0 | 5 | 0 |
| FT. SMITH | AR | 11 | 0 | 11 | | | | 11 |
| GRAND ISLAND | NE | 4 | 0 | 4 | | | | 4 |

MAS VINSON
& PRESIDENT

REW C. REILEY
CHNG SECRETARY

VIN HARRIS
STEE

RY L. KING
STEE

NETTE WATERS
STEE

LOCAL UNION NO. 776

AFFILIATED WITH THE

International Brotherhood of Teamsters
2552 JEFFERSON STREET
HARRISBURG, PA 17110-2505

THOMAS B. GRIFFITH
PRESIDENT AND BUSINESS AGENT

DALE H. CRUM
SECRETARY TREASURER AND BUSINESS AGENT

BUSINESS AGENTS

JOHN L. FOGLE
CARLOS N. RAMOS, II
CHARLES SHUGHART
GEORGE F. SMART, SR.
RUSSELL A. STEPP
DANIEL A. VIRTUE

October 12, 1995

Dear Carolina Employee:

   This letter is important.  Please take the time to read it.

   Surely you're aware that ABF and Carolina Freight recently merged their operations. Because of that merger, a change of operations was held on September 14/15, 1995.

   As a result of the decision from the change of operations committee, the Carolina employees who are laid off at Carlisle, Pa will have certain rights to future work opportunities with ABF.  Article 5, Section 5 of the NMFA addresses those rights.  Those work opportunities will be offered to laid off Carolina employees in seniority order.  However, it is necessary that you notify ABF in writing of your desire to be offered available work.

   Enclosed is a form letter and an envelope.  If you desire to be offered available work, you must complete the letter and mail it to ABF **as soon as possible.**  If you desire, you may also draft your own letter instead of using the form letter.  It is your choice to send the letter via regular mail or certified mail.   In either case, I suggest that you keep a copy of the letter as your file copy.

   You should <u>mail the letter to ABF</u> today.  On October 16, 1995, the Company will begin compiling the list of employees who desire available work.

   If you have any questions, please feel welcome to contact us.

                                        Sincerely,


                                        Charles Shughart
                                        Business Agent

*Boire Norman T.*
*(last)      (first)      (m.i.)*

*710 Charles Dr*
*street /P.O. Box*

*Dauphin    Pa    17018*
*(city)      (state)      (zip)*

*717·921·8505    106·32·7194*
*(home phone)    (social security #)*

*10/19/95*
*(date)*

Steve Walters, Terminal Manager
ABF Freight Systems
P.O. Box 1925
New Kingstown, Pa  17072

Ref:   Employment opportunities under Article 5, Section 5 of the NMFA

Dear Mr. Walters:

. . . . . . . . work opportunities that become available at ABF

I am interested in available work at the below areas:  (Mark only one block).

　　　　[X]    Carlisle/Camp Hill, Pa only
　　　　[ ]    All terminals in ABF's system


I am a qualified:   　　[X]    Road Driver
　　　　　　　　　　　[ ]    Jockey
　　　　　　　　　　　[ ]    Dockworker

　　　　　　　　　　　　　　　　　　　　Sincerely,


　　　　　　　　　　　　　　　　　　　　*(Signature)*


(Mail to ABF at above address.)



276

### EASTERN REGION JOINT AREA COMMITTEE

:ablished in accordance with the terms and conditions of the National Master Freight Agreement and the
:NT. PA Supplemental Agreement, entered into by and between the Local Union and carriers engaged in
y Pickup and Delivery and/or Over-the-Road Freight Operations.

DOCKET NO. C-149-00

THE MATTER OF THE DISPUTE BETWEEN

:AMSTERS LOCAL NO. 776
\RRISBURG, PA

SUBMISSION FORM

and

:F FREIGHT SYSTEM, INC.

e, the undersigned, parties to the National Master Freight Agreement and the CENT. PA  Supplemental
:reement, hereby agree to submit the dispute to arbitration under the Rules of Procedure prescribed by
e Eastern Region Joint Area Committee, by virtue of its authority, as set forth in Article 43 and    of
e CENT. PA  Supplemental Agreement, the following:

   On behalf of Rickey Bechtel, Union alleges violation of Article 5; requesting grievant be returned to
   proper seniority with all lost wages, benefits.

:1e undersigned further agree that a majority decision of the Eastern Region Joint Area Committee in the
:ove dispute will be final, conclusive and binding with no appeal and, further, that neither party will
:tempt through any overt acts, to void the decision rendered.

:he undersigned also agree that failure to comply with the decision of a majority of the Committee within
:n (10) days of the date of the decision will result in the loss of all contract rights, privileges and benefits
:1e them under Article 43 of the  CENT. PA  Supplemental Agreement.

:ate          July 25, 2000

:mployer      ABF FREIGHT SYSTEM, INC.          Local Union    776

:gned by      Steven J. Froias, Labor Rels.     Signed by      Charles Shughart, B. A.

