IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RICKEY A. BECHTEL,<br>  Plaintiff | : | |
| | : | |
| v. | : | No. 1:01-CV-789 |
| | : | |
| | : | Judge Sylvia H. Rambo |
| DANIEL VIRTUE, Business Agent of the<br>International Brotherhood of Teamsters;<br>INTERNATIONAL BROTHERHOOD<br>OF TEAMSTERS; LOCAL 776;<br>INTERNATIONAL BROTHERHOOD<br>OF TEAMSTERS; and ABF FREIGHT<br>SYSTEM, INCORPORATED,<br>  Defendants | : | |

### PLAINTIFF'S RESPONSE TO DEFENDANT UNIONS' STATEMENT OF [UNDISPUTED] MATERIAL FACTS

AND NOW comes Plaintiff, Rickey A. Bechtel, by and through his attorney, Robert S. Mirin, Esquire, and in the context of the pending motions for Summary Judgment presently before the Court, provides herewith its response to Defendant Unions' Statement of Material Facts and in support thereof states as follows:

1. ADMITTED.

2. ADMITTED.

3. ADMITTED. By way of further response, it is noted that Plaintiff, as a "yard jockey" should have appeared on the master seniority list (Exhibit 8 of Defendant Unions' supporting exhibits) and a master lay off list for the Carlisle terminal, which included, by company seniority, both platform yard jockeys, under the designation L, and over the road drivers, under the designation R. As can be seen from an examination of Defendant Union's Exhibit 8; there is an admission by the branch manager for ABF that



both the union and the company failed maintain the layoff list and inferentially failed to have any layoff mechanism to implement the contractual right of laid off Carolina Freight employees to recall during a five (5) year period.

4.  ADMITTED.

5.  ADMITTED. By way of further response, it is noted that laid-off Carolina Freight employees retained recall rights as laid off employees of ABF for five (5) years from the date of the layoff, although the initial layoff was from Carolina Freight.

6.  IT IS ADMITTED that among other options employees covered by the National Master Freight Agreement were either laid off, offered employment at one of Carolina Freight's other facilities, or offered ABF employment. By way of further response, shortly after Carolina Freight closed down all of its operations, Carolina Freight employees, in layoff status, were ostensibly advised that their layoff rights were transferred to ABF Freight seniority roster.

7.  The Defendant's Statement of Material Facts did not contain averment numbered as 7.

8.  ADMITTED.

9.  ADMITTED. By way of further response, Article 5 §5 reads as follows:

> Article 5 §5 Work Opportunity - Over-the-Road employees who are in letter of layoff shall be given an opportunity to transfer to permanent over-the road employment prior to the employment of new hires occurring at the over-the-road domiciles of the employer located within the conference area, provided they notify the employer in writing of their interest in a transfer opportunity. The offer of transfer will be made in the order of continuous over-the road seniority of the laid-off drivers domiciled within the conference area. The employer shall be required to make additional offers of transfer to an employee who has previously rejected a transfer opportunity provided the employee again

> notifies the employer in writing of his/her continued interest in additional transfer opportunities. However, the employer will only be required to make one transfer offer in any six (6) calendar month. An employee accepting such offer shall be employed as a "new hire" and shall be placed at the bottom of the seniority board for bidding and layoff purposes, but shall retain company seniority for fringe benefits only. A transferring employee shall pay his/her own moving expenses and shall, upon reporting to such new domicile, be deemed to have relinquished his/her rights to return with seniority to the domicile from which he/she transferred...

Plaintiff contends that returning from lay off status to Carlisle was not a transfer, as it involved the same terminal as Bechtel had been employed at as a Carolina Freight employee. The complicated seniority provisions of Article 5 and the provisions in place at the time of the closing of the Carlisle terminal, and subsequently when the entire Carolina Freight operation was merged, are set forth as an exhibit to Plaintiff's submissions. Furthermore, at the time of various meetings with local union agents and representatives, as well as company officials, employees were not told they had to provide written notification of their continuing interest in their return from layoff status. Thus, actual procedure, as explained to Plaintiff and others, indicated only that employees would retain five (5) years of layoff/recall rights.