## DECISION

   The Panel, in executive session, motion made, seconded and carried that this case is
   referred to the National Multi-Region Change of Operations Violations Committee.
   Cost split.

R. L. SCHAEFFER                          NICHOLAS PICARELLO
Employer Co-Secretary                    Union Co-Secretary

JULY 25, 2000                            JULY 25, 2000
Date                                     Date

Gentlemen,

In review of the facts, which were presented here, I would like to summarize what we have discussed. First of all, I have a paper from ABF stating that I declined work elsewhere and would remain laid off a Carlisle, PA ~~at all times~~. Second, contractually, I have recall rights for 5 years from date of lay off which was still in effect when I addressed this situation. I was made aware of this situation on February 18, 2000 and immediately proceeded to file this grievance. When the grievance was heard at the local level, it was at that point that I was made aware that ABF had hired employees on the local side as far back as 1998 so then I proceeded to send a letter to Mr. Schugart and requested a copy of the April, 2000 seniority list from ABF Freight at the Carlisle, Pa terminal. ~~This is a copy of the seniority list that is still up~~. There is something else that is very important in rendering a decision on this case and that is this document ~~that I put court here~~ which states that the United States court of appeals for the Fourth District heard this case involving this same situation on seniority where the ABF employees had filed against the Carolina Employees claiming the employees from Carolina should not "DOVETAIL", however the Fourth District Court argued the case on October 28, 1998 and rendered a decision on the case on December 29, 1999. It was docketed under the title of George, it al v Ron Carey. The judges who heard the case were Wilkinson, Chief Judge, and Luttig and Motz, Circuit Judges. These judges made the decision that the Carolina Employees will be DOVETAILED into their seniority positions.

In closing, gentlemen, I ask that you review all the facts present here and make a decision in favor of me the grievant and I be placed back to work on the local side at ABF Freight at Carlisle, PA with my original seniority date of February 01, 1986 and for any money due me.

Thank you for your time.

~~Lay off letter Exhibit 1~~

~~Seniority list Exhibit 2~~

~~Court case Exhibit~~ 5

# Earnings Statement

RICKEY A BECHTEL
2072 LOCUST LANE
HUMMELSTOWN    PA 17036

CAROLINA FREIGHT CARRIERS CORPORATION
1201 EAST CHURCH STREET
CHERRYVILLE, NC 28021-0697

| | Period End 05/27/95 | Pay Date 06/08/95 | Check Number 9149533 |
|---|---|---|---|

| | Federal | State | Local | Location |
|---|---|---|---|---|
| Taxable Marital Status: | S | S | S | CF1039 |
| Number of Exemptions: | 0 | 0 | 0 | |

Social Security Number
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

| Earnings | Rate | Hours | This Period | Year to Date |
|---|---|---|---|---|
| ADV VACATIO | 17.7200 | 135.00 | 2,392.20 | 2,392.20 |
| BIRTHDAY | | | | 139.36 |
| CHRSTMAS DA | | | | 278.72 |
| JURY DUTY | | | | 696.80 |
| NEW YEAR DA | | | | 139.36 |
| PERSONAL DA | 17.7200 | 24.00 | 425.28 | 425.28 |
| WORK | | | | 7,525.44 |

| Deductions | This Period | Year to Date |
|---|---|---|
| CARLISLE | 28.17 | 115.96 |
| FIT | 516.40 | 2,168.51 |
| MEDCARE | 40.85 | 168.16 |
| OASDI | 174.68 | 719.02 |
| SDI42 | 3.10 | 12.76 |
| SIT42 | 78.88 | 324.69 |
| CARL. TAX | | 10.00 |
| NATIONAL DR | 1.00 | 15.00 |
| UNION DUES | | 144.00 |

| Totals | Gross Pay | Taxable Wages | Taxes | Deductions | Net Pay |
|---|---|---|---|---|---|
| This Period | $2,817.48 | $2,817.48 | $842.08 | $1.00 | $1,974.40 |
| Year to Date | $11,597.16 | $11,597.16 | $3,509.10 | $169.00 | $7,919.06 |

CF1039
RICKEY A. BECHTEL
2072 LOCUST LANE
HUMMELSTOWN    PA 17036

<table>
<tr><td>TEAMSTERS LOCAL 776<br><br>VS<br><br>ABF FREIGHT SYSTEMS</td><td>Grievance 94532<br>(Thomas Schildt)</td></tr>
</table>

Gentlemen of the Committee:

Grievance number 94532 reads as follows:

*I am filing this grievance due to the fact that I am a laid off ABF employee at Carlisle, PA (see attached letter marked Exhibit A). It has come to my attention that ABF is hiring at the Carlisle, PA terminal and I am filing this because I have not been contacted for any available work opportunities. Under the National Master Freight Agreement that was in effect in 1995 when I was laid off, Article # 5, Section # 2 states that "If additional employees are required after the active list is exhausted, they shall be recalled from such inactive seniority roster and after recall, such employees shall be "dovetailed" into the active seniority roster with their continuous classification (road or city) seniority dates they are currently exercising which shall then be exercised for all purposes".* (Exhibit 1)

Note: The grievant amended the grievance by letter dated April 10, 2000 to include a claim for "all monies due" (Exhibit 2).