 10. ADMITTED.

 11. ADMITTED. At page 3 of Defendant Unions' Statement of [Undisputed] Material Facts, there appears in footnote 1 it is not specifically Article 8 Section 6 of the Change of operations in the National Master Freight Agreement is set forth in Defendant Union exhibits. Thus, as to the text of the footnote. While the 1995 change of operation decision appears to extend the provisions of Article 5 Section 5 concerning reinstatement to any bargaining unit employee (including layoff Carolina Freight employees) Plaintiff had been given to understand that the "life" of a change

of operation committee and change of operation decision was jurisdictionally limited to a 12 month period.

12. ADMITTED

13. ADMITTED  However, by way of further response, it is noted that by declining the job offers tendered to him in 1995; Plaintiff Bechtel was given to understand that he did not lose any of his recall rights during the ensuing 5 year period.

14. AGREED

15. It is agreed that the grievance path under the National Freight Agreement. In the agreement enforced at the time of the Plaintiff's layoff, provided for a grievance pattern as followed in the case of <u>Albright v. Daniel Virtue</u>. on this courts docket at 1:CV-00-878 (i.e. There was an appeal from the joint area committee decision on a grievance, and to the Eastern Conference with appeal rights.) See Exhibit Q. Furthermore, it is noted that Article 5 under which the layoff rights were conferred, unreservedly provided that "seniority would continue unless there was a layoff in excess of 5 years" (see Article 5 Section 1(b) of the 1994-1998 National Master Freight Agreement). [The text of Article 5 Section 1] It is noted, <u>passim</u> that the content of Article 8 Section 6 of the current labor agreement is cited incompletely at page 101 of the supporting exhibits of Defendant Unions and Defendant Daniel Virtue, and the content of the provided portions of Exhibit G to the Shughart affidavit do not read as indicated in the "Undisputed" Material Facts as explained at paragraph 15 of the Unions' Statement of [Undisputed] Material Facts.  Plaintiff submits that the operation of Article 8 Section 6 in the current agreement, which runs from 1998 to 2003, does not have retroactive effect on his rights under the National Master Freight Agreement, as enforced at that

time.. It is controverted that the Change of Operations Article 8 Section 6 reflected in the current labor agreement has retroactive effect on change of operations that were completed and jurisdictionally complete under the prior labor agreement.

16. ADMITTED

17. ADMITTED. However, by way of further response, Plaintiff believes that the referral of his grievance to change of operations violations committee is based upon improper considerations which his lawyer characterizes as invidious considerations predicated upon political issues and considerations arising from the fact that he was a Carolina Freight employee, and motivated by Defendants' desire to avoid and evade the contractually guaranteed rights given him at the time of his layoff.

18. Controverted as stated. It is controverted that the discretionary decisions and application of a subsequent collective bargaining agreement to Rickey Bechtel's grievance, as in accordance with the terms and provisions of the Parties supplemental agreement, the duty of fair representation or the obligation under <u>DelCostello</u> to properly administer labor agreements by there terms in good faith and noninvidious fashion.

19. ADMITTED. By way of further response, it is noted that the Union and its business agents are totally in control of the processing of a grievance once it is lodged by an employee.

20. ADMITTED

21. ADMITTED By way of further clarification, it is simply admitted that a letter dated April 5, 2000, was sent to Plaintiff concerning the status of his grievance. It is specifically controverted that the details of the letter of April 5, 2000, set forth at page 22 of the Unions' exhibits provided details clarifying or elucidating the changed or

altered role of the National Change of Operations Committee, nor did they elucidate the of the loss of appeal rights by electing to pursue that ostensible avenue. It is respectfully submitted that the April 5th letter did nothing to advise Mr. Bechtel of anything concerning the Change of Operation Committee in as much as it appears to be addressed to one Andy Upchurch of ABF Freight Systems., and as noted above, merely discusses certain mechanical issues concerning date of layoff. It should be noted, passim, that the April 5, 2000, letter previously referenced is the same one set forth and referenced in Shughart affidavit paragraph 15 as Exhibit 2 page 103 of the Unions' exhibits and is in fact a letter addressed from business agent Shughart to Andy Upchurch of ABF Freight Systems. While it appears that grievance may have been copied on the letter, Mr. Bechtel is not specifically referenced.. The letter does not relate to the "National Change of Operations Committee" ostensibly created in a subsequent labor agreement not dealing with completed change, which Plaintiff submits is not relevant for completed change of operations which occurred under a prior labor agreement.