The grievant was a full-time dock employee with Carolina Freight at the Carlisle, Pennsylvania breakbulk terminal. His seniority date was January 11, 1988. In May, 1995, Carolina Freight Carriers terminated their breakbulk operations at the Carlisle, Pennsylvania terminal. All remaining employees not previously laid-off were placed on layoff status.

On July 10, 1995, it was announced that ABF Freight Carriers, Inc would acquire Carolina Freight Carriers and Red Arrow Freight Lines. On September 14 and 15, 1995, the issues concerning the change of operations were presented at a meeting held in Chicago. At the change of operations, Local 776 addressed concerns about the previously laid off employees at the Carolina terminal at Carlisle (Exhibit 3).

Mr. Schildt has filed this grievance, claiming that ABF is violating the term of Article 5, Section 2 (of the 94 - 98 NMFA). That language reads as follows:

> *In addition, the inactive seniority rosters (employees who are on letter of layoff) shall be similarly "dovetailed" by appropriate classification. If additional employees are required after the active list is exhausted, they shall be recalled from such inactive seniority roster and after recall such employees shall be "dovetailed" into the active seniority roster with their continuous classification (road or city) seniority dates they are currently exercising which shall then be exercised for all purposes. Seniority rosters previously combining job classifications shall be continued unless otherwise agreed.*

Obviously, Mr. Schildt was on a letter of layoff from Carolina Freight at the time the ABF merger / acquisition took place. When that occurred, it would seem that ABF assumed the debts, liabilities and contractual obligations previously held by Carolina Freight. One aspect of those contractual obligations is the recall rights of Carolina employees who were previously placed in layoff status by Carolina. As such, Mr. Schildt should by entitled to recall rights under Article 5, Section 2.

Should there be any question that Mr. Schildt was on layoff from ABF, the attached letter (Exhibit 4) clearly indicates his layoff status. It reads in part:

> *This letter is to confirm that you elected to decline the job offer and to remain in **layoff** status at Carlisle, PA*

Attached is a copy of a seniority list from the ABF at Carlisle, Pennsylvania (Exhibit 5). As can be determined from the list, ABF has hired 84 employees who have a seniority date of April, 1999 or later. Approximately 30 of those individuals work in the dock / local classification.

In view of the clear and undisputable facts related to this grievance, we respectfully request that the Committee uphold the claim of the grievant.

Respectfully Submitted

Charles Shughart
Business Agent

# EXHiBiT #4

THOMAS M SCHILDT
5486 BEAGLE ROAD
ELIZABETHTOWN    PA 17022

## Earnings Statement

| | Period End | Pay Date | Check Number | Location |
|---|---|---|---|---|
| | 03/18/95 | 03/30/95 | 9085846 | |

CAROLINA FREIGHT CARRIERS CORPORATIO
1201 EAST CHURCH STREET
CHERRYVILLE, NC 28021-0697

| Social Security Number | Taxable Marital Status: | Federal | State | Local | Location |
|---|---|---|---|---|---|
| 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 | Number of Exemptions: | M | M | M | CF1039 |
| | | 3 | 3 | 3 | |

| Earnings | Rate | Hours | This Period | Year to Date |
|---|---|---|---|---|
| BIRTHDAY | | | | 139.36 |
| CHRSTMAS DA | | | | 278.72 |
| NEW YEAR DA | | | | 139.36 |
| SICK | | | | 278.72 |
| WORK | 17.4200 | 7.00 | 121.94 | 4,442.10 |

| Deductions | This Period | Year to Date |
|---|---|---|
| CARLISLE | 1.22 | 52.79 |
| FIT | | 452.66 |
| MEDCARE | 1.76 | 76.53 |
| OASDI | 7.56 | 327.25 |
| SDI42 | 0.14 | 5.81 |
| SIT42 | 3.41 | 147.78 |
| CARL TAX | | 10.00 |
| NATIONAL DR | 1.00 | 9.00 |
| UNION DUES | | 72.00 |

| | Gross Pay | Taxable Wages | Taxes | Deductions | Net Pay |
|---|---|---|---|---|---|
| Totals This Period | $121.94 | $121.94 | $14.09 | $1.00 | $106.85 |
| Year to Date | $5,278.26 | $5,278.26 | $1,062.82 | $91.00 | $4,124.44 |

CF1039
THOMAS M SCHILDT
5486 BEAGLE ROAD
ELIZABETHTOWN    PA 17022