22.   ADMITTED to the extent that business agent Shughart mechanically processed Plaintiff's grievance. However, business agent Shughart at no time explained the ramifications of his apparently discretionary decisions concerning the grievance path for Plaintiff's grievance nor the invidious alteration and truncation of Plaintiff's previously existing recall from layoff rights.

23.   It is admitted that business agent Shughart did, upon request, supply a seniority list of employees and it is specifically controverted that a "layoff list" of Carolina Freight employees was ever supplied. The seniority list supplied was under cover of a June 5th letter (see Defendant Unions' Exhibit commencing at page 25 and

concluding at page 41) which, pursuant to the cover letter, was characterized as a "...current seniority roster..." and made no reference to a "layoff list."

24.   It is admitted that the referenced correspondence requests a seniority list by business agent Shughart from ABF. However, Plaintiff is without knowledge, information, or belief that said correspondence was ever transmitted.

25.   It is admitted that there is a seniority list transmitted under the date of the letter of June 5, 2000 (supra), and it is further admitted that Plaintiff received said list on or about June 15, 2000.

26.   ADMITTED.

27.   ADMITTED.

28.   ADMITTED. . However, it is controverted that the discussions and/or review of said ERGC Brief in any way, shape, or form encompassed a meaningful discussion of the appeal path elected by the Local and its business agent, nor did it discuss any of the invidious considerations which were pertaining to treatment of Carolina Freight employees. that were involved in the handling of said grievance.

29.   ADMITTED. However, by way of further reply, it is noted that the letter of December 28, 2000, supplies no reasoning and/or basis for the decision denying Plaintiff's grievance. As indicated by Plaintiff Rickey Bechtel in his deposition at page 117, which is set forth in Defendant Unions' at exhibits 17 (page 30 consisting of pages 114-117 of Plaintiffs' deposition*), "And you felt Mr. Shughart did a very thorough job in preparing the case ?" Answer – "To the best of my knowledge, I mean he—I got to put my trust in my business agent to know the contract better than when I was a shop steward, I would often have to go and ask you know shame on me, I should have known

better, but I don't. I had to put my faith in them I'm not. I mean they have been to schools with the International Brotherhood of Teamsters, you know, they get schooled in all of this stuff. They should be able to handle it. ."*

30. It is admitted that Plaintiff's case was referred to the National Multi-region Change of Operations Violations Committee. However, as is the case in the earlier <u>ABF et al v. Albright</u> case presently before this court on remand form the Third Circuit. (Plaintiff's Exhibit Q)

31. ADMITTED. However, it is noted that the significance of presenting said grievance to the Change of Operations Committee when, in fact, the issues involved a completed change of operations from 1995 were never explained to Plaintiff. Thus, Plaintiff was deprived of an opportunity to meaningfully discuss and/or analyze the effects of the Union's discretionary decision to proceed in this fashion.

32. ADMITTED

32. CONTROVERTED. It is submitted that Defendant Daniel Virtue was, in fact, the individual who was "calling the shots" and dictating the manner and fashion in which Plaintiff's grievance was handled and routed. Plaintiff makes this observation based upon the documented role of Daniel Virtue with regard to the handling of seniority issues surrounding the reluctant return of the Plaintiff's and Albright et. al. and the handling of the grievances in a similar fashion, which resulted in their denial. Thus, it is submitted that Mr. Virtue, as the Local's president set policy and directed it that it be applied to Rickey Bechtel's grievance.

---

*The exhibits to Defendant Unions' Motion were not legibly marked on Plaintiff's copy. The actual pages reflecting the submission are attached hereto as Exhibit "A".

33.  CONTROVERTED. Article 1 §2 Governing Unions covet establishes the International Brotherhood of Teamsters is a *de facto* party to the National Master Freight Agreement. The complete text of Article 1 §2 provides "...the Union consists of any local union which may become a party to this agreement and other supplemental agreement has hereinafter set forth." Such local unions are hereinafter as designated as local union. In addition to such local unions the Teamsters' National Industry Freight negotiating committee representing the local unions affiliated the International Brotherhood of Teamsters, here and after referred to as National Union Committee is also a party to this agreement and the agreement supplemental here to..." However, further response is submitted Daniel Virtue as president of Local 776 and in his other capacities with the International Brotherhood of Teamsters is, *inter alia*, involved in the administration, interpretation, and application of the National Master Freight Agreement.

*34.*  CONTROVERTED. Plaintiff believes and therefore avers that the International Brotherhood of Teamsters is *inter alia,* is responsible for the negotiation of, interpretation of, and application of the National Master Freight Agreement as *de juare* matter.

35.  It is admitted that Plaintiff did not speak directly with any one proporting to be a representative of the International Brotherhood of Teamsters. However as a legal matter Plaintiff asserts that the International Brotherhood of Teamsters supervisors and administers the grievance procedures under the National Motor Freight Agreement.

36. CONTROVERTED. Plaintiff authorized the Complaint as filed based upon the legal advice of counsel and, *inter alia*, his belief that his final decision on his grievance was contractually improper and invidiously predicated.

Respectfully Submitted,

Robert S. Mirin, Esquire
Supreme Court ID# 25305
AHMAD & MIRIN
8150 Derry Street, Suite A
Harrisburg, PA 17111
(717) 909-4343 Phone
(717) 561-1515

## **TABLE OF CONTENTS**

| | Page |
|---|---|
| Relevant Portions of Bechtel Transcript | 1 |
| Bechtel Exhibit No. 3 | 7 |
| Bechtel Exhibit No. 4 | 8 |
| Bechtel Exhibit No. 5 | 9 |
| Bechtel Exhibit No. 6 | 10 |
| Bechtel Exhibit No. 7 | 11 |
| Bechtel Exhibit No. 8 | 19 |
| Bechtel Exhibit No. 10 | 20 |
| Bechtel Exhibit No. 12 | 21 |
| Bechtel Exhibit No. 13 | 22 |
| Bechtel Exhibit No. 15 | 23 |
| Bechtel Exhibit No. 16 | 24 |
| Bechtel Exhibit No. 17 | 25 |
| Bechtel Exhibit No. 18 | 42 |
| Bechtel Exhibit No. 19 | 43 |
| Bechtel Exhibit No. 22 | 44 |
| Bechtel Exhibit No. 23 | 45 |



PLAINTIFF'S EXHIBIT A

Bechtel Exhibit No. 25 .................................................................................................... 54

Bechtel Exhibit No. 26 .................................................................................................... 55

Bechtel Exhibit No. 28 .................................................................................................... 56

Bechtel Exhibit No. 29 .................................................................................................... 57

Affidavit of Charles W. Shughart .................................................................................... 79

Certificate of Service ....................................................................................................... 110

### Page 114

1  Q    Did you consider Local 776 to be the union
2  that was responsible for processing your grievance?
3  A    Oh, definitely. That's -- I don't know how
4  you would go out of your -- I personally don't know how you
5  would go out of your -- I mean, they're my local. That's
6  where your grievance would be handled. My grievance is for
7  Carlisle, and they're the local that's dealing in that
8  area. If there was a way to go other than that, I don't
9  know of it.
10 Q    Now, did you discuss your grievance with
11 anybody from the international?
12 A    No, no.
13 Q    Do you even know anybody from the
14 international who is an international representative other
15 than myself? I guess I introduced myself.
16 A    Personally, no, no. I guess back in '95 it
17 was Carey and now it's Morris, but, no, I didn't call none
18 of them guys.
19 Q    You didn't call them? And is it true that you
20 didn't call them because you didn't think they were
21 responsible for processing your grievance?
22 A    The local union's responsible for my grievance
23 and I would say the international should be making sure that
24 -- because you see the Teamster magazine all the time where
25 they're looking over and trying to govern over the locals

### Page 115

1  that aren't what they should be -- you know what I'm saying
2  -- to make sure that things are going the right way. I
3  just felt that I was wronged.
4  Q    Is it true in your lawsuit that you filed that
5  the main reason why you filed the lawsuit is because you
6  think that -- you disagreed with the grievance panel's
7  decision?
8        MR. MIRIN: I'm going to object to the form of
9  the question. It calls for a legal conclusion on the part
10 of the witness as to the basis for his action.
11 BY MR. McCALL:
12 Q    Okay. You can answer. My question is, the
13 main reason why you filed your lawsuit, is it true it is
14 because of the fact that you disagreed with the change of
15 operations committee's decision on your grievance?
16 A    I would say after I talked to Chuck and he
17 said there is no other provisions to advance through the
18 union I would say it would probably be correct in that I was
19 wronged and not given -- somehow they took it from one
20 context and changed it to another. I don't know how that
21 was done. I was laid off one way and all of a sudden now
22 I'm out in the street with no recall rights, and I don't
23 understand how that happened. I think it should have been
24 -- I was wronged, and it should be corrected.
25 Q    Would you agree that you filed your lawsuit

### Page 116

1  because you believe that the grievance -- that the change of
2  operations committee decided your case wrong?
3  A    If they were to decide in favor, we wouldn't
4  be here. I would say you're probably correct. You know
5  what I'm saying? If it would have been in my -- we wouldn't
6  be here -- in my favor we wouldn't be here. If you want to
7  get to where you think you should be, sometimes we have to
8  do alternative routes. The only other thing after asking --
9  and there was nothing left that I knew to do was to get to
10 where I needed to be and get the right wronged or the wrong
11 righted. This is the only avenue I knew.
12 Q    Right. And what you're really trying to do is
13 get the grievance panel's decision and the change of
14 operations committee's decision reversed, is that true,
15 through this lawsuit?
16 A    Get it to in my favor, yes, and get righted
17 for what was wronged as far as what was compensated, yes. I
18 just felt that it wasn't -- some areas got stuff that we
19 didn't get. And I didn't find this out until after the
20 grievances, you know. How can one area get something and we
21 don't get the same thing? We're all local Teamsters. We're
22 all under the United Brotherhood of Teamsters. We should
23 all be treated the same.
24 Q    Now, you attended all the grievance hearings
25 relative to your particular grievance; right?

### Page 117

1  A    That's correct.
2  Q    And you felt that all -- you had an
3  opportunity to say everything that you wanted to say at
4  those hearings to support your case; isn't that also
5  correct?
6  A    I think that -- yeah, I would say yes.
7  Q    And you also --
8  A    To the best of my knowledge, you know, of what
9  I know.
10 Q    You also participated in preparing your case
11 for these grievance panels, didn't you?
12 A    Oh, yes.
13 Q    And you felt that Mr. Shughart did a very
14 thorough job in preparing the case?
15 A    To my best of knowledge, I mean, he -- I've
16 got to put my trust in my business agent to know the
17 contract better than -- when I was a shop steward, I would
18 often have to go and ask. You know, shame on me, I should
19 know better, but I don't. I had to put my faith in them.
20 I'm not -- I mean, they have been to schools with the
21 International Brotherhood of Teamsters, you know, they get
22 schooled on all this stuff. They should be able to handle
23 it.
24 Q    You don't have any complaints with the way
25 Mr. Shughart performed his job, do you?

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| RICKEY A. BECHTEL,<br>    **Plaintiff** | :<br>:<br>: |
| v. | :   No. 1:01-CV-789<br>:<br>:   Judge Sylvia H. Rambo |
| DANIEL VIRTUE, Business Agent of the<br>International Brotherhood of Teamsters;<br>INTERNATIONAL BROTHERHOOD<br>OF TEAMSTERS; LOCAL 776;<br>INTERNATIONAL BROTHERHOOD<br>OF TEAMSTERS; and ABF FREIGHT<br>SYSTEM, INCORPORATED,<br>    **Defendants** | :<br>:<br>:<br>:<br>:<br>:<br>:<br>: |

## CERTIFICATE OF SERVICE

  I, Robert S. Mirin, Esquire, do hereby certify that on the ___31___ day of ___May___, 2002, I served a copy of the foregoing Plaintiff's Memorandum, Plaintiff's reply to Defendant's Undisputed Facts and Plaintiff's Exhibits on the following person(s) and in the following manner:

**VIA HAND DELIVERY**

Ira Weinstock, Esquire
Jason Weinstock, Esquire
800 North Second Street
Harrisburg, PA 17102

Vincent Candiello, Esquire
MORGAN, LEWIS & BOCKIUS, LLP
One Commerce Square
417 Walnut Street
Harrisburg, PA 17101-1904

**VIA FIRST CLASS MAIL**

James A. McCall, Esquire
International Brotherhood of Teamsters
25 Louisiana Avenue, N.W.
Washington, D.C. 20001

Joseph E. Santucci, Esquire
Mary D. Walsh, Esquire
MORGAN, LEWIS & BOCKIUS, LLP
1111 Pennsylvania Avenue, N.W.
Washington, D.C. 20004

_____
Robert S. Mirin, Esquire